# Exhibit 12

Aug 3, 2021

# NY Gov. Andrew Cuomo Sexually Harassed Multiple Women, Report Finds: Letitia James Press Conference Transcript



Rev › Blog › Transcripts › Andrew Cuomo Transcripts › NY Gov. Andrew Cuomo Sexually Harassed Multiple Women, Report Finds: Letitia James Press Conference Transcript

New York Attorney General Letitia James held a press conference on August 3, 2021 to announce that the state investigation found that Gov. Andrew Cuomo sexually harassed multiple women. Read the transcript of the briefing speech here.

 

**Transcribe Your Own Content**

Try Rev and save time transcribing, captioning, and subtitling.

Search the transcript here...

    

Letitia James: (01:32)

Good morning. I'm joined here today by Anne Clark and Joon Kim, the two lead attorneys who are designated as special deputies to the attorney General's office to announce the findings of their investigation into allegations of sexual harassment made against Governor Andrew Cuomo. I'll make a brief statement, and then turn it over to Ms. Clark and to Mr. Kim, who will delve into the investigation's findings. The independent investigation has concluded that Governor Andrew Cuomo sexually harassed multiple women, and in doing so violated federal and state law. Specifically, the investigation found that Governor Andrew Cuomo sexually harassed current and former New York state employees by engaging in unwelcome and non-consensual touching and making numerous offensive comments of a suggestive and sexual nature that created a hostile work environment for women. The investigators independently corroborated and substantiated these facts through interviews and evidence, including contemporaneous notes and communications. This evidence will be made available to the public, along with the report. This investigation was started after a number of women publicly alleged that they had been sexually harassed by Governor Cuomo. And on March 1st of this year, the governor's office made a referral to my office, pursuant to state executive law 63.8 regarding these allegations. Executive law section 63.8 permits the New York Attorney General's office, with the approval of the governor, or when directed by the governor to inquire into matters concerning the public peace, the public safety and public justice. This referral issued by the governor enabled my office to appoint independent outside investigators to look into these allegations. And on March 8th, 2021 Anne Clark and Joon Kim, they were officially deputized as special deputies. Ms. Clark and Mr. Kim and their respective firms were chosen to lead this investigation because of their decades of work at the highest levels, their deep expertise on matters in question, and their careers fighting to uphold the rule of law. Anne Clark is a partner at Vladeck, Raskin & Clark, P.C., where she focuses on employment law issues on behalf of employees at their trial and appellate levels. And during our more than 30 year career, Ms. Clark has represented clients in a variety of employment, sexual harassment, and other discrimination cases in the private sector in education and in government. She also has deep experience with retaliation, whistleblower, breach of contract, and compensation and benefits cases.

Letitia James: (04:53)

Joon Kim is partner at Cleary Gottlieb Steen & Hamilton LLP. And for more than two decades, he has worked at the highest levels of government and in private practice. From March 2017 to January 2018, he served as the acting United States attorney for the Southern district of New York as the most senior federal law enforcement officer in the district. He oversaw all cases and civil litigation conducted on behalf of the United States. Before becoming acting United States attorney, Mr. Kim served in various leadership positions in the office, including Deputy United States Attorney, Chief of the criminal division, and Chief Counsel to the United States attorney. Ms. Clark and Mr. Kim are experienced, credible and deeply respected professionals. And together, they ensure that this investigation was both independent and thorough. Over the course of the five month investigation, the investigators spoke to 179 individuals, including complainants, current and former members of the executive chamber, state troopers, additional state employees, and others who interacted regularly with the governor. In addition, they reviewed more than 74,000 pieces of evidence, including documents, emails, taxes, audio files, and pictures. These interviews and pieces of evidence reveal a deeply disturbing yet clear picture. Governor Cuomo sexually harassed current and former state employees in violation of both federal and state laws. The independent investigation found that Governor Cuomo sexually harassed multiple women, many of whom were young women, by engaging in unwanted groping, kisses, hugging, and by making inappropriate comments. Further, the governor and his senior team took actions to retaliate against at least one former employee for coming forward with her story, her truth. Governor Cuomo's administration fostered a toxic workplace that enabled harassment and created a hostile work environment where staffers did not feel comfortable coming forward with complaints about sexual harassment due to a climate of fear and given the power dynamics.

Letitia James: (07:51)

The investigators found that Governor Cuomo's actions and those of the executive chamber violated multiple state and federal laws, as well as the executive chamber's own written policies. This investigation has revealed conduct that corrodes the very fabric and character of our state government and shines light on injustice that can be present at the highest levels of government. But none of this, none of this would have been illuminated if not for the heroic women who came forward. I am inspired by all the

brave women who came forward, but more importantly, I believe them and I thank them for their bravery. And I thank the independent investigators for their professionalism, despite the attacks, and for their dogged determination that brought us to the truth.

Letitia James: (09:04)
And now we will hear from Joon Kim and Anne Clark, who will walk us through the report and their findings.

Joon Kim: (09:29)
Thank you, Attorney General James. Good morning. My name is Joon Kim. I'm along with my colleague Anne Clark. We have led the teams at our two law firms in conducting the investigation into allegations of sexual harassment by Governor Cuomo. We have now completed our investigation and have made our findings and reached our conclusions. They're set forth in a detailed report issued today.

Joon Kim: (10:06)
As set forth in the report, we find that the governor, on numerous occasions, engaged in conduct that constitutes unlawful sex based harassment. Specifically, we find that the governor sexually harassed a number of current and former New York state employees. He did so by, among other things, engaging in unwelcome and non-consensual touching, and also repeatedly making comments of a sexualized or gender based nature.

Joon Kim: (10:49)
Our investigation revealed that these were not isolated incidents. They were part of a pattern. The governor's pattern of sexually harassing behavior was not limited to members of his own staff, but extended to other state employees, including a state trooper who served on his protective detail. There are 11 complainants whose allegations are set forth in great detail in the report. Nine of them are or were employed by the state of New York or a state affiliated entity.

Joon Kim: (11:33)
The complainants interacted with the governor under different circumstances. For example, some then met with him regularly as an executive assistant or as members of his staff, or as I said, as a trooper on his protective detail, while others only met him once. But all of them experienced harassing conduct from the governor. Some suffered through unwanted touching and grabbing of their most-

Joon Kim: (12:03)
Some software through unwanted touching and grabbing of their most intimate body parts. Others suffered through repeated offensive, sexually suggestive, or gender-based comments. A number of them endured both. None of them welcomed it. And all of them found it disturbing, humiliating, uncomfortable, and inappropriate. And now we find that it was unlawful sex-based harassment. Our investigation has also found that the executive chamber responded to allegations of sexual harassment in ways that violated their own internal policies and also constituted unlawful retaliation with respect to one of the complainants.

Joon Kim: (12:53)
And finally, based on our investigation, we concluded that the executive chamber's workplace culture, one rife with bullying, fear, and intimidation on the one hand, while normalizing frequent flirtations and gender-based comments by the governor on the other created the conditions that allowed the sexual harassment and retaliation to occur and to persist. As attorney general has said, we reached these findings and conclusions after a thorough and independent investigation. We were allowed to, and did follow the facts without fear, without favor. As you will see in the report, our findings are supported by extensive evidence that includes interviews and testimony from 179 witnesses. And review of tens of thousands of documents. I'll now turn it over to my colleague Anne Clark to walk through some of the specifics related to the sexual harassment, the policy violations, and the retaliation.

Anne Clark: (14:05)
We find that the governor on many occasions engaged in sex-based harassing conduct and conversations. The most serious was the governor's unwelcome physical contact with women, including touching intimate body parts. He engaged in this conduct with state employees, including those who didn't work in the executive chamber, as well as non-employees. One current employee

who we identify as Executive Assistant Number One, endured repeated physical violations. On November 16th, 2020 in the executive mansion, the governor hugged Executive Assistant Number One and reached under her blouse to grab her breast. This was the culmination of a pattern of inappropriate sexual conduct, including numerous close and intimate hugs, where the governor held her so closely that her breasts were pressed against his body. And he sometimes ran his hands up and down her back while he did so.

Anne Clark: (15:06)

There were also several occasions on which the governor grabbed her butt. Executive Assistant Number One had vowed that she was going to take these violations as she put it, "To the grave." She was terrified that if she spoke out, she would lose her job. But she broke down in front of colleagues when she heard the governor on March 3rd, 2021 in his press conference claim that he had never touched anyone in appropriately. She then confided in her coworkers who saw her breakdown as to what had happened, and they were the ones that reported the conduct to attorneys in the executive chamber.

Anne Clark: (15:44)

The governor also several times inappropriately touched a state trooper assigned to the unit to protect the governor. In an elevator, while standing behind the trooper, he ran his finger from her neck, down her spine and said, "Hey you." Another time she was standing holding the door open for the governor. As he passed, he took his open hand and ran it across her stomach from her belly button to the hip where she keeps her gun. She told us that she felt completely violated to have the governor touch her as she put it, "Between her chest and her privates."

Anne Clark: (16:22)

The governor also inappropriately touched women who were attending work-related events at which the governor made remarks. At one event in September, 2019, while having his picture taken with an employee of a state entity, the governor grabbed this young woman's butt. At another event in May of 2017, the governor pressed and ran his fingers across the chest of a woman while reading the name of her company whose logo was on her chest. The governor also engaged in a widespread pattern of subjecting women to unwanted hugs and kisses and touching them in ways that made them uncomfortable. Conduct that is not just old-fashioned affectionate behavior, as he and some of his staff members would have it, but unlawful sex-based harassment.

Anne Clark: (17:12)

In addition to the physical conduct, our investigation found that the governor regularly made comments to staff members and state employees that were offensive and gender-based. For example, the governor crossed the line many times when speaking with Charlotte Bennett, a briefer and executive assistant, particularly in spring of 2020. When she confided in the governor that she'd been sexually assaulted in college, he asked her for the details of her assault. When talking about potential girlfriends, he said he thought he could date women as young as 22, knowing that Ms. Bennett was 25 at the time.

Anne Clark: (17:50)

He asked her whether she had ever been with older men. He told her that he was lonely and wanted to be touched. He asked her if she was monogamous and what she thought about monogamy. He speculated on how her history as a sexual assault survivor might affect her romantic life. He told her that she looked like Daisy Duke. He suggested that she get a tattoo she was contemplating on her butt, and asked her if she had any piercings anywhere other than her ears. Ms. Bennett texted to a friend on the day where many of these comments were made that she was upset and confused and that she was shaking. Another example is the governor's comments to the state trooper, the same trooper he touched on the stomach and back. After the governor had become single, he asked the trooper how old she was. When she responded that she was in her late twenties, he said that's too old for him. He then asked her how much of an age difference he thought he could have between him and a girlfriend and have the public still accept it. She suggested it might be a good idea to stick with women at least as old as your daughters. She then tried to deflect the conversation by asking the governor what he was looking for in a girlfriend. He responded that he was looking for somebody who could handle pain.

Anne Clark: (19:11)
Another time when the governor found out that the trooper was engaged, he asked her why she'd want to get married because among other things, your sex drive goes down. As detailed in the report, employees recounted a pattern of similarly offensive comments and conversations, such as the governor repeatedly asking Executive Assistant Number One whether she would cheat on her husband, saying to her, "If you were single, the things I would do to you." Telling her that she looked great for her age, which was early thirties and for a mother, calling her and coworker, Alyssa McGrath Mingle Mamas. Comparing Lindsey Boylan to a more attractive version of one of his ex-girlfriends and to actresses.

Anne Clark: (19:56)
Women also described to us having the governor seek them out, stare intently at them, look them up and down, or gaze at their chest or butt. In some, the governor routinely interacted with women in ways that focused on their gender, sometimes in explicitly sexualized manner, in ways that women found deeply humiliating and offensive. Both federal and state law prohibit gender-based harassment in the workplace. In fact, the governor himself in August of 2019 passed a law that eliminated in New York state the requirement that harassing conduct needed to be severe or pervasive. In New York, a woman need only show that she was treated less well, at least in part because of her gender. The governor's conduct detailed in the report clearly meets and far exceeds this standard.

Anne Clark: (20:50)
We also find that the executive chamber failed to follow its own harassment policies and procedures, ones that on paper are consistent with New York legal requirements. This was exemplified by the handling of Charlotte Bennett's complaint. In June of 2020, Ms. Bennett told the governor's Chief of Staff about recent conversations of a sexual nature that were so uncomfortable that she no longer wanted to interact with the governor. The Chief of Staff relayed Ms. Bennett's complaints to others in the governor's inner circle and transferred Ms. Bennett within days.

Anne Clark: (21:23)
Two weeks later, the Chief of Staff and a special counsel spoke with Ms. Bennett, who detailed interactions with the governor that went back to May of 2019. The Chief of Staff and special counsel both found Ms. Bennett to be credible. The Chief of Staff consulted with the special counsel and with Melissa DeRosa, the secretary to the governor. And they decided they did not need to report this to the governor's office of employee relations, GOER, or conduct any meaningful investigation. They simply moved Ms. Bennett and instituted a policy of not having a junior staffer be alone with the governor. And even that, they said, was to protect the governor. That response we find was a violation of the executive chamber's harassment policy, which clearly requires that all possible harassment be reported to GOER and investigated.

Anne Clark: (22:16)
Six months later in December of 2020, when Lindsey Boylan tweeted that she had been sexually harassed by the governor, the executive chamber once again failed to report the issue to GOER. Although Ms. DeRosa, the special counsel, and certain other advisors knew about the allegations that Charlotte Bennett had made, that the special counsel had found credible, no one treated Ms. Boylan's allegations seriously, other than as a threat to the governor. Rather than any effort to determine if the governor had engaged in a pattern of sexually harassing behavior, a team of senior staffers, former staffers, and outside confidants with no official title or role mobilized to attack and try to neutralize Ms. Boylan by sharing disparaging information with the press. Within hours of Ms. Boylan's, December 13th, 2020 tweet alleging sexual harassment, key members of the governor's inner circle had obtained confidential memos, ones there were stamped, Attorney Client Privileged." They were primarily about an interaction between Ms. Boylan and an assistant.

Anne Clark: (23:20)
They then redacted the names of individuals other than Ms. Boylan and started sending the memos to reporters. There was also a proposed letter or op-ed drafted by the governor that went through several drafts. The letter attacked Ms. Boylan for alleged conduct at work, for alleged conduct with men other than the governor, as well as postulating various political conspiracies,

including that Ms. Boylan was funded by far right Republicans and supporters of Donald Trump. Although the letter was never published, it was sent or read to a variety of people outside the executive chamber, either to get their advice or ask them to sign their names to it, and shared ultimately with at least one member of the press.

Anne Clark: (24:03)
And shared ultimately with at least one member of the press. The Governor was arguing for the release of that letter. He was finally convinced to abandon it by a number of people who thought the letter was a bad idea, in part because what was in the letter couldn't be substantiated and because they thought that victim shaming would be bad as a strategy.

Anne Clark: (24:22)
Both federal and state law prohibit an employer from taking any action that would dissuade a reasonable employee or former employee from making or supporting a charge of discrimination. Under that standard, the confidential release of internal records to the press and the dissemination of the letter disparaging Ms. Boylan constituted unlawful retaliation.

Anne Clark: (24:45)
I will now turn it back to Mr. Kim to say a few words about our findings with respect to the workplace culture within the Executive Chamber.

Joon Kim: (24:54)
Thank you, Ms. Clark. As set forth in our report, we find that the culture within the Executive Chamber contributed to the conditions that allowed the Governor's sexually harassing conduct to occur and to persist. The culture also informed the way in which the Executive Chamber responded to allegations of sexual harassment, as Ms. Clark has described, through violations of their own policies and through unlawful retaliation.

Joon Kim: (25:26)
Well, what was the culture? Words that witnesses have used repeatedly to describe it include toxic, hostile, abusive. Others use words like fear, intimidation, bullying, vindictive. As one senior staffer stated bluntly as the sexual harassment allegations became public in March of this year in text exchanges with others, with another in the administration, I quote, "Hopefully, when this is all done, people will realize the culture, even outside of the sexual harassment stuff, is not something you can get away with. You can't berate and terrify people 24/7."

Joon Kim: (26:23)
It was a culture where you could not say no to the Governor, and if you upset him or his senior staff, you would be written off, cast aside, or worse.

Joon Kim: (26:38)
But at the same time, the witnesses described a culture that normalized and overlooked everyday flirtations, physical intimacy, and inappropriate comments by the Governor. One senior staffer testified that at a work event, she sat on the Governor's lap. Another staffer said she recalled kissing the Governor on the lips. The Governor testified that those things may have happened with senior staffers.

Joon Kim: (27:14)
One complainant described her interactions with the Governor by saying they were, quote, "Strange and uncomfortable, but it was like the Twilight Zone, the typical rules did not apply. You should just view it as a compliment if the Governor finds you aesthetically pleasing enough."

Joon Kim: (27:36)
The coexistence in the Executive Chamber's culture of fear and flotation, intimidation and intimacy, abuse and affection, created a work environment ripe for harassment. As another complainant testified, and I quote, "What makes it so hard to describe every single inappropriate incident is the culture of the place. On the one hand, he makes all this inappropriate and creepy behavior normal and like you should not complain. On the other hand, you see people getting punished and screamed at if you do anything where you disagree with him or his top aides. I really just wanted to go to work and be recognized for my work and nothing else."

Joon Kim: (28:34)
Charlotte Bennett, the complainant Ms. Clark mentioned who was transferred after she reported inappropriate comments by the Governor to senior staff, summarized her experience in a text message as follows, quote, "The verbal abuse, intimidation, and living in constant fear were all horribly toxic, dehumanizing, and traumatizing. And then he came onto me. I was scared to imagine what would happen if I rejected him, so I disappeared instead. My time in public service ended because he was bored and lonely. It still breaks my heart." That's a quote from a text that Ms. Bennett wrote.

Joon Kim: (29:33)
This culture made it all the more difficult, if not impossible, for complainants to report the harassment from which they were suffering, particularly when the harasser was the Governor of the State of New York. But one by one, one courageous woman after another stepped forward. They stepped forward to say, "Enough is enough." They came forward in our investigation to tell us about their experiences, the harassment they suffered at the hands of the Governor.

Joon Kim: (30:12)
In our report, we've used their words, and their words, so long silenced, speak loudly for themselves. These brave women stepped forward to speak truth to power, and in doing so, they expressed faith in the belief that although the Governor may be powerful, the truth is even more so. This is what lies at the heart of our investigation and the findings in our report.

Letitia James: (30:58)
We will now take questions, and the questioning will be directed by Delaney Kempner.

Delaney Kempner: (31:06)
[inaudible 00:31:06]. Hold on, hold on. Please say your name and your outlet.

Marcia Kramer: (31:10)
Marcia Kramer from CBS. I wondered if you could tell me if the Governor will be facing any… I know this is a civil investigation, but will you be making any referrals to prosecutors so that he could face either state or federal charges?

Letitia James: (31:21)
[inaudible 00:31:21] that our work has concluded and the document is now public. And the matter is civil in nature and does not have any criminal consequences. It is my understanding… [inaudible 00:31:37], you want to…

Anne Clark: (31:39)
I will state that it's our understanding that for the young woman whose breast was groped, that Albany Police Department already has a report about that. As for anything else, as the Attorney General stated, all the information is fully documented in the report and any prosecutors or police departments can look at the evidence and determine if they want to take further action.

Delaney Kempner: (32:02)
Josefa?

Josefa Velásquez: (32:02)
Hi, Josefa Velásquez, The City. Now that the report has concluded, will your office be sharing it with the Assembly Committee that is investigating whether or not these are impeachable offenses? And if so, what's the coordination between your office and the Assembly?

Letitia James: (32:19)
There is no coordination between the Office of Attorney General and the Assembly. The document is now public and will be distributed to members of the Assembly, as well as the leadership.

Speaker 1: (32:31)
Ms. James, can the Governor-

Delaney Kempner: (32:33)
Can you introduce yourself?

Speaker 1: (32:34)
Oh, [inaudible 00:32:35] from The New York Post. Can the Governor be sued in any way? Is there a statute of limitations or are there any penalties specifically tied to this report? I know [inaudible 00:32:44]

Anne Clark: (32:46)
There's no penalties specifically tied to this report. The women can decide, some of the women can decide themselves if they want to bring a civil action. The statute of limitations is generally three years under one federal statute in the state law and a little bit shorter under another federal statute, although for hostile work environments, as long as one act occurs within the statute of limitations, one can go back to cover the entire hostile work environment.

Speaker 1: (33:11)
And in regards to the violation against the Executive Chamber's own policy, what kind of violations [inaudible 00:33:19]?

Anne Clark: (33:20)
I can't think of a specific law that that would violate, but that certainly is taken into account in determining liability for sexual harassment.

Speaker 1: (33:27)
Thank you.

Speaker 2: (33:32)
[inaudible 00:33:32]. Ms. James, can I ask you, do you think the Governor, given the devastating nature of this report, and I get what you're saying about it's up to local prosecutors if they want to move forward on this, but do you think that this would all be wrapped up well if he would resign or leave?

Letitia James: (33:47)
That decision ultimately is up to the Governor of the state of New York. The report speaks for itself. And right now, I think we should all be focused on the courageous and bravery of the women who came forward, and all of us should be focused on keeping women safe, believing women, and allowing women to speak their truth. And that's exactly what this document does.

Speaker 3: (34:09)
[inaudible 00:34:09] from WNBC. You mentioned in your opening remarks today defending the credentials of your investigators today. Are you personally bothered by the Governor's own remarks in the past week or so that you can just Google their backgrounds and draw your own conclusion that this is a politically motivated investigation?

Letitia James: (34:34)
There were attempts to undermine and to politicize this investigation, and there were attacks on me as well as members of the team, which I find offensive. And our focus, again, should be on the bravery and the courage of these 11 women and of the others who came forward.

Letitia James: (34:52)
These allegations were substantiated. They were corroborated. And the team before you, Ms. Clark and Mr. Kim, are professionals who are widely respected not only in New York, but all across this nation. And I support their work, will defend their work, and I believe these women.

Delaney Kempner: (35:10)
Zack?

Zack: (35:13)
Zack [inaudible 00:35:13] from New York 1. You mentioned that it corroborated a lot of what the witness testimony was when you spoke with [inaudible 00:35:19] the investigation. When you interviewed Governor Cuomo, did he admit to or deny the majority of what was said here?

Anne Clark: ([35:27](#))

There was a combination. There are some incidents that he admitted to, but had a different interpretation of, and there were other things that he denied or said he didn't recall.

Speaker 4: ([35:42](#))

Can you speak a little bit more about that? [inaudible 00:35:43], WNYC. Can you speak a little bit more about what that conversation, that 11 hour conversation was like the other week?

Anne Clark: ([35:49](#))

I can't recount all 11 hours. As I said, there were certain things. Like he admitted that he asked Ms. Bennett whether she had been involved with older men. He denied touching the state trooper, although he said he might-

Anne Clark: ([36:03](#))

He denied touching the state trooper, although he said he might've kissed her at an event. And there were certain things that he turned around and said that, for example, executive assistant number one, that he did hug her repeatedly, but claimed she was the one who initiated the hugs. So it was a mixture of admitting to certain things, but putting a different spin on them, and denying others.

Speaker 5: ([36:24](#))

It's all outlined in the report.

Josefa Velásquez: ([36:28](#))

Broadcast from CNN. So what are the next steps here? You have this report, obviously a lot of devastating information in it. A lot of people are going to ask, "okay, so what happens next?" And you're not referring it for criminal charges. What are the next steps that you would like to see perhaps maybe the assembly take or someone else take to have some other kinds of punishment or something else here? Because right now it just seems like you have this report and it's out there and what would be the next steps?

Letitia James: ([36:57](#))

We were tasked with the responsibility of engaging in an investigation. We have concluded our investigation, and our work is done. So as it relates to next steps, that's entirely up to the governor and/or the assembly and the general public. But the work of the office of the attorney general and these special deputies has concluded.

Josefa Velásquez: ([37:22](#))

Do you think the government could run for reelection?

Letitia James: ([37:24](#))

That's a political question. The work of the office of the attorney general is done.

Speaker 5: ([37:29](#))

Yeah. We're going to take two more questions in here and then we're going to go virtual.

Speaker 6: ([37:33](#))

Hi, Dana Rubinstein from the New York Times. This is a little bit of a hypothetical, but an individual with a history of running a workplace like this, or running for governor, when you can spear that person fit to serve as the leader of New York City.

Letitia James: ([37:47](#))

I don't engage in speculation, Dana. The report speaks for itself. They substantiated and corroborated the allegations and have issued findings. And in fact, the governor violated state and federal laws.

Speaker 5: ([38:01](#))

Okay, this is the last one here, and then we're going to go on to virtual.

Speaker 7: ([38:02](#))

Adam Reese, NBC News. As a prosecutor and an attorney general, are you frustrated that you can't move criminally on these charges? Numerous charges, did you and the investigators that said are both state, violate state and federal law?

Letitia James: ([38:20](#))

It's not an issue with being frustrated. The issue, we were tasked with the responsibility by the governor of the state of New York to issue a report, and we have issued this report. And all throughout the process, we put our heads down. We've done our work. And at this point, the chip lab, we're going to allow the chips to fall where they may.

Speaker 5: ([38:39](#))

Okay, we're going to go virtual now. Fabian.

Speaker 8: ([38:43](#))

Thank you everybody. If you have a question, please click the raise hand button. If you have a question, please click the raise hand button. First, we're going to hear from John Campbell from Gannett. John, your mic is open.

John Campbell: ([38:55](#))

Hi, attorney general. A couple of questions, and I apologize, it's tough to hear some of the questions, so some of these might be repeats here, but the investigation into the governors book deal as well as the staff resources that were used on that. Does that remain ongoing? That's separate from this, is it still ongoing? And also, can you make some sort of formal referral to prosecutor's offices based on this report today, or is that something that they would have to pick up the ball on, on their own?

Letitia James: ([39:29](#))

The investigation, with respect to the book and whether or not public resources we utilize is ongoing and it's separate and apart from this investigation, and with regards to criminal jurisdiction, criminal jurisdiction usually is conveyed upon the office of attorney general. Usually we get a request under the executive law. And at this point in time, our work is concluded and we will not be engaging in any criminal investigation with respect to the conduct of the governor of the state of New York.

Speaker 8: ([39:56](#))

Our second question is from Josh Dossie from Washington Post. Josh, your line is open. Josh, you have to unmute your line.

Josh Dossie: ([40:20](#))

Can you hear me now? I'm sorry.

Letitia James: ([40:22](#))

Yeah, we can hear you Josh.

Josh Dossie: ([40:24](#))

Hi, attorney general. There appears to be about 11 allegations here, 11 different victims. Did you find all 11 of the victims who came forward to be credible? And were you able to find contemporaneous notes or proof about all 11 of the victims?

Anne Clark: ([40:47](#))

We found all 11 women to be credible. There was corroboration to varying degrees. Probably at the end of being most corroborated, Charlotte Bennett talked to people and texted people contemporaneously. Some of her texts were practically in real time regarding conversations with the governor. As well, the reports that she made to the chief of staff and the special counsel, their contemporaneous notes are quite consistent with what she's said to the press and what she told us. The state trooper, the touching incidents, the one where he touched her stomach was witnessed by another state trooper who confirmed it to us. The kiss, the governor kissed her once. That was confirmed to us by another state trooper. And there were other incidents where she told people at the time. Other people that we spoke to did tell people at the time, and we confirmed with the people they spoke with or had written documentation, either text messages or emails in which they recounted things contemporaneously. So things, when you see the report, everything is documented. Things were very well corroborated.

Speaker 8: ([42:01](#))

Next question is from Emma Kinnari from Bloomberg News. Emma, your line is open.

Emma Kinnari: ([42:08](#))

Hello. Thank you. I was wondering, you said that your work is done, but there's still a criminal matter in place. What would you … what will happen from there?

Letitia James: ([42:19](#))

So I cannot speculate as to what will happen from external agencies and/or external legislative bodies. That is entirely up to them, but as far as the office of attorney general is concerned, our office and our investigation has concluded. We will be issuing this report, along with evidence to the general public.

Speaker 8: ([42:49](#))

Our next question is from Brian Tarnellie from the New York Law Journal.

Brian Tarnellie: ([42:55](#))

Yes. Can you hear me okay?

Letitia James: ([42:56](#))

Yes.

Brian Tarnellie: ([42:58](#))

So I know that there was mention of a report to the Albany police department regarding the groping incident. Can you specify if that was made by the executive chamber or has the victim herself stepped forward and given a report to the Albany police department?

Speaker 9: ([43:15](#))

It's our understanding that the report was made by the executive chamber.

Speaker 8: ([43:25](#))

Our last question is from Rebecca Lewis, from city and state. Rebecca, your line is open.

Rebecca Lewis: ([43:31](#))

Hi, attorney general. I just wanted to ask, with this report out now, you said that you're not going to speculate on whether the governor's fit to serve or if he should run again. What do you want the public to take away from this report?

Letitia James: ([43:47](#))

That these 11 women were in a hostile and toxic work environment, and that we should believe women and that what we have an obligation and a duty to do is to protect women in their workplace. And what this investigation revealed was a disturbing pattern of conduct by the governor of the great state of New York. And those who basically did not put in place any protocols or procedures to protect these young women who believed in public service. I believe women, and I believe these 11 women. I thank you all for being here this morning.

**Transcribe Your Own Content**

Try Rev and save time transcribing, captioning, and subtitling.