# EXHIBIT 9




August 4, 2021

**VIA E-MAIL**

Joon H. Kim
Anne L. Clark
Special Deputies to the
First Deputy Attorney General
Office of the Attorney General
The Capitol
Albany, NY 112224-0341

Re: Response to Special Investigators' Report

Dear Counsel:

As outside counsel to the Executive Chamber, we write to express our client's deep concerns about the fairness of your investigation, and the lack of neutrality and impartiality with which it was conducted and concluded.

First, it is very disappointing that you refused to provide the subjects of the investigation, many of whom are current and former Chamber officers and employees, with an opportunity to review and respond to your findings before they became public today.[1] Unlike civil litigation or criminal prosecutions, where an investigation is followed by the opportunity for a trial or a hearing, your report is the end of the line. There will be no formal setting in which those whose conduct the report discusses will have a meaningful opportunity to challenge, rebut, or even raise questions about the investigators' accuracy, their credibility determinations, or their thoroughness. That lack of process explains why it has now become commonplace in circumstances like these for agencies such as the New York Inspector General,[2] the U.S. Department of Justice's

---

[1] We also note that you did not even alert us that you were releasing your report today.

[2] *See, e.g.*, State of New York Offs. of the Inspector Gen., Investigation of the New York State Department of Motor Vehicles Political Subdivision Program at 4 (Mar. 2021), https://ig.ny.gov/system/files/documents/2021/03/03.04.21.dmvpsd2761.014.2019-alb.pdf (DMV "fully cooperated with the Inspector General's review and

![Arnold & Porter] 

Joon H. Kim
Anne L. Clark
Page 2

Office of the Inspector General (DOJ-OIG),[3] DOJ's Office of Professional Responsibility,[4] and the U.S. Government Accountability Office (GAO),[5] as well as for special counsel appointed to investigate executive-branch malfeasance in the federal government[6] to share their reports before finalizing them — even where there is no basis to believe that the investigators are biased or may not be independent. Those agencies provide that procedure to protect the subjects of their investigation, as well as the public and the investigators themselves. The reasons are clear. As DOJ-OIG has explained, providing a draft report to the subject of an investigation, as well as to key individuals who have testified, is the "standard practice in all of [its] reviews" to ensure the "factual accuracy" of its reports.[7] To that end, DOJ-OIG gives subjects a chance to review the entire draft; provides "individuals who were interviewed during the review … an opportunity to review the portions of the draft report that pertained to their testimony"; conducts "follow up interview[s]" based on comments on the draft report;[8] and regularly

---

has examined its findings"); State of New York Offs. of the Inspector Gen., Investigation of the New York State Office of Mental Health Hutchings Psychiatric Center at 2 (Oct. 2016), https://ig.ny.gov/sites/g/files/oee571/files/2017-02/OMHHPCFinalReport10.31.16.pdf ("In response to the Inspector General's report, OMH advised it was in agreement with the findings and recommendations. . . .").

[3] *See, e.g.*, U.S. Dep't of Just. Off. of the Inspector Gen., Audit of the Department of Justice Policy on Body Worn Cameras at i (June 2021), https://oig.justice.gov/sites/default/files/reports/21-085.pdf ("In May 2021, we provided a draft of this report to DOJ and the Components for review. . . ."); U.S. Dep't of Just. Off. of the Inspector Gen., Audit of the Drug Enforcement Administration's Laboratory Information Management System Support Contracts at App. 3 (June 2021), https://oig.justice.gov/sites/default/files/reports/21-079.pdf (appending "The Drug Enforcement Administration's Response to the Draft Audit Report" to investigatory report).

[4] *See, e.g.*, U.S. Dep't of Just. Off. of Pro. Resp., Executive Summary of Report at vi (Nov. 2020), https://www.justice.gov/opr/page/file/1336471/download ("The subjects reviewed and provided comments on their respective interview transcripts and on OPR's draft report."); U.S. Dep't of Just. Off. of Pro. Resp., Report at 5 (May 30, 2018), https://www.justice.gov/opr/page/file/1207181/download ("On March 22, 2018, OPR sent its draft report to the USAO, Ruby, and Goodwin, and provided them with an opportunity to review and comment on the draft report.").

[5] U.S. Gov't Accountability Office, *Government Auditing Standards* 124 (July 2018), https://www.gao.gov/assets/gao-18-568g.pdf.

[6] *See* Attorney General William P. Barr Delivers Remarks on the Release of the Report on the Investigation into Russian Interference in the 2016 Presidential Election, https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-release-report-investigation-russian (Apr.18, 2019).

[7] U.S. Dep't of Just. Off. of the Inspector Gen., *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services* 7, https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf.

[8] *Id.*

# Arnold & Porter



Joon H. Kim
Anne L. Clark
Page 3

publishes the comments of investigated parties in its final reports.[9] In "high profile and sensitive matters" like this one, DOJ-OIG recognizes the need for "*extra care*" to "assure that … reports are objective and accurate."[10]

Instead of following these standard practices, you published today a 165-page report, released hundreds of pages of exhibits (including highly personal and sensitive communications involving Chamber officials and others), and held a press conference to announce your findings — all with virtually no notice to the subjects of the investigation or their counsel.  As a result, the individuals whose conduct you describe have been reading your conclusions at the same time as the press and the public.  Unsurprisingly, the calls for comment have been incessant, and the opportunity for meaningful rebuttal have been miniscule.  Particularly given the media spotlight in which this investigation has proceeded, the stakes of this investigation so high, and the report's describing such sensitive information and personal communications, there was no reasonable basis for your refusal to provide for advance review.

Without that opportunity, neither we nor our clients have had a chance to fully review the report and the exhibits.  Even without that opportunity, however, the report nevertheless confirms to our clients what they have believed for months:  the investigation would not fairly and neutrally evaluate the facts, but would reach confirm a preordained conclusion.

As you know, the Governor initially announced in February 2021 that Barbara Jones, a highly respected former federal judge, would lead a "full and thorough" independent review of the allegations.  He directed all state employees to cooperate fully, and he pledged that he would have "no further comment until the review has concluded."[11] When that appointment met with resistance from the Attorney General and others because of a perception that Judge Jones was not sufficiently independent, the Governor — with the Attorney General's agreement -- asked that she and Chief Judge

---

[9] U.S. Dep't of Just. Off. of the Inspector Gen., *Information Quality Guidelines*, https://oig.justice.gov/foia/guidelines (last visited Aug. 3, 2021).

[10] *Id.* The U.S. Court of Appeals for the District of Columbia made similar observations about the importance of such a procedure.  As that Court has noted, the Independent Counsel statute that Congress passed in 1978 provided for the disclosure of "relevant portions of an independent counsel's report, prior to its public release, to any individual named in a report and to authorize such individuals to submit comments or factual information" that could be included in the report.  *In re Sealed Motion*, 880 F.2d 1367, 1369 (D.C. Cir. 1989).  Congress did so "to ensure fairness to named individuals," and the court noted that "fairness considerations are heightened" in cases of "national importance." *Id.*  Allowing affected parties to review reports protects not just the named party, but "the government and the public," who share the interest in "ensur[ing] the accuracy of the [report]." *Id.*

[11] Statement From Governor Andrew M. Cuomo, (Feb. 27, 2021), https://www.governor.ny.gov/news/statement-governor-andrew-m-cuomo-208.



Joon H. Kim
Anne L. Clark
Page 4

Janet DiFiore jointly select independent counsel to lead the review. When the Attorney General then insisted on overseeing the review herself, the Governor urged and the Attorney General committed (both publicly and privately) that she would select lawyers who were "independent." To that end, the formal Referral from the Governor stipulated that an "independent law firm"[12] would conduct the inquiry.[13]

Although independence in this context always requires the appointment of someone untainted by political partisanship,[14] true independence requires more. Indeed, it is essential that those conducting any investigation — particularly one with issues of this sensitivity, complexity, and significance — come to the task entirely free of any actual or perceived personal bias. In other words, it was imperative that this important investigation be led by lawyers untainted by any meaningful association, history, or relationship — positive or negative — with the individuals whose conduct the investigators would evaluate. And, once selected, it was incumbent upon those investigators to carry out their responsibilities free from any agenda, bias, or preconceptions about the facts or the appropriate outcome.

Against that backdrop, your selection as the leaders of the investigation was surprising. As the New York Times very recently observed, Mr. Kim has "a history with Mr. Cuomo."[15] From April 2013 until March 2017, Mr. Kim served as Chief Counsel, Chief of the Criminal Division, and Deputy U.S. Attorney under U.S. Attorney Preet Bharara, and he ultimately succeeded Mr. Bharara as Acting U.S. Attorney from March 2017 until January 2018. It has been widely reported that, in those positions, Mr. Kim played major roles in the SDNY's grand jury investigation of Governor Cuomo's disbanding of the Moreland Commission and the subsequent grand jury investigation and

---

[12] Letter to Hon. Letitia James from Beth Garvey, (Mar. 1 2021), https://ag.ny.gov/sites/default/files/letter_to_ag_3.1.21.pdf.

[13] There is ample federal and state precedent for the selection of such independent investigators. On the federal level, for example, Archibald Cox, Leon Jaworski, Robert Fiske, and Robert Mueller all fit that mold. And Governor Cuomo, when he was Attorney General, appointed former Chief Judge Judith Kaye to handle a referral of an investigation into Governor David Paterson.

[14] "It is imperative that the investigation be perceived as impartial and not a cover-up. If the conclusion of the investigation is that there is not enough evidence of wrong-doing to proceed, the American public must have reason to believe that this is based on an independent investigation and not simply the result of partisanship. Moreover, if the investigation finds sufficient evidence to warrant further action, whether a prosecution or impeachment proceedings, the public must have reason to believe that this was the result of an impartial decision and not simply a partisan desire to get the incumbent." Erwin Chemerinsky, *Learning the Wrong Lessons from History: Why There Must be an Independent Counsel Law*, 5 WIDENER L. SYMP. J. 1, 3 (2000).

[15] Luis Ferré-Sadurní and William K. Rashbaum, *Cuomo to Be Questioned in Sexual Harassment Inquiry*, THE NEW YORK TIMES, (July 15, 2021), https://www.nytimes.com/2021/07/15/nyregion/cuomo-investigation-harassment.html.

**Arnold & Porter** 

Joon H. Kim
Anne L. Clark
Page 5

prosecution of Joseph Percoco, a very close friend of the Governor and a member of his administration. As a result, one headline vividly perceived the potential implication of Mr. Kim's appointment: "The Knives Are Out."[16]

It was also extensively reported that, during Mr. Kim's tenure supervising those matters involving Governor Cuomo, and while those investigations were pending, Mr. Bharara (Mr. Kim's then-supervisor and close friend[17]) was publicly very critical of the political culture and leadership in Albany, including Governor Cuomo. In particular, during speeches and interviews, Mr. Bharara repeatedly articulated his deep distrust of politicians in Albany and his intent and eagerness to probe deeply to find evidence of wrongdoing.[18] It is reasonable for our client to question whether Mr. Kim shared those views.

Although those facts are well known, our client has advised us that there were other relevant circumstances that were not public at the time of Mr. Kim's selection that also could bear on Mr. Kim's independence. In particular, when United States Attorney General Eric Holder announced his resignation in the fall of 2014, the press speculated that Mr. Bharara was a potential replacement.[19] We understand that Governor Cuomo

---

[16] Jim Zirin, *The knives are out for Cuomo*, NEW YORK DAILY NEWS, (Apr. 9, 2021), https://www.nydailynews.com/opinion/ny-oped-the-knives-are-out-for-cuomo-20210409-wat7sfp4l5gbbnokwmjzkkujky-story.html.

[17] *See* David Lat, *Doing Justice: An Evening with Preet Bharara at Cleary Gottlieb*, ABOVE THE LAW (May 3, 2019), https://abovethelaw.com/2019/05/doing-justice-an-evening-with-preet-bharara-at-cleary-gottlieb/; Cristian Farias, *Preet Bharara's Former Deputy on His Old Boss's Firing and the Michael Cohen Case*, NEW YORK MAGAZINE (Apr. 29, 2018), https://nymag.com/intelligencer/2018/04/joon-kim-on-following-preet-and-the-michael-cohen-case.html.

[18] *See, e.g.,* Jimmy Vielkind, In a letter, Bharara warns Cuomo about being Cuomo, Politico (July 31, 2014), https://www.politico.com/states/new-york/albany/story/2014/07/in-a-letter-bharara-warns-cuomo-about-being-cuomo-014725; Marc Santora, *U.S. Attorney Criticizes Albany's 'Three Men in a Room' Culture*, THE NEW YORK TIMES (Jan. 23, 2015), https://www.nytimes.com/2015/01/24/nyregion/us-attorney-preet-bharara-criticizes-albanys-three-men-in-a-room-culture.html; Jennifer Fermino, *Preet Bharara says de Blasio, Cuomo should 'stay tuned' as executive offices are 'far from immune' to his corruption cleanup*, NEW YORK DAILY NEWS, (Apr. 13, 2016), https://www.nydailynews.com/news/politics/preet-bharara-de-blasio-cuomo-stay-tuned-article-1.2598678; John Cassidy, *Cuomo vs. Bharara: Battle of the Heavyweights*, THE NEW YORKER, (July 23, 2014), https://www.newyorker.com/news/john-cassidy/cuomo-vs-bharara-battle-heavyweights. Dana Rubenstein, Colby Hamilton, *Preet Bharara Branches Out*, POLITICO, (Apr. 24, 2015), https://www.politico.com/states/new-york/city-hall/story/2015/04/preet-bharara-branches-out-000000.

[19] *See, e.g.*, Elizabeth Hartfield, *Who might replace Eric Holder?*, CNN, (Sep. 25, 2014), https://www.cnn.com/2014/09/25/politics/eric-holder-replacement/index.html; Catalina Camia, *After Eric Holder: Potential attorney general choices*, USA TODAY, (Sep. 25, 2014), https://www.usatoday.com/story/news/politics/2014/09/25/eric-holder-attorney-general-replacements/16203345/.

![Arnold & Porter] 

Joon H. Kim
Anne L. Clark
Page 6

reached out to the White House to urge strongly against that choice, and described Mr. Bharara and his colleagues as "unethical, press hungry, political operatives."

Mr. Kim is apparently aware of that episode: a year later (in the fall of 2015), he personally interviewed the Governor as part of the SDNY's investigation of the Moreland Commission. During that meeting, he specifically asked whether the Governor had ever called the White House to discuss Mr. Bharara. The Governor readily admitted that he had done so.

Our client also wants to highlight other facts regarding the relationship between the Governor and Mr. Bharara. Shortly after the 2016 election, President-elect Trump met with Mr. Bharara at Trump Tower, and Mr. Bharara announced that he had been asked to stay on as U.S. Attorney. After President Trump subsequently changed his mind and fired Mr. Bharara in March 2017, the New York Times reported that Governor Cuomo had told President Trump that Mr. Bharara was "a bad guy" and urged the President to fire him because "Preet is not your friend."[20] Although the Governor, at the time, publicly denied the report, it may have left an impression on Mr. Bharara, who soon tweeted a comparison between Governor Cuomo and the President: "Now I know how the Moreland Commission felt."[21] Mr. Bharara further criticized the Governor in his book "Doing Justice," and in interviews surrounding its release: "Dare I say it, there's a parallel between Trump and Cuomo in some regards."[22] Again, given the close relationship between Mr. Bharara and Mr. Kim, the Chamber is very concerned that the apparent animus between the Governor and Mr. Bharara may have colored Mr. Kim's approach here.

Put simply, this history has given our client severe misgivings about Mr. Kim's independence. His multi-year record of investigating the Governor and those around him; his exposure to information from two grand jury investigations about the Chamber and its operations; and whatever conclusions and credibility determinations he had made regarding witnesses and others from those matters all suggest to our client that Mr. Kim

---

[20] Benjamin Weiser, Ben Protess, Matthew Goldstein and William K. Rashbaum, *Preet Bharara Shunned Politics. His End Was Tinged by Them*, THE NEW YORK TIMES, (Mar. 12, 2017), https://www.nytimes.com/2017/03/12/nyregion/preet-bharara-politics-us-attorney.html.

[21] Erin Durkin and Stephen Rex Brown, *Preet Bharara compares Trump firing him to Gov. Cuomo disbanding anti-corruption commission amid Albany investigations*, NEW YORK DAILY NEWS, (Mar. 13, 2017), https://www.nydailynews.com/news/politics/bharara-firing-linked-probe-trump-administration-article-1.2995854.

[22] Casey Seiler, *Ex-U.S. Attorney Draws Parallels between Trump and Cuomo*, ALBANY TIMES UNION (March 19, 2019) https://www.timesunion.com/news/article/Bharara-goes-back-to-first-principles-13697674.php%20%E2%80%9C.



Joon H. Kim
Anne L. Clark
Page 7

may have come to this task with too much baggage to give the public — or those being investigated — the requisite confidence in his impartiality.  Nor does the Governor believe that the Attorney General would have selected Mr. Kim to lead this investigation — and have touted his independence — if she had been fully aware of all these facts.  Yet, even without the full story, one commentator has observed that "[t]here are a plethora of former prosecutors in New York highly qualified to investigate Cuomo's conduct who could start afresh without the optics of bias."[23]

Unfortunately, the retention of Anne Clark as co-investigator did not mitigate our client's concerns over the potential for bias and unfairness.  Although Ms. Clark — unlike Mr. Kim — has a background in employment law, the press release announcing her appointment highlighted that her practice "focuses on employment law issues on behalf of employees . . . and that [s]he has successfully represented plaintiffs in numerous sexual harassment and other employment discrimination cases in the private sector, in education, and in government."[24]  Her orientation as a plaintiffs' lawyer has also been regularly noted in the press.[25]

In light of these facts, your appointments raised serious concerns for the Chamber in March about the impartiality of the investigation.  But the Governor had already pledged full cooperation, and he was determined to keep that promise.  In addition, given the Attorney General's assurances to the Governor and his senior staff before the referral, there was some hope that the investigation would nevertheless be neutral and fair, without the taint or hint of any personal, professional, or political bias.

Unfortunately, over the last few months, it appears that standard has not been met.  You seem to have approached your task with unwarranted skepticism toward the

---

[23] Jim Zirin, *The knives are out for Cuomo*, NEW YORK DAILY NEWS, (Apr. 9, 2021), https://www.nydailynews.com/opinion/ny-oped-the-knives-are-out-for-cuomo-20210409-wat7sfp4l5gbbnokwmjzkkujky-story.html.  We do not suggest that, under other circumstances, prosecutors would be precluded from investigating the same individual or entity again.

[24] Press Release, New York Attorney General, *Attorney General James Makes Appointments to Lead Investigation Into Sexual Harassment Allegations Against Governor Cuomo*, (Mar. 8, 2021), https://ag.ny.gov/press-release/2021/attorney-general-james-makes-appointments-lead-investigation-sexual-harassment.

[25] *See* Gregory Krieg and Kara Scannell, *Investigations into Cuomo Heat Up as New Controversies Arise in Their Wake*, CNN, (Mar. 20, 2021), https://www.cnn.com/2021/03/20/politics/cuomo-investigations-joon-kim-anne-clark/index.html;  Yancey Roy, *James Names 2 To Probe Harassment Allegations Against Gov. Cuomo, Including Ex-US Attorney*, NEWSDAY, (Mar. 8, 20211), https://www.newsday.com/news/region-state/dr-edited-james-cuomo-sexual-harassment-investigator-1.50176710.

Joon H. Kim
Anne L. Clark
Page 8

Governor and the Chamber, as well as an approach to the gathering of evidence that appears geared toward proving a particular narrative.

Your orientation was telegraphed at the outset. For example, in mid-March, shortly after our firms were engaged, we met by Zoom with a group of Chamber employees (as we would do at the beginning of any representation of an organization or other entity). The meeting had several purposes: (1) an introduction of the lawyers representing the Chamber; (2) a reminder of the employees' obligation to preserve potentially responsive material; (3) a description of how the investigation would likely proceed, including as to collection of relevant documents; and (4) an explanation of the employees' right to representation by counsel, including their option to use our law firms or to choose someone else.

On March 23, 2021, you sent a letter alleging that the purpose of our meeting was unethical and that we were attempting to intimidate witnesses and obstruct the investigation. We were stunned at the letter's tone, as well as the predisposition to accept whatever information you had received. Nor could we fathom the source of the unsupported — and, frankly, offensive — description; we simply knew it to be untrue.

Only later did we come to learn the apparent source: on March 22, the day before your letter to us, Debra Katz — the attorney representing Charlotte Bennett — sent a letter to you (which she apparently also provided to the press) in which she leveled *identical* accusations. The parallels between the letters, and our subsequent conversations with you on those topics, gave us the clear impression that you already had adopted part of the complainants' narrative: the leadership of the Chamber, and even those representing them, could not necessarily be trusted.

Once witness interviews began, the bias was also evident from the questions posed by you and your colleagues and the subject matters you chose to pursue or neglect. For example, during the course of the 18 interviews in which we represented individual Executive Chamber employees, we often observed that the questions were frequently leading, posed with an air of incredulity, and seemingly designed to push witnesses into particular answers that seemed less favorable to the Governor or the Chamber.

Your approach to one particular complaint is a troubling example. At his interview on July 17, the Governor was asked about his interactions with the anonymous complainant who alleged in early March that the Governor had touched her breast in the Governor's mansion on November 16, 2020. Although you apparently had been aware of that date for some time, it appears that you declined to provide that information to any of the Chamber's witnesses or their counsel and, instead, waited until the Governor's testimony on July 17 to ask about his activities on that date. As a result, it appears that



Joon H. Kim
Anne L. Clark
Page 9

you did not ask several of the Chamber employees who were in the mansion on the same day about their whereabouts, or explore with them whether there had been an opportunity for the event to have occurred. That approach raises questions of thoroughness, as well as the extent to which you pursued evidence that might prove inconsistent with the complaints, despite your promise to "act judiciously and follow the facts wherever they lead."[26]

The report is also vague in material respects. At least one example stands out. In the Chamber's memorandum of Alphonso David's meeting with Lindsay Boylan in January 2018, it is clear that Ms. Boylan stated that had never been sexually harassed. The report does not mention whether she testified to the same effect, and it also is vague about whether she was questioned at all about that report during your investigation.

Similarly, your report references threats that Ms. Boylan made to several Executive Chamber employees after "they failed to respond in the way Ms. Boylan wanted them to," but it fails to disclose or describe the substance and timing of these messages. For instance, while your report mentions the "jarring" and "threatening" message that Ms. Boylan left Howard Zemsky after he denied that the Governor asked Ms. Boylan to play "strip poker" during a flight in October 2017, it lacks any reference to testimony from Ms. Boylan about the underlying communications. Nor does the report describe the nature of the threat; why Mr. Zemsky found it so persuasive that he changed his story about the "strip poker" episode; or why you found his change of recollection more credible than his initial denial that the episode had occurred.

The report also fails to acknowledge the Chamber's disagreement with your legal analysis of the unpublished statement that various individuals drafted about Lindsay Boylan in December 2020. In particular, just two weeks ago, on July 18, we submitted a letter to you addressing what appeared to be your view of the facts, and we highlighted our concern that your approach to the questioning suggested a mistaken view of the law. Yet your report simply ignores that lengthy and thoughtful submission. In fact, but for a passing reference to your having received correspondence, the report does not even acknowledge that there might be a contrary view of the legal ramifications of the Chamber's conduct. Without any mention of the nuances in the law or the fact that our concerns went unanswered, you simply concluded it is retaliation.

Similarly, your handling of witness testimony made it particularly difficult for the Chamber to maintain a coherent approach to privilege questions. In particular, private

---

[26] Peltz & Neumesiter, *Lawyers investigating Cuomo have taken on political figures*, AP NEWS, (Mar. 8, 2021), https://apnews.com/article/new-york-andrew-cuomo-trump-investigations-archive-d5e19b4d024c90929eee282dca57380f.



Joon H. Kim
Anne L. Clark
Page 10

counsel for a number of current and former Chamber employees requested that our law firms attend their clients' interviews or testimony. They made those requests so that counsel representing the Chamber could advise when it was appropriate and necessary for their clients to protect the State's interest and invoke the Chamber's attorney-client privilege. Because our firms had been primarily responsible for providing advice on such questions throughout the investigation, there was a sound and principled reason for us to continue to do so during those witnesses' testimony. On each occasion, however, you refused to permit our attendance As a result, we were forced to make certain privilege determinations in an *ad hoc* manner, which was both inconsistent with how such matters are ordinarily handled, and also substantially increased the risk of error.

In addition, because of our inability to attend the testimony and interviews of Chamber employees, we found it necessary to protect the institutional interests of the Governor and the Chamber by discussing legal issues that arose during interviews from which we were excluded. Such discussions were completely proper and routine. But when we began that process in mid-April with counsel for an attorney whose testimony necessarily implicated the Chamber's attorney-client privilege, you reacted with inappropriate threats of criminal enforcement under Executive Law § 63(8). As we have pointed out extensively in correspondence with you over the last three months, your interpretation of Executive Law § 63(8) does not follow from the text of the statute and raises serious constitutional concerns.

We also note your apparently inconsistent approach toward the confidentiality of the investigation: over the last several months, complainants have effectively communicated with each other through their own statements to the press or those by their counsel. But you and your colleagues have repeatedly warned Chamber witness and their private counsel that they risk prosecution under § 63(8) for communications intended, for example, to protect legal privileges. The selective threats of criminal penalties have furthered the perception that your approach has not been even-handed.

Finally, it is a common practice — indeed, often a requirement — for witnesses in civil matters to review the transcripts of their own testimony. Here, it is our understanding that you refused to turn over any transcripts or videos of testimony to any witnesses or their counsel, even when those attorneys offered to sign nondisclosure agreements. The Governor's access to his own testimony was likewise restricted, and he was refused a copy of the video recording or the transcript.

That unwillingness was baffling, particularly where the investigation moved at a breakneck pace and the resulting report was issued to the public and to other investigative bodies (including the Assembly) before witnesses had any chance to review and

potentially correct or provide context to their testimony. At today's press conference, you reported that you conducted 178 witness interviews. In situations like this, where there were so many interviews in such a compressed time, and by different members of the investigative team, there were bound to be errors and inconsistencies in the transcripts as well as in the report that quotes and paraphrases the testimony. As a result, we remain concerned that the report contains additional inaccuracies and fails to present the evidence in a balanced and fair manner. And it is also problematic that witnesses and their counsel still do not have access to their own transcripts and you still apparently have no plans to provide them.

\* \* \* \* \* \* \* \*

Draping yourselves in the cloak of independence, you pursued a process that was designed to make you the only ones with any visibility into the evidence. But merely calling an investigation independent is not an excuse or an opportunity to prevent those who are being investigated from having a truly meaningful way to contest unadjudicated findings and conclusions. The witnesses, the subjects of the investigation, and the public deserve more.

Respectfully Submitted,

Paul Fishman
ARNOLD & PORTER
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019

Mitra Hormozi
WALDEN MACHT & HARAN
250 Vesey Street, 27th Fl.
New York, NY 10281

Dipanwita Deb Amar
ARNOLD & PORTER
KAYE SCHOLER LLP
3 Embarcadero Center
San Francisco, CA 94111

cc: Hon. Letitia James, Attorney General of New York