```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------
ANDREW M. CUOMO,

                              Movant,

        - against -

OFFICE OF THE NEW YORK STATE
ATTORNEY GENERAL,

                              Defendant.
```

1:22-mc-03044 (LDH)(TAM)

# DECLARATION OF YE EUN CHARLOTTE CHUN

I, Ye Eun Charlotte Chun, declare as follows pursuant to 28 U.S.C. § 1746:

1. My name is Ye Eun Charlotte Chun, and I am an attorney at the law firm Cleary Gottlieb Steen & Hamilton LLP ("Cleary").

2. On March 26, 2021, pursuant to New York State Executive Law Section § 63(8), I was appointed a Special Assistant to the First Deputy Attorney General within the New York State Office of the Attorney General ("OAG") to conduct, with several of my colleagues, an independent investigation into and report on allegations of, and circumstances surrounding, sexual harassment by the former governor, Andrew M. Cuomo.

3. In my role as Special Assistant to the First Deputy Attorney General, I was a member of an independent investigative team comprised of attorneys from Cleary and Vladeck, Raskin & Clark PC ("Vladeck") (collectively, the "Investigative Team"). Over the course of the investigation, the Investigative Team interviewed 179 witnesses in

connection with the allegations of, and circumstances surrounding, sexual harassment by the former governor, and took on-the-record testimony from 41 of these witnesses. The Investigative Team additionally issued over 70 subpoenas for documents and received over 74,000 documents. As required by New York State Executive Law Section § 63(8), the Investigative Team also periodically reported to OAG, consulting with attorneys in the Office of General Counsel at OAG on issues relating to OAG's practices and procedures.

4. From the outset and during the course of the investigation, the former governor Andrew M. Cuomo, the Executive Chamber, and certain former and then-current members of the Executive Chamber indicated that they might assert potential legal challenges to aspects of the investigation, including the selection and appointment of the Special Deputies, the scope of issued subpoenas, differing positions on attorney-client privilege, and access to investigative materials produced by other witnesses. For example, in March 2021, the Investigative Team became aware of allegations that the former governor and certain former and then-current members of Executive Chamber staff were seeking to conduct what was referred to as "opposition research" on members of the Investigative Team and research on the personal history of women who had accused the former governor of misconduct. Documents that were produced by witnesses to the Investigative Team confirmed this, including at least one such document that was published on the OAG website in redacted form (Ex. 104 to Report). Additionally, as early as April 2021, the Executive Chamber and former members of the Executive Chamber asserted what the Investigative Team believed were overly broad and unjustified assertions of privilege in order to limit the production of documents and information that would otherwise have

been responsive to OAG subpoenas. Counsel for the Executive Chamber and the former governor additionally requested access to testimony transcripts. The Investigative Team responded as early as April 2021 that New York State Executive Law Section § 63(8) and New York Civil Rights Law § 73(3) do not entitle witnesses access to their testimony transcripts, and that it is OAG's practice not to provide witnesses with copies of their testimony transcript to ensure the government actor preserves and protects the confidentiality of the proceeding.

5. On August 3, 2021, the Investigative Team published a final report reflecting the findings and conclusions of our investigation (the "Report"). As noted in the Report, the Investigative Team made all substantive decisions regarding the analysis and conclusions reached in the Report independently of OAG.

6. Over the course of the investigation, I was personally involved in the drafting and issuance of subpoenas, review of responsive documents, interviews and testimony of witnesses, and drafting of the Report. I was also involved in the exhibit redaction process for the Appendices to the Report.

7. Subsequent to the publication of the Report, I was personally involved in document productions to various government agencies, including district attorneys' offices, in response to requests for relevant portions of our investigative files in connection with their own potential criminal and civil investigations. I was also personally involved in the redaction process for transcripts, transcript exhibits, and (for a subset of the witnesses) testimony video footage for the 41 on-the-record witnesses, in advance of their publication on the OAG website. The review and redaction process for this full set

of published materials took approximately five months, due to the high volume of materials and extremely time-consuming review and redaction process. These materials were published on the OAG website between November 2021 and January 2022 on a rolling basis as the redactions were completed, though the review and redaction process began in August 2021.

8. The process for reviewing and redacting documents and other media files contained in our investigative files was extremely time-consuming due to the highly sensitive and confidential nature of information shared with us over the course of the investigation. Examples of sensitive and confidential information include: identities (including identifying information) of witnesses who expressed credible fears of retaliation; identifying personal information, including home addresses, phone numbers, email addresses; health information about witnesses and others (including minor children) discussed in their testimony; confidential employment personnel information, including files from confidential Equal Employment Opportunity investigations; information implicating law enforcement and security plans, including security footage of government buildings and floorplans of government offices; and personal information about the witnesses, including information about certain of their personal or romantic relationships.

9. As part of the Appendices to the Report, the Investigative Team made available 111 exhibits that were cited to or quoted from in the Report. Subsequent to the publication of the Report, additional documents and media files were published on OAG's website, either in whole or redacted form, including: transcripts for the 41 on-the-record witnesses, exhibits to each transcript, and video or audio files of 23 on-the-record

witness testimonies. Each of these three categories of files required a separate review and redaction process. As noted above, the entire process to review, redact, and publish materials for the 41 on-the-record witnesses took approximately five months.

10. More specifically, the Investigative Team collectively spent over 3,600 hours identifying, reviewing, redacting, and publishing approximately 1,000 documents which were either published as exhibits appended to the Report or as additional materials published on the OAG website subsequent to the publication of the Report. These published materials are a subset of the materials contained in our investigative files, leaving approximately 73,000 documents that have not yet been reviewed for redaction.

11. There are over 100 witnesses whose identities are not otherwise known to the public, including a number of non-public on-the-record witnesses, many of whom expressed credible fears of retaliation and were hesitant to cooperate with the investigation for this reason. Many witnesses who cooperated with our investigation requested that their identity and cooperation be protected, and they might not have cooperated as fully had they believed the substance of their information and documents they produced would be provided to the former governor, former members of the Executive Chamber, and their counsel.

12. As noted above, there are also 73,000 documents we received from witnesses that remain unredacted. These documents are separate and apart from internal documents created by the Investigative Team, which include internal communications, interview memos reflecting the Investigative Team's mental impressions and used by the Investigative Team to provide legal advice to OAG on next steps, notes, and other attorney work

product. These internal documents created by the Investigative Team were intended to remain confidential, notwithstanding that the Report was always intended to be made public. All 73,000 documents received from witnesses would have to be reviewed in order to determine whether and what needs to be redacted. This would be extremely time-consuming and burdensome. Given our experience with the review and redaction of the materials that were released as part of the publication of the Report, it would take thousands of hours of work by a dedicated review team working daily focused solely on reviewing and redacting the remaining materials to complete that process.

13. The Investigative Team ran searches across all of the documents we received from witnesses over the course of the investigation for materials specific to Trooper #1. These searches included specific searches using variations of Trooper #1's name and email address, and search strings including ("Female" OR "Woman" OR "She" OR "Her) w/2 ("Trooper") and ("Trooper") across all custodial documents. We have only identified a few documents (by family) that relate to Trooper #1.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 8, 2022

_____

Ye Eun Charlotte Chun