# Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------------------------------x

In the matter of the application of ANDREW M. CUOMO,

                      Petitioner,

                                          **AFFIRMATION**

      -against-                               Index No. 156771/2022

                                            Hagler, J.

LETITIA JAMES, as Attorney General of the State of
New York,
                      Respondent.
---------------------------------------------------------------------X

        Christine A. Ryan, an attorney admitted to practice in the courts of the State of New York, affirms under penalty of perjury pursuant to CPLR 2106(a) as follows:

        1.    I am a Deputy Attorney General in the Office of Letitia James, Attorney General of the State of New York.

        2.    I submit this affirmation based on personal knowledge to describe the two-part test that Public Officers Law § 17 ("POL § 17") imposes upon the Office of the Attorney General ("OAG") to use to determine whether a State-funded defense is authorized under POL § 17, and to demonstrate that the OAG determination that POL § 17 does not authorize the State to pay the legal fees for the private attorneys hired by former Governor Andrew M. Cuomo ("Petitioner") to defend him in *Trooper 1 v. New York State Police, et al.*, No. 22 CV 893 (E.D.N.Y.) (LDH) (TAM) ("Trooper 1 Action"). POL § 17 representations are evaluated on a case-by-case basis and are governed by the application of the statutory two-part test.

**The Underlying Federal Action - Trooper 1 Action**

3. On February 17, 2022, the plaintiff ("Trooper 1") filed the complaint in the Trooper 1 Action against Petitioner and two other defendants. Complaint, ECF No. 1, Trooper 1 Action. On February 18, 2022, Trooper 1 filed an amended complaint ("Am. Compl."), adding an additional defendant, and alleging, *inter alia*, that Petitioner sexually harassed Trooper 1 and then retaliated against her in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the New York State Human Rights Law, and New York City Human Rights Law. Am. Compl., ECF No. 7, Trooper 1 Action, a copy of which is attached as Exhibit A to the Petition ("Pet. Ex. A").

4. As alleged in the Amended Complaint, from 2018 through 2021 Petitioner:

  a. commented on Trooper 1's appearance ("why don't you wear a dress?") ("'Look at you with your glasses looking like ohwee,'" meaning he thought she was attractive in her sunglasses") (*id.* ¶¶ 3, 48, 72);

  b. asked to hug and kiss Trooper 1 ("[c]an I kiss you?") and did hug and kiss Trooper 1 (*id.* ¶¶ 3, 43, 45, 58, 61);

  c. asked Trooper 1 to find him a girlfriend who could "handle pain;" (*id.* ¶¶ 3, 57);

  d. steered their conversations towards sex ("[w]hy would you want to get married? . . . your sex drive goes down") (*id.* ¶¶ 3, 36);

  e. used his physical proximity to her to inappropriately touch her while in an elevator ("he runs his finger down the center of my back of my spine, basically from the top of my neck, basically midway down with his pointer finger and just said, 'Hey, you'" and touched her bra clasp) (*id.* ¶¶ 3, 39, 46);

  f. invited her "upstairs" in the Governor's mansion (*id.* ¶ 51);

  g. initiated intimate physical contact with her when he placed the palm of his hand on her belly button and slid it across her waist to her right hip, where her gun was holstered (*id.* ¶ 53);

  h. intentionally touched her in intimate locations between her breasts and vagina causing Trooper 1 to feel violated (*id.* ¶ 54);

2

    i. asked Trooper 1 her age and, when she replied she was in her late 20's, said, "You're too old for me" and proceeded to ask Trooper 1 "what age differential Trooper 1 thought the public would be willing to tolerate in a relationship of his" (*id.* ¶¶ 55-56); and

    j. six months after Petitioner resigned, retaliated against Trooper 1 on February 10, 2022, by announcing that he would seek criminal charges against Trooper 1, and others, for engaging in protected activity (*id.* ¶¶ 6, 151-155).

**<u>Petitioner's Request to OAG that the State of New York Pay His Attorneys' Fees</u>**

    5. On March 8, 2022, at 7:36 p.m., Rita M. Glavin, counsel to Petitioner, contacted me by email with the subject line "Request for counsel/payment of counsel fees: Trooper v. NYS Police, et al., 22 Civ 893 (E.D.N.Y.)." In that email, counsel to Petitioner wrote, "As you know I am former Governor Andrew Cuomo's attorney and I write to inform you that on March 7, 2022 I agreed to accept service of the above-referenced complaint on behalf of my client. My understanding is that I must make this request to you to obtain counsel/approval counsel fees for the former Governor. I assume that the AG's office is conflicted from representation from my client in this matter. Can you please confirm receipt of this email and my request? Can you also please let me know what, if anything else, I may need to do to ensure legal representation and payment of legal fees for the former Governor in this matter? I appreciate your assistance. Let me know if you need me to send you a copy of the complaint." Attached as Exhibit A is a true and correct copy of Petitioner's March 8, 2022 Email Request for Counsel/Payment of Counsel Fees..

    6. On March 8, 2022, at 8:46 p.m., I replied by email to counsel to Petitioner writing, "By this email, I acknowledge receipt of your request for representation on behalf of Andrew M. Cuomo in the matter of *Trooper 1 v. New York State Police, et al.*, 22 CV 893 (E.D.N.Y.). Pursuant to Public Officers Law § 17 (the "Statute"), upon receipt of a request for representation, this Office must consider whether the Statute authorizes the State to provide for representation and the appropriateness of Attorney General representation. We will inform you shortly of the

determination." A true and correct copy of OAG's March 8, 2022 Email Acknowledgement of Petitioner's Request for Counsel/Payment of Counsel Fees is included as part of the email chain attached as Exhibit A.

7. By letter to Petitioner, c/o counsel to Petitioner, Attorney Glavin, dated April 12, 2022, OAG informed Petitioner that "based upon our review of the Amended Complaint and publicly available information" the OAG had determined that the State is not authorized to provide for Petitioner's legal representation or to pay for private counsel to represent Petitioner in the Trooper 1 Action. Attached as Exhibit B is a true and correct copy of OAG's April 12, 2022 Letter Advising Petitioner of OAG Determination in Response to Petitioner's Request for Counsel/Payment of Counsel Fees ("OAG Determination").

8. On Friday, April 15, 2022, counsel to Petitioner contacted me by email requesting to speak with me on April 18, 2022, about the OAG Determination. Attached as Exhibit C is a true and correct copy of counsel to Petitioner's April 15, 2022 Email.

9. On April 19, 2022, by telephone, counsel to Petitioner and I discussed Public Officers Law § 17 and the OAG Determination. Counsel to Petitioner requested that I review the matters of *Cojocaru, et al. v. City Univ. of N.Y., et al.*, No. 19 CV 5428 (S.D.N.Y.) and *Mosier v. SUNY Stonybrook*, No. 18 CV 7173 (E.D.N.Y.), and the New York State Comptroller Opinion 90-47. I reviewed the matters Petitioner's counsel had requested that I review. I determined that none were analogous in any way to the OAG Determination at issue. The New York State Comptroller Opinion dealt with whether a local law or Town Law permits a municipality to reimburse a former town superintendent of highways for legal expenses incurred in defending a lawsuit brought against the town and the superintendent in both his individual and official capacities. The underlying facts in *Cojocaru* and *Mosier* did not include undisputed facts and admissions by the

defendants. Accordingly, on April 20, 2022, I wrote to counsel to Petitioner, informing counsel that I had reviewed the matters and the Opinion, as counsel requested during our discussion on April 19, 2022, and, per my letter dated April 12, 2022, this Office has determined that the State is not authorized to provide for legal representation or to pay for private counsel to represent former Governor Cuomo in *Trooper 1 v. New York State Police, et al.*, 22 Civ. 00893 (E.D.N.Y.). Attached as Exhibit D is a true and correct copy of OAG April 20, 2022 Email.

10. On July 6, 2022, counsel to Petitioner contacted me by email, attaching the summons, complaint, and amended complaint filed in the Trooper 1 Action, and "request[ed] reconsideration of the [OAG Determination] or, at the least, some more specific explanation for the denial." Attached as Exhibit E is a true and correct copy of counsel to Petitioner July 6, 2022 Email.

11. On July 7, 2022, I replied to counsel to Petitioner's 's July 6, 2022 email and attached another copy of the OAG Determination. Attached as Exhibit F is a true and correct copy of OAG July 7, 2022 Email.

**Public Officers Law § 17**

12. When a State employee, as defined in POL § 17, is served with a summons and complaint in a civil action or proceeding and requests that the State provide for the defense of the employee, the OAG must determine whether POL § 17 authorizes the State to provide for the employee's legal representation, subject to the terms and conditions set forth therein.

13. In making this determination, in accordance with the applicable case law construing POL § 17, the OAG follows a two-step process. First, the allegations in the complaint are reviewed to determine if it is alleged that the employee committed a wrongful act while acting within the scope of his public employment. Absent a specific allegation that the employee was acting within

5

the scope of his public employment, the OAG proceeds to the second step in the analysis. The second step requires the OAG to look behind the pleading to the facts underlying the occurrence alleged in the complaint. The OAG can deny a defense under POL § 17 based upon the OAG's determination that the employee was acting outside the scope of employment when the facts are so clear-cut that reasonable minds could reach no other conclusion.

**Step One**

14. Upon receipt of Petitioner's request for a State-funded defense, I reviewed the Amended Complaint in the Trooper 1 Action to determine if it included an allegation that Petitioner's alleged sexual harassment of Trooper 1 and retaliation against Trooper 1 occurred or is alleged in the Amended Complaint to have occurred while Petitioner was acting within the scope of his public employment, or if some of the alleged facts and circumstances could be construed as allegations that Petitioner's alleged sexual harassment of Trooper 1 and retaliation against Trooper 1 occurred while Petitioner was acting within the scope of his employment.

15. I determined that the Amended Complaint did not contain an allegation that Petitioner was acting within the scope of his public employment.

16. I also determined that the Amended Complaint did not allege facts and circumstances that could be construed to suggest that Petitioner's alleged sexual harassment and retaliation of Trooper 1 were actions taken in furtherance of the State's interest or to carry out duties incumbent on Petitioner as Governor.

**Step Two**

17. Since the Amended Complaint did not contain an allegation that Petitioner was acting within the scope of his public employment and the allegations did not imply that Petitioner was acting within the scope of his public employment, I proceeded to the second step in the

6

analysis to look behind the pleading to the facts underlying the occurrence alleged in the complaint concerning scope of employment.

18. Petitioner resigned from State employment on August 10, 2021, effective August 24, 2021. Attached as Exhibit G is a true and correct copy of Transcript of Petitioner's August 10, 2021 Resignation Speech (Petitioner's Resignation Speech"), as publicly available at N.Y. Times (Aug. 10, 2021), https://www.nytimes.com/2021/08/10/nyregion/cuomo-resignation-speech-transcript.html

19. The allegations in the Amended Complaint that relate to the retaliation claims against Petitioner are based entirely on statements Petitioner made after Petitioner resigned from State employment. *See* Pet. Ex. A, Am. Compl. ¶¶ 152-158.

20. Accordingly, Petitioner was not acting withing the scope of his public employment when the alleged retaliation occurred.

21. I reviewed Petitioner's publicly available sworn testimony that Petitioner provided to investigators on July 17, 2021. Attached as Exhibit H is a true and correct copy of Transcript of Petitioner's Testimony, dated July 17, 2021, as publicly available at https://ag.ny.gov/CuomoIndependentInvestigation.

22. In his sworn testimony, Petitioner:

    a. admitted he has asked staffers "May I kiss you?" (Ex. H Tr. 83:7-24);

    b. admitted that he has kissed staffers on the cheek (*id*. Tr. 84: 1-3);

    c. admitted that he hugged Trooper 1 (*id*. Tr. 435:15-22.);

    d. admitted that he may have kissed Trooper 1 on the cheek (*id*. Tr. 435:23-25; 436:4-15);

    e. admitted that he may have touched Trooper 1 on the shoulder for a hug (*id*. Tr. 437:1-9);

    f. admitted that he may have touched Trooper 1 on the back for a hug (*id.* Tr. 437:10-11);

    g. admitted that he may have run his hands across Trooper 1's stomach (*id.* Tr. 438:1-5); and

    h. admitted that he may have made marriage-related jokes to Trooper 1 (*id.* Tr. 440:1-6).

23.     I also reviewed the publicly available Transcript of Petitioner's Resignation Speech, Exhibit G.

24.     In Petitioner's Resignation Speech, Petitioner:

    a. admitted that he offended 11 women ("Now don't get me wrong, this is not to say that there are not 11 women who I truly offended. There are. And for that I deeply, deeply apologize.") (Ex. G ¶ 3);

    b. admitted that he hugs and kisses people casually ("I have been too familiar with people. My sense of humor can be insensitive and off-putting. I do hug and kiss people casually men and women.") (*id.* ¶ 5);

    c. admitted that he made jokes to Trooper 1 about the negative consequences of married life, and these jokes were offensive to Trooper 1, and Trooper I was right to be offended. ("This female trooper was getting married, and I made some jokes about the negative consequences of married life. I meant it to be humorous. She was offended, and she was right.") (*id.* ¶ 7);

    d. admitted that he believed Trooper 1's allegations that he touched her inappropriately ("The trooper also said that in an elevator I touched her back and when I was walking past her in a doorway, I touched her stomach. Now I don't recall doing it, but if she said I did it, I believe her. . . . It was totally thoughtless in the literal sense of the word, but it was also insensitive. It was embarrassing to her, and it was disrespectful. It was a mistake, plain and simple. I have no other words to explain it.") (*id.* ¶ 8); and

    e. apologized to Trooper 1 ("I want to personally apologize to her and her family.") (*id.* ¶ 8).

25.     I also reviewed the publicly available Impeachment Investigation Report to Judiciary Committee Chair Charles Lavine and the New York State Assembly Judiciary Committee, dated November 22, 2021, ("Impeachment Report"). Attached as Exhibit I is a true

8

and correct copy of the Impeachment Report, as publicly available at https://nyassembly.gov/Press/?sec=story&story=99809.

26. The findings and conclusions in the Impeachment Report and its reliance on certain admissions made by Petitioner related to Trooper 1's sexual harassment allegations, are set forth below:

> Trooper #1 has worked for the New York State Police since 2015. Trooper #1 has alleged that the then-Governor touched her inappropriately on multiple occasions – including by running his finger slowly down her spine, running his hand across her stomach, kissing and hugging her, and making numerous inappropriate and offensive comments to her. According to Trooper #1, the then-Governor instructed her not to tell "anyone about [their] conversations."

Ex. I, Impeachment Report, at 2.

> Former Governor Cuomo has not himself publicly denied that he engaged in the conduct described by Trooper #1. First, the former Governor publicly admitted to making "some jokes about the negative consequences of married life" to the Trooper when she was getting married. He said he meant them to be "humorous." Of those remarks, he said, "She was offended, and she was right." With respect to Trooper #1's allegations that he touched her back and stomach, the former Governor said, "Now, I don't recall doing it, but if she said I did it, I believe her." Although he apologized for his behavior, the former Governor denied having any recollection of his behavior, stating: "I didn't do it consciously with the female trooper. I did not mean any sexual connotation. I did not mean any intimacy by it. I just wasn't thinking." The former Governor admitted the behavior identified by the Trooper was "insensitive," "embarrassing to her, and it was disrespectful."

*Id.* at 18 (citing Petitioner's Resignation Speech).

> The experiences of [ ] and Trooper #1 are just two examples of the inappropriate nature of the former Governor's conduct, and each independently satisfies the definition of sexual harassment under New York State law. The former Governor acknowledged his understanding of this standard in his sworn testimony before the NYAG: "unwanted verbal or physical advances, sexually explicit derogatory statements or sexually discriminatory remarks . . . which

9

> are offensive or objectionable to the recipient, which cause the recipient discomfort or humiliation or which interfere with the recipient['s] job performance," and "that consist[] of more than petty slights or trivial inconveniences."

*Id*. at 3 (citing to sworn testimony of Andrew Cuomo; Tr. 39:14-41:1)

> [W]e find that there is overwhelming evidence that the former Governor engaged in multiple instances of sexual harassment. We highlight two examples here, which – standing alone – demonstrate that the former Governor engaged in sexual harassment, both under the former New York State law, which required conduct to be severe or pervasive, and under the more recent, less stringent sexual harassment law signed by the former Governor.

*Id*. at 16.

27. I also reviewed the publicly available Report of Investigation Into Allegations of Sexual Harassment By Governor Andrew M. Cuomo, dated August 3, 2021, ("Investigation Report"). Attached as Exhibit J is a true and correct copy of the Investigation Report, as publicly available at N.Y. Times, (Aug. 3, 2021), https://www.nytimes.com/interactive/2021/08/03/nyregion/cuomo-sexual-harassment-report.html.

28. The Investigation Report concluded that Petitioner, on multiple occasions, engaged in conduct and conversations that were offensive and sexual in nature that constituted sex-based harassment. Ex. J, Investigation Report, at 141.

29. The Investigation Report concluded that Petitioner engaged in the following forms of offensive touching of Trooper 1 as described below:

> On one occasion in an elevator, the Governor ran his finger down the center of Trooper #1's back from the top of her neck down the center of her spine, while saying, "hey you."

*Id*. at 142.

> At an event on September 23, 2019, the Governor touched Trooper #1 on the stomach, running his hand across it from her belly button to her right hip while she was holding a door open for him.

*Id.*

> Over the years, the Governor has hugged and kissed staff members in ways that made them uncomfortable or were unwelcome, including . . . kissing Trooper #1 on the cheek in the presence of her colleague, a man, while she was working on the Governor's protective detail . . . .

*Id.* at 143.

30. The Investigation Report concluded that Petitioner engaged in the following offensive and gender-based conversation and conduct with Trooper 1:

> When Trooper #1 informed the Governor that she was getting married, the Governor asked her why she would want to get married, because "it always ends in divorce, and you lose money, and your sex drive goes down."

*Id.* at 144.

> On another occasion, after he had become single again, the Governor discussed with Trooper #1 age differences in relationships, joking that she was "too old" for him. He then asked her what age difference for him and a girlfriend she thought would be acceptable to the public. When she asked what criteria he was looking for in a girlfriend, in order to deflect the conversation, the Governor said he was looking for someone who "can handle pain."

*Id.*

> In September 2018, when told by Trooper #1 that she would be going to Albany for her sister's wedding, the Governor made Trooper #1 uncomfortable by offering her a tour of the Governor's Mansion, "unless it [was] against protocols."

*Id.*

> In August 2019, the Governor asked Trooper #1 why she did not wear a dress, to which Trooper #1 stated that she would have nowhere to put her gun. The Governor also asked her why she only

11

> wore dark colors and, on another occasion, told her that her suit made her look like an "Amish person."

*Id*.

31. The Investigation Report concluded that Petitioner's touching of Trooper 1's stomach and back unquestionably amounted to sexual harassment. *Id*. at 146-147.

32. The Investigation Report concluded that Petitioner's comments of a sexually suggestive nature—including discussions about age differences in partners at the same time as asking Trooper 1 about finding a girlfriend for him, the criteria for the girlfriend being someone who "can handle pain," constitute unlawful sexual harassment. *Id*. at 147.

33. After reviewing the Amended Complaint and looking behind the pleading to the facts underlying the occurrences alleged in the Amended Complaint, including: (1) Petitioner's admissions in his sworn testimony, (2) Petitioner's admissions and statements contained in Petitioner's Resignation Speech, (3) the findings and conclusions in the Impeachment Report, including Petitioner's admissions cited therein; and (4) the findings and conclusions in the Investigation Report, I determined that the underlying facts are so clear cut that reasonable minds could reach no other conclusion than that Petitioner was not acting withing the scope of his public employment when the alleged sexual harassment occurred. Furthermore, as referenced above, Petitioner was not acting withing the scope of his public employment when the alleged retaliation occurred.

34. Accordingly, upon applying the required two-step test, the OAG determined that the State is not authorized to provide for Petitioner's legal representation or to pay for Petitioner's private counsel under POL § 17 and denied Petitioner's request for a State-funded defense pursuant to POL § 17.

Dated: New York, New York
       October 14, 2022

                                                s/ Christine A. Ryan
                                        Christine A. Ryan
                                        Deputy Attorney General

## CERTIFICATION PURSUANT TO RULE 202.8-B

The foregoing Affirmation complies with the word count limit set forth in Rule 202.8-b of the Uniform Rules of the Supreme and County Courts as it contains 3,666 words, excluding the caption and signature block, according to the word-processing system used to prepare the document.

Dated:  New York, New York
        October 14, 2022

                                            */s/* Tamikka Pate
                                            Tamikka Pate
                                            Associate General Counsel