1                    UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF NEW YORK (BROOKLYN)

3    GOVERNOR ANDREW M. CUOMO,
                                      Case No. 1:22-mc-03027-LDH-TAM
4                 Movant,

5    v.

6    THE NEW YORK STATE ASSEMBLY
     JUDICIARY COMMITTEE,
7
                  Respondent.
8    ------------------------------
     GOVERNOR ANDREW M. CUOMO,         Case No. 1:22-mc-03044-LDH-TAM
9
                  Movant,              Brooklyn, New York
10                                     February 7, 2023
     v.                                11:06 a.m.
11
     OFFICE OF THE NEW YORK STATE
12   ATTORNEY GENERAL,

13                Respondent.

14
                  TRANSCRIPT OF ORAL ARGUMENT HEARING
15              BEFORE THE HONORABLE TARYN A. MERKL
                   UNITED STATES MAGISTRATE JUDGE
16
     APPEARANCES:
17   For the Movant:              Theresa Trzaskoma, Esq.
                                  Allegra Noonan, Esq.
18                                Sher Tremonte, LLP
                                  90 Broad Street
19                                New York, NY 10004

20                                Rita Glavin, Esq.
                                  Glavin, PLLC
21                                156 West 56th Street
                                  Ste #2004
22                                New York, NY 10019

23

24

25

```
 1    For the Respondent:          Greg Andres, Esq.
      (The New York State          Michael Scheinkman, Esq.
 2    Assembly Judiciary           David Toscano, Esq.
      Committee)                   Davis Polk & Wardwell, LLP
 3                                 450 Lexington Avenue
                                   New York, NY 10017
 4
      For the Respondent:          Andrew S. Amer, Esq.
 5    (Office of the New York      Serena Longley, Esq.
      State Attorney General)      Office of the NY Attorney General
 6                                 28 Liberty Street
                                   New York, NY 10005
 7
      Clerk:                       K.C.
 8
      Court Recorder:              Electronic Sound Recording
 9
      Transcription Service:       Chris Hwang
10                                 Abba Reporting
                                   PO Box 223282
11                                 Chantilly, Virginia  20153
                                   (518) 302-6772
12

13

14

15

16

17

18

19

20

21

22

23

24    Proceedings recorded by electronic sound recording;
      transcript produced by transcription service.
25
```

1     (Call to order at 11:06 a.m.)

2     THE CLERK:  This is oral argument for docket 22-MC-

3  3027, Cuomo v. The New York State Assembly Judiciary Committee

4  and docket 22-MC-3044, Cuomo v. Office of The New York State

5  Attorney General.

6     Will the parties please state their appearances for

7  the record starting with the Movant?

8     MS. TRZASKOMA:  Good afternoon, Your Honor, Theresa

9  Trzaskoma from Sher Tremonte on behalf of Governor Cuomo.

10     THE COURT:  Good morning.

11     MS. GLAVIN:  Rita Glavin, Glavin, PLLC on behalf of

12  Governor Cuomo along with Allegra Noonan, who's with Sher

13  Tremonte.

14     THE COURT:  Good morning.

15     MR. ANDRES:  Good morning, Your Honor, Greg Andres,

16  together with Mike Scheinkman, David Toscano on behalf of the

17  Judiciary Committee of the New York State Assembly.  Good

18  morning, nice to see you.

19     THE COURT:  Good morning.  You, too.

20     MR. AMER:  Good morning, Your Honor, Andrew Amer on

21  behalf of the Office of the Attorney General with my colleague

22  Serena Longley, also with the Office of the Attorney General.

23     THE COURT:  Good morning.

24     So we are here today for oral argument on two on

25  motions that were initiated originally by former Governor Cuomo

1    to seek documents from both the Assembly Judiciary Committee

2    and the Attorney General's Office in connection with the

3    investigations that were undertaken by those two entities.

4         Obviously, the arguments have some overlap, but

5    there's also some significant differences in my assessment as

6    to the, you know, arguments being made by each of the

7    respondents to the subpoenas.

8         So I would like to sort of inquire about how we

9    should best structure this.  Obviously, the Movant has the

10   initial burden to establish relevance and you are -- you

11   initiated the motion.

12        So I was anticipating we could start with you and

13   hear argument from one of the entities in response and then,

14   you know, move to the second entity.

15        I don't know if the parties have discussed sort of

16   who would like to go first in terms of the Respondents.  Has

17   there been any discussion along those lines, Mr. Andres?

18        MR. ANDRES:  No discussions, Judge.

19        THE COURT:  Okay.  Well, I'm inclined to just do it

20   in docket order then if it doesn't matter to the parties.  So I

21   think we should do the Assembly Judiciary Committee first if

22   that's acceptable.

23        And I'd like to start by hearing from the Movant

24   since it is your opening motion.

25        MS. TRZASKOMA:  Yes, thank you, Your Honor.  Is it

1    all right if I sit?  My eyesight is --

2              THE COURT:  Yes, I think the mics pick you up a

3    little bit better, but it's your decision.  Whatever's more

4    comfortable.

5              MS. TRZASKOMA:  So, you know, I just -- a starting

6    point, we submitted a letter to Your Honor this week reflecting

7    an update on Governor Cuomo's Article 78 proceeding, which was

8    pending in state court.  That was a challenge to the Attorney

9    General's denial of Governor Cuomo's request for a public

10   funded defense under Section 17 of the Public Officers' Law.

11             Last the Court heard argument and ruled in that -- in

12   Governor Cuomo's favor in that matter.  And the Attorney

13   General has now certified Governor Cuomo for a publicly funded

14   defense in connection with the Trooper 1 action.

15             And I mention that because I think it goes to some of

16   the efficiency and burden questions.  The taxpayers are paying

17   for all of this.

18             And so, I think there really should be consideration

19   of the efficiency arguments and taking into account, you know,

20   the burden on the public as well.

21             So, you know, we are here because we served Rule 45

22   subpoenas on both the Assembly Judiciary Committee and the

23   Attorney General's Office seeking documents as Your Honor

24   noted.  And the Assembly Judiciary Committee has refused to

25   prove produce anything.

1        As Your Honor saw, and from their discovery

2    responses, they agreed to meet and confer with us.  But

3    ultimately through those meet and confers, it was clear that

4    there was nothing that they were willing -- that the Assembly

5    Judiciary Committee was willing to produce.

6        And the same thing with the Attorney General's

7    Office, they agreed to produce what I now think is four

8    documents, those that specifically reference Trooper 1's name.

9        So, you know, I'm going to really focus.  First, I

10   can start with the Assembly Judiciary Committee.  I think some

11   of the issues are the same.

12       And we can start with sovereign immunity.  So that is

13   the -- a new argument that the -- both the Assembly Judiciary

14   Committee and Attorney General have made in connection with

15   their motions to quash.  There was no --

16       THE COURT:  Before we actually get to motions to

17   quash, I'd like actually to hear your argument on your motion

18   to compel.

19       I mean, is it fair to characterize your subpoena for

20   the AJC as basically seeking everything that they generated,

21   received, or communicated in connection with this

22   investigation?

23       MS. TRZASKOMA:  Yes, Your Honor, we are seeking -- so

24   to go high level to Trooper 1's complaint, as Your Honor knows,

25   her complaint I would say it's divided into two halves.

1          And we didn't draft Trooper 1's complaint.  We

2     didn't, you know, we're not -- we didn't choose the lawsuit

3     that has been filed against Governor Cuomo.

4          But in Trooper 1's lawsuit, she has two, you know,

5     she has the allegations relating to her, which is about half of

6     her allegations.

7          And then, the remainder are allegations related to

8     other claimants, who are reflected in the reports issued by

9     both the Judiciary Committee and the Attorney General.

10          THE COURT:  But aren't the documents about those

11     claimants publicly available at this point on the Office of the

12     Attorney General's website, the transcripts that are quoted and

13     things?

14          MS. TRZASKOMA:  There are some materials, but far

15     from everything.  I mean, really from everything.

16          So the Attorney General selectively released

17     approximately 42 transcripts.  Those were transcripts that the

18     Attorney General decided, you know, on the record testimony

19     that the Attorney General decided to take.  There were 179

20     witnesses.

21          THE COURT:  I'm not asking about those witnesses.

22     The persons who are cited in the complaint, aren't those

23     transcripts and materials for those individuals largely

24     available on the Office of the Attorney General's website?

25          MS. TRZASKOMA:  The -- so Ms. Glavin can probably

1    respond.

2        MS. GLAVIN:  So, Your Honor, the transcripts of 41

3    individuals, redacted transcripts, are available on the

4    Attorney General's website, along with redacted exhibits.

5        What we do know, okay, is that for instance for the

6    11 complainants, for example, we know that some if not all of

7    them were -- had interviews with the A.G.'s Office informally,

8    and that is reflected in interview memos, before those

9    complainants were put under oath for formally transcribed

10    interviews.

11        The reason I know that is because when Governor Cuomo

12    was charged with a misdemeanor in Albany County, the Attorney

13    General had to give the Albany County District Attorney's

14    Office some of that discovery, including interview memos

15    relating to other complainants.

16        But what you have on the Attorney General's website

17    is what the Attorney General's Office decided was in their view

18    relevant to release.

19        So you don't have, like for instance if you look at

20    the Attorney General's report, just with Trooper 1, okay, the

21    Attorney General references, and I can refer Your Honor say to

22    page 40 of the report, two incidents that are referred to in

23    Trooper 1's complaint.

24        And the Attorney General talks about having

25    interviewed other troopers unnamed in connection with those

1    incidents, which then appear in Trooper 1's complaint.

2             We have an idea who a couple of them are, but not all

3    of them.  And all of -- those people were not all put under

4    oath.

5             So what -- how the investigation played out is that

6    the Attorney General at some point made a decision on who they

7    were putting under oath and who they weren't.

8             But the report relied on both the informal interviews

9    that were never transcribed or put under oath, as well as

10   dozens of informal interviews.  They are referenced throughout

11   the report and they were never publicly released.

12            THE COURT:  Right, but do you have a sense of whether

13   or not there's any real relevance with regard to dozens and

14   dozens of those interviews as to Trooper 1's allegations

15   because --

16            MS. GLAVIN:  Absolutely.

17            THE COURT:  -- the reason that I'm obviously asking

18   these questions is the scope of your request is extremely vast.

19   And I question whether or not you've actually established

20   relevance quite frankly --

21            MS. GLAVIN:  Okay.

22            THE COURT:  -- with regard to the motion to compel as

23   to everything.

24            There may be some things that are relevant, but the

25   wide swath of 73,000 unredacted documents seems extraordinarily

 1   broad, not to mention the -- in inter -- you know, inner office

 2   memos with other agencies and all of the communications,

 3   communications with counsel.

 4          I mean, it's -- I mean, extraordinary volume and

 5   really inconsistent with Rule 26's proportionality and

 6   relevance.

 7          So that's the baseline concern.  And so please, you

 8   know, kind of try to frame your arguments in that vein.

 9          MS. GLAVIN:  Yes.

10          THE COURT:  Generalizations are not going to work in

11   terms of establishing relevance.

12          MS. GLAVIN:  Okay.

13          MS. TRZASKOMA:  Well, I mean, just to take an example

14   from the Assembly Judiciary Committee's documents.  And I get

15   that we're, you know, we're now -- they're connected, but they

16   interviewed Trooper 1.

17          And that interview -- you know, so there's been a

18   subsequent -- there are subsequent statements by Trooper 1.

19   There are subsequent statements by other complainants.

20          And you know, I mean, I don't know if what -- if Your

21   Honor was trying to suggest that only documents related to

22   Trooper 1 are relevant to her claims.

23          I mean, if there's a ruling that the allegations

24   related to everyone else are not part of her lawsuit, that

25   would be great, but they're in her complaint.

1           There's probably going to be some motion practice at

2   some point about whether those complaint -- you know, the

3   admissibility, the relevance, but we're not there yet.  And

4   part --

5           THE COURT:  I agree with you.  And I did not intend

6   to imply that.  In fact, I asked specifically about the

7   individuals named in the complaint.  I did not limit my

8   question to Trooper 1.

9           MS. TRZASKOMA:  Understood, Your Honor.  And I

10  did -- I probably misunderstood.

11          So, you know, the fact that there are

12  witnesses -- there are for example, unidentified claimants.

13  There are people whose identities, you know, who made claims,

14  who are in Trooper 1's complaint as state entity

15  number -- state employee number 2 and state employee number 1.

16  We don't know who those are in one instance.

17          And so, the state -- I mean, without question

18  statements made by those complainants, statements made by

19  witnesses who are interviewed about events.

20          For example, witnesses were -- Trooper 1 alleges that

21  Governor Cuomo touched her on the back as they were riding up

22  an elevator to his office.

23          There were others troopers who were in the elevator.

24  There were troopers who were outside the elevator.  There were

25  troopers who heard things.

1          Those troopers are referenced in the A.G.'s report,

2    but they are not -- their statements have been not been made

3    available to us, nor their identities.

4          And there are other examples like that.  As Ms.

5    Glavin pointed out, just the -- if you read the Attorney

6    General's report or the Judiciary Committee's report, there are

7    multiple footnotes that reference others, you know, other

8    witnesses who said things.

9          And the Attorney General's investigation was about

10   the sexual harassment allegations.  If there are documents that

11   don't relate in any way to the allegations that are in Trooper

12   1's complaint, which are pretty much, you know, a mirror image

13   of the A.G.'s report, then you know, if they're truly

14   irrelevant, we don't need them, but we're a little shooting in

15   the dark because we don't know who, you know, the -- we don't

16   know what is in the 73,000 pages of -- 73,000 documents.

17         It's entirely possible that we don't want all of

18   that.  But at this point, we have -- I -- the documents that we

19   have requested are relevant.

20         Who the Attorney General and who the Assembly

21   Judiciary Committee subpoenaed are relevant.  It will be

22   incredibly helpful to know who has been spoken with, who has

23   produced documents.

24         What -- we should not have to re-invent the wheel of

25   the two investigations that have already been done on, you

 1    know, taxpayers' dime.  And that's essentially what the

 2    Attorney General's opposition says is you can go do this

 3    yourself.

 4              THE COURT:  But isn't that always the answer from a

 5    law enforcement entity when they've conducted an investigation?

 6    If you were to subpoena the U.S. Attorney's Office for

 7    everything that they have done in connection with an

 8    investigation, what do you think you would get back?

 9              MS. TRZASKOMA:  Well, Your Honor this is not a law

10    enforcement investigation.  To be clear, the Attorney General's

11    investigation --

12              THE COURT:  One of the privileges they're claiming.

13    Answer my question.

14              MS. TRZASKOMA:  Well, I think that the U.S.

15    Attorney's Office would have all sorts of grand jury secrecy --

16              THE COURT:  Fine, the Kings County D.A., same

17    question?

18              MS. TRZASKOMA:  Or they might have also grand jury

19    secrecy issues that they, you know, are current investigations.

20              THE COURT:  Doesn't the executive law actually

21    include a secrecy provision in 63.8?

22              MS. TRZASKOMA:  It has a confidentiality provision,

23    but it is not -- it is -- it all leads to a public report.

24    That -- so it's confidential while it's going on, but the idea

25    of 63.8 is that it is an investigation into a matter of public

1    concern that is statutorily required to end in a public report.

2          THE COURT:  Do you have any source of authority that

3    specifically states that because of 63.8's differences as

4    compared to traditional law enforcement investigative agencies,

5    such as District Attorney's Office, that the secrecy or law

6    enforcement privileges is different for them?

7          MS. TRZASKOMA:  Well, I don't think it's the same

8    including because --

9          THE COURT:  My question is do you have authority?

10         MS. TRZASKOMA:  I have the statute, Your Honor, which

11   says that the subpoenas that the A.G. can issue pursuant to

12   63.8 are to be issued under the CPLR, the Civil Practice Rules

13   and Laws.

14         So it's not a law enforcement investigation.  It is a

15   particular investigation that is to be conducted pursuant to

16   the CPLR.  It can -- it is done in confidence, but it leads to

17   a public report.

18         THE COURT:  But doesn't -- I mean, I find it

19   fascinating that it actually created a crime to disclose the

20   persons who are interviewed in connection with the

21   investigation.

22         I mean, given that level of protection that the

23   legislature was entrusted in affording persons who are asked to

24   provide information, is there a source of authority to suggest

25   that once it's over, all that information becomes public?

1          MS. TRZASKOMA:  Well, I think the Attorney General's

2     Office has admitted that it becomes public.  And the Attorney

3     General --

4          THE COURT:  Not everything.  They certainly have not

5     admitted that everything becomes public.

6          MS. TRZASKOMA:  No, but they state -- she -- the

7     Attorney General stated her intention that to make it all

8     public.  That she ultimately did not make it public, it is not,

9     you know, that's just selective disclosure.  She could have

10    made everything public.

11         And she said she was going to.  And she -- and then

12    she didn't.  There is no prohibition on disclosure,

13    particularly not in the context of a proceeding like this,

14    where I mean, confidentiality obligations exist all the time

15    and that's why we have protective orders and that's why Your

16    Honor entered one in this case.  And it's why documents could

17    be produced pursuant to protective order.  They may be -- they

18    remain confidential.

19         And you know, Your Honor or another court might

20    determine that all of that information should remain under seal

21    pursuant to a showing, but it's not a basis not to give us the

22    documents.

23         THE COURT:  My question is do you have an authority

24    that differentiates the privileges that may attach?  That's the

25    question.

1          MS. TRZASKOMA:  I don't think there's any case that

2    says that this material needs to be -- or is undiscoverable

3    pursuant to some law enforcement privilege, but I think if you

4    look at the purpose of a law enforcement privilege or the

5    legislative privilege, none of those applies here, where there

6    was not a law enforcement investigation.  That's not what this

7    was.

8          There were -- it was not intended -- the fact that

9    the Attorney General did it was statutorily directed, you know,

10   was directed to do it by the governor.

11         It doesn't create some law enforcement purpose where

12   none existed.  It was -- the purpose of this was not to

13   prosecute individuals, not to investigate crimes.  It was to

14   look into a matter of public concern and issue a public report.

15         THE COURT:  But how does that make it all public?

16         MS. TRZASKOMA:  It doesn't -- it didn't make it

17   public, but it is discoverable.  So we're not saying it should

18   all be made public.

19         What we are saying is that we are entitled to it

20   pursuant to a Rule 45 subpoena.  And there is no case that says

21   these sorts of materials are never to be disclosed.

22         And once we establish relevance and proportionality,

23   which I think at least as to the underlying interview memos,

24   notes of communications with witnesses or their counsel, the

25   documents that were produced pursuant to subpoena, none of

1    that -- I mean, that is -- none of that should be protected.  I

2    don't know what basis there is -- I mean, we can talk through

3    the arguments, the privileges that have been asserted, but no

4    one as far as I know has -- not even the Attorney General has

5    asserted that, you know, because of the structure of 63.8,

6    everything -- you know, nothing can be disclosed.

7              And I don't even know how that would work.  So the

8    Attorney General just had discretion what to make public and

9    what not?  We're not -- I mean, we don't live in the star

10   chamber, right?  This is like -- this is not how this is

11   supposed to work.

12             THE COURT:  But the question, that's why I asked you

13   for authority, because it's very unclear how this is supposed

14   to work.

15             I mean, the statute expressly includes a misdemeanor

16   provision for disclosing the identities of persons who were

17   called to testify, which is fascinating in and of itself in

18   terms of the, you know, need -- the interest that the state

19   legislature evidenced in protecting secrecy of parts of the

20   investigation.

21             So whether they're asserting it or not, my question

22   to you is really about, you know, first, you know, we've gotten

23   far offtrack in terms of establishing arguable relevance and

24   proportionality.

25             I mean, I think that 73-, 74,000 documents, however

1  ever many thousands of documents have been unredacted and have

2  not yet been disclosed is so vast, that it's hard to, you know,

3  understand how you've established relevance as to everything.

4  　　　　MS. TRZASKOMA:  Well, Your Honor, I think it's -- it

5  would -- it's very difficult for us to establish relevance as

6  to everything.

7  　　　　But I think, you know, with what we can go down the

8  list and I'm happy to start -- I know we've drifted from the

9  Judiciary Committee back to the A.G.'s Office, but I -- you

10  know, my view of the statute is that it does not prevent the

11  Attorney General from disclosing information once the report is

12  done and issued.

13  　　　　So it may impose criminal sanctions for interfering

14  with the confidentiality of an investigation while it's

15  ongoing, but once it concludes and it results in a public

16  report, I don't -- there's nothing in the statute that says

17  that it can not be discovered in the course of a subsequent

18  litigation.

19  　　　　THE COURT:  I agree with -- and there's nothing in

20  the statute that says that.  But you know, those are not the

21  Attorney General's arguments as to nondisclosure.

22  　　　　Their arguments are based on law enforcement

23  privilege and deliberative process privilege, which we haven't

24  addressed.

25  　　　　And we had started trying to talk about the AJC, so I

1    understand that in terms of what's available to you, whether

2    it's, you know, the AJC's position or the A.G.'s position is

3    largely driven by what decisions A.G. has made in terms of

4    putting the documents out there.  And I get that.

5            And that's why we're talking about it in terms of the

6    relevance question.  Because I'm trying to understand if there

7    is a universe of documents that can actually be identified with

8    some particularity, that could potentially be, you know,

9    relevant and sufficiently proportional that you actually could

10   get them.

11           MS. TRZASKOMA:  Well --

12           THE COURT:  And saying I need all 72,000 so I can see

13   every step they took sounds a lot like a vast intrusion into

14   the deliberative process privilege.

15           MS. TRZASKOMA:  Well, so I guess we're going back to

16   just -- well, focusing on the Assembly Judiciary Committee for

17   a moment, I don't actually know what the volume of responsive

18   documents to our requests would be.

19           And -- but I think at a minimum, the communications

20   the -- and again, the Judiciary Committee's report is

21   more -- it's broader than the investigation that the A.G. did

22   in terms of subject matter.  There are other subjects covered

23   in that report apart from the allegations that appear in

24   Trooper 1's complaint.

25           So it's not clear to us exactly what the Judiciary

1    Committee did.  You know, we can read the report.  We know that

2    they interviewed Trooper 1 and a couple of others.  So we know

3    that there are interview memos of that.  There are probably

4    communications with counsel.

5         Right, so there are -- there were interviews with

6    Trooper 1, with Lindsey Boylan, Britany Commisso, executive

7    assistant number 2, chamber employee number 2, executive

8    assistant number 3, and an interview with Alyssa McGrath.

9         So we know at a minimum, based on what is in the

10   Judiciary Committee's report, that there are materials that

11   are, you know, just in the heartland of relevance for Trooper

12   1's claims.

13        And I don't know what I don't know.  So, you know, I

14   don't know what else there might be.  I think I'm imagining

15   that there are communications with attorneys for those

16   witnesses.

17        There may be -- some of those may be just about

18   scheduling, but some of them may be substantive in terms of

19   questions.  I don't know.

20        I don't know what documents those folks turned over,

21   if they turned over any additional documents to the Judiciary

22   Committee.

23        So, you know, that would have been a helpful thing to

24   get out of a meet and confer, and we might have ordinarily

25   gotten out of a meet and confer, but we hit roadblocks very

1     early on with both of these subpoenaed parties.

2              And you know, where they are taking extreme positions

3     that they're not turning anything over and they don't have to

4     do anything in compliance with our subpoena basically.

5              I mean, I get the A.G. said I'll give you everything

6     that has Trooper 1's name on it, which turns out to be four

7     documents.  So, you know, it would -- we're -- we can do our

8     best to articulate the specific documents.

9              But again, without you know, I think if there's

10    anything that, you know, any interviews with witnesses that are

11    relevant to any of the allegations in Trooper 1's complaint,

12    that's relevant and it should be turned over.

13             THE COURT:  From the Judiciary Committee's work-

14    product specifically?

15             MS. TRZASKOMA:  From the Judiciary Committee's work-

16    product.

17             THE COURT:  Okay, so you had started with sovereign

18    immunity.  Would you like to go to that?

19             MS. TRZASKOMA:  I would -- I -- not really, but I

20    will.  So you know that study -- so sovereign immunity has been

21    now raised by both the Attorney General and the Judiciary

22    Committee.

23             And the theory is that under the 11th Amendment,

24    state agencies are absolutely immune from federal discovery

25    subpoenas.

 1          I gather from reading the tea leaves that they

 2   thought of this argument after the 5th Circuit rendered its

 3   decision in Russell v. Jones, which happened in September.

 4          Prior to that, nobody had made -- nobody had said to

 5   us the Judiciary Committee or the Attorney General's Office

 6   that they believed that they were immune.

 7          There's no law in this circuit that supports that.

 8   Many -- besides the 5th Circuit, other circuits, who have

 9   considered it, have rejected the idea that states are immune

10   from discovery subpoenas, that state agencies are immune from

11   discovery subpoenas.

12          The one court in the 2nd Circuit to have considered

13   it, the Jackson case, rejected the idea that state sovereign

14   immunity protects state agencies from having to produce

15   documents.

16          And I will say in my experience, I have litigated a

17   number of cases, civil rights cases principally, where we

18   needed documents from a state agency, a New York state agency,

19   and we served subpoenas, and we got those documents.

20          The state -- I mean, it would completely up end these

21   kinds of cases if the state agency could pick and choose when

22   to comply and when not to comply or to do what the Attorney

23   General's Office is trying to do here, which is to say we're

24   immune from subpoena, but we will comply with the subpoena, but

25   only the way we want to comply.  And our decision to comply or

1    not comply or partially comply is not reviewable by any court.

2    We just get to decide whether we -- whether we comply or not.

3            So I don't think there's any law to support, you

4    know, beside the outlier 5th Circuit case.  I think it's not

5    consistent with what I understand, you know, what the cases

6    talk about in terms of the purpose of the 11th Amendment.

7            And that's particularly true in this kind of case

8    where the state, you know, the taxpayer dollars are at issue

9    for all of this and where not responding to our subpoena's

10   actually going to increase the burden on the taxpayer.

11           THE COURT:  Well, it depends.  I mean, if they truly

12   do need to do redact the documents and do various things to

13   prepare them, I mean, we're talking about hundreds and hundreds

14   of hours of attorney work.

15           MS. TRZASKOMA:  Well, so I'm not even -- I'm not sure

16   that they need to redact them, frankly, because my

17   understanding is they were redacting them for public

18   disclosure.

19           Here, we're not -- there's a step in between that.

20   Producing them to us, there's a protective order.  They can

21   produce them to us pursuant to protective order.

22           The documents can be made -- can be designated

23   confidential.  They can be treated confidentially.  And again,

24   they can be, you know, to the extent there's any confidential

25   material in there, any personal identifying information, any

1    particularly sensitive health information, that can all

2    continue to be shielded from the public and you know --

3              THE COURT:  I would think that they would argue, as

4    they have, that they also would like to shield that from the

5    former governor to the extent it is truly private and

6    irrelevant information.

7              MS. TRZASKOMA:  Well, I think that the problem we run

8    into is with what's relevant or not relevant.  And I --

9              THE COURT:  The examples you just gave strike me as

10   important.  You have private sensitive medical information,

11   health information, personal identifying information.

12             MS. TRZASKOMA:  Well, I -- so I think some of that

13   probably is irrelevant, but some of it may be relevant.  I

14   don't know.  I can't give you an example because I don't -- but

15   I can image situations where someone, I don't know, like

16   admitted that they had a drinking problem and that they were

17   drunk everyday they went to work.

18             That would certainly affect the credibility of that

19   witness.  I would consider that to be highly personal,

20   sensitive information, but hugely relevant to the credibility

21   of that particular witness.

22             So I'm not saying there's anything like that out

23   there.  I can't imagine that, but I don't know what I don't

24   know.  And so, you know, I do think we have a problem letting

25   the Attorney General just decide, you know, what is -- I mean,

1    without logging it, without telling us what kind of information

2    it is, it's very -- it's very difficult.

3              MS. GLAVIN:  Your Honor, on the issue of the

4    redactions, you know, if it might be helpful to the Court, on

5    interview memos, what I can say is what we have already seen in

6    interview memos from discovery we got from the Albany County

7    District Attorney's Office.

8              So we got maybe, I don't know, 25 to 30, I think,

9    interview memo -- in that range.  And the redaction of those

10   interview memos are what you see like with an FBI 302.

11             THE COURT:  Uh-huh.

12             MS. GLAVIN:  So what I've seen is they will have at

13   the end of those memos what the investigators did was they

14   would cross reference like, okay, they named this, you know,

15   persons discussed during this.

16             That was like an easy redaction.  It's what you see

17   like in a DEA-6.  So at the bottom, they routinely redacted

18   that information.  There wasn't that much more that I'm

19   remembering being redacted in the memos except maybe the intro

20   part.

21             And these look -- these memos look like an FBI 302,

22   except done by a law firm.

23             THE COURT:  Uh-huh.

24             MS. GLAVIN:  Most of what's in there is factual and I

25   don't think that it is a terrible burden.  If the Court wants,

1    you know, we're happy to give some examples so you can get

2    sense of what that would be.

3           I do think that probably what took the most time,

4    again, I'm not focused on the is Assembly Judiciary Committee,

5    but what the Attorney General released.  My personal opinion is

6    what took the most time for them and these, you know, they said

7    it took five months.

8           I think it was the redacting of the transcripts,

9    because there were decisions made if things were going to be

10   publically released.

11          Like for instance, I know in one witness' testimony,

12   there were three or four whole pages redacted.  Because I think

13   they didn't want that out -- for whatever reason, they didn't

14   want it out publicly.  It was incredibly relevant to some of

15   the arguments I think the Governor would make about why a

16   complainant wasn't reliable.

17          But I think a lot of the time that they spent

18   redacting had to be the redacting of exhibits.  Like they

19   attached some text messages from complainants.  You know, and I

20   think there might have been stuff, you know, interspersed that

21   was personal.

22          But I think for what we're looking for in terms of

23   the transcripts is we are looking for unredacted transcripts,

24   which would be their full testimony.

25          We are looking for in terms of the interview memos,

1    we have 179 witnesses were interviewed, okay.  But of those

2    179, some of them were interviewed multiple times.

3            And it ended up with a transcript at the end.  So

4    they would have an informal interview, and then, there would be

5    transcribed testimony.  We're looking for, you know, all of

6    those interview memos.

7            To my knowledge, I mean, I don't know what -- what we

8    would have loved and I think that Ms. Trzaskoma got at this,

9    was to have a meaningful meet and confer because I think we

10   could have narrowed this down.

11           The problem is we don't know who the 179 witnesses

12   are.  How many troopers did you interview because I see

13   throughout the report interspersed, you see P.S. we talked to

14   other PSU members.  We spoke to other troopers who said X, Y,

15   Z, but we don't know who all those people are.

16           It would have been great to get a chart from the

17   A.G.'s Office to us saying here are the 179.

18           With respect to the 79,000 documents, you and I know,

19   Mr. Andres and I know, I bet a ton of those documents are

20   things like phone records that are toll records that may or may

21   not be meaningful as to who had phone calls when.

22           I bet a lot of the 79,000 documents were emails

23   actually that the executive chamber provided to the A.G.'s

24   Office.  I think they got thousands of emails.

25           If we could sit down, you know, and they would say to

1      us, look, of the 79,000, here are what these 11 complainants

2      provided us.  Here are what witnesses to the following

3      incidents that are referred to in Trooper 1's complaint

4      provided us, you know, all the text messages, et cetera.

5           You know, I'm guessing they probably don't have

6      people's bank records in there, but I think a lot of the

7      $79,000 -- 79,000 documents are emails, you know, various phone

8      records.  I know a lot was provided by the executive chamber.

9           So it's not an issue.  When we say we want

10     everything, our fear was we didn't want do give anything up

11     because we didn't know precisely what they had, but we do know

12     core materials that are relevant that we do absolutely need to

13     be able to defend our client in this.  And all of this can be

14     covered by protective order.

15          With respect to the Assembly Judiciary Committee in

16     terms of like the materials, I can just tell from reading from

17     the report, I mean Your Honor can take a look at pages -- I

18     mean, just look at the footnotes.

19          You know, I was focused like on, you know, the

20     Trooper 1 Davis Polk interview, it's cited dozens of times in

21     the footnotes.  Look at footnotes 46 to 49 and then 93 to 120.

22     See how many times her interview with Davis Polk is cited in

23     reliance on the report.

24          I can also see in the footnotes, you know, other

25     interviews that Ms. Trzaskoma just mentioned.  If all the

1    Assembly Judiciary Committee did was a handful of interviews

2    that are cited in the report, and they didn't gather documents

3    beyond that, other than what they got from the A.G.'s Office,

4    then it's a pretty narrow universe that we're talking about

5    here.

6         We just don't know that.  And we would have liked to

7    have narrowed that down, but my guess is that the Assembly

8    Judiciary Committee largely took what they got from the A.G.'s

9    Office, did some extra stuff, and then wrote the report.

10        One thing also I'd like Your Honor to focus on with

11   Assembly Judiciary Committee in terms of narrowing it down,

12   look at page 16 of the Assembly Judiciary Committee's report

13   because this is what sort of we're interested in.

14        What the report said is quote after interviews with

15   relevant witnesses and the independent review of tens of

16   thousands of documents, including emails, text messages,

17   Blackberry pin messages, photographs, recordings of phone calls

18   social media accounts, materials from prior litigation, video

19   records, interview memos, deposition transcripts, and other

20   relevant materials, we find, you know, blah, blah, blah, that

21   the Government engaged in harassment.

22        Those are the materials that Davis Polk and the

23   Assembly Judiciary Committee deem to be core to their

24   conclusions.

25        That's the stuff we want, too.  And who are the

1    people that they did the interviews with?  We know there's a

2    handful, but did they just simply get what the A.G.'s Office

3    provided?  So that's what we're looking for and we would have

4    loved to have narrowed it down.  And that was our goal.

5              THE COURT:  Okay, so I've heard your argument on the

6    sovereign immunity, but I'm not sure who's handling on your

7    side the question of the legislative privilege or if we want to

8    give Mr. Andres a turn and then you can respond to his

9    legislative privilege argument?

10             MS. TRZASKOMA:  Well, I think -- you know, if we've

11   satisfied Your Honor, that we're you know, A, what we're

12   seeking are relevant materials, and B, that we -- you know that

13   we -- we've been willing to narrow the requests, you know, once

14   we have an understanding of what it is that exists, I'm happy

15   to let Mr. Andres and Mr. Amer articulate their, you know,

16   theories of why they should not have to produce anything.

17             THE COURT:  Well, I mean I just -- just like -- as

18   you have already alluded to, Ms. Trzaskoma, it's difficult for

19   the Court in every one of these discovery disputes, and this is

20   no exception, to you know make a finding or a ruling based on a

21   body of documents that I haven't seen.

22             And so, these are always very tricky inquiries.  And

23   so, you know, part of why I was asking you for more precision

24   in your requests is because it does seem extremely vast and

25   broad.  And I can imagine a subset of documents that would be

1    highly relevant to the case.

2            But you know, every single email with counsel for

3    every single witness is beyond the pale.  I mean, there's no

4    way you need scheduling emails and it's a huge of waste of

5    everybody time.  So, you know, to even look for them.

6            So, you know, there's certainly categories of things

7    that aren't relevant in your requests.  And because there are

8    things within your categories of requests that aren't relevant,

9    it's hard for me to suss out what would be relevant and then to

10   evaluate the applicable privileges as to those specific

11   subcategories.

12           MS. TRZASKOMA:  Well, just to, again, go back to our

13   requests were broad, again, because we don't know what, you

14   know, what exactly is out there.

15           But we have an idea that there might be relevant,

16   helpful documents in those categories, broad categories of

17   information.

18           If something if truly irrelevant, scheduling, bank

19   records, you know, I don't know what is truly irrelevant, but

20   if it's irrelevant, that's not what we're asking for.  We're

21   asking for --

22           THE COURT:  But you did that -- and that's the motion

23   that I'm being asked to rule on.

24           MS. TRZASKOMA:  Well, Your Honor, we did ask for

25   documents that relate to the claims that have been made.  And I

1    think it may be that we asked for some -- the categories have

2    both relevant and irrelevant documents.  It doesn't mean that

3    we didn't serve a subpoena that asked for relevant documents.

4           It calls -- these subpoenas call for the production

5    of relevant documents.  And you know, again, there -- it's not

6    like in any category, you can just say that whole category is

7    irrelevant.

8           There -- we crafted those requests to capture the

9    relevant information and if there are substantive

10   communications between the investigators and witnesses or their

11   counsel, those would fall into those, you know, the

12   communications that we've requested.

13          THE COURT:  I understand your argument.

14          MS. TRZASKOMA:  Yeah.

15          THE COURT:  I understand.

16          Mr. Andres, you've been very patient.

17          MR. ANDRES:  Which is not my strong suit, Judge.  So

18   thank you.  So just a few things.  And I'll try to be brief.

19   There's obviously been significant briefing here.

20          I'm going to talk about the -- among the basis that

21   we think that you should quash the subpoena and grant

22   the -- grant that motion whether it's the 11th Amendment, the

23   legislative privilege, and if you need to get there, the

24   attorney-client privilege.

25          But let me just, if I could have a minute to step

1    back and talk about some facts, which I think Mr. Cuomo has

2    simply misstated.

3         First, the underlying lawsuit by Trooper 1 is not

4    about the Judiciary Committee's report.  That report's not

5    going to be admitted as evidence in this trial.  It's hearsay.

6    It's cited once in her complaint.  In one paragraph, it's

7    cited.

8         What's going to happen in this case is what happens

9    in every case.  There is going to be party discovery and other

10   third-party discovery that doesn't upset sovereign immunity or

11   legislative privilege or the attorney-client privilege.

12        There are going to be witness lists and depositions.

13   And presumably Trooper 1 and maybe even Mr. Cuomo will be

14   deposed and questions about what happened in the Governor's

15   conduct will be determined.

16        This is not a case about the Judiciary Committee's

17   report.  And I would argue that it's not relevant.

18        Now, again, Mr. Cuomo contends that the amended

19   complaint is quote unquote based on the Judiciary Report and

20   that's false.

21        There's a reference to the report in the amended

22   complaint.  Mr. Cuomo says the Trooper 1 lawsuit relies heavily

23   on the AGC report.  That's not true.

24        It says that the AGC -- AJC or the Judiciary

25   Committee report is at the heart of the litigation.  That's not

1    true.

2         Mr. Cuomo's actions are at the heart of the

3    litigation, certainly something that he's aware of.

4         Mr. Cuomo goes so far as to accuse the Judiciary

5    Committee of launching a public grenade that triggered Trooper

6    1's lawsuit.

7         Now that is, stepping back, sort of amazing in

8    attempt to re-write history that somehow the Judiciary

9    Committee in exercising its constitutional obligations to

10   investigate the possible impeachment of the Governor somehow

11   triggered Trooper 1's lawsuit here.

12        And, again, Mr. Cuomo says that the Judiciary

13   Committee deliberately invited its own participation in

14   litigation, all of which is patently false.

15        The third fact that I just wanted to highlight is

16   that throughout Mr. Cuomo's briefing, he says that the purpose

17   of the investigation was simply to publish a report.

18        And that also is not true.  The Speaker mandated that

19   there be an impeachment investigation, which continued after

20   Mr. Cuomo's resignation because the issue about whether an

21   official could be impeached after he left office whether Mr.

22   Cuomo or former President Trump is one that's not decided

23   necessarily.

24        There's only been one impeachment of a governor in

25   the state of New York.  So, after Mr. Cuomo resigned, there was

1    certainly a need to continue to investigate that issue

2    notwithstanding the fact that there's also been legislation and

3    the like.

4              And then lastly --

5              THE COURT:  Can I ask you a question about that

6    point?

7              MR. ANDRES:  Sure.

8              THE COURT:  So, you know, what evidence or

9    information is the Court even permitted to consider to evaluate

10   whether or not something falls within the legislative sphere?

11             MR. ANDRES:  Well, if you get through the first quote

12   unquote roadblock of sovereign immunity, yes, I think Your

13   Honor could end this case very quickly relying on sovereign

14   immunity.

15             But turning to a legislative privilege, you know,

16   arguably that privilege is absolute, right?  Arguably, after

17   the NRP case, it's absolute.  And the Court shouldn't look in

18   or need to look into that.

19             Here, there's really no question that impeachment is

20   a core legislative function that the Speaker directed the

21   Judiciary Committee to engage in an impeachment inquiry.

22             Beyond that, there's the oversight of the executive,

23   that the legislature's also charged with doing.

24             And lastly, there's actually been legislation.  So

25   there's been legislation, there's been discussion of

1    constitutional amendments.

2           I think the Schiff case, where Judicial Watch tried

3    to get, I think, the subpoenas relating to the impeachment

4    investigation by the House of Representatives is a good

5    precedent.  We're not talking about anything other than what is

6    core legislative functions here by the Judiciary Committee.

7           THE COURT:  But how am I even supposed to make a

8    determination?  Like what -- I'm literally asking like what

9    body of information or evidence can the Court even look to, to

10   decide what the legislature was up to?

11          I mean, they've -- people have submitted public

12   speeches.  People have submitted newspaper articles.  You know,

13   what is the body of information that I can look to decide

14   whether or not something is legislative activity?

15          MR. ANDRES:  Well, I think for starters and maybe for

16   starters and the end of the inquiry is that you look at the

17   Speaker's mandate.

18          The Speaker mandated the Judiciary Committee to

19   engage in an impeachment investigation.  And then, to continue

20   it after the Governor's resignation.  That is the end of the

21   inquiry.

22          This is a legislative function.  And again, you know,

23   courts have held that that is the some cases absolute.

24          To the extent that there -- to the extent that it's

25   not absolute, which we don't agree with, you know, the Court

1    would then turn to the Rodriguez factors, which I think

2    overwhelmingly -- a review of those factors establish that no

3    disclosure is appropriate here, right?  Those factors include

4    whether it's relevant.  We've talked about that.

5            The Governor himself had said that -- in a sworn

6    affidavit, the Governor has said that the entirety of the -- of

7    Trooper 1's complaint is based on the Attorney General's

8    report, A.

9            And B, for the reasons I've said, the Judiciary

10   Committee's conclusions and the findings are not relevant for

11   this investigation.

12           The second factor in the Rodriguez analysis, I

13   believe, is whether or not you can get this material from other

14   sources.

15           Obviously, the legislature issued subpoenas and

16   obtained information from other sources, the same way that Mr.

17   Cuomo can from the state police or other entities that aren't

18   subject to the legislative privilege.  And certainly they can

19   pursue those.  So the second factor whether or not there are

20   other available sources is relevant.

21           The third factor, whether this case is serious or

22   extraordinary, of course, it's a federal case and we know

23   federal cases are serious.

24           And obviously, not to dis -- to suggest that the

25   Governor's treatment or alleged treatment of Trooper 1 was not

1    serious, but this not an extraordinary case that has public

2    harm.

3              It's not a case about redistricting.  Or it's not a

4    case that outside of the parties here, which again I don't mean

5    to minimize, it doesn't fall in the category of an

6    extraordinary case.  So those are the first three factors,

7    which all favor or disfavor disclosure here.

8              The fourth factor is whether the State is involved or

9    is a party, the Governor's a party.  The Government is not

10   categorically a party here.

11             So each of those first four factors favor the Court

12   not disclosing any of the material that's subject to the

13   legislative privilege.

14             The fifth factor, which by the way, doesn't matter if

15   you find that the first four factors weigh in favor of

16   nondisclosure, the fifth factor relates to the chilling effect

17   that might occur based on disclosure.

18             And there can be no question that an impeachment

19   investigation here of the Governor, that invading legislative

20   privilege to a lawsuit would prejudice a legislature's ability

21   to gain testimony from relevant witnesses.

22             So, again, Judge, our view is this is core

23   legislative activity.  The Speaker's mandate is enough for the

24   Court to rule that this is core legislative activity.

25             Obviously, impeachment is something that's -- is a

1    duty of the Assembly.  So it ends there.  We believe that the

2    privilege is absolute.  And even if it isn't and you go to the

3    Rodriguez factors, we win there, too.

4           So that is the issue with respect to legislative

5    privilege.  And whether or not Mr. Cuomo somehow threads the

6    needle that there's a difference between legislative immunity

7    and legislative privilege is really of no moment here because

8    the cases that refer to one also refer to the other and both

9    are -- basically come from the speech and debate clause.

10          So there's really no meaningful difference here

11   whether you're talking about legislative immunity about whether

12   or not somebody can be sued or legislative privilege in terms

13   of what you can hold back in terms of documents because they

14   merge.

15          If I could just take one more moment and address the

16   issue of sovereign immunity?  Because again, I think, Your

17   Honor, what's been viewed as either an extreme position by Mr.

18   Cuomo's counsel or a quote unquote roadblock is longstanding

19   Supreme Court precedent with respect to New York sovereign

20   immunity, which in effect bars the subpoena for Mr. Cuomo.

21          So the Dugan case, Dugan v. Rank, the Supreme Court's

22   decision is not new to anybody.  It was decided in 1963.  And

23   it holds that sovereign immunity bars any action in which a

24   judgment would expend itself on the public treasury or domain

25   or interfere with the public administration or if the effect of

1  the judgment would be to restrain the government from acting or

2  to compel it to act.

3          Judge, if you look at the last five words of that

4  Supreme Court precedent, that the State of New York can't be

5  compelled to act, we're talking about a case in which Mr. Cuomo

6  is seeking to compel them to comply with the subpoena.  So that

7  case is not new.

8          And to the extent that sovereign immunity wasn't

9  raised in the meet and confer or previously, it's

10  jurisdictional.  And it can be raised at any point.  So the

11  Dugan case is step 1 in the analysis.

12          THE COURT:  But it certainly can't be your argument

13  that New York can never be compelled to act.  And the ex parte

14  Young doctrine, for example, makes clear that individual

15  officers of the state and folks working on behalf of the state

16  can be compelled to act in an injunctive capacity.  Isn't this

17  more analogous to some sort of prospective relief of a kind

18  anticipated by ex parte Young and less about compelling the

19  state to do something different?

20          MR. ANDRES:  No, I think there are whole number of

21  areas where the State has waived sovereign immunity.

22          And counsel talked about civil rights cases.  That's

23  a good example.  If there are constitutional issues, there are

24  certainly instances where the State has waived affirmatively

25  their sovereign immunity, but this is not that case.

1           THE COURT:  Well, what about, I don't know if you

2    read this one, the Arista Records case, involving Virginia

3    Technical University?

4           So in that case, Arista Records tried to seek

5    information from Virginia Technical University about basically

6    who was, you know, infringing on their IP rights, who was using

7    which IP addresses when to download music, right?

8           And Virginia Tech is like, no, you know, sovereign

9    immunity, we're a state institution.

10           SUNY institutions and all agencies of New York State

11    would not be subject to private lawsuit for any information

12    under your theory?

13           MR. ANDRES:  I'm not suggesting that, Judge, because

14    there are instances where whether it's the -- I think

15    the -- Mr. Cuomo cites a case relating to the New York Pension

16    Board and there are a series of cases involving the D.A.

17    so -- or D.A.s.  So sovereign immunity doesn't always -- isn't

18    always applicable.

19           But certainly in this case, with respect to the New

20    York State Assembly, I think it is applicable.  And if you look

21    the G.E. case, which is stage 2, the G.E. case is a 2nd Circuit

22    case that basically precludes the enforcement of a subpoena

23    against the federal government.

24           So in the first instance, you'd have the Dugan

25    standard.  And then, you have the G.E. case.  And basically

1   holds at the end of the day, that the State can neither be sued

2   nor can be compelled to produce documents pursuant to the Dugan

3   standard, which again, has been applied by various courts and

4   is not new.

5        Mr. Cuomo wants to you believe that there is no case

6   that holds that the New York State Assembly isn't subject to a

7   federal subpoena.

8        The truth of the matter is that the application of

9   the precedent that we've cited in Dugan and G.E. in a case

10  called MBTE, the natural application of those precedent leads

11  to that conclusion.

12       And notably, there's no case on the other side

13  either.  There's no case that says that a private plaintiff is

14  entitled to the relief of compelling the production of a

15  subpoena by assembly.

16       THE COURT:  But I mean, not in this circuit

17  potentially, but the 8th Circuit, the 7th Circuit, the 1st

18  Circuit, you know, the other circuits have recognized that

19  private subpoenas may be enforceable against state entities.

20       I mean, what is the outer limit because, you know,

21  the distinction that you're drawing with between D.A's offices

22  or D.A.'s officer weird creatures, right?  They're both

23  statutory and they're also local authorities.  And so, the

24  D.A.'s offices are kind of in their own category.

25       But you know, would SUNY institutions not be subject

1    to suit if somebody needed information from an institution with

2    regard to a private lawsuit?

3              Would, you know, what would be the outer limit?  Is

4    your argument because they are a core governmental entity, that

5    that they are -- that they get some sort of extra sovereign

6    immunity or would this apply to every agency in New York State?

7              MR. ANDRES:  Well, Judge, respectfully, I'm not

8    representing SUNY or any of the -- or the D.A.'s offices.  I

9    will say that the cases that Mr. Cuomo cites relating to the

10   D.A.'s offices are not state officials.  And so, sovereign

11   immunity didn't apply there.

12             In fact, all of the cases they cite don't relate to

13   sovereign immunity.  It wasn't raised in those cases.  So

14   again, I'm not --

15             THE COURT:  But the rule you're advancing is broad.

16   And I'm trying to understand the outer limit.

17             MR. ANDRES:  Yeah, the rule that I'm advancing as it

18   relates to the New York State Assembly depends on the Court's

19   ability to require the New York State Assembly to compel it to

20   respond.

21             And that's, I think, the essence of sovereign

22   immunity that the federal court cannot be commanding the State

23   of New York to act in the way that it's being asked to with

24   respect to the subpoena.

25             THE COURT:  As a branch of government, is the

1    legislature differently situated from your friends at the end

2    of the table from the A.G.'s Office?

3          MR. ANDRES:  I think, Your Honor, in the briefing,

4    and again, I don't -- I'm not sure this is relevant to us.  So

5    I'm happy to yield, but I think there are some arguments in the

6    briefing that differs as it relates to an argument from Mr.

7    Cuomo about whether sovereign immunity has been waived by the

8    Attorney General's Office.  And I'll certainly yield to that.

9          But as it relates to the Judiciary Committee, they

10   have not waived sovereign immunity.  They have absolutely not

11   waived sovereign immunity.

12         In fact, it's not clear that the New York State

13   Assembly has the ability to even waive sovereign immunity

14   itself because the State has to expressly waive it.  And

15   obviously, the Judiciary Committee or the Assembly is only one

16   part of the government of the State of New York.

17         But as it relates to the New York State Assembly and

18   the Judiciary Committee, we have not waived sovereign immunity.

19         THE COURT:  Are agencies different from branches of

20   government --

21         MR. ANDRES:  Your Honor, could I just have --

22         THE COURT:  -- for purposes of this question?

23      (Counsel confer)

24         MR. ANDRES:  I'm sorry, Your Honor.

25         THE COURT:  Are agencies different from branches of

1  government on the sovereign immunity question?  Because in the

2  Russell case, you're dealing with the judicial branch and

3  officers of the judicial branch arguably.  There's one way to

4  cabin that case.  But would the -- are you in different

5  situation than SUNY and the A.G.'s Office?

6          MR. ANDRES:  Again, I --

7          THE COURT:  Not throwing your friends under the bus.

8          MR. ANDRES:  No, no, no.

9          THE COURT:  They get it.

10          MR. ANDRES:  Look.

11          THE COURT:  This is oral argument.

12          MR. ANDRES:  I think that as it relates to the

13  legislature to have a court either compel the New York State

14  Assembly to act, it sort of goes to the core of what sovereign

15  immunity is.

16          Not just from the 11th Amendment, but before the Bill

17  of Rights.  It's sort of an -- it's sort of crucial to our

18  organization of our states and our government.

19          So, my argument, again, as to the New York State

20  Assembly is that the Court cannot compel it to respond to the

21  Governor's subpoena.

22          THE COURT:  Okay.  Is there anything else you'd like

23  to add before I hear them respond?

24          MR. ANDRES:  I would just say, Your Honor, and just

25  to -- so you can finish me off, the third obviously quote

1      unquote wall or roadblock is the attorney-client privilege.

2             And there's been briefing about the fact that somehow

3      the publication of the Judiciary Committee's report waives the

4      privilege, but the Van Bulow (phonetic) case holds fairly

5      clearly in the 2nd Circuit that in the absence of using that

6      document as a sword if you will or in litigation, that absent

7      doing that, that there is in fact no waiver of the attorney-

8      client privilege.

9             And so, because the Judiciary Committee hasn't used

10     that document to its advantage in some litigation, there hasn't

11     been a waiver.

12            There's obviously also been quite a bit of

13     argument  -- I -- it seems like and I'm exaggerating here, but

14     the -- but Mr. Cuomo cites at least 150 times the fact that the

15     Judiciary report has been made public is somehow a waiver of

16     the legislative privilege and that too is wrong as a matter of

17     law because confidentiality is not an aspect of the legislative

18     privilege.

19            Obviously, legislatures, and we want them to act in

20     the public.  And when they publish a document, it doesn't make

21     it somehow there's no waiver and that's consistent with the

22     Favors case that's cited as well by the -- by Mr. Cuomo.

23            The fact that there's been a publication and nobody

24     should be surprised by that by the legislature clearly doesn't

25     waive the legislative privilege.

1          If I could just have one moment, I'm sure somebody

2     will tell me I got something wrong.  So, Judge, just --

3          (Counsel confer)

4          MR. ANDRES:  Yeah, just as to the Younger case that

5     you mentioned, I think that deals with individuals as opposed

6     to an institution might be the judiciary.

7          But with that, Judge, thank you for your time.  I'm

8     happy to -- again, to answer any questions.

9          THE COURT:  One more question.  In evaluating, you

10    know, what is kind of core -- back to a question about core

11    legislative function, in the Doe v. McMillan case, the Supreme

12    Court observed that members of Congress may frequently be in

13    touch with and seek to influence the executive branch of

14    government, that this conduct though generally done is not

15    protected legislative activity.

16         To what extent, you know, and this I think is one of

17    the questions that goes back to not really knowing what's in

18    the documents, to the extent that they are seeking documents

19    relating to your correspondence with the A.G.'s Office, any

20    correspondence the AJC may have had with other entities, would

21    those communications be legislatively protected activity or is

22    there some other basis of which you're arguing they should not

23    be disclosed?

24         MR. ANDRES:  So, let me take that.  I'm not familiar

25    with that case, Your Honor, but in terms of -- if the question

1    relates to information that the Judiciary Committee shared with

2    law enforcement about the sexual harassment issues or any of

3    the issues, obviously, sexual harassment was one of but four

4    different areas that we explored in terms of the impeachment

5    investigation.

6           But to the extent that they were sharing with law

7    enforcement, again, that was pursuant to the direct mandate of

8    the Speaker of the Assembly, who you know, ordered the

9    Committee or mandated that the Committee that it share and

10   cooperate with law enforcement.

11          So from a -- from that standpoint, again, I think it

12   would be a legislative function to be sharing that information

13   with law enforcement and coordinating with respect to that

14   work.

15          THE COURT:  Okay, thank you.

16          Ms. Trzaskoma, you have a lot to respond to and I

17   promise you we'll get to the A.G.'s Office.

18          MS. TRZASKOMA:  Yeah, I appreciate the opportunity to

19   address these arguments.

20          THE COURT:  They are different.

21          MS. TRZASKOMA:  I mean --

22          THE COURT:  The privileges being asserted are

23   somewhat different.

24          MS. TRZASKOMA:  They are somewhat different, although

25   they overlap.  So just looking at Your Honor's question about

1    what you're supposed to look at to tell you whether what was

2    going on here was some -- was part of legislative function or

3    not, Mr. Andres said look at the mandate from the Speaker.

4    Well, I'm looking at the mandate from the Speaker dated August

5    13th, 2021, which is Exhibit 9, to I believe my declaration.

6         And the Speaker says the Assembly will suspend its

7    impeachment investigation.  There are two reasons for this.

8         And then, the Speaker goes on to explain why the

9    impeachment investigation has ended as of August 13th.

10        He -- the Speaker directed the Chair to turn over the

11   relevant investigatory materials to -- and all of the evidence

12   that the Committee gathered, to turn that over.  There's no

13   effort to keep it, you know, in the legislature and to keep it

14   confidential.  Instead, there's a mandate to turn it over and

15   not keep it confidential.

16        And then, there's a second mandate, which is on

17   August 16th.  I don't know about the inner workings, what led

18   to this, but the Assembly Judiciary Committee is now going to

19   continue to review evidence and issue a final report on its

20   investigation of Governor Cuomo.

21        No mention of any, you know, impeachment activities.

22   It -- the purpose is very clearly now to continue an

23   investigation for the purposes of issuing a public report.

24        THE COURT:  But don't the Empecco (phonetic) and

25   Chang cases that rely expressly on Doe v. McMillan acknowledge

1    that the preparation and publication of a report are

2    legislative activity and that doesn't waive any legislative

3    privilege?

4                MS. TRZASKOMA:  It depends what the purpose of the

5    investigation is.  I mean, that's the Favors case, which --

6                THE COURT:  Does it?  Because the source of the

7    authority is legislative authority.  There's no other basis for

8    them to issue a subpoena.

9                MS. TRZASKOMA:  It's legislative authority, but if

10   the purpose of that legislative action is not -- is

11   that -- exercise of legislative authority is not for the

12   purpose of legislating, but is for the purpose of, you know, as

13   Your Honor said influencing the executive, influencing the

14   public, communicating to the public, I mean, that was what this

15   report was was --

16               THE COURT:  But how would I ever that make that

17   finding?  And that goes back to my question of what information

18   I could rely upon.  Do I have to get Hasty and Debecks

19   (phonetic) and ask them questions?

20               And then ask all the other members of the Judiciary

21   Committee?  Because that would be an intrusion.  That would be

22   totally inappropriate.

23               MS. TRZASKOMA:  Well, Your Honor, they bear the

24   burden.  The Judiciary bears the burden.  It's a high burden to

25   show that the legislative privilege attaches.  And under these

 1   circumstances, they should have.  I mean, there could be --

 2          THE COURT:  But you haven't answered the question

 3   about Empecco and Chang.  And which again, rely on the Doe v.

 4   McMillan case, where this D.C. circuit, which has the most

 5   occasion I would posit to pass upon questions of, you know,

 6   attempts to get at materials that are being generated by

 7   committees, both of -- all of those cases hold unequivocally

 8   the preparation and publication of a report is part of a core

 9   legislative function and is within the sphere of legislative

10   activity.

11          There -- nobody says it has to result in legislation.

12   Do you have cases that specifically state that it has to result

13   in legislation?

14          MS. TRZASKOMA:  It does have to be part of the

15   legislate -- like there has to -- I mean, the purpose of the

16   legislative immunity, and I want to be clear that what -- that

17   the legislative immunity is to protect the inner discussions

18   and contemplations of the legislators, who are making

19   decisions.

20          And if this had been -- had continued through an

21   impeachment investigation, I think we would be very differently

22   situated.

23          But what happened here is up until the Governor's

24   resignation, there's an impeachment.  There is consideration of

25   impeachment.  That is one of the purposes of the investigation.

1          But once it's no longer an impeachment investigation

2     and the legislature changes its approach and its purpose, I

3     mean, I think purpose is central to this question of why in

4     those cases the D.C. Circuit held that that's core legislative

5     material.  It's because those reports were prepared in

6     connection with legislative decision-making.

7          THE COURT:  That was the Chang -- in the Chang case,

8     the report concerning the metropolitan police.  How was

9     that -- how does that fit with your argument?

10          MS. TRZASKOMA:  I have to look back at the Chang

11     case.

12          MS. GLAVIN:  Your Honor, if I might have a moment?

13          THE COURT:  Sure.  Citing the Empecco case, the Chang

14     case stated we today decline to command the disclosure of

15     information to test the accuracy of a printed statement,

16     something that Cuomo has expressed interest doing here.

17          As the preparation of the statement for publication,

18     the subcommittee report was part of the legislative process.

19     That is the end of the matter.

20          And in the Chang case, they were investigating

21     conduct of the police officers.  There's no discussion of

22     whether or not it resulted in any type of legislation or any

23     type of action that you would argue is the type of legislative

24     action that would be sufficient to have their privilege

25     continue.

 1          MS. TRZASKOMA:  Well, in that case, Your Honor, they

 2   were considering legislation.  I mean, there's a legislative

 3   investigation.  And there were, you know, it did result in

 4   legislation about that very issue.  So I think that is a

 5   distinguishing fact.

 6          And to the extent in this case the Assembly can point

 7   to some legislation that grew out of its report, I

 8   don't -- it's not related to the issues that we're seeking

 9   discovery in.

10          THE COURT:  But why --

11          MR. ANDRES:  I mean, Judge, we cited to specific

12   legislation that was passed.

13          THE COURT:  No, I'm --

14          MR. ANDRES:  And specific.

15          THE COURT:  -- aware of that.

16          MR. ANDRES:  Thank you.

17          THE COURT:  What about Brown -- okay, here's another

18   one that I found fascinating.  This -- I don't know if anybody

19   read this case, Brown and Williamson Tobacco Corp. v. Williams?

20   Anybody?

21          In that case, a law firm paralegal basically stole a

22   bunch of confidential documents from a tobacco company and gave

23   them to a senator.

24          That senator then went on press, you know, "Meet the

25   Press".  It wasn't "Meet the Press".  That type of show, talked

1    about them, they're on the radio talking about them.

2         And the D.C. Circuit said, no, absolutely not.  You

3    don't get to get these documents out of the senator.  You don't

4    get to intrude on the legislative privilege at all.

5         The fact that he has the documents is -- it's all

6    legislative.  Their own documents trying to get them back and

7    the D.C. Circuit said no.

8         MS. TRZASKOMA:  Well, I do think that that goes -- I

9    mean, I would have to go back and look at Brown.  That didn't

10   make it to the top of my printed out cases, which I tried

11   honestly not to have as many.

12        Yeah, I don't -- I don't even know if we had cited

13   that case, but in any event, I will take a look at it, but I

14   think that all of the cases, and we're happy to do supplemental

15   briefing on the legislative privilege issue, all of those cases

16   where the court finds legislative privilege is looking at what

17   is it going on in that senator's thinking?  What is

18   that -- your -- the --

19        THE COURT:  No, the point is not to go into what the

20   senator's thinking.

21        MS. TRZASKOMA:  No, exactly, it's to protect, it's to

22   protect that process.  Asking for the materials underlying the

23   public report is not asking for what was going on in any

24   legislator's mind.

25        THE COURT:  But that's not what you asked for.  You

1   asked for everything.  As you conceded at the outset of the

2   argument.

3           And so, everything.  Evidence is evolution of the

4   thought process of the various people involved in the

5   investigation.

6           You could evidence how investigators were linking

7   pieces of information to one another as the investigation

8   unfolded.

9           You did not just ask for interview reports for the

10  following 11 people.  That is that not what your subpoena says.

11          And that goes back to the original questions of

12  relevance and proportionality, but also, I think goes very far

13  into the questions that are relevant to deliberative process

14  and the legislative privilege.

15          MS. TRZASKOMA:  I don't think, Your Honor, that we

16  asked for -- I mean, we did not intend to ask for any documents

17  concerning what legislators were doing or commenting or we did

18  not seek those communications so.

19          THE COURT:  Even just following the trail of what

20  order the subpoenas were issued in can evince deliberative

21  process and legislative intent.  And there is ample case law

22  that discusses that in the legislative immunity context.

23          MS. TRZASKOMA:  Well, I don't agree that the outside

24  investigators have.  And you know, I don't think that that

25  is  -- evidences the -- any kind of legislative thought, but I

1    understand Your Honor's disagrees with that.

2              THE COURT:  It did in Chang.  I mean, Chang was a

3    professor tasked to do this investigation on behalf of the

4    special subcommittee.

5              MS. TRZASKOMA:  Well, but again, the -- I think that

6    there's a difference between the investigation that was

7    conducted in Chan (sic), which was to inform future legislation

8    and what we have here.

9              And I understand again that they have cited to

10   legislation that they believe came out of this, but I don't

11   think that was -- the purpose of this investigation was started

12   out as impeachment.

13             Didn't start out as what is going on with the police

14   department and what kind of legislative action can we take to

15   deal with it.

16             That's not what the sexual harassment investigation

17   into Governor Cuomo was doing.  It was simply -- it started off

18   as an impeachment, potential impeachment, and then, stopped

19   once the Governor resigned.  And then its sole purpose was to

20   issue a public report.  That's what it was.

21             THE COURT:  But isn't that part of the legislative

22   function to conduct oversight investigations and inform the

23   public?  How is that not legislative activity?

24             MS. TRZASKOMA:  Well, it's not legislative in the

25   sense of needing, you know, again, going back to the purpose of

1    the legislative privilege, which --

2            THE COURT:  But (indiscernible) the Judiciary to

3    define what the legislative -- what the speech and debate

4    clause like encompasses.

5            We are -- the Judiciary's certainly not in a position

6    to tell the legislature, you know, this -- what you did on the

7    floor in this instance doesn't count.

8            MS. TRZASKOMA:  But there are cases that say that

9    like Favors.

10           THE COURT:  Not on the floor.  There cases that say

11   that where -- if you can find the case law on the floor, I'd be

12   fascinated to read it, but the cases that I have seen public

13   speeches, constituent services, things wholly outside the

14   chamber.

15           But do you have a single case where it is something

16   happening within a committee or on the floor where they said

17   that's not legitimate legislative sphere activity?

18           MS. TRZASKOMA:  I think in Favors that was -- it was

19   a publically released report in Favors.  I mean, that was the

20   case that went against Governor, you know, Governor Cuomo's

21   position and the Attorney General's position at that time.

22           But it was a report, the New York State Legislative

23   Task Force.  So it -- it is the case that the Assembly

24   Judiciary Committee bears the burden to show why the

25   legislative privilege attaches here.

1    And I think that what we've heard is listen or read

2    the Speaker's mandate.  That tells you why this was legislative

3    in nature.

4    And I don't think it -- they can use that because of

5    the subsequent statements that transform -- that acknowledged

6    that it was no longer serving that legislative

7    privilege -- function.  So I don't think they've met their

8    burden.

9    THE COURT:  So is it your argument that the entire

10   investigation was like somehow *ultra vires*?  Like they were

11   acting outside the scope of the -- as to the legislators?

12   MS. TRZASKOMA:  No, that's not --

13   THE COURT:  Because I mean, that's what the sort of

14   extension of your arguments.

15   MS. TRZASKOMA:  Well, I would urge Your Honor to look

16   at Favors, which involved a legislative report.  And you know,

17   for a lot of reasons, the court ordered that information to be

18   turned over, including under Rodriguez, which leads to me to

19   the Rodriguez factors.  You know, I think even where there is a

20   privilege, it's not -- it can be overcome.

21   I -- Governor Cuomo takes issue with the idea that

22   this is not an important case, a significant case.  It

23   certainly is to him.

24   He is not the only Defendant.  And it's not correct

25   that the State is not involved in this case.  The New York

1    State Police are a Defendant.  The Plaintiff, Trooper 1, has

2    indicated that she intends to bring a claim against the State.

3    So this is very serious.

4        And you know, I think the Rodriguez factors weigh in

5    favor of requiring the disclosure of at a minimum the interview

6    memos and the documents that the Assembly Judiciary collected

7    on top of whatever they got from the Attorney General's Office.

8        And I just want to touch a little bit on, first, the

9    sovereign immunity argument.  Dugan [DOO/GAN], or Duggan

10   [DUG/AN], I'm not sure how you say it, is -- references a

11   judgment.  That is how courts have looked at that case and

12   limited the scope of sovereign immunity.

13       There is no principal line.  The cases do not

14   distinguish between state agencies and core government bodies.

15   The cases say -- they do distinguish as Your Honor as noted

16   between, you know, municipalities and local governments.

17       But in terms of the state for purposes of 11th

18   Amendment, that's a very broad swath of agencies and other

19   government bodies that would be able to claim.

20       And there really is no -- there's no line.

21   There -- it is an absolute immunity.  Russell v. Jones makes

22   clear that it's like either you're immune or you're not.

23   There's no exceptions.  There are no it applies to this body,

24   but not that body.

25       It is -- if Your Honor adopts sovereign immunity,

1     that is a, you know, huge change in the law in this circuit.

2     And it would allow state agency --

3               THE COURT:  I certainly don't think I'd be the last

4     word on that if I were to do that.

5               MS. TRZASKOMA:  Well, Your Honor, would be

6     caught -- setting in motion the huge shift in the law.  General

7     Electric, which is a case that applies to federal agencies and

8     it's not a state sovereign immunity case, is completely

9     different.  And in part, that's because federal agencies are

10    immune, but they can be subpoenaed pursuant to the APA.  So

11    there's a whole regulatory and statutory scheme for federal

12    agencies to be compelled to produce documents.

13              But what the Assembly Judiciary Committee and the

14    Attorney General are proposing is that they have the last word

15    on whether they have to turn anything over pursuant to a

16    subpoena.

17              There's no oversight, no judicial oversight, no

18    regulatory scheme.  There are no standards to guide any

19    agency's discretion as to whether to comply with the subpoena

20    or to turn over documents or not.  They can just willy nilly

21    say yes in this case, no, in that case.

22              They could -- I mean, the opportunities for mischief

23    are really endless.  And particularly in unpopular cases where,

24    you know, the administration or the state agencies might not

25    like a particular litigant, might not want to comply with that

1   particular litigant's Rule 45 subpoena.  And you know, so

2   that's the scenario that they're setting up.

3          With respect to attorney-client privilege, again,

4   it's their -- it's the Judiciary Committee's burden to

5   establish that any of the documents are subject to the

6   attorney-client privilege.

7          Their -- not everything lawyers do is privileged.

8   Not everything lawyers do is work-product.  The attorney-client

9   privilege does not protect the Judiciary Committee's

10  discussions with witnesses.  It does not protect the Judiciary

11  Committee's discussions with lawyers for witnesses.

12         And if the materials are prepared in anticipation of

13  a public report, that's not work-product.  So -- and we don't

14  have a privilege log.

15         So what we have is the Judiciary Committee providing

16  us with the same kind of log that the Attorney General did,

17  which is just very high level information, you know,

18  information about what categories of documents they're

19  withholding.

20         But within those categories, I can think of, you

21  know, most of them.  I can think of lots of documents that

22  would not be subject to an attorney-client privilege, even

23  assuming that Davis Polk was retained as outside counsel to

24  provide legal advice.

25         I mean, that's the -- that's when the attorney-client

1    privilege attaches.  Is there a confidential communication for

2    the purpose of providing legal advice as opposed to conducting

3    an investigation, issuing a public report?

4         It may be that Davis Polk provided advice to the

5    Judiciary Committee about impeachment law, standards, sexual

6    harassment law, I don't know.

7         But it's not obvious to me what the legal

8    advice -- and I didn't see it anywhere in their papers, what

9    legal advice Davis Polk was being asked to render and, sorry,

10   how that -- if there was legal advice being given, how that

11   claim covers every single document in our request.

12        And I would just say -- I would say the same thing

13   with respect to the work-product privilege.  It -- to the

14   extent it ever existed, and you know, maybe impeachment is a

15   litigation, maybe some of this material is prepared in

16   anticipation of that.

17        But at some point, again, that shifted.  The purpose

18   of this material is now to be used for purposes of creating a

19   public report.  That is not the primary purpose of -- it no

20   longer was the primary purpose of creating these materials.

21             THE COURT:  Okay.

22             MR. ANDRES:  Judge, just three things and then I'll

23   --

24             THE COURT:  Yeah.

25             MR. ANDRES:  -- then I'll yield to the A.G., but we

1    beg you to read Favors.

2            THE COURT:  Ms. --

3            MR. ANDRES:  We beg you to read Favors because

4    there --

5            THE COURT:  I've read Favors, but continue.

6            MR. ANDRES:  The fact of a public report did not

7    waive the legislative privilege.  And the one document that was

8    ultimately ruled not within the legislative privilege was ruled

9    to be the equivalent of a press release.  It's nothing like the

10   work -- and we did that.

11           I can assure you that Davis Polk, when it was hired

12   by the Assembly, we're not doctors, we're lawyers.  And we

13   provided legal advice to the Assembly.

14           Lastly, the only way to make new law here, the only

15   way to make new law here is to rule in favor of Mr. Cuomo and

16   violate the General Electric standard, which governs.  And with

17   that, thank you.

18           MS. GLAVIN:  Can we take a short bathroom break?

19           THE COURT:  Yes, we may, Ms. Glavin.  Can we come

20   back in five?  Is that good for everybody?

21           MS. TRZASKOMA:  Yes.

22           THE COURT:  Thank you.

23           MR. AMER:  I will be back for sure.

24           THE COURT:  Yes, please come back.

25       (Recess taken at is 12:32 p.m., recommencing at 12:39

1  p.m.)

2          THE COURT:  We have everybody back?  Yeah, great.

3  Okay, are we back on the record?

4          THE CLERK:  Yes.

5          THE COURT:  Oh, okay, we're back on the record

6  apparently, thank you.  Thank you all for coming back promptly.

7  So we obviously discussed at length, you know, sort of what may

8  or may not exist on the Office of the Attorney General's

9  website.

10          And you know, my questions to Ms. Trzaskoma at the

11  outset with regard to kind of the universe of documents that

12  could be sort of more tailored or potentially relevant to the

13  case.

14          But I wanted to actually start with the Office of the

15  Attorney General by asking, you know, if there's anything other

16  than these four documents, I mean, you guys have met and

17  conferred and discussed it.

18          Is there any sort of group of documents that you are

19  actually willing to produce, what has been produced, just kind

20  of curious about the state of play?

21          MR. AMER:  Sure, so first of all, the -- what we're

22  talking about is four documents.  Those are documents that

23  through a search that we ran actually referred to Trooper 1 by

24  name.  And it actually comprises about 100 to 200 pages of

25  material.  So it's not a small amount.

1           We start from the premise, Your Honor, that you know,

2    the report is not on trial here.  And it shouldn't be on trial

3    here.

4           I wrote down and I believe I got this quote right.

5    Ms. Glavin said at one point that interview memos are relevant

6    to whether the report is reliable.

7           And I think that kind of sheds exactly the light on

8    this attempt to subpoena the investigative material in a proper

9    context.

10          This is all about the Movant's attempt to attack the

11   report and to gather evidence to show whether or not the

12   report's reliable.

13          But the report has nothing to do with the Trooper 1

14   case.  It's not about the report.  The Trooper 1 amended

15   complaint refers to the OAG investigative report in one

16   paragraph, paragraph 4 of the amended complaint.  And nowhere

17   else is there any reference to the report.

18          Now it's true that Trooper 1, who has the same access

19   to the material on the OAG website as everybody else, quotes

20   liberally throughout her complaint to other complainants'

21   testimony that's been published.

22          But that's got nothing to do with the report or the

23   investigation.  And there's no reason why the Movant needs to

24   test or challenge the reliability of the report.

25          The investigation itself, we should all remember,

1     took place months and in some cases years after the conduct

2     that's at issue in the Trooper 1 amended complaint, the conduct

3     that she alleges with respect to the sexual harassment by

4     the -- allegedly by the Movant.

5              The other thing I would mention is that the Movant

6     here knows the name of all of the other 10 complainants.  We

7     know that because during the Movant's interview under oath by

8     the investigators, he was questioned about each of the other

9     complainants and the names were disclosed.

10             And Ms. Glavin was representing the formal governor

11    at that examination.  And if I'm certain of anything, I'm

12    certain that she wrote down the names dutifully on her legal

13    pad when they were disclosed during that questioning.

14             So the basic issue we have here is that we don't see

15    how anything related to the other 10 complainants can possibly

16    be relevant.

17             There's no allegation in the Trooper 1 complaint that

18    is akin to a workplace environment-type discrimination claim.

19    I would also point out that Trooper 12 is alone among all 11

20    complainants in being a trooper, a state trooper.

21             All of the other complainants, none of them are

22    employees of the New York State Police.  They're either current

23    or former employees or former employees rather of the executive

24    chamber or other state agencies, but Trooper 1 is unique in

25    that she is the only state trooper.

 1          And her allegations in the complaint are not about

 2    some sort of hostile work environment, where other complainants

 3    might be relevant under some of the cases we cited.  So --

 4          THE COURT:  You know, just pause on that for a

 5    moment.  I mean, I think it's a little premature as I

 6    mentioned -- you know, for me to be weighing in on whether or

 7    not information regarding some of these other complainants may

 8    or may not come on at trial.  We don't know yet what the 404(b)

 9    practice will look like.  We don't know how people will

10    testify, whether doors will get opened.  You know, it's all a

11    bunch of question marks, right, with regard to how the evidence

12    could shake out at trial?

13          MR. AMER:  And the Movant as a Defendant in the

14    Trooper 1 case has available all the means of discovery that

15    any litigant has.

16          If he wants to depose the other complainants, he

17    knows who they are.  He can depose them.  If he wants to

18    request documents from them, he can do so.

19          But to try and use our investigation as the conduit

20    through which this material should be discoverable is just

21    inappropriate.

22          It's inappropriate because it raises all the

23    privileges that we'll discuss at more length in a minute.  But

24    it's also because it's being used as a pretense, Your Honor, to

25    achieve a purpose that the Movant has, which we've demonstrated

1    in the declarations we've submitted to attack the investigation

2    and to impugn the integrity of both the lawyers who worked on

3    the investigation team, as well as the Attorney General's

4    Office.  And that's not an appropriate purpose for which to

5    subpoena a state agency.  It's just not.

6         Again, they know who the complainants are.  And they

7    have all of the same public information that is cited in the

8    report that Trooper 1 has.

9         And the Movant should be required to use the

10   discovery tools at his disposal as a litigant to the same

11   extent that any litigant can to seek discovery that's relevant.

12   But it, you know, it just makes no sense to allow investigative

13   materials to be subpoenaed for that purpose.

14        THE COURT:  Well, in weighing, you know, sort of the

15   undue burden piece of the analysis that I would need to

16   evaluate both with regard to evaluation of relevance and the

17   motion to quash standard, what do you make of the current

18   situation where the A.G.'s Office has to fund the defense?

19        I mean, your argument is it's going to be less

20   burdensome.  It's more appropriate for him to just go conduct

21   civil discovery like any normal litigant, right?  He's not

22   exactly a normal litigant at this point in light of the ruling

23   that the A.G.'s Office does need to fund the defense.

24        Is there some argument for expediency or efficiency,

25   as Ms. Trzaskoma started with, that would suggest or counsel

1    that this would be more efficient in terms of getting the

2    information that he seeks with regard to those other 10

3    complainants if limited to for example the interview memos?

4         MR. AMER:  So let me say first of all that I disagree

5    that the Governor's not like other litigants just because

6    there's been a POL-17 determination that as a state employee

7    he's entitled to have his defense funded by the taxpayers.

8         I think, you know, in many, if not most instances

9    where state employees are sued, they seek a POL-17

10   determination, and are given a determination that they're

11   entitled to state-funded defense, provided that their conduct

12   falls within the scope of their employment.

13        And that was the key issue that was being litigated

14   in state court.  And the state court judge held it was at least

15   arguably within the scope of his employment.

16        But I don't -- so I don't think that makes him unique

17   in any respect.  And I think that the POL-17 determination that

18   he's entitled to a state-funded defense actually cuts against

19   the Movant's position because it's our view that the Movant is

20   using the subpoena here to obtain material that has nothing to

21   do with his defense in the Trooper 1 action, but rather is for

22   his own personal use in attacking the investigation.

23        So it adds insult to injury in our view to have

24   taxpayers fund his counsel's review of material that actually

25   has absolutely nothing to do with defending the Trooper 1

1    action.

2            So, I think, if anything, the POL-17 determination

3    suggests that this Court should make sure that anything that

4    the taxpayers are going to have to fund by way of attorney

5    time, reviewing material, is definitely relevant to his claims

6    and defenses in that case.

7            THE COURT:  Ms. Trzaskoma has argued and so has Ms.

8    Glavin, you know, that some of the interviews may have been of

9    witnesses, other troopers who may have been around, people who

10   may have seen or heard some of the events or the aftermath of

11   any events.  How are they to identify those folks?

12           MR. AMER:  Well, the same way that any Defendant

13   identifies potential witnesses.  I mean, they actually have the

14   added benefit of the report, but presumably they can seek

15   discovery.

16           There is, I would add, that a Defendant in the case

17   is the State Police.  But they don't need our office's

18   investigative work to shed light on where they should pursue

19   discovery in the case.

20           And they have the name of every complainant.  We

21   will, as we indicated, provide to them the 100 to 200 pages of

22   material where Trooper 1's name is identified.

23           But again, this is not a case that involves a hostile

24   work environment.  So it's unclear to me what the issue would

25   be that would be broader than just Trooper 1's account of what

1    happened to her, the Movant's account of what he did, and

2    whatever records exist within the executive chamber concerning,

3    you know, her assignments to protect him, but all of that is

4    available to the former governor.

5            And like I say, I think in fact the report, you know,

6    points him in all of the directions he needs to go to defend

7    this case.

8            And anything that relates to this desire to attack

9    the investigators is in our view completely off-base and not

10   appropriate.

11           I did want to talk about sovereign immunity, Your

12   Honor.  It is a threshold issue.  And in our view, it's the

13   clearest path for the Court to resolve these motions.

14           We do think that the Court's hands are tied by the

15   2nd Circuit's decisions in the G.E. case and the Glotzer case.

16           In those decisions, the 2nd Circuit said in no

17   uncertain terms that a subpoena served on a government agency

18   is a judicial proceeding that triggers sovereign immunity.  And

19   it did so by invoking the standard under Dugan.

20           And there's just no principal basis to draw any

21   distinction between that ruling, depending on whether the

22   government agency is a state agency or a federal agency or

23   quite frankly as Judge McMann determined in the Catskill

24   Development case, is a tribal party, entitled to tribal

25   immunity.

1          She in that case extended the 2nd Circuit's rationale

2     in G.E. and Glotzer to a subpoena served on a tribe and

3     determined that that triggered -- that was a judicial

4     proceeding that triggered tribal sovereign immunity.

5          And it -- it's true, well, a couple of things to

6     observe.  One is that in all of these cases, the court went on

7     to hold that although sovereign immunity was triggered, there

8     was waiver.  And so at the end of the day, sovereign immunity

9     didn't bar the subpoenas, but that's a separate question.

10          And I think this Court is bound by Glotzer and G.E.

11     to find as an initial matter that the subpoena served on a

12     state official, here the A.G.'s Office, is a judicial

13     proceeding that triggered sovereign immunity.

14          And it is true that other circuits have not applied

15     Dugan in the same way and have determined that unless you have

16     a judgment, it doesn't trigger sovereign immunity.

17          And then maybe that there's a circuit split that the

18     Supreme Court will have to resolve, but we're in the 2nd

19     Circuit.  And the 2nd Circuit law is clear that the subpoena is

20     a judicial proceeding that triggers sovereign immunity.

21          And I don't even think another panel of the 2nd

22     Circuit could ignore that ruling.  And unless and until the 2nd

23     Circuit sits *en banc*, it is the law within this Circuit that a

24     subpoena on a government agency is a judicial proceeding that

25     triggers sovereign immunity.

1          So then you go to the next question, which is has

2     there been waiver of sovereign immunity?  And in General

3     Electric and Glotzer, there was waiver due to the APA.  That

4     statute obviously doesn't apply here.

5          There has been some limited abrogation of New York's

6     sovereign immunity through the Freedom of Information Law.

7          So there is a procedure under FOIL for any member of

8     the public to seek agency documents.  And I disagree with the

9     notion that the A.G. has the final say because as I'm sure the

10    Court's aware, a FOIL determination is subject to challenge in

11    state court under an Article 78 proceeding.

12         That's the procedure that a party needs to follow if

13    they want to get documents from a nonparty state agency under

14    Glotzer and G.E.

15         And if you can name a state officer as a party, then

16    of -- in an ex parte Young case, then of course, you can seek

17    discovery through the normal federal rules or CPLR if your

18    federal rules if you're in federal court.  I don't think that

19    ex parte Young applies to this situation.

20         THE COURT:  Well, what if the subpoena were issued to

21    Ms. James herself?

22         MR. AMER:  I think Ms. James as a state officer

23    absolutely has sovereign immunity.  And I should point out that

24    it's not --

25         THE COURT:  From injunctive relief?

1          MR. AMER:  Well, that goes to your point about

2     whether she could be named as a Defendant in the case under ex

3     parte Young.

4          THE COURT:  But I mean, in a subpoena.  If they sent

5     a subpoena to her?

6          MR. AMER:  Well, no, if you're talking about whether

7     --

8          THE COURT:  Or the records custodian --

9          MR. AMER:  Yeah, yeah.

10         THE COURT:  -- for the A.G.'s Office, whoever that

11    may be.

12         MR. AMER:  So the question is does sovereign immunity

13    apply?  And I think the answer is yes.  And so, the subpoena

14    would not be enforceable.

15         I think the ex parte Young fiction that allows

16    federal courts to entertain a suit against a state official as

17    a named Defendant doesn't apply here.

18         I mean, that legal fiction is that the state officer

19    is engaging in some ongoing violation of federal law or is

20    acting in some unconstitutional manner, and as a result, is not

21    cloaked with the state office that enjoys the immunity.

22         THE COURT:  Certainly, but the reason that I ask

23    the -- for the analogy is because of the sort of type of relief

24    sought, right, under the ex parte Young sort of injunctive

25    relief, prospective relief.

1          MR. AMER:  Well --

2          THE COURT:  You're thinking about, you know, causing

3    the state to act, which is different than dipping into the

4    State's coffers.

5          MR. AMER:  Well, but it's causing the -- so the ex

6    parte Young doctrine doesn't depend on Dugan or what it is the

7    State's being asked to do.  It's based on the notion that the

8    state official is engaging in an ongoing violation of federal

9    law.

10         Nobody's contending here that the Attorney General's

11   Office is violating some ongoing constitutional or federal law.

12         THE COURT:  Certainly not implying that.

13         MR. AMER:  No, no, so there's no basis to analogize

14   this case or any subpoena situation.

15         If there is a circumstance where the Attorney General

16   can be sued as a named party, and there are circumstances.  And

17   I've been involved in any number of them where the Attorney

18   General has the statutory authority to enforce a law that is

19   being challenged as unconstitutional.

20         And so, the relief being sought is to enjoin the

21   Attorney General from enforcing the law that is being asserted

22   as unconstitutional.

23         That's a classic ex parte Young situation.  There's

24   no sovereign immunity because of ex parte Young.  And those

25   cases go forward.

1          And in those cases, there's no problem with the

2     plaintiff taking discovery of the state agency, whether it's

3     the Attorney General or the Commissioner of DMV, or you know

4     the Tax Commissioner, whoever it is the state official was

5     being named as the Defendant in the case.

6          I mean, I will say that at least for some of the

7     cases that are being cited by the Movant, where you do have a

8     state official, who is named properly under ex parte Young.

9          So, for example, an 8th Amendment case brought by an

10    inmate suing the facility superintendent, who is an employee of

11    DOCS.

12         You know, do you need to subpoena DOCS to get records

13    from Albany if you've got as a Defendant in the case the

14    superintendent of the facility who's an employee of DOCS?  I

15    mean, that's a very different situation.

16         So the fact that an inmate can get records from

17    Albany DOCS without subpoenaing DOCS or if you subpoena DOCS

18    and DOCS is not going to raise its sovereign immunity argument

19    that we're discussing here --

20         THE COURT:  But what if they start?  I mean, that's

21    part of the sort of question, you know, I was posing to Mr.

22    Andres in terms of the scope of where this could go.

23         MR. AMER:  Sure, well, I think again, where you name

24    a state official under ex parte Young, who is a state employee,

25    I think it'd be a -- I don't see the circumstance, where

1     whatever records are relevant to that case wouldn't be

2     produced, because you have as a parting defendant the state

3     official who's properly named and subject to discovery.  I

4     think --

5              THE COURT:  Okay, so how about this?  You have a

6     horrific murder on the highway.  And the state -- you want to

7     subpoena the state troopers and the State of New York for all

8     of their road cameras and surveillance footage or whatever the

9     state troopers may or may or not have related to this incident,

10    but they are not a party.

11             MR. AMER:  And --

12             THE COURT:  Can the New York State Police just say

13    no, no thank you --

14             MR. AMER:  Well --

15             THE COURT:  -- we have sovereign immunity?

16             MR. AMER:  Those type of records are exactly the type

17    of records that are FOIL'd.  And in fact, we've all just

18    recently seen some video excerpts of the former President Trump

19    at his A.G. deposition.  And those were obtained by a news

20    organization submitting an FOIL request to our office.

21             And if the person who submits the FOIL request gets a

22    determination that they don't want like, then they take that to

23    the state court under an Article 78 proceeding.

24             So, in your example, video surveillance footage would

25    be the subject of an FOIL request and that's exactly the

 1     procedure that the legislature envisioned when it abrogated to

 2     the extent that the FOIL law New York's sovereign immunity.

 3              And that's the path that is available.  And I just

 4     don't see any principal basis to distinguish this case from

 5     Glotzer or General Electric with respect to the 2nd Circuit's

 6     initial determination in those cases that a subpoena is a

 7     judicial proceeding.

 8              And it's for that very reason, I would submit, that

 9     the 5th Circuit in the Russell case held that the reasoning of

10     those cases has to be extended to a subpoena against a state

11     official.

12              You know, they looked -- the 5th Circuit looked at

13     the cases that hold a federal subpoena on a federal agency

14     triggered sovereign immunity and a subpoena on a tribe triggers

15     tribal immunity.  And it declined to follow those circuits that

16     held a different standard under Dugan in the 2nd Circuit.

17              THE COURT:  So let me ask you this.  Is your argument

18     more grounded on sort of common law principles of sovereign

19     immunity or the 11th Amendment?

20              MR. AMER:  I'm glad you asked that.  And I want to

21     make this clear.  This is not based on 11th Amendment immunity.

22     This is -- and it's not -- it's based on state's broad

23     sovereign immunity that existed prior to ratification of the

24     Constitution that the Supreme Court has certainly made clear

25     exists independent of 11th Amendment immunity.

1          And you know, I don't see that as being any basis to

2     distinguish the 2nd Circuit decisions, because a judicial

3     subpoena -- a subpoena's either a judicial proceeding or it's

4     not.

5          And if it's a judicial proceeding, then whatever

6     sovereign immunity exists is triggered.  So whether it's

7     federal sovereign immunity, whether it's tribal sovereign

8     immunity, or whether it's state sovereign immunity of the type

9     we're talking about, which is the pre-ratification state

10    sovereign immunity.

11         And there is an important distinction to be made

12    between 11th Amendment immunity and state sovereign immunity

13    that the Court most recently recognized in the Hyatt (phonetic)

14    decision.

15         And that is that state sovereign immunity is

16    jurisdictional under -- because it's governed by state law in

17    terms of how you view it.

18         And New York views its own sovereign immunity as

19    jurisdictional.  So what that means that is you can't waive it

20    by litigation conduct.

21         Now we would contend that even under the 2nd Circuit

22    standard for whether you waive 11th Amendment immunity by

23    litigation conduct, this record doesn't support a waiver

24    finding but you don't even get there because under New York

25    law, there's only waiver by abrogation.

1            And here, as I mentioned the only abrogation is the

2    FOIL law and it doesn't allow this proceeding in federal court.

3    It only allows a FOIL request followed by a challenge in state

4    court under Article 78.

5            THE COURT:  I do -- I think I know the answer because

6    you made an allusion to it at the outset, but is it your

7    position that the Court much reach this issue to decide this

8    case?

9            MR. AMER:  Yes, because it's jurisdictional.  So we

10   don't think the Court can entertain the --

11           THE COURT:  You can't do the Springfield Hospital

12   hypothetical jurisdiction thing?

13           MR. AMER:  The Court has no jurisdiction to decide

14   the motion to compel that this is a judicial proceeding that

15   triggers sovereign immunity.  It's a threshold question the

16   Court needs to address.

17           And because the 2nd Circuit law is clear that

18   subpoenas on a government agency trigger sovereign immunity,

19   that really ends the question.

20           The only question actually that the Court would then

21   have to address is whether there's been waiver.  And for all

22   the reasons I've mentioned certainly on this record, there's no

23   possible basis to find that there's been a waiver of state

24   sovereign immunity.

25           I did want to mention, I mean, we've talked about

1    relevance and the -- I did want to mention about

2    proportionality.

3         We also think that in addition to Rule 26 requirement

4    of demonstrating relevance to the claims and defenses in

5    Trooper 1 as well as proportionality, that there's also Rule

6    45, which has a heightened burden on nonparties, which I think

7    gets ignored in the other side's brief.

8         Most of the investigation that took place through the

9    deputized law firms just has nothing to do with Trooper 1.

10   There were 11 claimants.  So only one was Trooper 1.  And most

11   of the investigation just by definition related to others who

12   were not Trooper 1.

13        And as I mentioned, she was in a somewhat unique

14   position as being the only state employee.  And I would commend

15   Your Honor to look at the Blue Angel Film's decision because

16   there, I think it makes clear that if the purpose of seeking

17   the discovery is to pursue an agenda that is unrelated to the

18   defense of the claims at issue, that that's improper.  And we

19   would contend that that's what's going on here.

20        THE COURT:  I could ask you the same question that I

21   asked the -- Mr. Andres and Ms. Trzaskoma, what information or

22   evidence would I even look to determine the true motivation and

23   is that even appropriate at this stage without having a

24   hearing?

25        MR. AMER:  Well, I think there is information that

1    we've put forward in sworn testimony from Ms. Chun and Ms.

2    Longley about what they saw during the investigation that

3    suggested there was an effort to do oppositional research to

4    sully the reputations of the investigators.  That -- so that is

5    in the record.

6            There's publicly available information that we have

7    cited to, including the most recent ethics complaint that the

8    Movant filed with the first department disciplinary committee

9    where he, you know, attacks the investigation and the

10   investigators.

11           So I think there's plenty of evidence that is in the

12   record before the Court now for the Court to conclude that that

13   is a motivating factor behind this subpoena.

14           I did want to briefly touch on the privileges.  And I

15   appreciate the Court's indulgence.  I know we've been going for

16   a long time, but I haven't been so I would --

17           THE COURT:  You haven't been.  Thank you.  Go ahead.

18           MR. AMER:  -- appreciate an opportunity.

19           THE COURT:  Go ahead.

20           MR. AMER:  So in terms of the attorney-client and

21   work-product privileges, which sort of go hand-in-hand, you

22   know, here the investigative team was clearly tasked with

23   conducting an investigation with the purpose of providing legal

24   advice.

25           It was to provide legal advice both on investigation

1    strategy, who to pursue in terms of witnesses, what documents

2    to seek, and also, ultimately, whether there were violations of

3    law.

4            And you know, it shouldn't go without notice by the

5    Court that, you know, by specifically tasking Cleary and

6    Vladeck, a firm that has specialization in employment

7    discrimination, we were -- the office was certainly seeking

8    that legal advice from people with that subject matter

9    expertise.

10           Unlike the cases that the Movant relies on, where the

11   purpose of the investigation was to render business advice,

12   that was not what we have here.  The purpose was for legal

13   advice.

14           I just mentioned the Allied Irish Bank case that they

15   rely heavily on.  You know that was a situation where the rogue

16   trader and the bank actually appointed as the lead investigator

17   a banker, somebody who is not a lawyer.

18           And the purpose was to understand what went wrong and

19   to be able to give business advice as to what procedures,

20   internal procedures, would need to be changed to ensure that

21   the rogue trading wouldn't happen in the future.  So that's

22   clearly a different situation than we have here.

23           This case is also distinguishable from other cases

24   that they cite where the report that was ultimately published

25   was put at issue affirmatively and then sought to be, you know,

1    cloaked with the privilege.

2            We think this is case is most like the General Motors

3    decision, where the court agreed that investigative material

4    retained their privilege, both under attorney-client and

5    work-product privilege.

6            And finally, we think that clearly, we meet the

7    requirement of material prepared in anticipation of litigation.

8    There was always the possibility of impeachment proceedings

9    from Day 1.  There was always the possibility and expectation

10   that there would be litigation from the complainants as

11   happened.

12           And there was also anticipation that there may be

13   litigation by the Movant himself, which of course also happened

14   in the form of the ethics complaint that I mentioned.

15           And that's all of the aspects of the anticipation of

16   litigation are set forth in the Longley and Chun declaration as

17   being part and parcel of the thinking process that went into

18   the investigation.

19           Let me speak briefly about law enforcement privilege.

20   The notion that the Office of the Attorney General was not

21   conducting a law enforcement investigation just makes no sense.

22   I mean, the Attorney General is the chief law enforcement

23   official of New York State.  And the Office of the Attorney

24   General is a law enforcement agency.

25           And so, of course, this investigation was a law

1     enforcement investigation that's entitled to invoke that

2     privilege.

3              And although was the expectation and the intent that

4     the report itself would be published along with evidence

5     referenced in the report for in the interests of transparency,

6     it was never intended that the investigative materials in the

7     form of attorney notes, interview memos, communications between

8     the OAG and the two private law firms, communications with

9     other law enforcement agencies, it was never any expectation

10    that that material would be disclosed.

11             And in fact, the opposite is true as detailed in the

12    declarations in order to obtain cooperation of the witnesses

13    that were interviewed, you know, which goes well beyond

14    interviews that were taken under oath, in order to obtain a

15    full cooperation and to address their credible fears of

16    retaliation, they were promised that their information would be

17    maintained as confidential.

18             And it contains a host of personal information.  And

19    it would absolutely impair the Office's ability to do

20    investigations in the future if this type of material would be

21    subject to disclosure in the way that this material is now

22    being sought.

23             Assurances were provided.  Cooperation was obtained.

24    And it was very much important to the truth seeking mission of

25    the investigation.  And that is also detailed in the two

1    declarations.

2           There are over 100 witnesses whose identities have

3    never been publicly disclosed.  And you know, there are any

4    number of investigations that our office conducts.

5           And in fact, the Court may be aware that we now have

6    something called the Office of Special Investigation, which is

7    tasked under executive law 70B to investigate civilian at the

8    hands of police officers.

9           So those investigations are now mandated by statute

10   and don't even need the 63.8 referrals.

11          So for all those reasons, it's critical that this

12   material remain confidential.  And for similar reasons, the

13   deliberative process privilege applies here.  This is an agency

14   that was undergoing an investigation into whether there were

15   violations of law.

16          So the agency, the other side claims that there was

17   no agency determination, but there was.  There was a

18   determination as to whether or not the law was violated.

19          And there was a deliberative process that went into

20   that determination that involved strategic planning of the

21   investigation and ultimately, you know, many drafts back

22   and -- many week -- drafts of weekly reports, drafts in

23   internal communications between the investigators and the OAG.

24          So for all those reasons, we think this is analogous

25   to the Thompson v. Lindbrook Police Department case, where a

1   D.A.'s office was conducting an investigation for purposes of

2   making recommendations to other officials on whether certain

3   actions should be taken.

4           And here, the Attorney General's Office was

5   conducting an investigation to determine whether laws were

6   violated for purposes of making a report that would then

7   everybody understood would go to the Assembly for consideration

8   of whether further action, namely impeachment, needed to be

9   undertaken as well.  So, for all those reasons, Your Honor, we

10  think those privileges all apply.

11          I will also just quickly mention the enormous burden

12  because Your Honor pointed this out at the very top of the

13  argument, that you had concerns about the tremendous breadth of

14  material being sought here.  And I think that concern is very

15  well founded.  It is a huge amount of material.

16          The Cleary and Vladeck firms spent thousands of

17  attorney hours going through the material that was ultimately

18  published on the OAG website to ensure that that material was

19  redacted to protect the confidential information that we

20  assured witnesses would not be published.

21          And that involved, although some of that time,

22  probably about a third of that time, related to dealing with

23  the media material that was disclosed, so the videotapes, the

24  transcripts.  But the rest of it dealt with maybe a thousand

25  pages of material.

 1        So the balance is 73,000 pages of material.  So you

 2   could do the math.  And it doesn't -- it's not an answer to

 3   say, well, only a small portion will need to be redacted

 4   because you don't know what portion to redact unless you --

 5        THE COURT:  Read every page?

 6        MR. AMER:  Yeah, you have to read everything.  So

 7   that's -- so that doesn't really provide any solace at all.  So

 8   we're talking about a --

 9        THE COURT:  And your and --

10        MR. AMER:  -- an enormous amount of --

11        THE COURT:  -- their argument is that the

12   confidentiality or the protective order in this case would be

13   sufficient.  Why is that not so?

14        MR. AMER:  Well, it's not so because the person who

15   this material is supposed to be protected from is the Movant.

16   I mean, the witnesses were expressing credible fears of

17   retaliation by the Movant and his associates and others in the

18   executive chamber.

19        So it has the very impact on future investigations to

20   say that we're going to disclose this material to the subject

21   of the investigation that the law enforcement privilege is

22   intended to avoid.

23        In other words, these witnesses cooperated because

24   they understood and were assured that their personal

25   information was not going to be divulged not to the public, but

1    to the Movant.  I mean, that was the fear that they had and

2    that was the assurance that they provided.  So that's why

3    producing this material under a protective order is just not an

4    answer.

5          And, of course, it doesn't answer the initial

6    question of why this material is even properly the subject of a

7    subpoena in the first place, which is of course the relevance

8    question.

9          And you know, in light of the fact that we're making

10   available, you know, 100 to 200 pages of material that

11   mentioned Trooper 1 by name and the Movant has the list of all

12   the other complainants and all of the other information in the

13   report to pursue discovery, we think that's sufficient and

14   that's appropriate, but nothing more.

15         THE COURT:  So, just to be clear, you know, you've

16   argued the law enforcement privilege, the attorney-client

17   privilege, the deliberative process privilege, and argued that

18   there has been no waiver, but each of these privileges is a

19   qualified privilege, correct?  There are situations where they

20   might not protect everything.  Do you agree with that?

21         MR. AMER:  Qualified in the sense that that

22   there's -- there is -- there are circumstances under which the

23   privilege can be overcome.

24         THE COURT:  That's what I mean by qualified.

25         MR. AMER:  Yes.

1              THE COURT:  Exactly.  And with regard to the

2       deliberative process privilege in particular, you know, it does

3       not cover factual material, correct?

4              MR. AMER:  It wouldn't cover factual material except

5       that, you know, attorney notes commenting on factual material.

6       I'm thinking about for example the interview notes.

7              I mean, that would certainly be covered by the

8       deliberative process privilege, as well as communications going

9       back and forth between the Office of the Attorney General and

10      the law firms conducting the investigation.  That would be

11      protected.

12             Communications going back and forth between the

13      Office of the Attorney General and other law enforcement

14      agencies that we were cooperating with, who were conducting

15      their own investigations, that would be covered.

16             And there is in the Longley declaration the detailed

17      agreement that was entered into between our office and these

18      other law enforcement agencies that, you know, spelled out the

19      confidential treatment that this material was to be afforded.

20             THE COURT:  Okay, what about transcripts?

21             MR. AMER:  So --

22             THE COURT:  To the extent they aren't already turned

23      over?

24             MR. AMER:  -- all -- my understanding is all of the

25      witnesses whose interviews were transcribed have been turned

1    over.

2             THE COURT:  Okay.  I'm sure you have --

3             MS. GLAVIN:  Albeit with redactions.

4             THE COURT:  -- a lot of responses.

5             MS. GLAVIN:  Yes.

6             MS. TRZASKOMA:  I know, and I --

7             THE COURT:  It is now 1:25.  I don't know if other

8    people have other places to be.  I was not expecting to go

9    quite this long.  I knew we'd be a couple hours.  I wasn't

10   expecting three.  I'll be candid.

11            But Ms. Trzaskoma, Ms. Glavin?

12            MS. TRZASKOMA:  Yeah, I'll -- we'll try to be brief.

13   And just to respond on a couple of factual points, I would like

14   to know of the 4 documents that comprise 100 to 200 pages what

15   are those?

16            I'm guessing by the length, you know, they could be

17   just a list of all of the troopers who were assigned to the PSU

18   or I don't -- or you know, her personnel file.  I'm guessing

19   that it's not, you know, they're not kind of core documents

20   that we're looking for.

21            You know, Mr. Amer said that the report is not on

22   trial.  True.  We are not here to try the Attorney General's

23   report, but this is a situation where the conclusions reached

24   in the report are on trial.

25            THE COURT:  Not really.  I mean, the conclusions are

1    rank hearsay.

2           MS. TRZASKOMA:  Well, the conclusion that Governor

3    Cuomo sexually harassed -- the question did Governor Cuomo

4    sexually harass Trooper 1?  Did Governor Cuomo sexually harass

5    the other 10 complainants?  That question, the question that

6    the Attorney General's report purported to answer, those issues

7    are on trial.

8           THE COURT:  Sure.

9           MS. TRZASKOMA:  So it's -- you know, we have a

10   situation where the question is what does any of the -- our

11   work have to do with what's going on here?  The factual overlap

12   is identical.

13          So it's, you know, and it's not a -- we did as I

14   said, and I will tell you that I am not here to make Trooper

15   1's arguments, but you know, on the question of relevance, and

16   her counsel are here.

17          They can confirm this if they like, but I can think

18   of a lot of arguments that I expect we're going to hear from

19   Trooper 1 about how the other claimants, how those allegations

20   are relevant to Trooper 1's claims.

21          THE COURT:  Well, why can't you depose them?

22          MS. TRZASKOMA:  We can certainly take their

23   deposition, but it would be enormously efficient, much more

24   efficient for us to have not -- have all of the statements that

25   they made, the records of all the statements that they made

1    before complete, you know, all the information that they gave

2    to the Attorney General's Office, not just what ultimately

3    ended up being transcribed.  I mean, those are statements,

4    prior statements, that those individuals made to the Attorney

5    General, and you know, about their claims.

6         And so, you know, that is absolutely relevant.  Just

7    quickly on and, you know, also it is not true that Governor

8    Cuomo was informed of every claimant, you know, every

9    complainant.

10        State employee number 1, that -- the identity of that

11   person was never disclosed and including not during the

12   Governor's testimony.

13        And you know, ultimately, this is, you know, this

14   is -- it's -- well, and you know, that is not even taking into

15   account the statements by all of the witnesses that the

16   Attorney General interviewed.

17        There are hundreds of witness, you know, more than

18   100 witnesses whose statements we just don't have, whose

19   identities we don't know.

20        And in, you know, in a situation like this where that

21   information exists in one place, it -- we should be able to get

22   it.

23        THE COURT:  I totally understand how it would be nice

24   to get it, right?  It's much more efficient, it's more

25   convenient for the reasons you described.

1          But the end of the day, and I -- it might have been

2     discussed at length in your argument today, but in evaluating

3     the motion to quash standard, I need to look at whether or not

4     there's an undue burden assuming that I have jurisdiction for

5     now.  I have to look at whether there's an undue burden being

6     placed on the third-party.  They're a third-party in this case.

7     They are not even the Defendant.

8          And under those circumstances where it's taking 2,600

9     odd hours to redact 1,000 documents, how is it that your

10    efficiency outweighs their burden and the burden on the

11    taxpayers, not to mention the conscription of whoever will be

12    tasked doing this work, which is something I should look at

13    under the case law.

14         MS. TRZASKOMA:  Well, I believe and the Attorney

15    General's Office should correct me, but I believe based on

16    publicly available information about the contract, the State's

17    contract with Cleary Gottlieb, that it has been extended,

18    additional funds have been set aside.

19         So there already -- there is already a law firm in

20    place to do this work.  And I don't think that if you compare

21    that to, I mean, you know, Your Honor, we thought we could get

22    discovery done relatively quickly.

23         Obviously, we ran into the six-month roadblock with

24    getting what we think, you know, are the starting points for an

25    efficient discovery process.

1          We're -- if we have to go out and re-create these two

2     wheels, so there's the Attorney General wheel, which is

3     enormous amount of work.  They spent millions of taxpayer

4     dollars doing it.  And then, the Judiciary Committee added on

5     top of that, spending even more taxpayer dollars.

6          And then, the expectation that Governor Cuomo and the

7     other Defendants in this case several, the New York State

8     troopers, another Defendant who is also certified for a private

9     defense, are going to have to go out and re-create that wheel.

10         THE COURT:  That's not what you have to do.  You have

11    to actually conduct discovery relevant and proportional to this

12    case.

13         What the Attorney General's Office mandate was was to

14    look at the whole thing, the whole shebang from soup to nuts,

15    beginning to end figure out if there was misconduct in the

16    office, right, relating to these specific issues.

17         But that's not that what this case is.  This case is

18    one Plaintiff over a span of years saying she had multiple

19    interactions with this person.

20         You take her deposition.  You depose some of the

21    other witnesses, she may or may not have been there.  That's

22    what's relevant and proportional to this case.

23         MS. TRZASKOMA:  Well, Your Honor, I've really I mean,

24    I'm happy to have Mr., you know, have the Court say half of the

25    complaint irrelevant.  Trooper 1 can never introduce evidence

1    about complainant number 5 because that's --

2           THE COURT:  And you can depose all of the

3    complainants, can't you?

4           MS. TRZASKOMA:  Well, but the problem is, Your Honor,

5    that the way that I expect Trooper 1 is going to want to use

6    the other complainants is to say if Governor Cuomo says it was

7    an incidental touching of her --

8           THE COURT:  (Indiscernible) M.O. I get it.

9           MS. TRZASKOMA:  Yes.

10          THE COURT:  All of the regular 404(b) arguments.

11          MS. TRZASKOMA:  Right.

12          THE COURT:  I don't mean to cut you short, but I

13   understand.

14          MS. TRZASKOMA:  So then the Trooper 1 is going to

15   come forward and say yo ho, not an accident.  Not incidental.

16   It was intentional.  He has a pattern of this.  And look at

17   these four other complainants who testified that he did

18   something, you know, who testified that he did something

19   similar.

20          So, for each of those, we have to figure out if

21   they're reliable or not or credible or not.  It means we have

22   to do the exact same work that the Attorney General says that

23   --

24          THE COURT:  Well, you're going to want to depose them

25   anyway.

1          MS. TRZASKOMA:  It's not about depositions.  It's

2     about being prepared for the depositions and understanding.

3     There's already a tremendous amount of work done that led the

4     Attorney General to conclude that things, you know, that

5     witness statement or that claim, you know, claims that people

6     were making were or were not credible.

7          And for us to go through, we would be doing the exact

8     same thing.  Is this witness credible?  Well, let's go talk to,

9     you know, everyone else who she worked with.  Let's go talk to

10    people who she talked to.  Let's get her emails and then go

11    talk to the -- I mean, you follow the rabbit down the hole.

12         THE COURT:  You're going to want to do all that any

13    way.

14         MS. GLAVIN:  Are you going to let us?

15         THE COURT:  I mean, you're going to want to do it all

16    anyway because --

17         MS. TRZASKOMA:  Well, I'm really trying shorten and

18    try --

19         THE COURT:  At the end of the day, at the end of the

20    day, reading a cold record does not tell you much about what

21    the witnesses are going to be like in person, how they're going

22    to present on the stand, all of those factors that go into an

23    evaluation of the case.

24         MS. TRZASKOMA:  100 percent, but it is much easier as

25    you know to cross-examine a witness with their 3500 material.

1        For example, what did they say previously?  What did

2    they say the first time they came in and met with the New York

3    Attorney General?  What did they say the second time they came

4    in and met with the New York Attorney General?  How did their

5    statements change from beginning to their testimony?  And what

6    was not in their testimony?

7        It's -- I get that it -- we're going to want to do

8    some of this again, but I am telling you it will be so much

9    more difficult and burdensome and complicated if we have to for

10   every single claimant do what we're doing.  The -- we have to

11   defend every single claim.

12        THE COURT:  I totally get it, but the question is

13   under the law, why doesn't that burden fall on you as the

14   Defendant as opposed to the third-party, who would have to

15   spend hours or however many hundreds of thousands of dollars

16   paying Cleary to do the review and the redactions?

17        MS. TRZASKOMA:  Well, I think we have a problem with

18   their burden argument, which is they have just said 73,000

19   documents all need to be redacted.  I actually don't know that.

20   I don't know if, for example, you know, 20,000 of those

21   documents were documents that they got from the executive

22   chamber.  I don't know --

23        THE COURT:  Ms. Chung's declaration is, you know,

24   quite specific in terms of all of the steps that were taken and

25   all the things that they've done, but continue.  It's okay.

1        MS. TRZASKOMA:  No, her -- it's specific about what

2   they did -- somewhat specific about what they did, but not at

3   all specific about what those 73,000 documents are.  So she

4   just asserts we'd have to go -- there are all these documents.

5        THE COURT:  Well, because they say they're

6   privileged.

7        MS. TRZASKOMA:  Well, I want to get to that.  I

8   definitely want to get to that.

9        But you know, it -- it's our view, we're happy to and

10  would have done this in a meet and confer if there had been a

11  back and forth like there usually is.  We didn't have that

12  opportunity here because, you know, the door was just slammed

13  in our faces from the get-go.

14       And I get that the Attorney General doesn't want

15  anyone questioning the report or the report's conclusions, but

16  that's kind of star chamber stuff, right, where they have

17  unidentified witnesses, like secret witnesses, secret

18  claimants.

19       We're -- that doesn't make any sense here where

20  public allegations, including in Trooper 1's claims, are public

21  complaint.

22       THE COURT:  Well, and that's why the report's not

23  admissible, right?  I mean, like you -- you're right.  The

24  process by which the report was generated did not provide your

25  client what you would argue is full opportunity to be heard,

1    cross-examine all the witnesses, have the due process that

2    would be consistent with the Court.  But that's why the report

3    doesn't come in.  And that's why the report's not on trial.

4         So, if you know, you guys need to conduct robust

5    discovery as to these other complainants.  I understand that

6    based on current allegations, there may be some relevance

7    arguments that could be posited, but nothing is answering my

8    question about why their arguments about undue burden -- why

9    your, you know, efficiency argument outweighs their burden?

10        MS. TRZASKOMA:  Well, I would like to know, I mean, I

11   think that the question is what would the burden be to produce

12   to us the interview memos?  What would that burden be?

13        Because I think, you know, it's not enough for the

14   Attorney General to say they want so much, it's also

15   burdensome.  I think for each request, they have to say why,

16   you know, why is the information being sought in this request

17   particularly burdensome and what would it take?

18        And that's my problem with the just throwing out

19   73,000 pages is or 73,000 documents is that it doesn't really

20   help us figure out if the Court is going to narrow the

21   subpoena, which would be fine with us, what makes -- you know,

22   given their arguments and burden, what would make sense in that

23   regard?  Just --

24        MS. GLAVIN:  I want to hit on the interview memos,

25   because I think, as I mentioned to the Court, we're happy to

1    provide to the Court if it would be helpful for you -- Your

2    Honor in judging the burden argument.

3           Take a look at some of these interview memos.  I know

4    as an AUSA, I routinely did these on my own doing redactions

5    and could do it in a day.

6           I am not questioning the burden it took for the

7    A.G.'s Office when they wanted to release these to the world.

8    I'm sure it took a ton of time to edit the video statements.

9    We're, you know, past that.

10          Now, we're just talking about there are witnesses to

11   this case.  And it's not just the complainants but there are

12   witnesses to these events, some of which, you know, I'm sure

13   Trooper 1 might be interested in.  They said they corroborated

14   it, but it's also important to the Governor's defense that

15   there are witnesses that have exculpatory information.

16          And you can see that in the report, witnesses that do

17   not remember anything of note in a particular instance say with

18   Trooper 1, or say with Lindsey Boylan, or say with Britany

19   Commisso.

20          I agree with you, the report shouldn't come into

21   evidence.  The judge hasn't ruled on that.

22          What we have heard from Plaintiff is that they have a

23   theory that the report could come in under an admission by

24   party opponent theory if the State is a Defendant in the case.

25          I agree with you.  I have the same --

1            THE COURT:  Skeptical of that.

2            MS. GLAVIN:  I gave the same look to the

3    (indiscernible) firm when they raised that.  I said there's no

4    way that comes into evidence.  And we want to make the

5    arguments of course it can't come in because it's full of

6    hearsay.

7            So I don't think it's going to come in.  It's not to

8    say we're not going to argue about it.

9            But let's put the report to the -- put the report to

10   the side.  With those interview memos, again, I can give them

11   up to the Court, I just am finding it very difficult to believe

12   it's burdensome having gone through this exercise as an AUSA

13   and redacting, you know, memos that we've had to produce.

14           Getting them from law firms as an AUSA when, you

15   know, a law firm has done an investigation and they're making,

16   you know, presentations to the government and they want to hand

17   over you know, memos.

18           The meat of these memos, the paragraphs between the

19   intro and the end are Ms. Commisso said X, Y, and Z.  Ms.

20   Commisso doesn't remember this, that.

21           There are not interspersed within those memos

22   attorney, you know, perceptions, et cetera.  These are prior

23   statements by witnesses, some of which we believe would be

24   incredible helpful to our defense and that we don't have

25   another party to subpoena that from.

1          So when you're saying you could do robust discovery,

2     the report talks about other troopers they spoke to, not

3     necessarily ones that Trooper 1 would know about or knows what

4     they would have to say or what they remember.

5          So I'm just not -- I'm not buying the burden argument

6     on those interview memos.  And I think if Your Honor takes a

7     look at them, I think you would very quickly be able to say,

8     no, this is what we see routinely in criminal cases.

9          And I'll say in the interview memos, so the Governor

10    was charged in that misdemeanor case.  I think it was like

11    October 28 or 29th.

12         THE COURT:  Uh-huh.

13         MS. GLAVIN:  We spoke to the D.A.'s Office because

14    they had to produce discovery.  We got some interview memos

15    relevant to the, you know, to the groping allegation.

16         They were produced to us relatively quickly once they

17    started getting them.  They did initial tranche of discovery

18    they had to go to the A.G.'s Office in getting them.

19         That material, we're not going to be able to get from

20    all 11 complainants.  So say we take all 11 complainants'

21    depositions.

22         Well, I say probably 10 because there's one

23    complainant whose name we don't know.  State employee number 1

24    was never disclosed to the Governor during his testimony.  And

25    we don't have that person's identity to this day.

1          State entity employee number 2, we became aware of

2     just because you could deduce it through, you know, public

3     reporting.

4          But there's a whole host of people.  Like there's

5     also a -- there was a line that I focused on the A.G.'s report

6     that there are a number of, you know, people that work for the

7     Governor because part of, you know, the allegations that the

8     Governor engaged in gender based, you know, discrimination.

9          They interviewed a lot of staffers.  And not every

10    one of those people was promised everything you'd say is

11    confidential.  They couldn't promise that.  The A.G. knows they

12    couldn't promise that because she went out and released all

13    these transcripts.

14         And when she released the transcripts, she didn't

15    have a back and forth.  And I'm making that representation to

16    the Court, you can ask the Attorney General's office, she

17    didn't give a heads up to Trooper 1 and say how are do you feel

18    about your testimony being released to the world on November

19    10th?  She wasn't asked that and given an opportunity to

20    respond.

21         And they were also released at a time when the Albany

22    County District Attorney's Office had a pending investigation

23    and there was a pending criminal case.

24         And the woman involved in that, Britany Commisso, had

25    not only her testimony, you know, shown to the world, but the

1    video of it.

2           And so, you know, this idea of people being promised

3    confidentiality, they couldn't have made that promise because

4    they couldn't have kept that promise.

5           They were going to have to do a report.  And if it

6    there were criminal investigations, their names were going to

7    have to be provided to the Governor's attorneys.

8           On this issue that, you know, some people -- I have

9    looked at the interview memos.  I don't see notations of the

10   interview memos of people saying promise me, you know, the

11   witness does not want the Governor to ever know X, Y, and Z

12   about this.  There's a lot of interview memos that I think are

13   exculpatory.

14          Witnesses who know some of the complainants that will

15   say -- I mean, I see -- saw an interview memo saying you could

16   not believe this complainant.

17          In particular, there -- you know, I had an

18   interaction with her.  She lied to me.  I'm not going to be

19   able by doing the deposition of this particular complainant

20   going to get out of her sort of that incident unless I have

21   that interview memo.

22          That complainant's not going to tell me about the

23   interaction with Jane Doe, who worked with her on a daily basis

24   to the Chamber.

25          So, for us, it's not just about, you know, testing as

1    well the truth of the allegations of Trooper 1's complaint.

2    It's also about us getting exculpatory information from people

3    who were there.

4         It goes to our ability to defend against the

5    allegations because our client maintains, one, a number of

6    these incidents did not happen in the way they're being

7    alleged.

8         Two, a number of these incidents just didn't happen.

9         And three, for some of these incidents if, you know,

10   I commented on someone's hair, yes, I -- it's not gender based.

11   I commented some of the men's hair as well.  All of that goes

12   to our defenses and puts us in a position as well for summary

13   judgment motions.

14        So what we're trying to do here is we know there is a

15   place, okay, that these interview memos, some of which were

16   already provided to us under discovery in the criminal case, we

17   know there's a universe, a place, that we won't necessarily

18   find out about I think a lot of which we won't find out about

19   by just going out and subpoenaing tons of people and getting

20   depositions.

21        Your Honor already dealt with when the case started,

22   you probably remember one of these initial conferences, we were

23   talking about how many depositions do you think you're going to

24   take?  And under the rules, I think it says 10.

25             THE COURT:  Uh-huh.

1        MS. TRZASKOMA:  We have 11 complainants.  And you

2   know, I know Mr. Ligar (phonetic) is here, Trooper 1's lawyer's

3   here.

4        If we just start with the baseline 11 complainants,

5   then I got to figure out who all the troopers were that might

6   have -- that not might have, I know have relevant information

7   but I don't know their names.

8        And then, get subpoenas to all of them and take their

9   depositions when we know we have prior statements that are

10  recorded.  That would be 3500 or Jenks, you know, in any

11  universe.  And we understand will have information that is

12  incredibly exculpatory.

13       I'm somewhat surprised that Trooper 1 did not join in

14  our subpoena on this, but the interview memos I just think are

15  core and I don't think it's going to take that much work.

16       With respect to the documents, 79,000 documents --

17       MS. TRZASKOMA:  73-.

18       MS. GLAVIN:  73-, sorry.  2,500 of those were a

19  production by Governor Cuomo, okay, so I know that category.

20       There's also, you know, thousands of emails that were

21  produced by the executive chamber.  I think you could whittle

22  that number down pretty quickly if you -- if Your Honor would

23  entertain us or indulge us by saying why don't you sit down

24  with the A.G.'s Office and talk about what different categories

25  are in there.

1        The Blackberry pins, you know talk about that.

2   Trooper Blackberry pins or the Chamber Blackberry pins, of

3   course that would be information that's relevant in terms of

4   when you talk about say Britany Commisso, Alyssa McGrath, or

5   two an executive assistants that would staff the Governor, what

6   they're talking about with the other assistants during the time

7   period in question.  And they are two of the complainants in

8   this case.

9        All of it is right there.  Ms. McGrath and Ms.

10  Commisso necessarily may not still have access to their pins.

11  So are we going to have to subpoena the executive chamber to go

12  and get any relevant pin records from Ms. Commisso and Ms.

13  McGrath during the time period?

14       Same with the emails.  They may not have the ability

15  to pull all of those, you know, relevant emails.  We would have

16  to go and ask the Chamber.

17       Lindsey Boylan, she claimed that she was sexually

18  harassed while she was working for the Empire State Development

19  Corporation.

20       Presumably, the Empire State Development Corporation

21  would have pulled her emails during the time period in

22  question, such that we can figure out when she was on this

23  plane where she claims strip poker was mentioned, when she was

24  in the Governor's office where she claimed that he kissed her

25  and he absolutely denies this.

1          Those would be in her emails.  Lindsey Boylan's not

2    going to have those emails because she doesn't work for the

3    Chamber any more.

4          So I think for a lot of these, I think on the

5    interview memos, I just implore, you know, the Court to think

6    long and hard about this, knowing that these are going to be

7    core Jenks material.  And I can give Your Honor a sampling so

8    you can see what you're dealing with.  Not Jenks, it's

9    (indiscernible).

10          THE COURT:  I understand.  No.

11          MS. GLAVIN:  And on the documents, what we would also

12    ask is what, you know, contemporaneous communications that the

13    A.G.'s Office obtained for these core allegations.

14          So, for instance, you have, you know, with Trooper

15    number 1, of course we're going to want all the relevant pins

16    and email correspondence that Trooper 1 isn't going to have.

17          I mean, we are -- as Your Honor knows, we're engaged

18    in document discovery of Trooper 1.  Trooper 1 apparently has

19    represented to us doesn't have a -- I think maybe has one

20    responsive text message from her phone.  Doesn't have the phone

21    anymore that she was using at the time period.

22          And you know, we're curious, not curious.  I think

23    there has to be relevant, you know, communications with the

24    Chamber.  You know, between the state police and the Chamber.

25    Perhaps we can get that from the state police.

1       But also talking about we'll go through a couple of

2    these others.  State entity employee number 1, who you know, we

3    still don't know what her name is, but what were the email

4    communications that were subpoenaed amongst her group of people

5    that she purportedly told that we don't know the names of those

6    people, the email communications that are in the Attorney

7    General's possession that deal with the four or five people

8    that apparently were involved in the incident and

9    communications?  That's what we're looking for.

10      And if it would help the Court for us to even break

11   this down more, we'd be happy to do that for each, to sort of

12   go through and give you subsections and take each one of these

13   complainants.

14      THE COURT:  Should the Court conclude, and there's a

15   lot to chew on in this case of course, that the sovereign

16   immunity issue does not, you know, sort of end the inquiry as

17   to what you can seek to obtain from the Attorney General's

18   Office, you know, I certainly do think a more granular

19   understanding of what, based on your case knowledge and the

20   discovery that you got in the other misdemeanor case, showed

21   with more precision what you think exists and how that's

22   relevant.

23      And because part of the challenge candidly of the

24   subpoenas is that, as I asked Ms. Trzaskoma at the outset, it

25   appeared to me that the subpoena basically sought every

1    document reviewed, generated, obtained, or communicated during

2    the course of the investigation.

3              And that is just too much.  And it is not

4    proportional to the needs of the case.

5              The burden that has been amply established by the

6    declaration submitted by the Respondents illustrate that it

7    would be a tremendous undertaking for any firm, even one the

8    size of Cleary to try to, you know, go through those documents.

9    It's not going to be a small project.

10             And you know, I'm not saying I'm going to order this

11   now.  There's a lot to chew on here and I have a lot of things

12   to think about based on the briefs and today's argument.

13             But I certainly think that that would be helpful.

14   And you may, you know, even be able to get some specific things

15   that the A.G.'s Office may agree to.

16             If it really is the Blackberry pin messages and those

17   are a reasonable production that can be disclosed.  And they

18   don't implicate work-product because they are literally just

19   the contemporaneous conversations that happen to be preserved

20   in this one place.

21             There are maybe specific categories of things they're

22   willing to give you.  I think the touchier topics are going to

23   be interview notes, the interview memos, things that may

24   contain impressions.

25             I understand they may be able to redact it, but we

1    don't have a sense of the volume you know, so I do think that

2    trying to work through with more precision what you're looking

3    for would certainly benefit everyone.

4              MS. GLAVIN:  Okay.

5              THE COURT:  Mr. Amer?

6              MR. AMER:  Just I want to make a few quick points.

7    First of all, the testimony that was made public by the

8    Attorney General was obviously redacted.  So it was consistent

9    with assurances made about protecting confidential information.

10             The interview memos are classic work-product.  And

11   they're not entitled to them.

12             And yes, it's a qualified privilege, but I didn't

13   hear anything that meets the requirement for overcoming that

14   privilege.  Ease and convenience just don't cut it in terms of

15   overcoming work-product.

16             With respect to the pins, they have a Defendant in

17   this case, the New York State Police.  They should serve

18   discovery on the New York State Police to get the pins.  That's

19   the course that they should take.

20             And you know, for all those reasons, I didn't hear

21   anything that would overcome our privileges or address the

22   relevance and burden and proportionality arguments.

23             THE COURT:  Okay.

24             MR. AMER:  Thank you, Your Honor.

25             THE COURT:  Thank you.

1        MS. TRZASKOMA:  Your Honor, just may I just very

2    briefly --

3        THE COURT:  Uh-huh.

4        MS. TRZASKOMA:  -- on the privilege question?  As to

5    attorney-client privilege, I do not believe that there is an

6    attorney-client relationship between the Attorney General's

7    Office and the independent investigators.

8        All of the materials, the engagement agreements, the

9    appointment letters make clear that the -- that the

10   investigators are not -- are conducting an independent

11   investigation.  They are not acting as the Attorney General's

12   counsel.

13       This was not a situation where there's an

14   investigation into goings-on at the Attorney General's Office.

15   Not a situation where outside counsel's retained to advise the

16   Attorney General on past conduct in her office, future conduct

17   in her office.

18       That is not -- I don't see how you can make claims of

19   independence on the one hand and they're my lawyer on the other

20   hand.

21       THE COURT:  But that's not their only claim of

22   privilege.  They're also relying on work-product, no?

23       MS. TRZASKOMA:  Well, then again, it gets -- I have a

24   problem with the work-product doctrine as well because the

25   purpose, the primary purpose -- the materials have to have been

1   created because of the potential for litigation.

2           And in this case, where the only reason the materials

3   were created is to carry out the Attorney General's obligations

4   under 63.8, that's not in anticipation of litigation.

5           The fact that their litigation may have, you know, is

6   potentially on the horizon, the case law is very clear that

7   that is not work-product.

8           So it is -- if the purpose of preparing those memos

9   and conducting that investigation is not because of expected

10  litigation, but is because of the directive under 63.8 to

11  conduct an investigation, that's not prepared in anticipation

12  of litigation.  It's not.

13          So, yes, there were lawyers.  They were doing

14  lawyerly things, but they're not creating work-product.  It's

15  not to help the Attorney General in some future litigation.

16  That's not what they were prepared for.

17          And I think the case law is very clear that that's

18  not --

19          THE COURT:  I think Mr. Amer is saying, oh, not just

20  limited to litigation at the A.G.'s Office to be involved in,

21  but the possibility of impeachment proceedings, the possibility

22  of referral for criminal cases.  In this -- the A.G.'s mandate

23  is broad.

24          MS. TRZASKOMA:  But the reason, if the memos were

25  prepared because of 63.8 and they would have been prepared

1    anyway, in other words, if the prospect of litigation didn't

2    affect the work of the investigators, they would have created

3    that -- those memos anyway, the law is clear that that's not

4    work-product.  That's -- that is just investigative materials,

5    factual materials that are not subject to protection.

6         So I don't think either as, you know, it may be that

7    there are communications for the purpose of providing --

8    confidential communications for the purpose of providing legal

9    advice that are among the materials we've requested.

10        We don't want those, but I don't think that the

11   underlying -- the documents that were gathered, the -- and the

12   interviews that were conducted were either subject to the

13   attorney-client privilege or work-product protection.

14        THE COURT:  But also argue law enforcement privilege

15   and deliberative process.

16        MS. TRZASKOMA:  Well, again, I think where here where

17   the part of the problem with law enforcement privilege is that

18   the Attorney General has made a disclosure of information at a

19   time --

20        THE COURT:  Does that -- does that choice to disclose

21   part mean the whole is now waived?

22        MS. TRZASKOMA:  I think that the choice to disclose

23   many parts does call into question whether there's a legitimate

24   law enforcement reason to protect those materials.

25        And as Ms. Glavin said, this idea that, you know, in

1    order to obtain cooperation of witnesses, the Attorney General

2    had subpoena power.  Witnesses were obligated to come in and

3    talk to them.

4              THE COURT:  Subpoena power does not mean establishing

5    trust.

6              MS. TRZASKOMA:  Well, I get that, but I don't know on

7    what basis the Attorney General investigators, who are in the

8    process of conducting an investigation, that by statute has to

9    be, the findings have to be reported publicly, on what basis

10   could one of those investigators have said to a witness under

11   no circumstance will we -- you know, we will keep your

12   information, your identity totally confidential.

13             How can an investigator who is charged with making a

14   public report of the findings of the investigation give such

15   assurances or even promises we heard, promises?

16             And I don't think that it was -- I really do not

17   think that to the extent witnesses were assured that their

18   information would not be made public, that it was specifically

19   to keep their identities from Governor Cuomo.

20             MS. GLAVIN:  And on that point, if it would be

21   helpful and I could put this in a supplemental letter, but I

22   think there's a really good example of this.

23             Out of the 41 transcripts that were released, so they

24   came out in three tranches.  The first tranche was November

25   10th.  That was the 11 complainants and the (indiscernible),

1      okay?  That was the first tranches that was released.

2           The second tranche was November 28th.  That tranche

3      had a number of staffers that worked for the Governor.

4           And then, the third tranche that was released I call

5      that sort of the grab bag and I also call it the exculpatory

6      release, but the A.G. can disagree with me.  Take a look if

7      Your Honor, and I can cite to this, there's one witness that

8      was interviewed, his name is Matthew McGrath.  He's the

9      ex-husband of one of the complainants, Alyssa McGrath.

10          He was interviewed under oath.  And what he says to

11     the Attorney General's Office, is this going to be confidential

12     because he's concerned about his ex-wife, who's a complainant

13     in the case.

14          And they're saying, well, we're going to try and keep

15     this confidential.  And they just blasted that transcript out.

16     And I don't think they told Mr. McGrath it was coming on

17     January 20th.  He's unrepresented by counsel.

18          And the Attorney General's Office chose not, as far

19     as I know, maybe they did, I'd like to get the memo, but what

20     he had to say was incredibly exculpatory of Governor Cuomo as

21     it related to two of the complainants, which was Alyssa McGrath

22     and Britany Commisso, who were accusing the Governor of sexual

23     harassment.

24          He talked about how Alyssa McGrath expressed nothing

25     but absolutely devotion to the Governor, had his photo, a

1    collage of photos that she had with him next to her bed.

2          And that he never heard her complain in any way,

3    shape, form, nor Ms. Commisso.  That's someone with material

4    exculpatory evidence, you know, that we would want to use in

5    the case.

6          But his concern was not Governor Cuomo.  His concern

7    was Ms. Commisso and Ms. McGrath, and you know, how this might

8    impact his relationship with his ex-wife.  They have a child.

9          And the Attorney General indicated to him we'll keep

10   it confidential until they didn't and released it to the world.

11   So the confidentiality argument to say it's, you know, to keep

12   it from Governor Cuomo just doesn't hold water.

13         The other aspect, Your Honor can do, because we

14   do -- you do it routinely in cases with the government.  To the

15   extent things should be on an attorney eyes only in the first

16   instance, and then if we believe that there was information in

17   there that we need to discuss with him, because he will be able

18   to assist with his defense, then we can come Your Honor and

19   talk about that.

20         But we're willing to take to the extent some of this

21   stuff should be attorneys' eyes only, we're willing to do that,

22   too.  We just want to be able to defend against the allegations

23   and be able to assert defenses that we know are there with

24   witnesses and evidence that we know exist.

25         And so, what I would propose for us to do is I can do

1   a follow up.  We can to a follow up letter with Your Honor.

2   And I think what we can do is on the interview memos, I can

3   provide some more information about that, which I think once

4   the Court takes a look at it, I think you can think about it as

5   it goes to burden.

6           With respect to specific documents out of 79,000, or

7   73,000, I'd like to have further engagement with the A.G.'s

8   Office about those categories.

9           And in addition with respect to the four documents

10  that they're proposing that they would provide with Trooper 1's

11  name on it, just say why are we beating around the bush?  What

12  are those documents that just have a her name on it?  Will you

13  identify for us for instance the other troopers who are

14  witnesses or not witnesses to events or, you know, the

15  atmosphere and how the Governor treated the state troopers?

16          See if we can have a discussion with them about the

17  79,000 or 73,000, what the categories are, and come back to

18  you.

19          If we can't come to an agreement, but we come into

20  this in good faith, if we can't come to an agreement, I will go

21  through the complaint with each of these incidents based on my

22  knowledge of the case and, you know, records I think I'm pretty

23  sure exist will be helpful.  And then come up with a subset for

24  Your Honor to consider.

25          MR. ANDRES:  Your Honor, if I could just -- I'm happy

1      to let you go away --

2              THE COURT:  I certainly want to hear what your --

3              MR. ANDRES:  -- but at some place about a half hour

4      ago, we moved from the civil subpoenas to criminal law.  And

5      now, we have an explicit request for 3500 material.

6              MS. TRZASKOMA:  No.  I did not --

7              MR. ANDRES:  And to the extent - excuse me.  Excuse

8      me.  To the extent that said earlier that the biggest mistake

9      you could make would be to not apply General Electric, I revise

10     that.

11             The biggest mistake that you could make in this case

12     is to apply some sort of 3500 material requirement because it's

13     easier for them.

14             I mean, these arguments border on the frivolous.  And

15     it just is not -- there is no Brady requirement.  I won't speak

16     for the A.G.'s Office.  There's no 3500 material.  They're not

17     entitled to prior statements of these witnesses.

18             And literally for a half hour now, we have been off

19     track.  So with that, I'll -- that's all I wanted to say, but

20     it's sort of stunning to sit here and say I'm not

21     (indiscernible).  I knew they wanted 3500 material.  They've

22     been talking about, but they actually said it.

23             THE COURT:  I of course noticed that, Mr. Andres.

24     And I did not take it as 3500 material explicitly, but as

25     shorthand for the type of exculpatory information that they

1    think may be in the files.

2            MR. ANDRES:  Well, then we should look at the

3    transcript to see what they said, because they specifically

4    have asked for 3500 material and witness statements.

5            MR. AMER:  I also -- thank you, Your Honor.  We're

6    heading down the wrong path with this suggestion about wanting

7    meet and confers.

8            I don't understand what Mr. McGrath and his divorce

9    has to do at all with Trooper 1.  It has nothing to do with

10   Trooper 1.

11           Why are they entitled to this material?  They're not.

12   It's not about this case and their defense of the claims in

13   this case.  It's about their interest and desire and ease and

14   convenience.

15           And none of that is relevant.  And I can assure you

16   that Cleary, although they're you know still under the

17   appointment, they're not pro bono.  And it's going to be very

18   expensive and it's going to take thousands of hours.  And the

19   burden shouldn't be on us.  It should be on them.

20           They should do the work they need to do to defend the

21   case and they shouldn't be allowed to just try and piggyback on

22   the work that our office did in an investigation that was far

23   more broad, far more encompassing, dealt with 11 different

24   witnesses.

25           And what Mr. McGrath had to say about other people

1    and his divorce and any exculpatory information he may have

2    about his ex-wife, who cares?  How does that at all impact

3    Trooper 1?  It doesn't.  And so, that's the problem we have

4    here.

5              THE COURT:  Well, I understood that argument to be a

6    response to your representation that the witnesses are promised

7    confidentiality and that the main concern was disclosure to the

8    Movant himself.

9              So I think that's how Ms. Glavin intended that

10   argument.  I think it was a response to something you had said

11   previously today, but it's really neither here nor there

12   because I do hear you, both of you, that you think that you are

13   entitled to sovereign immunity and all of this is wrong headed.

14             If I were not to so conclude, however, that you were

15   entitled to sovereign immunity as to the Attorney General in

16   particular, what do you make of the specific request for

17   documents that you have in your possession as a result of

18   gathering them and the investigation that are not work-product?

19   Blackberry pin messages email dumps, things along those lines?

20             MR. AMER:  Certainly as I mentioned with the pins,

21   those are more readily available from a party.  It's, you know,

22   it's black letter law that if you can get discovery from a

23   party, that's the -- where you should get it from.  And you

24   should not impose a burden on a nonparty to get the same

25   material that you can get from a party.

1           So they have the ability to subpoena the New York

2     State Police Department and seek to obtain through party

3     discovery some of this material.

4           I don't know what they have and what they don't have

5     or what they would say in response, but it just seems to me

6     that that's an easy one.  They have a party in the case that

7     has the information that they're seeking.

8           And you know, the interview memos, I think they're

9     just totally off-base.  I mean, that's classic work-product.

10    They shouldn't get to see the mental impressions of the

11    lawyers, who were appointed as special deputies in this case.

12    They're not entitled to it.  They shouldn't get it.

13          THE COURT:  I think they've acknowledged that they

14    aren't entitled to the impressions, but to the extent to the

15    interview memos are so and so stated the following, so and so

16    further stated the follow, are those mental impressions or are

17    those facts?

18          MR. AMER:  Well, I think to the extent that they

19    reveal the questioning, that's work-product.  You know, you're

20    not entitled to that.  And not to mention the fact they have

21    the actual transcripts of the people who testified under oath.

22          THE COURT:  Okay, so I do hear, Mr. Andres, that

23    we're a little off-track, talking about 3500 material, although

24    I did understand it to be shorthand for exculpatory material if

25    that's what you meant, Ms. Glavin.

1          MS. GLAVIN:  I did mean it as such.  It's --

2          THE COURT:  Okay, and --

3          MS. TRZASKOMA:  And prior --

4          MR. ANDRES:  How is anything with exculpatory

5   material, there's no Brady obligation.  It's --

6          THE COURT:  There's no Brady obligation.  The

7   question is whether or not they can obtain the discovery from

8   another source or whether or not this information exists in the

9   world.  They may be entitled to it if privileges and sovereign

10  immunity don't apply, which are major hurdles in terms of the

11  analysis.

12         MS. TRZASKOMA:  Yeah, just very briefly on that.  I

13  mean, in any civil case, if I know that a relevant witness in

14  the case I'm litigating gave prior testimony, made prior

15  statements, I would go get those statements.  So --

16         THE COURT:  If you could.

17         MS. TRZASKOMA:  -- if I could.  And I would do

18  everything in my power to get those prior statements.

19         So there happens to be a statute in the criminal law

20  that, you know, requires the government to disclose that, but

21  that's exactly what Rule 45 subpoenas are for.  Discovery is

22  broad.

23         And you know, I think to Mr. Amer's point about, oh,

24  just go ask the New York State Police, again, it's very focused

25  on Trooper 1, which I get.  It would be great if that's half

 1    the complaint were gone, but we have 11 -- 10 other

 2    complainants.  They were not employees, some of them weren't

 3    state employees at all.  Many of them weren't -- no other

 4    complainant was an employee of the New York State Police.

 5            So what, we're going to go through this again?  We're

 6    going to subpoena the executive chamber?  We're going to get

 7    the sovereign immunity argument again?

 8            There is one place, there is one agency that has

 9    these materials or two agencies.  There's no reason we need to

10    go serve 100 subpoenas to get what is most efficiently obtained

11    from the Attorney General and the Judiciary Committee.

12            THE COURT:  So --

13            MS. TRZASKOMA:  So I --

14            THE COURT:  I fully understand the arguments.  And I

15    appreciate all of you spending this much time.

16            Mr. Andres, is there something finally you wanted to

17    add?

18            MR. ANDRES:  Nice to see you, Judge.  Thank you for

19    your time.

20            THE COURT:  Thank you for your time.  Nice to see you

21    all.  Thank you, Mr. Amer, for your excellent argument and your

22    briefing.

23            And thank you, of course, to the Movant's attorneys

24    as well.  I thought the case was very well briefed.  I truly

25    did not expect this last three hours, but thank you all for

1    your patience.

2              MR. AMER:  Thank you, Your Honor.

3              MS. GLAVIN:  So just following up, what I suggested

4    make sense is to follow-up status letter.

5              THE COURT:  I mean, to the extent Mr. Amer's willing

6    to engage, I certainly would not oppose hearing an update that

7    the parties have narrowed the gap between them, but you know,

8    I'm not going to order that at this juncture in light of the

9    arguments that have been raised by both sides.

10             MS. GLAVIN:  Okay, so I -- what we'll do if it's okay

11   with the Court is we will submit a follow up letter.  We'll

12   endeavor.  We'll submit a follow up letter and break it down I

13   think a little bit more and give you some examples.

14             THE COURT:  And if you are intending to do that, I

15   assume you guys would want to have some sort of a response if

16   there -- if the letter does not evident agreement.  Is that

17   fair, Mr. Amer?

18             MR. AMER:  Sure, yes.

19             THE COURT:  Okay, what time frame are you thinking,

20   Ms. Glavin?

21             MS. GLAVIN:  Could we all confer on our schedules

22   because I'm away the next couple of weeks?  Would it be

23   possible if we come up with a schedule amongst us and submit to

24   the Court?  Because I just don't know what Ms. --

25             THE COURT:  That's fine, but I'm not ordering the

1    A.G. to talk to you.  So if they choose to talk to you --

2                MS. GLAVIN:  You don't --

3                THE COURT:  -- and they choose to try to narrow the

4    gap, and you provide me with an update, that would be welcome.

5                And there a scheduling order of a sort would also be

6    welcome.

7                MS. GLAVIN:  Yeah.

8                THE COURT:  But you know, in light of the issues

9    raised, at this juncture, I'm not going to order it.

10               MS. GLAVIN:  No, no, no, you don't have to order them

11   --

12               THE COURT:  Okay.

13               MS. GLAVIN:  -- it's fine.  We'll confer with them as

14   to just sort of timing on us to submit something and if they

15   want a response.  Not that they have to have a substantive

16   discussion.  Mr. Amer and I will exchange pleasantries.

17               THE COURT:  Yes.

18               MS. GLAVIN:  Okay.

19               THE COURT:  But Mr. Amer, when can you disclose the

20   four documents you've agreed to provide?

21               MR. AMER:  So we are waiting for a protective order

22   to be put in place that would apply to any production from our

23   office.

24               Our understanding of the current status is there's a

25   protective order, but no mechanism for nonparties to designate

1    --

2            THE COURT:  I see, okay.

3            MR. AMER:  So --

4            THE COURT:  So when there is a protective order in

5    place in a case, do we need to do something to the protective

6    order, some sort of amended protective order?

7            MS. TRZASKOMA:  I mean, I think we could -- we're

8    happy to speak with Mr. Amer to figure out what additional

9    language he needs.

10           THE COURT:  Okay.

11           MS. TRZASKOMA:  -- in the protective order.

12           THE COURT:  All right, and you know, I would you

13   know, welcome your filing on that at any time.  And hopefully,

14   we could get that resolved quickly, so that you can get these

15   documents that may further narrow your gap in terms of what

16   you're looking for.

17           MR. AMER:  Yeah, they just need to be reviewed for

18   redaction, but it's only 1- to 200 pages, so I don't think

19   that's the issue.  It's just getting in place something that

20   would allow us to designate the material as confidential.

21           THE COURT:  Okay, understood.  Yeah, that we do have

22   a protective order in the case and if we need to add you as a

23   party, an addendum something --

24           MR. AMER:  Not as a party.

25           THE COURT:  Not as a party.  A party to the

1    protective order.

2              MS. TRZASKOMA:  Yes.

3              THE COURT:  All right, thank you all.

4              MR. AMER:  Thank you.

5              MS. TRZASKOMA:  Thank you very much.

6          (Proceedings concluded at 2:12 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **CERTIFICATE**

2

3

4          I, Chris Hwang, court approved transcriber, certify

5     that the foregoing is a correct transcript from the official

6     electronic sound recording of the proceedings in the above-

7     entitled matter.

8

9

10

11

12

13     _____          February 13, 2023

14     Chris Hwang                 Date

15     Court Reporter

16

17

18

19

20

21

22

23

24

25