UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------X

ANDREW M. CUOMO,

                  Movant,

       -against-

THE NEW YORK STATE ASSEMBLY
JUDICIARY COMMITTEE,

               Defendant.
----------------------------------------------------------X

ANDREW M. CUOMO,

                  Movant,

       -against-

OFFICE OF THE NEW YORK STATE
ATTORNEY GENERAL,

               Defendant.
----------------------------------------------------------X

**MEMORANDUM AND ORDER**
22-MC-3027 (LDH) (TAM)
22-MC-3044 (LDH) (TAM)

**TARYN A. MERKL**, United States Magistrate Judge:

       With two subpoenas presently before the Court on motions to compel, former

Governor Andrew M. Cuomo seeks documents and evidence from investigations into

allegations of his involvement in sexual harassment and misconduct gathered by the

New York State Assembly Judiciary Committee and the New York State Office of the

Attorney General. The Judiciary Committee and Attorney General contend that the

subpoenas should be quashed because the documents sought are protected by various

privileges and because they enjoy sovereign immunity. Former Governor Cuomo

disagrees. For the reasons discussed herein, the motion to compel the Office of the

Attorney General is denied. In addition, the Assembly Judiciary Committee's cross-

motion to quash is granted.

# FACTUAL BACKGROUND AND PROCEDURAL HISTORY

## I. The OAG and AJC Investigations[1]

In December 2020 and February 2021, two women accused former Governor Cuomo of sexual harassment. (Cuomo Mem., 22-MC-3044, ECF No. 2, at 3; Cuomo Mem., 22-MC-3027, ECF No. 2, at 3.) On March 1, 2021, then-Governor Cuomo issued a formal referral to the New York Office of the Attorney General ("OAG" or the "AG's Office") to appoint an independent law firm to investigate the claims, in accordance with New York Executive Law § 63(8). (Mar. 1, 2021 Ltr., 22-MC-3044, ECF No. 3-8; Mar. 1, 2021 Ltr., 22-MC-3027, ECF No. 3-5.) On March 8, 2021, the OAG issued a press release indicating that Attorney General Letitia James had appointed independent counsel to lead the investigation, and that the investigators would release a public report at the conclusion of the investigation. (Mar. 8, 2021 Press Release, 22-MC-3044, ECF No. 3-9.)

Shortly thereafter, on March 17, 2021, the Speaker of the Assembly, Carl Heastie, and Judiciary Committee Chair Charles D. Lavine issued a press release announcing that the Assembly Judiciary Committee ("AJC") had hired the law firm of Davis Polk & Wardwell to conduct an investigation into the allegations. (Mar. 17, 2021 Press Release, 22-MC-3027, ECF No. 3-7.) On March 24, 2021, Speaker Heastie requested that the AJC investigate, *inter alia*, "whether evidence exists to support a finding that the Governor has engaged in 'misconduct or malversation in office' which merits impeachment under

---

[1] This opinion assumes general familiarity with the substance and history of the case, as well as the fact that the New York State Attorney General's Office and the New York State Assembly Judiciary Committee conducted investigations into allegations of sexual harassment by former Governor Cuomo, which resulted in public reports, which were published in August 2021 and November 2021, respectively. (*See* OAG Report, 22-MC-3044, ECF No. 3-10; AJC Report, 22-MC-3027, ECF No. 3-12.) Only the background relevant to the instant motions is included herein.

the New York State Constitution and the New York State Judiciary Law." (Ltr. from Speaker Heastie to Committee Chair Lavine, 22-MC-3027, ECF No. 16-2.)[2]

On August 3, 2021, the OAG issued its report, which detailed the investigation's findings, and also published 111 exhibits, including approximately 400 pages of evidence. (OAG Resp. to Cuomo's Subpoena, 22-MC-3044, ECF No. 3-6, at 2; *see* OAG Report, 22-MC-3044, ECF No. 3-10.) The OAG Report indicates that, as part of their inquiry, the investigators "issued over 70 subpoenas for documents and other information, and received over 74,000 documents" and "interviewed 179 individuals and took testimony under oath from 41 of them." (OAG Report, 22-MC-3044, ECF No. 3-10, at 15.) Former Governor Cuomo announced his resignation one week later, on August 10, 2021, effective August 24, 2021. (Cuomo Mem., 22-MC-3044, ECF No. 2, at 5.) Thereafter, between August 3, 2021 and January 20, 2022, the OAG published "more than 20 videos, 40 transcripts, and 1,000 exhibits" on its website. (OAG Resp. to Cuomo's Subpoena, 22-MC-3044, ECF No. 3-6, at 2.)

In the meantime, on August 13, the Speaker announced that the AJC's investigation would be suspended because counsel had advised the Assembly that it "probably" could not impeach a former governor. (*See* Aug. 13, 2021 Press Release, 22-MC-3027, ECF No. 3-9; *see also* Mem. of Law to AJC, 22-MC-3027, ECF No. 3-9, at ECF pp. 4–9 (stating that Assembly "probably" did not have the authority to impeach a former official).) Three days later, the Speaker and Chair of the AJC declared that the investigation would continue notwithstanding Cuomo's impending resignation. (*See*

---

[2] In New York, legislative subpoenas are authorized by state law, and the Assembly's rules permit the Speaker of the Assembly to direct committees to conduct investigations. *See* N.Y. Legis. Law § 62-a; N.Y. State Assembly Rule I, § 1(c)(11). The New York State Constitution provides that the "assembly shall have the power of impeachment." N.Y. Const. art. VI, § 24.

Aug. 16, 2021 Press Release, 22-MC-3027, ECF No. 3-11.) The Committee then completed its investigation, during which it reviewed approximately 600,000 pages of documents, including materials from proffers, interviews, and depositions involving more than 200 individuals, culminating in the release of the AJC Report on November 22, 2021; the report was released to the public the same day. (AJC Report, 22-MC-3027, ECF No. 3-12; *see also* Nov. 22, 2021 Press Release, 22-MC-3027, ECF No. 16-16.)

## II.  The *Trooper 1* Case

On February 17, 2022, Trooper 1, a member of former Governor Cuomo's Protective Service Unit ("PSU"), initiated an action alleging that former Governor Cuomo sexually harassed her. (*See Trooper 1 v. New York State Police*, No. 22-CV-893 (LDH) (TAM) (E.D.N.Y.) (referred to herein as "*Trooper 1*"), Complaint ("Trooper 1 Compl."), ECF No. 1.) In that case, Trooper 1 named as Defendants the New York State Police ("NYSP"), former Governor Cuomo (also referred to herein as "Movant"), Melissa DeRosa ("DeRosa"), and Richard Azzopardi ("Azzopardi") (collectively referred to as "Trooper 1 Defendants"). (*See id.*; *see also* Trooper 1 First Amended Complaint ("Trooper 1 FAC"), ECF No. 7; Trooper 1 Second Amended Complaint ("Trooper 1 SAC"), ECF No. 71.)

As alleged in *Trooper 1*, Plaintiff Trooper 1 is a member of the NYSP who was on former Governor Cuomo's PSU starting in January 2018. (*See* Trooper 1 SAC, ECF No. 71, ¶¶ 3, 11, 20, 29.) Trooper 1 alleges that former Governor Cuomo sexually harassed her while he was in office. (*Id.* ¶¶ 3, 31–61, 68–74.) Of relevance here, Trooper 1 includes allegations in her second amended complaint that stem from findings reached following the OAG and AJC Investigations. For example, the *Trooper 1* second amended complaint states:

4. An exhaustive investigation by independent attorneys appointed by the New York State Attorney General concluded that "the Governor sexually harassed a number of current and former New York State employees by, among other things, engaging in unwelcome and nonconsensual touching, as well as making numerous offensive comments of a suggestive and sexual nature that created a hostile work environment for women." The investigation further concluded that "the Executive Chamber's culture – one filled with fear and intimidation, while at the same time normalizing the Governor's frequent flirtations and gender-based comments – contributed to the conditions that allowed the sexual harassment to occur and persist."

5. A separate comprehensive investigation by the Judiciary Committee of the New York State Assembly found "overwhelming evidence that the former Governor engaged in sexual harassment," expressly highlighting the Governor's victimization of Trooper 1.

(Trooper 1 SAC, 22-CV-893, ECF No. 71, ¶¶ 4–5.) Trooper 1's second amended complaint also includes detailed allegations regarding her experiences with the former Governor, including how he asked for her to be transferred to his detail, and her interactions with him that she claims amounted to, *inter alia*, sexual harassment and a hostile work environment. (*See id.* ¶¶ 19–61, 68–74.) In addition, Trooper 1's second amended complaint includes background allegations regarding former Governor Cuomo's harassment of other women, including Brittany Commisso, Charlotte Bennett, Lindsey Boylan, Alyssa McGrath, Ana Liss, Kaitlin, and others. (*See id.* ¶¶ 75–143 (describing incidents of harassment).)

The claims asserted by Trooper 1, which are alleged solely on her behalf, include the following: discrimination and retaliation in violation of the Equal Protection Clause (against former Governor Cuomo in his individual capacity); discrimination and retaliation in violation of the New York State Human Rights Law ("NYSHRL") (variously alleged against the NYSP, former Governor Cuomo, DeRosa, and Azzopardi); discrimination and retaliation in violation of the New York City Human Rights Law ("NYCHRL") (variously alleged against former Governor Cuomo, DeRosa,

and Azzopardi); and discrimination in violation of Title VII (against the NYSP). (Trooper 1 SAC, 22-CV-893, ECF No. 71, ¶¶ 160–94.)

## III. The Motions to Compel

Attorneys for former Governor Cuomo in the *Trooper 1* case filed the current motions to compel as miscellaneous actions. Specifically, in the first motion to compel, filed in *Cuomo v. The New York State Assembly Judiciary Committee*, 22-MC-3027, former Governor Cuomo moves to compel the AJC to comply with a Rule 45 subpoena that demands production of documents related to its investigation. (*See* Mot. to Compel, 22-MC-3027, ECF No. 1.) Similarly, in the second action, *Cuomo v. Office of the New York State Attorney General*, 22-MC-3044, former Governor Cuomo moves to compel the OAG to provide documents pursuant to a Rule 45 subpoena related to its investigation. (*See* Mot. to Compel, 22-MC-3044, ECF No. 1.) Both the Judiciary Committee and the AG's Office object.

By way of background, on July 1, 2022, former Governor Cuomo served a Rule 45 subpoena on the AJC, seeking documents related to its investigation and report (referred to herein, respectively, as the "AJC Investigation" and the "AJC Report"). (AJC Subpoena, 22-MC-3027, ECF No. 3-3; Cuomo Mem., 22-MC-3027, ECF No. 2, at 2; *see also* AJC Report, 22-MC-3027, ECF No. 3-12.) Specifically, the subpoena demanded, among other things, the following categories of information, all related to the sexual harassment allegations against former Governor Cuomo:[3] (1) all subpoenas or information requests issued by the AG's Office, the AJC, or the law firm hired by the AJC, Davis Polk & Wardwell ("DPW"), in connection with the AJC Investigation;

---

[3] The AJC Report also addressed issues not related to its investigation into the sexual harassment allegations. Former Governor Cuomo's subpoena only seeks those records that relate to the sexual harassment investigation. (*See* Cuomo Mem., 22-MC-3027, ECF No. 2, at 2 n.2.)

(2) "all evidence" gathered in connection with the AJC Investigation, including but not limited to documents provided to, and records of statements made to, the AJC by third parties (including the OAG), as well as unredacted transcripts, recordings, and videos of witness statements and/or attorney proffers; (3) all documents reflecting communications between the AJC and (a) any witness, (b) any attorney or representative of a witness, to include agreements of understanding concerning witness testimony, interviews, attorney proffers, and productions of documents, (c) the AG's Office, relating to evidence collected in both the AJC Investigation and the OAG Investigation, or any transmittals of evidence between the AJC and the AG's Office, and (d) any federal or state law enforcement, including any district attorney's office and the U.S. Department of Justice; (4) all drafts of the AJC Report; and (5) any reports by DPW to the AJC. (App. to Cuomo Mem., 22-MC-3027, ECF No. 2, at 23–26; Cuomo Mem., 22-MC-3027, ECF No. 2, at 2.)

Shortly thereafter, on July 11, 2022, former Governor Cuomo served a Rule 45 subpoena on the AG's Office, seeking documents related to its investigation and report (referred to herein, respectively, as the "OAG Investigation" and the "OAG Report"). (Cuomo Mem., 22-MC-3044, ECF No. 2, at 2.) Specifically, the subpoena demanded, among other things, (1) all documents concerning efforts to investigate sexual harassment allegations against former Governor Cuomo before February 28, 2021; (2) all subpoenas or information requests issued by the AG's Office in connection with their investigation; (3) documents provided to, and records of statements made to, the AG's Office by third parties, including unredacted transcripts and videos of testimony; (4) records of communications with third party witnesses or their attorneys, and all communications between the AG's Office and law enforcement, including any district attorney's office and the U.S. Department of Justice; (5) all drafts of the OAG Report;

and (6) reports by OAG deputies to the Attorney General or First Deputy Attorney General on the investigation (described in Movant's memorandum of law as "any periodic reports summarizing the investigation"). (App. to Cuomo Mem., 22-MC-3044, ECF No. 2, at 31–33; Cuomo Mem., 22-MC-3044, ECF No. 2, at 2–3.)

The AJC and the AG's Office each objected to the documents sought by the Rule 45 subpoenas, leading former Governor Cuomo to file the motions to compel presently before the Court. In response, both the AJC and the AG's Office have filed cross-motions to quash the subpoenas. (*See* AJC Cross-Mot. to Quash, 22-MC-3027, ECF No. 14; AJC Mem. in Supp. ("AJC Mem."), 22-MC-3027, ECF No. 15; AJC Decl. in Supp. of Cross-Mot. to Quash ("AJC Decl."), 22-MC-3027, ECF No. 16; *see also* OAG Cross-Mot. to Quash, 22-MC-3044, ECF No. 17; OAG Mem. in Supp. ("OAG Mem."), 22-MC-3044, ECF No. 18; OAG Decl. in Supp. of Cross-Mot. to Quash ("OAG Decl."), 22-MC-3044, ECF No. 19.)

Following extensive oral argument on the original motions, former Governor Cuomo filed a letter indicating a willingness to "consent to narrowing" his requests to (1) memoranda prepared by the OAG of witness interviews related to (a) "the eleven complainants referred to in Trooper 1's Amended Complaint" and (b) "witnesses relating to the allegations by the eleven complainants referenced in Trooper 1's Amended Complaint" (to the extent these memoranda were not previously produced in discovery in an Albany County criminal case that was started against Movant[4]) (referred to collectively as "OAG Witness Memoranda"); (2) witness interview memoranda related to complainants Trooper 1, Brittany Commisso, Lindsey Boylan,

---

[4] *See* Press Release, Statement from DA David Soares (Jan. 4, 2022), https://www.albanycountyda.com/Media/news/22-01-04/Statement_from_DA_David_Soares.aspx ("[W]e are declining to prosecute this matter and requesting the charges filed by the Albany County Sheriff be dismissed.").

and Alyssa McGrath prepared by AJC investigators and referenced in the AJC Report (referred to collectively as "AJC Witness Memoranda"); (3) records provided to the OAG by the 11 complainants (referred to collectively as "OAG Records from Complainants"); (4) records produced by third parties to the OAG that relate to the allegations of the 11 complainants (referred to collectively as "OAG Records Regarding Complainants"); and (5) unredacted transcripts and related, unredacted exhibits of the 41 witnesses whose testimony has been released to the public by the OAG (to the extent not previously produced in discovery in the Albany County case) (referred to collectively as "Unredacted OAG Transcripts and Exhibits"). (Cuomo Ltr., 22-MC-3027, ECF No. 27 & 22-MC-3044, ECF No. 28 (referred to herein as "Cuomo Ltr.").)[5]

For the reasons discussed herein, Movant's motion to compel the OAG is denied, and the AJC's cross-motion to quash is granted.

## DISCUSSION

### I. Legal Standards

#### A. Motion to Compel

Under Federal Rule of Civil Procedure 45(d)(2)(B)(i), a party who has properly served a subpoena "may move the court for the district where compliance is required for an order compelling production or inspection." Fed. R. Civ. P. 45(d)(2)(B)(i); *see, e.g.,*

---

[5] Thereafter, on July 7, 2023, without seeking leave of Court to supplement the briefing, former Governor Cuomo filed a letter, citing no new law, arguing that the Court should grant Movant's motions to compel, "at least to require the OAG and AJC to produce all interview memos reflecting witness statements, unredacted transcripts of all witness statements, and all documents produced by nonparties to the OAG or AJC," due to difficulties he claims to be experiencing in taking discovery in *Trooper 1*. (Cuomo Ltr., 22-MC-3027, ECF No. 29; Cuomo Ltr., 22-MC-3044, ECF No. 32.) In this latest version of his request, Movant appears to be attempting to revert somewhat to the extremely broad requests propounded in the first round of subpoenas. The Court does not, however, consider the factual arguments advanced in Movant's unauthorized 11th-hour filing. *See, e.g., Shukla v. Deloitte Consulting LLP*, No. 19-CV-10578 (AJN), 2021 WL 1131507, at *4 (S.D.N.Y. Mar. 24, 2021) (observing that the court is not obligated to consider an unauthorized sur-reply; citing cases).

*Gov't Emps. Ins. v. Dinesh Verma Med., P.C.*, No. 22-CV-2893 (GRB) (JMW), 2023 WL 2771638, at *1 (E.D.N.Y. Apr. 3, 2023). "'The party issuing the subpoena must demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings.'" *Gov't Emps. Ins.*, 2023 WL 2771638, at *1 (quoting *Knight v. Local 25 IBEW*, No. 14-CV-6497 (DRH) (AKT), 2016 U.S. Dist. LEXIS 45920, at *4 (E.D.N.Y. Mar. 31, 2016)); *see also Silver Sands Motel Inc. v. Long Island Cap. Mgmt.*, No. 21-CV-1224 (GRB) (JMW), 2023 WL 4054526, at *5 (E.D.N.Y. June 15, 2023). Relevance in this context is analyzed under the familiar standard outlined by Rule 26(b)(1). *See Silver Sands Motel Inc.*, 2023 WL 2771638, at *5 ("Subpoenas issued under Rule 45 are subject to the relevance requirement of Rule 26(b)(1)." (quotation marks omitted)); *see also Breaking Media, Inc. v. Jowers*, No. 21-MC-194 (KPF), 2021 WL 1299108, at *5 (S.D.N.Y. Apr. 7, 2021); *Varbero v. Belesis*, No. 20-CV-2538 (LJL), 2020 WL 7043503, at *1 (S.D.N.Y. Dec. 1, 2020). Federal Rule of Civil Procedure 45(d)(2)(B)(ii) specifically recognizes the need to protect non-parties from "significant expense resulting from compliance" with a subpoena. Fed. R. Civ. P. 45(d)(2)(B)(ii).

Rule 26(b)(1), as amended on December 1, 2015, recognizes that "[i]nformation is discoverable . . . if it is relevant to any party's claim or defense and is proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment; *see Sibley v. Choice Hotels Int'l*, No. 14-CV-634 (JS) (AYS), 2015 WL 9413101, at *2 (E.D.N.Y. Dec. 22, 2015) (observing that "the current version of Rule 26 defines permissible discovery to consist of information that is, in addition to being relevant 'to any party's claim or defense,' also 'proportional to the needs of the case'") (citation omitted); *see also Robertson v. People Magazine*, No. 14-CV-6759 (PAC), 2015 WL 9077111, at *2 (S.D.N.Y. Dec. 16, 2015) ("[T]he 2015 amendment [to Rule 26] does not create a new standard; rather it serves to exhort judges to exercise their preexisting control over

discovery more exactingly."). The Court has "broad discretion" in determining relevance for discovery purposes. *Michael Kors, L.L.C. v. Su Yan Ye*, No. 18-CV-2684 (KHP), 2019 WL 1517552, at *2 (S.D.N.Y. Apr. 8, 2019). The Court also "has wide latitude to determine the scope of discovery." *Broidy Capital Mgmt. LLC v. Benomar*, 944 F.3d 436, 446 (2d Cir. 2019) (quotation marks omitted); *see In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 125 (2d Cir. 2020) (recognizing courts have "broad discretion in managing discovery").

A magistrate judge's rulings on discovery matters are reviewed under a "highly deferential" standard "as magistrate judges are 'afforded broad discretion in resolving discovery disputes and reversal is appropriate only if their discretion is abused.'" *Best Payphones, Inc. v. Dobrin*, 409 F. Supp. 3d 130, 134 (E.D.N.Y. 2018) (quoting *McNamee v. Clemens*, No. 09-CV-1647 (SJ) (CLP), 2014 WL 1338720, at *2 (E.D.N.Y. Apr. 2, 2014)); *see also* Fed. R. Civ. P. 72(a) (providing that district courts may modify or set aside any part of a non-dispositive pre-trial order issued by a magistrate judge that is "clearly erroneous or is contrary to law"). "A court abuses its discretion when its decision rests on an error of law or on a clearly erroneous factual finding, or when its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) (quotation marks, modification, and citations omitted).

### B. Motion to Quash

As set forth above, Rule 45(d)(2)(B)(i) provides the mechanism for a motion to compel "production or inspection" pursuant to a subpoena. However, subsection B of Rule 45(d)(2) further provides that "[t]hese acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer

from significant expense resulting from compliance." Fed. R. Civ. P. 45(d)(2)(B)(ii). The movant bears the burden of persuasion in a motion to quash a non-party subpoena. *See Silverstone Holding Grp., LLC v. Zhongtie Dacheng (Zhuhai) Inv. Mgmt. Co.*, No. 22-MC-353 (RA) (GWG), 2023 WL 163256, at *2 (S.D.N.Y. Jan. 12, 2023); *Dukes v. NYCERS*, 331 F.R.D. 464, 469 (S.D.N.Y. 2019).

Under Rule 45, "the court for the district where compliance is required must quash or modify a subpoena" if it "requires disclosure of privileged or other protected matter" or "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii)–(iv). To determine whether a subpoena imposes an undue burden, "courts weigh the burden to the subpoenaed party against the value of the information to the serving party by considering factors such as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Citizens Union of N.Y.C. v. Att'y Gen. of N.Y.*, 269 F. Supp. 3d 124, 138 (S.D.N.Y. 2017) (quotation marks omitted). "Motions to compel and motions to quash a subpoena are both 'entrusted to the sound discretion of the district court.'" *In re Fitch Inc.*, 330 F.3d 104, 108 (2d Cir. 2003) (quoting *U.S. v. Sanders*, 211 F.3d 711, 720 (2d Cir. 2000)).

\* \* \* \* \*

For the following reasons, the Court grants the AJC's motion to quash former Governor Cuomo's subpoena on legislative privilege grounds. In addition, as to the investigatory documents prepared and gathered by AG's Office, the Court denies Movant's motion to compel.

## II.  The AJC Subpoena

As noted above, former Governor Cuomo's narrowed motion seeks to compel the production of four interview memoranda generated by the AJC, i.e., the memoranda

reflecting the interviews by the AJC of Trooper 1, Brittany Commisso, Lindsey Boylan, and Alyssa McGrath, which are referred to in the AJC Report.[6] (Cuomo Ltr. at 2.) In response to Movant's revised request, the AJC continues to argue that (1) the AJC enjoys Eleventh Amendment immunity that "bars the Subpoena" and (2) the witness interview memoranda are "precisely the type of legislative fact-finding that courts protect" under the legislative privilege. (AJC Ltr., 22-MC-3027, ECF No. 28, at 1.) The AJC has also asserted that the documents responsive to Movant's original subpoena demand of "[a]ll evidence gathered in connection with the [AJC] Investigation" (which category appears to include the AJC Witness Memoranda he now seeks) are protected by the attorney-client privilege and constitute attorney work product. (AJC Mem., 22-MC-3027, ECF No. 15, at 3, 21–24 (quoting AJC Subpoena, 22-MC-3027, ECF No. 3-3).) In response, Movant argues that the privileges claimed here do not apply and that they have been waived by the AJC's disclosure of the AJC Report to the public. (Cuomo Mem., 22-MC-3027, ECF No. 2, at 12–13 (discussing argued waiver of the legislative privilege); 16–17 (attorney-client privilege); 19 (work product doctrine).)

For the reasons discussed below, the Court grants the AJC's motion to quash former Governor Cuomo's subpoena on legislative privilege grounds.[7] However, as discussed *infra*, the Court declines to reach the question of whether Eleventh Amendment or common law sovereign immunity protects the New York State

---

[6] Movant's revised request does not specify whether former Governor Cuomo is seeking all of the requested materials from both entities, to the extent that the entities are in possession of documents gathered or generated by the other. Due to the Court's ultimate conclusions, this question need not be answered. (*See* Cuomo Ltr., 22-MC-3027, ECF No. 27 & 22-MC-3044, ECF No. 28.)

[7] Because the Court grants the AJC's motion to quash on legislative privilege grounds, the Court declines to evaluate relevance, proportionality, or burden under the motion to compel rubric.

legislature from having to comply with a federal subpoena. *Cf. Judicial Watch, Inc. v. Schiff*, 998 F.3d 989, 993 (D.C. Cir. 2021) ("Because the Speech or Debate Clause bars Judicial Watch's lawsuit, the court need not address the district court's alternative ground for dismissal based on the doctrine of sovereign immunity.").

## A. Legislative Privilege

### 1. *The Origin of the Privilege*

The legislative privilege involves "related, but distinct, concepts of legislative immunity [and] legislative privilege." *Favors v. Cuomo*, 285 F.R.D. 187, 207 (E.D.N.Y. 2012) ("*Favors I*"). As the Honorable Roanne L. Mann observed in *Favors I*, "[t]he concepts of legislative privilege and legislative immunity developed in sixteenth- and seventeenth-century England as a means of curbing monarchical overreach, through judicial proceedings, in Parliamentary affairs." *Id.* Accordingly, the Speech or Debate Clause of the U.S. Constitution[8] has been interpreted as "providing Members of Congress with two distinct, but related, absolute protections: (1) immunity from suit for their legislative acts and (2) protection from being compelled to testify in court and produce information about acts that fall within the legitimate legislative sphere." *Citizens Union of N.Y.C.*, 269 F. Supp. 3d at 150 (quotation marks omitted). However, the legislative privilege afforded to state lawmakers in federal question cases is not a product of federal or state constitutional provisions, but is "governed by federal common law." *Favors I*, 285 F.R.D. at 208. In that context, the state legislative privilege "protects state legislators and their staffs from compelled disclosure of documentary

---

[8] The federal Speech or Debate Clause provides that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. The New York State Constitution includes an analogous provision, which states: "For any speech or debate in either house of the legislature, the members shall not be questioned in any other place." N.Y. Const. art. III, § 11.

and testimonial evidence with respect to actions within the scope of legitimate legislative activity." *Id.* at 209.

2. *Legitimate Legislative Activity*

Although the federal Speech or Debate Clause is "not directly applicable to state legislators . . . the Clause provides a useful framework for determining whether the legislative privilege applies to the documents and information sought" by Movant. *Favors v. Cuomo*, No. 11-CV-5632 (DLI) (RR) (GEL), 2013 WL 11319831, at *4 (E.D.N.Y. Feb. 8, 2013) ("*Favors II*") (citation omitted). The Supreme Court has observed that "[w]ithout exception, our cases have read the Speech or Debate Clause broadly to effectuate its purposes," including the purpose that the legislative function "may be performed independently." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501, 502 (1975); *see also Doe v. McMillan*, 412 U.S. 306, 312 (1973) (recognizing that the Speech or Debate Clause protects "legislative acts"). For federal lawmakers, "once it is determined that Members are acting within the 'legitimate legislative sphere' the Speech or Debate Clause is an absolute bar to interference." *Eastland*, 421 U.S. at 503. "In determining whether particular activities other than literal speech or debate fall within the 'legitimate legislative sphere' we look to see whether the activities took place 'in a session of the House by one of its members in relation to the business before it.'" *Eastland*, 421 U.S. at 503 (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880)).

More specifically, courts must evaluate whether the legislative matters are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel v. United States*, 408 U.S. 606, 625 (1972); *see also Eastland,* 421 U.S. at 504; *Doe v. McMillan*, 412 U.S. at 313

(recognizing that the "acts of authorizing an investigation pursuant to which the subject materials were gathered, holding hearings where the materials were presented, preparing a report where they were reproduced, and authorizing the publication and distribution of that report" were an integral part of legislative activity); *see also Eastland*, 421 U.S. at 505 (reiterating the holding that "the act 'of authorizing an investigation pursuant to which . . . materials were gathered' is an integral part of the legislative process") (quoting *Doe v. McMillan*, 412 U.S. at 313)); *see also Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 416 (D.C. Cir. 1995) ("The privilege also permits Congress to conduct investigations and obtain information without interference from the courts . . . .").

Applying these principles, the D.C. Circuit recently upheld the applicability of the legislative privilege to information received by a congressional committee through investigative activities, concluding that a "Committee's issuance of subpoenas, whether as part of an oversight investigation or impeachment inquiry, was a legislative act protected the Speech or Debate Clause." *Judicial Watch, Inc.*, 998 F.3d at 992. The rationale behind the broad protection afforded by the Speech or Debate Clause is "to preserve the independence and thereby the integrity of the legislative process." *United States v. Brewster*, 408 U.S. 501, 524 (1972); *see also MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856 (D.C. Cir. 1988) (quashing subpoena issued by the defendants in a civil case that would have required disclosure of documents and information in possession of a committee, and declining to abrogate legislative privilege to require disclosure of materials underlying printed report, where litigant challenged the accuracy of the report); *Miller v. Transamerican Press, Inc.*, 709 F.2d 524 (9th Cir. 1983) (holding that legislative privilege protected former congressman from questioning as a deponent regarding information he had placed in the congressional record); *SEC v.*

*Comm. on Ways & Means of the U.S. House of Representatives*, 161 F. Supp. 3d 199, 245 (S.D.N.Y. 2015) ("*Ways & Means*") (analyzing circuit split and concluding that, in the federal context, "the Speech or Debate Clause provides a non-disclosure privilege for documents that fall within the 'sphere of legitimate legislative activity'").

    3.  *Scope of the Legislative Privilege for State Lawmakers*

Although the Speech or Debate Clause for federal lawmakers, when it applies to legitimate legislative activity, is absolute, "the legislative privilege for state lawmakers is, 'at best, one which is qualified.'" *Favors I*, 285 F.R.D. at 209 (quoting *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 100 (S.D.N.Y. 2003)). Accordingly, district courts have observed that state "legislators may, at times, be called upon to produce documents or testify at depositions." *Rodriguez*, 280 F. Supp. 2d at 95; *see also Favors II*, 2013 WL 11319831 (analyzing applicability of qualified legislative privilege to discovery requests in case challenging New York State's redistricting); *ACORN v. County of Nassau*, No. 05-CV-2301 (JFB) (WDW), 2007 WL 2815810, at *2 (E.D.N.Y. Sept. 25, 2007), *aff'd*, 2009 WL 2923435 (E.D.N.Y. Sept. 10, 2009) (observing that the state "legislative privilege is qualified, not absolute, and must therefore depend on a balancing of the legitimate interests on both sides" (quotation marks omitted)).

In evaluating whether the qualified legislative privilege applies, courts have examined the following five factors:

> "(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the 'seriousness' of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable."

*Rodriguez*, 280 F. Supp. 2d at 100 (quoting *In re Franklin Nat'l Bank Secs. Litig.*, 478 F. Supp. 577, 583 (E.D.N.Y. 1979) (identifying the factors that should be analyzed to assess the applicability of the official information privilege)); *see also Favors II*, 2013 WL

11319831, at *11. As with the assertion of other privileges, "the party seeking protection on the basis of legislative privilege bears the burden of establishing entitlement to it." *Favors II*, 2013 WL 11319831, at *4.

## B. Analysis

Here, former Governor Cuomo argues that the legislative privilege does not apply because it only protects "legislators and their staff from compelled disclosure of documentary and testimonial evidence with respect to actions within the scope of legitimate legislative activity." (Cuomo Mem., 22-MC-3027, ECF No. 2, at 11.) Relying on *Favors II*, Movant contends that "the legislative privilege applies only to acts that are 'quintessentially legislative,' that are an 'integral step' in the legislative process, and that bear 'the hallmarks of traditional legislation.'" (*Id.* (quoting *Favors II*, 2013 WL 11319831, at *6).) Movant also argues that any legislative privilege was waived due to the publication of the AJC Report. (Cuomo Mem., 22-MC-3027, ECF No. 2, at 12–13.) For the following reasons, the Court rejects both arguments, and finds that a balancing of the interests here weighs in favor of protecting the AJC's documents from disclosure.

### 1. *Legitimate Legislative Activity*

"Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998); *Eastland*, 421 U.S. at 508 ("Our cases make clear that in determining the legitimacy of a congressional act we do not look to the motives alleged to have prompted it."). In addition, and of particular relevance to this argument, the Supreme Court has expressly recognized that the broad protection afforded by the Speech or Debate Clause, and the concomitant lack of judicial oversight of congressional activities, could present "potential for abuse" but that "the risk of such abuse was 'the conscious choice of the Framers' buttressed and justified by history." *Eastland*, 421 U.S. at 510

(quoting *Brewster*, 408 U.S. at 516);[9] *see also Brown & Williamson Tobacco Corp.*, 62 F.3d at 416.

Former Governor Cuomo contends that the AJC Investigation and subsequent issuance of the AJC Report were not protected legislative activity given the timing of Movant's resignation. (Cuomo Mem., 22-MC-3027, ECF No. 2, at 1; *see id.* at 5–6 (positing that the "purpose of the investigation was not to determine whether to initiate impeachment proceedings but was instead to provide a report to the public"); *id.* at 11–12 (arguing that because the investigation continued after Cuomo resigned, "the only reason to investigate was to issue a public report"); Cuomo Response Br., 22-MC-3027, ECF No. 19, at 1, 8–9.) Movant also argues that *Bogan* does not apply, since that case "simply confirms that a lawmaker's motive is irrelevant" in determining a legislator's immunity from suit for legislative acts. (Cuomo Response Br., 22-MC-3027, ECF No. 19, at 8.) Rather, Movant argues that the "relevant consideration in determining the character of the investigation is the purpose for which it was undertaken." (*Id.* (citing *Favors II*, 2013 WL 11319831, at *7; *Nat'l Ass'n for the Advancement of Colored People ("NAACP") v. E. Ramapo Cent. Sch. Dist.*, No. 17-CV-8943 (CS) (JCM), 2018 WL 11260468, at *6 (S.D.N.Y. Apr. 27, 2018)).)

---

[9] In *Tenney v. Brandhove*, for example, the Supreme Court made the following observations:

> Investigations, whether by standing or special committees, are an established part of representative government. Legislative committees have been charged with losing sight of their duty of disinterestedness. In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses.

341 U.S. 367, 377–78 (1951) (footnotes omitted).

The AJC argues in response that its impeachment investigation was an official legislative proceeding, and that the fruits of its investigation are protected legislative activity. (AJC Mem., 22-MC-3027, ECF No. 15, at 12.) The AJC also argues that the Assembly passed "multiple laws arising from the Committee's investigation that expanded protections against harassment and discrimination." (*Id.* at 6; *see id.* at 6–7, 17 (describing legislation passed and proposals introduced following the release of the AJC Report).)

Turning to Movant's specific request for the AJC Witness Memoranda, the Court concludes that the documents are, by their very nature, "materials prepared in connection with . . . committee meetings and reports . . . or formal information-gathering by . . . representatives for legislators." *Favors II*, 2013 WL 11319831, at *9; *see also Citizens Union of N.Y.C.*, 269 F. Supp. 3d at 150 (discussing the protection afforded by the legislative privilege from being "compelled to testify in court and produce information about acts that fall within the legitimate legislative sphere" (quotation marks omitted)); *see also id.* at 151 (recognizing that legislative acts may include "making, publishing, presenting, and using legislative reports; authorizing investigations and issuing subpoenas"). The AJC Witness Memoranda are not akin to press releases, newsletters, or public comments by individual legislators. *See Hutchinson v. Proxmire*, 443 U.S. 111, 133 (1979); *cf. Favors II*, 2013 WL 11319831, at *7 (concluding that document styled as a legal memorandum that included statements intended for public distribution was not protected).[10] Given that the AJC Witness Memoranda were

---

[10] Movant's response brief characterizes the rule as follows: "Information designed to be shared with the public, even if gathered in connection with some activity that can be characterized as legislative in nature, is simply not protected by the legislative privilege." (Cuomo Response Br., 22-MC-3027, ECF No. 19, at 9 (citing *Favors II*).) This formulation begs the question of what information was "designed" to share with the public. Unquestionably, the AJC

prepared by investigators tasked with conducting an independent investigation for the AJC, the Court finds that the memoranda were prepared "'in relation to the business before'" the committee.[11] *Eastland*, 421 U.S. at 503 (quoting *Kilbourn*, 103 U.S. at 204).

The next question is whether the "business" before the AJC was to conduct a committee investigation or to prepare a public statement that — according to Movant — may not be protected. Here, the acts undertaken by the legislative committee bear significant indicia of regularity: the documents sought were prepared in connection with an investigation by a committee of the state legislature that was empowered to subpoena witnesses, conduct an investigation, and produce a report of their findings, in accordance with the powers provided to it by the New York State Constitution and state law. *See supra* note 2. In addition, although the AJC may have lacked the power to impeach former Governor Cuomo due to the timing of his resignation, he has presented no authority to this Court that demonstrates that the AJC was acting outside the bounds of its legislative authority by completing its investigation. Moreover, Movant has presented no authority, and the Court is not aware of any, that would suggest either (1) that an executive branch official's decision to resign strips the New York State

---

Report was such a document. Nothing in the present record before the Court suggests that any other investigative documents generated along the way were earmarked for the public *ab initio*. *See Eastland*, 421 U.S. at 509 (recognizing that legislative inquiries may be unpredictable and that "[t]o be a valid legislative inquiry there need be no predictable end result").

[11] The Court notes that some courts have observed that the legislative privilege is considered "'a personal one and may be waived or asserted by each individual legislator.'" *Favors I*, 285 F.R.D. at 211 (quoting *ACORN*, 2007 WL 2815810, at *4). Other courts have recognized that the privilege may protect legislative committees, such as the AJC. *See, e.g., MINPECO, S.A.*, 844 F.2d 856; *Ways & Means*, 161 F. Supp. 3d 199. Indeed, the fact that the subpoena in this case was served on the AJC, not an individual legislator, underscores that the activities underlying the AJC Investigation were legislative in nature. Movant is seeking the work product of the legislative committee itself, not documents related to political acts undertaken by individual legislators. *See generally Gravel*, 408 U.S. at 625 (recognizing that the federal legislative privilege extends to "other matters which the Constitution places within the jurisdiction of either House").

legislature of its authority to investigate possible misconduct by an executive branch official or (2) that resignation of an executive branch official could somehow abrogate the legislative privilege. These results would raise serious separation of powers concerns.

The AJC also argues that information gathered through the investigation was utilized by the Assembly in relation to other legislative activities, including passing and proposing legislation. Although the legislation it cites adds some weight to the AJC's position, the AJC need not prove the legitimacy of its legislative activities by showing the Assembly's work product.[12] As the Supreme Court has observed, "[t]he wisdom of congressional approach or methodology is not open to judicial veto. Nor is the legitimacy of a congressional inquiry to be defined by what it produces." *Eastland*, 421 U.S. at 509 (citation omitted); *see also Schiff*, 998 F.3d at 992. Given that the AJC Witness Memoranda were prepared in connection with a committee inquiry, the Court finds that the activities as to which Movant seeks discovery were quintessentially legislative acts within the sphere of a matter under "the jurisdiction of" the Assembly. *Gravel*, 408 U.S. at 625. Accordingly, the Court declines Movant's invitation to "look beyond [the AJC's] formal actions" to determine whether any other aims motivated the AJC Investigation. *Bogan*, 523 U.S. at 55. To do so would be an inappropriate foray by this Court into New York State politics.

---

[12] Although, in the Court's view, the Assembly does not need to defend its investigation by establishing that it, in fact, passed legislation as a result of the investigation, in this case, the AJC asserts that the facts gathered during the investigation led to the passage of two bills, as well as the introduction of other proposals. (AJC Mem., 22-MC-3027, ECF No. 15, at 17 (quoting *Ways & Means*, 161 F. Supp. 3d at 232 (discussing an investigation that looked into "not only [issues] on which legislation could be had but [were] later the subject of actual legislation" (internal quotation marks and citations omitted) (modification in AJC Mem.))).)

Having found that the AJC Witness Memoranda fall within the scope of the legislative privilege, the Court next evaluates whether that privilege was waived and whether, even if privileged, the memoranda should be disclosed.[13]

2. *Waiver of the Legislative Privilege*[14]

Movant argues that the AJC waived the legislative privilege by publishing the AJC Report. (Cuomo Mem., 22-MC-3027, ECF No. 2, at 12–13.) The Supreme Court has made clear that the waiver of privileges flowing from the federal Speech or Debate Clause operates differently than more traditional privileges. *See United States v. Helstoski*, 442 U.S. 477, 491 (1979) ("The ordinary rules for determining the appropriate standard of waiver do not apply in this setting."). In applying the qualified legislative privilege for state legislators, courts have held that "the legislative privilege . . . can be waived if the parties holding the privilege share their communications with an outsider." *Favors II*, 2013 WL 11319831, at *10 (quotation marks omitted) (citing cases).

As set forth above, the AJC Witness Memoranda were prepared on behalf of the AJC during the course of its investigation. The fact that certain information gathered during the investigation was included in a public report does not, however, constitute

---

[13] In *Favors II*, the court observed that the applicability of the qualified legislative privilege includes "four discrete inquiries," namely (1) "whether the withheld materials are sufficiently 'legislative' in nature as to fall within the scope of that privilege"; (2) "whether the privilege has been properly asserted"; (3) "whether the legislative privilege, if properly asserted, has been waived with respect to any documents"; and (4) "whether the plaintiffs' need for disclosure outweighs the reasons for affording . . . protection." *Favors II*, 2013 WL 11319831, at *3. Courts have recognized that the legislative privilege may apply to legislative committees. *See supra* note 11. Accordingly, as to the second inquiry, the Court finds that the AJC has properly asserted the privilege on behalf of the institution. Inquiries three and four are discussed *infra*.

[14] Given the conclusion that the AJC's preparation of interview memoranda and information gathering fell within the sphere of legitimate legislative activity, and that the AJC's legislative privilege should be upheld, the Court need not reach the question of whether the AJC Witness Memoranda are also protected by the attorney-client privilege and work product doctrine. (*See generally* AJC Mem., 22-MC-3027, ECF No. 15, at 21–24.)

transmission to an outsider that waives privilege over the underlying investigative materials themselves. Such a rule would risk a significant intrusion into legislative activity, and create a substantial burden on the legislature. It could also chill legislatures from reporting their investigative findings to the public and reduce governmental transparency. *See generally MINPECO, S.A.*, 844 F.2d at 860, 861 (observing that "the process by which a committee takes statements and prepares them for publication clearly qualifies as an activity within the legislative sphere" and that "the preparation of [a] statement for publication in [a] subcommittee report was part of the legislative process" (quotation marks omitted)); *Ways & Means*, 161 F. Supp. 3d at 239. Accordingly, the Court finds that publication of the AJC Report was part of the legislative process, and did not waive the legislative privilege.

    3. *Balancing of Interests*

    In balancing Movant's interests against the AJC's, the Court looks to the five *Rodriguez* factors, and evaluates whether the "need for disclosure outweighs the reasons for affording . . . protection." *Favors II*, 2013 WL 11319831, at *3; *Rodriguez*, 280 F. Supp. 2d at 101. As to the first factor, relevance, the Court finds that there could be some relevance to the four AJC Witness Memoranda if these four witnesses testify in the *Trooper 1* case. However, in examining the second factor, the Court concludes that other evidence regarding these witnesses is readily available. As discussed above, Movant has access to substantial materials regarding the four witnesses; lightly redacted transcripts of their depositions and other materials related to them are available on the OAG's website. *See* Transcripts and Exhibits from Independent Investigation into Sexual Harassment Allegations Against Former Governor Andrew Cuomo, https://ag.ny.gov/CuomoIndependentInvestigation. In addition, if appropriate, Movant may have the opportunity to take discovery regarding these witnesses'

anticipated testimony in *Trooper 1*. Accordingly, the second factor does not weigh in favor of compelling disclosure.

Turning now to the third factor, the seriousness of the litigation, the *Trooper 1* case is undoubtedly serious. The former top executive branch official of New York State stands accused of sexual harassment while in office by a New York State Trooper. Former Governor Cuomo's strongest argument in favor of disclosure, which was raised at oral argument, relates to the possibility that the AJC Witness Memoranda could contain arguably exculpatory information and impeachment material for witnesses who may testify at the *Trooper 1* trial, and that the memoranda would thus be relevant to his defense. (Tr. of Feb. 7, 2023 Hearing, 22-MC-3027, ECF No. 24, at 24:12–21; 97:24–25; 107:10–12; 123:23–124:11.) As was made plain at oral argument, Movant is seeking these materials to help him prepare his case more efficiently, and in the hope that they contain impeachment information. These interests, although important, do not outweigh the other *Rodriguez* factors given the fact that other means are available to gather relevant evidence and the importance of protecting the legislative process.

Evaluating the fourth factor, the role of the government in the litigation, the Court notes that *Trooper 1* is a private lawsuit. This factor weighs in favor of the AJC. An evaluation of the final factor, whether disclosure could cause "future timidity by government employees," also weighs in favor of the AJC. *Rodriguez*, 280 F. Supp. 2d at 101. Requiring the AJC to turn over its memoranda could chill future witnesses' willingness to participate in important legislative inquiries. *Id.* at 100–01. Balancing all five factors, the Court finds that although factors one and three tip the scales somewhat in favor of Movant, the availability of other evidence, risk of a chilling effect, and lack of government involvement in the *Trooper 1* litigation weigh heavily in favor of the AJC.

\*     \*     \*     \*     \*

25

For all of these reasons, the AJC's motion to quash is granted, and the AJC is not required to respond to Movant's request for the AJC Witness Memoranda (and, if still applicable, other documents the AJC gathered during the course of its investigation). *See generally Eastland*, 421 U.S. at 505 (recognizing that gathering materials "is an integral part of the legislative process"); *see also Brown & Williamson Tobacco Corp.*, 62 F.3d at 416 (reiterating that the legislative privilege permits Congress "to conduct investigations and obtain information without interference from the courts").

### III. The OAG Subpoena

In response to the original Rule 45 subpoena that Movant issued to the OAG, the OAG first argued that this Court does not have subject matter jurisdiction based on the Attorney General's "broad state sovereign immunity." (OAG Mem., 22-MC-3044, ECF No. 18, at 10–14.) In addition, the OAG argued (1) that the subpoena should be quashed because the requested materials are irrelevant, not proportional to the needs of the *Trooper 1* case, and that production would impose an undue burden on the AG's Office (*id.* at 14–22); and (2) that the requested materials are protected by various applicable privileges, including the attorney-client privilege and work product doctrine, the law enforcement privilege, and the deliberative process privilege (*id.* at 22–30).

Following oral argument, as noted above, Movant narrowed his requests; he now seeks four categories of documents prepared or collected by the OAG: (1) OAG Witness Memoranda; (2) OAG Records from Complainants; (3) OAG Records Regarding Complainants; and (4) Unredacted OAG Transcripts and Exhibits. (Cuomo Ltr. at 1–2.) In response to former Governor Cuomo's effort to narrow the list of items sought pursuant to the subpoena, the OAG reiterates the same core objections it made in response to the original subpoena: sovereign immunity, irrelevance, disproportionality, and privilege. (OAG Ltr., 22-MC-3044, ECF No. 29.) Although the AG's Office

recognizes that the effort to narrow the document requests does appear to have excised requests that plainly sought "internal attorney communications and drafts," the OAG contends that "Movant continues to pursue all documents responsive to his remaining 5 requests seeking material relating to all 11 complainants rather than just Trooper 1" and that such requests are overly broad and unduly burdensome. (*Id.* at 1.)

More specifically, the OAG asserts that Movant "still seeks essentially all of the 73,000 non-public documents collected by the Investigative Team and all interview memos, which are attorney work product." (*Id.*) Given that the focus of the OAG Investigation was allegations of sexual harassment by 11 complainants, the AG's Office contends that the "'narrowed' subpoena continues to sweep up virtually all of the materials collected and all of the interview memos prepared" as part of the investigation, and that review of the entire investigative file would be extremely burdensome and costly. (*Id.* at 1–2.) As to the provision of the unredacted transcripts and exhibits for the witnesses that have been made available on the OAG's website, the OAG argues that concerns remain about witness confidentiality, privilege, and whether production could chill future investigations. (*Id.* at 2–3.)

Although Movant has articulated a theory of relevance for these materials, the Court is not persuaded by it; nor is the Court convinced that production of the requested documents would be proportional to the needs of the *Trooper 1* case. In addition, the Court concludes that production of the large volume of documents sought would impose a significant undue burden on the OAG, a non-party. As noted *supra*, in evaluating the burden to the OAG, a subpoenaed non-party, the Court considers various factors including relevance, the need for the documents, and the breadth of the request. *Citizens Union of N.Y.C.*, 269 F. Supp. 3d at 138.

## A. Relevance and Proportionality

Given the broad scope of the documents former Governor Cuomo seeks, he has not met his burden to establish relevance. *See Culbreath v. Griffin*, No. 17-CV-3406 (KMK) (LMS), 2018 WL 11299396, at *3 (S.D.N.Y. Mar. 1, 2018) (discussing two-step analytical framework governing motions to compel, including (1) the movant's burden to show relevance and, if met, (2) the resisting party's burden to show undue expense or burden). "'Information is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Relevance is a matter of degree, and the standard is applied more liberally in discovery than it is at trial.'" *N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 325 F.R.D. 36, 47 (E.D.N.Y. 2018) (quoting *Vaigasi v. Solow Mgmt. Corp.*, No. 11-CV-5088, 2016 WL 616386, at *11 (S.D.N.Y. Feb. 16, 2016)).

Regarding the OAG Witness Memoranda, and records provided by and "relate[d] to" the 11 complainants, Movant seeks all memoranda generated as a result of interviews of the complainants, as well as all memoranda that pertain to "witnesses relating to the allegations by the eleven complainants referenced in Trooper 1's Amended Complaint." (Cuomo Ltr. at 1–2.) He also seeks all records provided to the OAG by the complainants themselves or any records that "relate" to the allegations of the 11 complainants provided by others. (*Id.* at 2.) Finally, he seeks a complete set of the unredacted transcripts and exhibits regarding 41 witnesses, whose information is already published on the OAG website. (*Id.*) Movant asserts that all of these documents are relevant, without any particularized analysis as to the claims at issue in the *Trooper 1* case, the size of the proposed document production, or even what each category of documents may include. (*See* Cuomo Mem., 22-MC-3044, ECF No. 2, at 10–11; Cuomo

Ltr.) Rather, Movant asserts that he "is entitled to challenge the independent and exhaustive nature of the OAG Report" primarily because the complaint in *Trooper 1* makes reference to it. (*See* Cuomo Mem., 22-MC-3044, ECF No. 2, at 11.) In the letter submitted after oral argument, Movant again includes no particularized analysis of the different broad categories of documents he seeks. Rather, he simply asserts, with little explanation, that "[t]his narrowed scope should substantially address the OAG's and AJC's concerns regarding relevancy, proportionality, burden, and legislative and law enforcement interests, while still providing Governor Cuomo with the evidence he needs to litigate this case without forcing him to replicate the same investigation." (Cuomo Ltr. at 2.)

These arguments do little to establish relevance and proportionality. The claims in the *Trooper 1* case are specific to Trooper 1. The SAC includes detailed allegations regarding former Governor Cuomo's recruitment of Trooper 1 onto his protection detail, his alleged sexual harassment and retaliation, and claims regarding the other Defendants' involvement, but ultimately states specific causes of action brought by Trooper 1 solely on her own behalf. (*See* Trooper 1 SAC, 22-CV-893, ECF No. 71.) As set forth above, Trooper 1's claims are: discrimination and retaliation in violation of the Equal Protection Clause (against former Governor Cuomo in his individual capacity); discrimination and retaliation in violation of the NYSHRL (variously alleged against the NYSP, former Governor Cuomo, DeRosa, and Azzopardi); discrimination and retaliation in violation of the NYCHRL (variously alleged against former Governor Cuomo, DeRosa, and Azzopardi); and discrimination in violation of Title VII (against the NYSP). (*Id.* ¶¶ 160–94.) Given the narrow scope of the actual claims in the *Trooper 1* case, as compared to the much broader OAG and AJC Investigations, former Governor Cuomo appears to be attempting to use the civil discovery tools available to him in

*Trooper 1* to test "the independent and exhaustive nature of the OAG Report" and the AJC Investigation. (*See* Cuomo Mem., 22-MC-3044, ECF No. 2, at 11.)

Movant's claim that he needs the documents to test the investigations is unavailing. Whether the investigations were "independent and exhaustive" is not a question that the *Trooper 1* jury will need to decide. Moreover, as Movant acknowledged at oral argument, the full range of civil discovery tools is available to him in connection with the *Trooper 1* litigation, and he may seek to depose relevant anticipated witnesses and subpoena them for documents. (Tr. of Feb. 7, 2023 Hearing, 22-MC-3044, ECF No. 25, at 12:24–13:3.) In this vein, the Court further notes that nothing in the record indicates that Trooper 1, or any of the other anticipated witnesses in the *Trooper 1* case, have independent knowledge of, or access to, the materials underlying the OAG Report, apart from the information and documents that each witness provided. Accordingly, as to knowledge of the information gathered during the investigations, the record suggests that Trooper 1 and Movant are basically on an equal footing. Although Movant may find it easier, more efficient, or more convenient to conduct discovery with the investigative files generated by the OAG in hand, that does not establish relevance for the broad swath of documents Movant seeks. Nor is it a sufficient basis to shift the burden of production to the OAG, who is not a party in the *Trooper 1* action.

### B. Need for the Documents & Breadth of the Subpoenas

The document requests to the OAG are quite substantial in their breadth. Even as revised, Movant appears to seek nearly every witness interview memorandum and document gathered regarding all 11 complainants on which the OAG Investigation

focused.[15] In light of the broad scope of the documents former Governor Cuomo seeks, some of which encompass ill-defined categories (e.g., all records "relating" to the 11 complainants), he has not demonstrated a need for the documents. Indeed, much of the information gathered is included, in substance, in the OAG Report. The OAG website also includes deposition transcripts and exhibits from 41 witnesses, as discussed *supra*. Movant can also seek documents and materials through traditional discovery in *Trooper 1*.

Given that the OAG Investigation was focused on the 11 complainants, the OAG estimates that Movant's request seeks "essentially all of the 73,000 non-public documents" collected by the OAG and "all interview memos." (OAG Ltr., 22-MC-3044, ECF No. 29, at 1.) In response to the original subpoena, the OAG submitted a declaration from a Special Assistant to the First Deputy Attorney General, which detailed the scope of the investigative steps she and the other attorneys (the

---

[15] The Court notes that the breadth of the original subpoenas issued by Movant was even more staggering. Originally, former Governor Cuomo appeared to seek every document generated in connection with the AJC and OAG Investigations, including all correspondence with witnesses and their attorneys, all correspondence between the AG's Office, the AJC, and other governmental entities, correspondence between the AJC and their outside counsel, DPW, and draft and interim reports. (*See* AJC Subpoena, 22-MC-3027, ECF No. 3-3, at ECF pp. 9–11; OAG Subpoena, 22-MC-3044, ECF No. 3-3, at ECF pp. 9–10.) Notably, the AJC Report detailed that vast quantities of documents were collected and reviewed in connection with the AJC Investigation, as follows:

> In the course of this investigation, Davis Polk has reviewed approximately 600,000 pages of documents, including photographs, text messages, BlackBerry PIN messages, emails, policies and procedures, recordings of phone calls, social media accounts, materials from prior litigations, video recordings, interview memos, transcripts, and other relevant materials. In addition, we interviewed, received proffers from, and/or reviewed interview and/or deposition materials for more than 200 individuals.

(AJC Report, 22-MC-3027, ECF No. 3-12, at 1.) The OAG Investigation was also broad in scope; the OAG Report indicates that the investigators "issued over 70 subpoenas for documents and other information, and received over 74,000 documents" and "interviewed 179 individuals and took testimony under oath from 41 of them." (OAG Report, 22-MC-3044, ECF No. 3-10, at 15.)

"Investigative Team") took. (Chun Decl., 22-MC-3044, ECF No. 20, ¶ 3.) Specifically, she represents that the "Investigative Team interviewed 179 witnesses in connection with the allegations of, and circumstances surrounding, sexual harassment by the former governor" and that they "took on-the-record testimony from 41 of these witnesses." (*Id.*) In addition, they issued over 70 subpoenas, and "received over 74,000 documents." (*Id.*) Movant makes little effort to differentiate among these documents, seeking essentially everything OAG has related to the 11 complainants. This demand is too broad, and disproportionate to the needs of the *Trooper 1* case. *See, e.g.*, *Estate of Ungar v. Palestinian Authority*, 332 F. App'x 643, 645 (2d Cir. 2009) (concluding that district court "acted well within its discretion in quashing [a] subpoena" that sought "essentially every document" related to a law firm's representation of a client); *Vaigasi*, 2016 WL 616386, at *15 (collecting cases) ("Blanket requests of this kind are plainly overbroad and impermissible." (quotation marks omitted)); *Hedgeye Risk Mgmt., LLC v. Dale*, No. 21-CV-3687 (ALC) (RWL), 2023 WL 4353076, at *2 (S.D.N.Y. July 5, 2023) (collecting cases) (discussing the general rule that non-particularized requests for "all" documents are often overbroad and burdensome).

### C. Burden Imposed

The OAG has offered highly detailed information regarding the anticipated burden of production if the Court were to grant the motion to compel. If approximately 73,000 documents are potentially responsive to Movant's undifferentiated requests, as discussed above, the burden of production on the OAG to review and, if necessary, redact the documents would be incredibly burdensome.[16] In support of the OAG's

---

[16] In response to concerns about the burden imposed, Movant suggested that the documents be disclosed to him without redaction. (Tr. of Feb. 7, 2023 Hearing, 22-MC-3044, ECF No. 25, at 23:15–24:23 (Movant arguing that the case has a protective order in place), 26:22–24

motion to quash, the OAG submitted a declaration establishing that the OAG

Investigative Team spent over 3,600 hours "identifying, reviewing, redacting, and

publishing approximately 1,000 documents which were either published as exhibits

appended to the Report or as additional materials published on the OAG website

subsequent to the publication of the Report." (Chun Decl., 22-MC-3044, ECF No. 20,

¶ 10.) Even estimating the burden at a lower rate, at 3,000 hours per 1,000 documents,

the time for redacting and reviewing the documents here would be more than 200,000

hours. In light of the breadth of the documents Movant seeks, and the enormous

undertaking it would require of the AG's Office to produce the files, the Court finds

that compelling a response to the OAG subpoena would result in a significant

expenditure of resources and expense by a non-party.

     For all of the reasons outlined above, a balancing of the factors relevant to a

determination of a motion to enforce a Rule 45 subpoena weighs in favor of the

Attorney General. Ordering the OAG to comply with the revised document demand

---

(seeking unredacted transcripts), 118:13–24 (discussing "attorney's eyes only" possibilities).)
However, Ms. Chun's affidavit also detailed various types of sensitive, confidential information
that that were gathered during the course of the investigation, including:

> identities (including identifying information) of witnesses who expressed
> credible fears of retaliation; identifying personal information, including home
> addresses, phone numbers, email addresses; health information about witnesses
> and others (including minor children) discussed in their testimony; confidential
> employment personnel information, including files from confidential Equal
> Employment Opportunity investigations; information implicating law
> enforcement and security plans, including security footage of government
> buildings and floorplans of government offices; and personal information about
> the witnesses, including information about certain of their personal or romantic
> relationships.

(Chun Decl., 22-MC-3044, ECF No. 20, ¶ 8.) In light of the myriad sensitivities identified by the
OAG, even if the Court were to find that the documents were relevant and proportional, and
not protected by any applicable privilege, disclosure would pose an enormous burden on the
OAG. Movant's suggestion that the documents could be disclosed without review or redaction
is not viable or realistic.

would impose a substantial undue burden and significant expense on a non-party. Accordingly, the motion to compel the subpoena to the OAG is denied.

## IV. Sovereign Immunity

Scope and legislative privilege questions aside, Respondents argue as a preliminary matter that the Court has no business directing state entities to respond to non-party subpoenas in civil actions in any event. Although Respondents have not been sued, they assert that Movant's subpoenas are barred by sovereign immunity. (*See* AJC Mem., 22-MC-3027, ECF No. 15, at 8–10; OAG Mem., 22-MC-3044, ECF No. 18, at 10–14.) Because the Court ultimately denies Movant's requests other grounds, it need not address this argument.

The OAG asserts that state sovereign immunity is "a threshold matter" that *must* be addressed. (OAG Mem., 22-MC-3044, ECF No. 18, at 10; *see also* Tr. of Feb. 7, 2023 Hearing, 22-MC-3044, ECF No. 25, at 71:11–12, 80:5–16.) This, the AG's Office contends, is because sovereign immunity is "jurisdictional" and, therefore, unavoidable. (Tr. of Feb. 7, 2023 Hearing, 22-MC-3044, ECF No. 25, at 80:9.)

Simply because an issue is jurisdictional, however, does not mean that the Court must confront it before all other issues. *See, e.g.*, *Butcher v. Wendt*, 975 F.3d 236, 242–44 (2d Cir. 2020); *Miller v. Metro. Life Ins.*, 979 F.3d 118, 122–24 (2d Cir. 2020). Indeed, "[j]urisdiction, . . . is a word of many, too many, meanings," and not every issue broadly understood to be jurisdictional in nature goes to the Court's authority under Article III — the only type of jurisdictional question that the Supreme Court has expressly held "is always an antecedent question."[17] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90,

---

[17] At least, that is how *Steel Co.* has been interpreted in this Circuit. *See Butcher*, 975 F.3d at 242 ("The bar on hypothetical jurisdiction . . . applies only to questions of Article III jurisdiction." (quotation marks omitted)). Further, although the Supreme Court has sometimes

101 (1998) (quotation marks omitted); *see Bowers v. Nat'l Collegiate Athletic Ass'n*, 346 F.3d 402, 415–16 (3d Cir. 2003) (explaining that courts need not "answer all questions of 'jurisdiction,' broadly understood, before addressing the existence of the cause of action sued upon" (footnote omitted)).

The Attorney General cites no binding authority for the proposition that state sovereign immunity must be addressed as a threshold matter. By the Court's own search, the circuits appear to be split on this issue. *Compare United States v. Tex. Tech Univ.*, 171 F.3d 279, 285–86 (5th Cir. 1999), *In re Jackson*, 184 F.3d 1046, 1048 (9th Cir. 1999), *Martin v. Kansas*, 190 F.3d 1120, 1126 (10th Cir. 1999), *overruled on other grounds by Mannan v. Colorado*, 841 F. App'x 61 (10th Cir. 2020), *and Seaborn v. State of Fla., Dep't of Corr.*, 143 F.3d 1405, 1407 (11th Cir. 1998), *with Parella v. Ret. Bd. of R.I. Emps.' Ret. Sys.*, 173 F.3d 46, 53–57 (1st Cir. 1999), *Bowers*, 346 F.3d at 414–18, *Strawser v. Atkins*, 290 F.3d 720, 729–30 (4th Cir. 2002), *Kennedy v. Nat'l Juv. Det. Ass'n*, 187 F.3d 690, 696 (7th Cir. 1999), *and U.S. ex rel. Long v. SCS Bus. & Tech. Inst., Inc.*, 173 F.3d 890, 891–98 (D.C. Cir. 1999).

To the Court's knowledge, the Second Circuit has not expressly weighed in. It has, however, held that tribal immunity — which, as the Attorney General acknowledges, functions much like state sovereign immunity — is not "fundamentally preliminary" in the same way that Article III jurisdiction is. *Oneida Indian Nation v.*

_____

given questions of sovereign immunity priority, it has done so inconsistently — and not without exception where other issues are "logically antecedent." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 779–80 (2000); *see Calderon v. Ashmus*, 523 U.S. 740, 745 n.2 (1998) ("While the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power, and therefore can be raised at any stage of the proceedings, we have recognized that it is not coextensive with the limitations on judicial power in Article III."); *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (explaining that "*Steel Co.* confirmed that jurisdictional questions *ordinarily* must precede merits determinations" (emphasis added)); *Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 394–95 (1998) (Kennedy, J., concurring) (discussing "the inconsistency" of treating sovereign immunity as a waivable, non-obligatory issue while also one of subject matter jurisdiction).

*Phillips*, 981 F.3d 157, 171 (2d Cir. 2020) (quoting *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979)). This is because, unlike Article III limitations, but just like state sovereign immunity, tribal immunity is waivable and therefore not an "'absolute stricture[]' on the court." *Oneida Indian Nation*, 981 F.3d at 170–71 (quoting *Leroy*, 443 U.S. at 180); *cf. Parella*, 173 F.3d at 55 (reasoning that Eleventh Amendment immunity is not a threshold issue both because it is waivable and because it need not be addressed *sua sponte*). Similarly, in *U.S. E.P.A. v. General Elec. Co.*, a case heavily relied on by Respondents, although the court held that *federal* agencies have sovereign immunity from non-party subpoenas, it reached that issue only after first addressing whether the subpoena in question had been issued in accordance with relevant regulations. *See* 197 F.3d 592, 595–99 (2d Cir. 1999) (discussing *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951)). If the immunity question were necessarily antecedent, as the Attorney General contends it is, the court should have begun its analysis there.

One final note. Respondents' argument that the state is immune from federal subpoenas presents a novel and complex question of constitutional law. This too is reason not to address the argument, given the other bases for not enforcing Movant's subpoenas.[18] *See Hutchinson*, 443 U.S. at 122 ("Our practice is to avoid reaching

---

[18] The Court acknowledges that much of the above case law discusses Eleventh Amendment immunity, either literally or perhaps as "convenient shorthand" for state sovereign immunity generally. *Alden v. Maine*, 527 U.S. 706, 713 (1999). The Court is mindful that the OAG's sovereign immunity arguments are "not based on [Eleventh] Amendment immunity," but on the "state's broad sovereign immunity that existed" pre-ratification. (Tr. of Feb. 7, 2023 Hearing, 22-MC-3044, ECF No. 25, at 78:20–25.) This distinction does not change the Court's analysis. While true that "there are two types of [state] sovereign immunity" — "Eleventh Amendment immunity from suit in federal court" and states' "broader sovereign immunity . . . against *all* private suits, whether in state or federal court" — both are waivable. *Beaulieu v. Vermont*, 807 F.3d 478, 483 (2d Cir. 2015) (quotation marks omitted). Accordingly, the case law relied on above is equally applicable.

The Court further notes that Respondents dispute whether they waived their immunity here (to the extent it exists). The point is not, however, that the Court need not address

constitutional questions if a dispositive nonconstitutional ground is available."); *see also Parella*, 173 F.3d at 56 (observing that principles of constitutional avoidance and judicial economy weigh in favor of declining to address sovereign immunity "where there are other dispositive issues").

## CONCLUSION

For the foregoing reasons, former Governor Cuomo's subpoena to the New York State Assembly Judiciary Committee is quashed on legislative privilege grounds. In addition, his motion to compel enforcement of the subpoena issued to the New York State Attorney General's Office is denied.

**SO ORDERED.**

Dated: Brooklyn, New York
     July 21, 2023

_____
    TARYN A. MERKL
United States Magistrate Judge

---

Respondents' sovereign immunity argument because it has been waived; rather, the fact that sovereign immunity is *waivable* suggests it is not a threshold jurisdictional issue. *See Parella*, 173 F.3d at 55.