Exhibit 3

1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF NEW YORK

3    _____

4    TROOPER 1,

5         Plaintiff,

6    v                          Civil Action No.: 22-cv-893

7    NEW YORK STATE POLICE, et al.,              (LDH)(TAM)

8         Defendants.

9    _____

10

11

12            DEPOSITION OF: ANA LISS

13            DATE:          July 10, 2023

14            TIME:          10:27 a.m. to 7:07 p.m.

15            LOCATION:      Harris Beach, P.L.L.C.

16                           99 Garnsey Road

17                           Pittsford, New York 14534

18

19

20

21

22

23

24

1          Cornell and I took a slight pay cut in order to make

2          that transition.  But I really wanted to stay in Albany

3          and to stay there, but it was difficult workplace

4          environment.

5                              Q.    And you were in the executive

6          chamber from 2013 to 2015.  Is that right?

7                              A.    That's correct.

8                              Q.    Now, when you said that the --

9          during the time you work there, it was, quote, unquote,

10         hostile in many ways.  What do you mean by hostile?

11                             A.    There was a lot of fear.  I was in

12         communication with younger staffers, and there was a

13         constant threat and fear of, you know, losing your job

14         arbitrarily or there was a lot of gossip, office gossip.

15                             A lot of knowledge at high levels of what

16         was going on in younger staffer's personal lives, I

17         thought that was inappropriate.  It was a long time ago.

18         So it's hard for me to, kind of, gin up specific

19         examples in case studies.  But it was a scary place to

20         work, for me, at least.

21                             Q.    Okay.  In terms of your personal

22         interactions with Governor Cuomo, during the time you

23         worked in the executive chamber.  Do you have specific

24         complaints about your personal interactions with

1    Governor Cuomo?

2                    A.   I don't believe that the Governor,

3    to be clear, sexually harassed me.  I felt that on a

4    limited number of occasions, I did not have many

5    interactions with the Governor and I don't know if he

6    knew my name.

7    ████████████████████

    ████████████████████████████████

    ████████████████████████████████

    ████████████████████████████████████████

    ██████████

    ████████████████████████

    ████████████████████████████

    ██████████████████    ████████████████

    ██████████████████████████████

    ████████████████████████████

    ██    ██████

18                   A.   And I was over the moon to work for

19   him.  And then, subsequent to that occasion where he

20   sought out the photograph.  I remember the next day,

21   there was some office gossip about, oh, you know, the

22   Governor likes you.

23                   And you know, it didn't -- I found it

24   flattering at the time but then on subsequent

1    recollection and reflection, I felt that it was, in

2    light of some of the complaints that had come to the

3    fore I understood it to be inappropriate.

4                    And I felt that, as a woman, it was my

5    duty to use my voice to help set the record straight

6    about some of the other more, I think, egregious, which

7    I had no -- I had no -- I did not bear witness to any of

8    the other instances that have been alleged.

9                    But I felt that it was my duty as a woman

10   to speak up and say, I experienced this as a fellow

11   working in the Governor's office.  And overall, it was

12   a, somewhat inappropriate workplace environment, a

13   little bit dangerous for younger, vulnerable people,

14   particularly women.

15                    Q.   So we'd unpack that a little bit.

16                    A.   Uh-huh.

17                    Q.   With respect to your saying that you

18   didn't believe the Governor sexually harassed you.  You

19   don't believe that today?

20                    A.   No.

21                    █        ███████████████████████

█    ██████████████████████████████

█    ██        ███

24                    Q.   And in terms of when you talk about,

1          in light of some of the more egregious allegations that

2          -- that came out.  Are you referring to Lindsey Boylan

3          and Charlotte Bennett?

4                    A.    Yes.

5                    Q.    And when those allegations came out,

6          did that cause you to think, you know -- well, I think

7          some of maybe what happened with me was inappropriate,

8          not sexual harassment but --?

9                    A.    Yes.  Yes.  It was on the heels of

10         the -- MeToo movement and there was a cultural shift

11         around what was, and was not, what is ,and what is not

12         appropriate conduct in the workplace.  Particularly, on

13         the part of individuals in positions of power and

14         influence.

15                   And for several years, I had harbored a

16         lot of insecurity about my time there and my departure,

17         feeling as though I, you know, I -- I couldn't suck it

18         up enough to withstand some of the pressure and the --

19         the need to keep up with appearances, et cetera and --.

20                   Q.    Can I ask you what you mean about

21         that if I stop you right there.  The need to keep up

22         with appearances?  What do you mean by that?

23                   MR. CRAIN:  Wait, objection, you

24         shouldn't stop her answers in the middle even if her

1      journalism degree and I worked in that world for a short
2      time and I can tell you that the -- they will cherry-
3      pick what you say to suit a narrative that will elicit
4      more clicks and eyeballs.
5                     And I did -- I did take some issue with
6      some of the way that my narrative was presented by the
7      news media and, you know, had some -- had some
8      consternations about it.
9                     Q.   Yeah.  I wanted to ask you about
10     that because you did a number of interviews.
11                    A.   I did.  Yes.
12                    Q.   And did you feel some of the
13     interviews took your comments out of context?
14                    A.   Yes.
15                    Q.   Was it --?
16                    A.   I tried to do -- if I could.  So I -
17     - because I have some relationships here locally in this
18     community --
19                    Q.   Yeah.
20                    A.    -- with journalists --
21                    Q.   Yeah.
22                    A.    -- that I respect, I -- I thought,
23     you know, I ignored ninety-nine percent of the outreach
24     that I was getting.  But when Adam Chodak or Ginny Ryan

1    contacted me I thought, well, they're a friendly

2    audience, a friendly face, and I think they might

3    present my story in such a way that is a little bit more

4    accurate.

5                    And I won't be characterized the way

6    that, you know, perhaps Gothamist put the -- the story.

7    Even the Wall Street Journal, I felt, was a little bit -

8    - I thought I was super clear with -- with Jimmy about

9    what I was -- how I was characterizing my experience.

10                    And it felt like I was just thrown into

11   this group of women who said the Governor sexually

12   harassed me and I wanted to be clear that the Governor

13   didn't sexually harass me.

14                    Q.   Didn't --.

15                    A.   I don't think that that ever came

16   clear.  So now in my experience to this day, when and if

17   it -- it comes up, I always try to be clear with people

18   that, hey listen, I wasn't -- I didn't -- I was not

19   sexually harassed by the Governor.

20                    I was speaking up for other elements of

21   the workplace that I felt were questionable and

22   problematic that caused me to look elsewhere for

23   employment.  And I thought that my perspective might

24   undergird or bolster the perspectives of the women who

1          kind of put it all on the line, Ms. Boylan, and Ms.

2          Bennett at the time.

3                        I was not personal friends with either of

4          them.  I had only interacted with Ms. Boylan on a couple

5          of occasions when I was working there.  I think she was

6          based in Manhattan and Ms. Bennett and I had not met.

7                        So -- but I felt that -- and this was me

8          as a millennial on the heels of the MeToo movement,

9          feeling that it was the right thing for me to do.  And

10         again, I had been contacted by a number of journalists.

11                       Q.   I wanted to ask that because we're

12         going to talk a little bit and when it -- about the

13         Jimmy Vielkind piece.  And I wondered if your reaction

14         to the piece is exactly as you said to me, which is you

15         felt -- of course, you felt he sensationalized your

16         experiences.

17                       A.   I don't know if sensationalize is

18         the correct term, because the Wall Street Journal abides

19         by its own editorial principles, and journalistic

20         ethics, ethical code.

21                       Q.   Yeah.

22                       A.   They have their own kind of way of

23         fact checking.  So he -- he took the interview and he

24         distilled from it facts.  But he did not include

1          it's -- maybe more pages for you.

2                         A.    That's okay.

3                         Q.    The paragraph that starts, it says,

4          none of the staffers who spoke to Gothamist W.N.Y.C.

5          said they witnessed sexual harassment or sexual

6          misconduct by the Governor.

7                         A.    Uh-huh.

8                         Q.    Do you see that?

9                         A.    Yeah.

10                        Q.    And does that statement apply to

11         you?

12                        A.    Yes.

13                        Q.    Okay.  You didn't witness sexual

14         harassment or sexual misconduct by the Governor?

15                        A.    No, I did not.

16                        Q.    And you said you received kisses on

17         the cheek, just as one of the women who spoke out

18         against the Governor described.

19                        A.    Yes.

20                        Q.    And the Governor kissed you on the

21         cheek?

22                        A.    Yes.  And it says here, Liss said it

23         felt like a fatherly gesture, and I stand by that

24         statement.

1                    Q.    Okay.  It also says that Cuomo also

2          asked her personal questions including if she had a

3          boyfriend, which she did not consider out of line.

4                    A.    At the time, I did not consider it

5          out of line.  It felt par for the course for that

6          environment and for his reputation as a politician.

7                    Q.    But at -- but at the time you spoke

8          to Gwynne Hogan on March 4th, did you not consider it

9          out of line when you were speaking with her?

10                   A.    No, that's why I was talking to her.

11         So on the one hand, I wanted to attach my identity to it

12         because I knew that it was assisting the journalists,

13         telling a more accurate story.

14                   Q.    Yeah.

15                   A.    And then I also wanted to clarify my

16         experience that these things happened.  I did not

17         interpret them as sexual harassment.  I do not interpret

18         them as sexual harassment.  Were they inappropriate?

19                   Perhaps, yes.  At the time, I didn't feel

20         they were inappropriate.  I felt that they were

21         flattering.  And, oh my goodness, the most powerful man

22         in New York State is taking some interest in me as an

23         individual.

24                   And wow, you know, and calling my mom and

1          saying, hey mom, the Governor asked me if I had a

2          boyfriend today.

3                          Q.   Yeah.

4                          A.   And I thought that by sharing that

5          perspective, it would give the wider universe a better

6          lens on what was going on here.  The workplace

7          environment.

8                          Q.   Yeah.  So I want to talk about the

9          first time you met the Governor.  You were -- were you

10         outside of Howard's office?

11                         A.   Yes.  I think that's when it

12         happened.

13                         Q.   And what -- did he come walking

14         through?

15                         A.   Yes.  I think he was -- so Suzanne

16         saw him.

17                         Q.   This is Suzanne?

18                         A.   Suzanne Brackett.

19                         Q.   Brackett.

20                         A.   She saw him coming through and said,

21         you know, hi, Governor.  And he noticed that I was a new

22         face.  And he came over and he introduced himself to me,

23         I think, and again, over ten years ago.

24                         Q.   Yeah.

1       that afterwards.  But Ms. Tagliafierro, she'd been a

2       prosecutor for seven years?

3                       A.   Of course, yes.  She was a force to

4       be reckoned with in her own right.  I -- I mean, she was

5       very well-respected and regarded for her --

6                       A.   Uh-huh

7                       Q.   -- qualifications, her intellect.

8                       A.   Uh-huh.

9                       Q.   So you're not saying anything about

10      that -- that Letizia Tagliafierro was there because of

11      her looks?

12                      A.   No, no.  There was another woman,

13      Irene Baker, who's tall and lovely and beautiful, and

14      the -- these were all women who, while all at once, they

15      were attractive and -- and lovely as -- as I mentioned,

16      they were also highly credentialed and qualified to be

17      in their positions.

18                      They were all also highly qualified, very

19      beautiful women, and I know that I did make the comment

20      that, you know, you didn't necessarily need a

21      highfalutin degree, or education, or credential in order

22      to get to that level.

23                      And I think perhaps what I was getting at

24      was to be a briefer or to be on the more administrative

1    side of things and less so like I -- I fully acknowledge

2    that the Governor was not going to appoint someone to be

3    his secretary or to be his counsel who was not highly

4    credentialed.

5              Q.   And you didn't understand the

6    Governor would appoint someone because of their looks?

7              A.   No, no, but that I interpreted, it

8    was my impression that that didn't hurt.  You know, if

9    there are two candidates and one is Mr. Magoo and the

10   other is Barbie, and both have Harvard Law degrees and

11   have equal sets of skills, Barbie gets the job over Mr.

12   Magoo.  That's my very not prosaic way of describing

13   what was in my mind.

14             Q.   So this was in your head?

15             A.   In my head, and I was working there

16   observing.  It was impressed upon me based on my

17   observations of dynamics and who did what to whom, who

18   had what job, that it didn't hurt to be a beautiful and

19   well-dressed woman in a -- in the executive chamber of

20   Governor Andrew Cuomo.

21             Q.   But you weren't trying to suggest

22   that the Governor's goal was to surround himself with --

23             A.   A cabal of women.

24             Q.   -- beautiful women?

1          A.    Absolutely not, no.

2 ██      ████████████████████████

██ ████████████████████████████████████

██ ████ ████ ████████████████ ██████ ██████

██ ████████████████████████████████████

██ ████████████████████████████

██      ██    ██████

██      ██ ████████████████████████

██ ████████████████ ████████████████████

██ ██████████████████ ████████████████████████

██ ████████████████████████████████

██ ████████████████████████████ Is it

13 fair to say you don't know whether or not Melissa ever

14 got yelled at?

15          A.    I don't know whether.  I don't have

16 -- no.  In -- in my observation, sitting where I sat in

17 those instances that were limited in number and

18 frequency where I observed the two of them together,

19 there was no contentious nature with which the Governor

20 conducted himself around her.

21          It was much more respectful and friendly,

22 so I took that to mean that that was normal.  But I -- I

23 also knew from conversations working with Andrew

24 Kennedy, that the Governor had a vicious way about him

1         in dealing with his officers and managers, high -- high

2         expectations.  And he could really cut you down if -- if

3         you answered directly to him.

4                    So I wouldn't be surprised if that did

5         perhaps happen to her, but I observed that the

6         recipients of any more negative behavior or -- or

7         outbursts were more -- were men, I think.

8                    Q.   How often did you observe this from

9         where you were sitting at the end of the --

10                   A.   I didn't observe a lot, but I heard

11        through the walls screaming sometimes.

12                   Q.   Uh-huh.

13                   A.   I remember hearing Joe screaming on

14        the phone.  I remember there being conference calls

15        where the Governor was on the line and there was

16        yelling, and it didn't strike me as very professional,

17        and I had heard through -- and this is hearsay, which is

18        not material to everything, but I had heard that to be

19        dressed down by Joe or by the Governor was the ultimate

20        in humiliation.

21                   And I can't speak directly to that

22        because I didn't observe it directly.  I just heard

23        through the -- office gossip mill and also through

24        murmurs through the walls of, you know, yelling on the

1      phone.  And there was one in -- instance where like a --

2      a secretary who I think worked in Joe's office was burst

3      into tears and ran into our office and closed the door

4      and sat and was shaking.

5                          And I didn't know what had happened or,

6      but I -- I connected that and perhaps it was non-

7      sequitur, but I took that instance as evidence of toxic

8      office culture.  And I thought, gosh, you know, I've

9      never worked in an office as a young twenty-eight year

10     old where there were tears and yelling and screaming and

11     things of that nature.

12                          Q.    The secretary that came to Joe's

13     office crying, you don't know why she was crying?

14                          A.    I don't.

15                          Q.    Okay.

16                          A.    I don't.  It was one time.

17                          Q.    Okay.  And then, when you had heard

18     the Governor, I think you said yelling on conference

19     calls?

20                          A.    There were times that I could

21     overhear his voice on a conference call, whether it was

22     with Howard or with Jim.  And, you know, he could be

23     very -- he could bellow a little bit, but I didn't hear

24     him saying curse words or anything like that, or saying,

1    calling anybody names.

2                    I know that there was, you know, there

3    was a culture of name calling on the side, and I thought

4    maybe that comes from the top that trickles down from

5    the top.  So I was making a lot of assumptions here in

6    my characterization of the workplace environment, I will

7    say that.

8                    Q.   You've never heard the Governor call

9    anyone a name?

10                   A.   No.

11



1

19                  I felt as though it was this arbitrary

20    elevation to an empty desk because of a limited

21    interaction that I'd had with Howard Glazer.  And I

22    seemed to fit a certain build based on my observation.

23    And I said here that it was an assumption.  And it was

24    an assumption that was bolstered by observation.

1          Again, not being able to speak to

2     specific things that were said because of how much time

3     has passed, but spending forty, sometimes fifty hours a

4     week there in that environment, I understood that, as I

5     mentioned before, if you look a certain way, it doesn't

6     hurt.

7          And so I felt -- and I -- and oftentimes

8     I would sit there, and I didn't, you know, Howard was in

9     Manhattan, the Governor was in Manhattan, Andrew Kennedy

10    was running around.  I didn't have anybody giving me

11    meaningful work to do.

12          Q.   Uh-huh.

13          A.   And I would receive random

14    invitations to go staff a party at the mansion.  And I

15    thought, what the hell am I doing here?  I moved from

16    Rochester and I -- this is stressful and somewhat

17    meaningless and I was given some assignments that gave

18    me some routine, but it wasn't enough to really populate

19    the entirety of a workday and I took all of these

20    impressions to mean that looking a certain way didn't

21    hurt.

22          And it was -- that was, I think other

23    fellows and members of that crew, the younger staffers

24    made comments to that effect that, oh, yeah.  You?re

1          just there because, or you are there because.

2                          Q.   So when you refer to crew, again,

3          we're talking about younger staffers?

4                          A.   Yeah, yeah.

5                          Q.   And -- and they made comments to you

6          that you're just there because --

7                          A.   Well, they --.

8                          Q.   -- of your looks?

9                          A.   Nobody came up to me and said, well,

10         you're just here because of your looks.

11                         Q.   Yeah.

12                         A.   But there was a general sense that,

13         oh, yeah, you know, the prettiest, the most attractive

14         women do get a seat at those tables and do have, like

15         when you -- you have a higher propensity of catching the

16         eye of the Governor, therefore, so I just connected the

17         two and I thought.

18                              And -- and again, you know, it's rooted

19         in my imposter syndrome and feeling as though, what am I

20         doing here?  And it was an assumption and an impression

21         that I had, a cultural thing and perhaps rooted in the

22         office lore or the -- because again, I wasn't having

23         conversations with the Governor, with high senior

24         staffers.  I was talking with junior level staffers.

1           that a significant reason why I was there was because of

2           my own credentials and the fact that I had been

3           appointed as one of the Empire State Fellows in the

4           second cohort.

5                          It was an incredibly -- it's -- it's -- I

6           -- I, again -- again, I -- I'm -- I'm thinking about

7           things that happened over ten years ago and the feelings

8           that I had over ten years ago, and it was a really

9           lonely place to be at that desk.

10                          I felt undervalued as a professional and

11          as a contributor to the larger policy landscape.  Aside

12          from what contributions I was able to make that were

13          small and the only times that I ever did get a wink and

14          a nod and attention from the Governor was based on the

15          fact that I was, you know, I -- I suppose I was a cute

16          blonde that was -- and -- and a docile blonde that took

17          direction and executed that was afforded a seat in the

18          bullpen.

19                          And I think others who worked there at

20          the time and subsequent to that would testify to the

21          fact that it was a really demoralizing place to work and

22          people oftentimes were really desperate to get out of

23          there.  And there was this feeling that you had to get

24          the blessing of the higher ups to get out of there in

1           order to get a good job elsewhere.

2                     And it was sort of survival of the

3           fittest, and it was a -- there was jostling for position

4           and proximity to the Governor and others that were in

5           power.  And it was just really, it didn't feel like a

6           professional workplace.

7                     It felt like a -- it was like Mad Men-

8           esque, you know, but -- and it -- and I just -- it was -

9           - it was grating to my sense of self-worth

10          professionally, and I regretted that I had uprooted my

11          life and my work to move there and just to sit and

12          collect dust at this desk and to grind away at

13          oftentimes meaningless tasks.  And for what?

14                    I didn't have any -- there was no promise

15          to me that I was going to land in any sort of meaningful

16          position after the fellowship, and I just felt like,

17          what am I doing here except for, oh, hi,  Governor.  You

18          know, I -- and again, assumption, speculation.

19                    A lot of what I felt bad about the

20          culture and the toxicity beyond what I could hear

21          murmuring through the walls and what I could pick up

22          from things that I had heard from younger staffers and

23          whatnot, or through Michael Cassidy or through Howard

24          Glazer, I -- it was hearsay.

1                    Q.    So in other words, you made the --
2        you these were assumptions you were making?
3                    A.    Yes.  But I don't think I -- I'm a
4        pretty astute and observant person.
5                    Q.    Yeah.
6                    A.    And I don't think I was totally off
7        base.
8                    Q.    Well, let me ask you this.  When you
9        say it was Mad Men-esque, what do you -- what do you
10       mean by that?
11                   A.    Just, you know, women behind desks
12       and powerful men rubbing shoulders with powerful men.
13       An older -- an old school kind of office culture that
14       you would -- that you would see in a more traditional
15       old school environment, I guess.
16                         Not it -- it didn't feel like the kind of
17       place where you were free to be whomever you are as an
18       individual and express yourself.  You know, it was a
19       little -- it was more rigid.  And again, you know,
20       seeing a lot of attractive women, that was my
21       perception.
22                         And using that Mad Men-esque framework
23       helps me to add some color to what, I mean, I guess.
24                   Q.    So but there were a number of -- of

1          women there in power.  In that suite of the Governor's

2          office who were very powerful and qualified?

3                    A.   Yeah.

4                    Q.   How did they fit into the Mad Men

5          culture that you're describing?

6                    A.   Well, they were workhorses and I

7          can't speak to what their day-to-day experiences were

8          like because I didn't work closely with any of them.  I

9          just know that they weren't necessarily always beside

10         him, with him constantly.

11                   I understood that they were doing the

12         work of the State of New York consistently and -- and

13         regularly, and that they were very highly qualified,

14         that they weren't there because of aesthetics.  They

15         were there because of their qualifications, but I can't

16         speak to their experiences.

17                   Q.   In other words, you don't know

18         whether they were with him in Manhattan for events on

19         any given day?

20                   A.   I don't know what -- I mean, I -- I

21         don't know what his schedule was like every single day,

22         no.  Although that was, there were briefings and

23         circulars about what he was doing and where he was.

24                   Q.   Okay.  I want to ask about Howard

1      Glazer and sort of him leaving.

2                      A.    Uh-huh.

3                      Q.    And then, Jim Malatras comes in.  Is

4      that right?

5                      A.    Uh-huh.

6                      Q.    Can you explain what happened with

7      Howard when he left and you know, what -- what that

8      meant for you?

9                      A.    I don't know why he left, and it was

10     very abrupt, it seemed based on my observation from the

11     sidelines, and he never took me aside and told me I'm

12     leaving, and this is why I'm leaving, and here's what it

13     means for you and, you know, check in with so and so and

14     see where -- where you might want to end up with your

15     fellowship next.

16                     I was basically told Howard's leaving, I

17     think he went to go take a job at a company that

18     provided some services to airports and advised regarding

19     infrastructure airport design.  Again, spec --

20     speculation.  I -- and I -- I don't recall any specific

21     conversation.

22                     I think I understood from an impression

23     that I received perhaps through Michael Cassidy or

24     Andrew Kennedy, that like there was some break in the

1     dynamic between the Governor and Mr. Glazer and that

2     like Howard was off kind of wanting to do a different

3     thing.

4              And that Jim, who was the brainchild

5     behind initiatives such as START-UP New York and sort of

6     on the periphery as a wunderkind, so to speak, was being

7     elevated into that position and I knew that I had a

8     tenuous grip on the desk, which I occupied, and that Jim

9     could decide whoever he wanted to sit there, and it

10    didn't necessarily have to be me.

11             Q.   Why did you think you had a tenuous

12    grip on the desk outside Howard's office?

13             A.   Because whoever sits in that desk,

14    because it's affiliated with the Director of State

15    Operations working at, well, you're working ultimately

16    at the pleasure of the Governor, but you know, the

17    Director of State Operations has power to determine who

18    gets to sit in that desk.

19 

```
 1                    Q.   Have you read the Attorney General's

 2       report?

 3                    A.   Not to the letter.  But I know the

 4       gist of it, and I remember watching the press conference

 5       --

 6                    Q.   And --

 7                    A.   -- on television.

 8                    Q.   -- and you were included as one of

 9       eleven.

10                    A.   I was, yeah.  I was subpoenaed.  So

11       I had to --

12                    Q.   No, I --.

13                    A.   -- be.

14                    Q.   And if I could go, Leo, if you're

15       able to pull up the Attorney General's report and go to

16       footnote twelve twenty.

17                    MR. KORMAN:  Give me one moment and I can

18       put it in.

19                    MS. GLAVIN:  And we'll mark it as an

20       Exhibit.

21                    THE COURT REPORTER:  What Exhibit Number?

22                    MS. GLAVIN:  He's going to -- wait.

23                    THE COURT REPORTER:  Oh.

24                    MS. GLAVIN:  He's going to -- he's going
```

1       to get me one.

2                  MR. KORMAN:  .

                           I'm sorry, I was on mute.

3       It's introduced.  It's coming in as Exhibit Nineteen.

4                  MS. GLAVIN:  Okay.  If you can pull up on

5       the screen, footnote twelve twenty if you're able to so

6       that we can see it.  I can read that footnote to you.

7                  THE WITNESS:  Uh-huh.

8                  MS. GLAVIN:  It's just one sentence in

9       the footnote.

10                MR. KORMAN:  I don't think I can pull up,

11      I -- I don't think I can publish to the screen.

12                MS. GLAVIN:  Footnote twelve twenty.

13                BY MS. GLAVIN:  (Cont'g.)

14                Q.  Footnote twelve twenty has a

15      sentence about your -- what you told the Attorney

16      General?

17                A.  Uh-huh.

18                Q.  And then, also, what Kaitlin told

19      the Attorney General.  And the Attorney General's office

20      stated quote, although the conduct they endured occurred

21      too long ago for them to assert civil claims in court,

22      we find that the conduct did constitute sexual

23      harassment, end quote.

24

1 ████████████████████████████████

2 ██████████████████████████

3 ███ ██████████████████

4 ████████████████████████████████

5 ██████████████ But I did not at the time, and nor

6 do I interpret it as -- I don't think this -- the

7 Governor was sex -- overtly sexually harassing me.

8              Q.    They didn't include that in the

9 report that you said that to them?

10             A.    I didn't read the report, so I don't

11 know what came through.  I just know that since day one

12 I've been pretty clear because -- again, I did not want

13 to find myself in a situation like this one.  And I

14 thought I was doing the right thing.

15             And -- but I -- I think if you read laws

16 around sexual harassment, yes, perhaps when somebody --

17 when a boss approaches you and puts their hand on your

18 person in a way that is not invited, that is technically

19 sexual harassment, if you interpret it as such, right.

20 I -- I'm not an attorney, so I don't know.

21             But again, this was on the heels of the

22 MeToo movement and a lot of big conversations, big

23 picture conversations happening in -- in many arenas

24 about it and I felt that it was material to the larger

1        story, but I don't feel, and I didn't feel that I was

2        being sexually harassed.

3                        Q.   The -- I want to go to an article,

4        this is at 2010, two ten, you could look at this

5        article.  This is from March 23rd, 2021.

6                        A.   This is Exhibit Two Ten.

7                        Q.   Two Ten.

8                        MR. KORMAN:  Sorry.

9                        THE WITNESS:  Thank you.

10                       BY MS. GLAVIN:  (Cont'g.)

11                        Q.   The article is -- the title of it is

12       analyst becomes second Cuomo accuser who won't cooperate

13       with impeachment probe.  The article?s dated March 23rd,

14       2021?

15                        A.   Yeah.  Uh-huh.

16                        Q.   Before this article was written, did

17       you have any communication with Lindsey Boylan about

18       whether or not to cooperate with the assembly

19       impeachment investigation?

20                        A.   I'm just trying to re --

21                        Q.   Yeah.

22                        A.   -- acclimate myself.  No, but I --

23       she had posted publicly about it saying that she wasn't

24       going to cooperate, and I thought that it would -- if

1      Q.   You read her medium piece, correct,

2  yeah, here we go.

3      A.   I only read it in its entirety more

4  recently.

5      Q.   When you say more recently, like

6  when?

7      A.   Like, after I was subpoenaed, I

8  wanted to -- by reacclimate myself by --

9      Q.   By --

10      A.   -- Governor Cuomo, yes.

11      MS. GLAVIN:  Okay.  So can you go to page

12  two, Leo of Exhibit Two Twelve.  All right.  Go -- yeah,

13  at the very bottom.

14      BY MS. GLAVIN:  (Cont'g.)

15      Q.   Do you see Lindsay's medium piece

16  she states, "my first encounter with the Governor came

                      th
17  at a January 6 , 2016 event at Madison Square Garden --

18      A.   Yeah.  Uh-huh.

19      Q.   -- to promote the new Pennsylvania

20  Station Farley complex project.  After his speech, he

21  stopped to talk to me. I was new on the job and

22  surprised by how much attention he paid to me.

23      A.   Uh-huh.

24      Q.   Can you reconcile for me --

1                    A.    Yeah.

2                    Q.    -- the fact that Lindsey Boylan says

3    her first encounter with the Governor happens on January

4    6th, 2016?

5                    A.    Of course.

6                    Q.    You've been gone for nine months.

7                    A.    Right.  She had been -- ████████████

1

2

3

4

5

6

7

8

9

10          Q.   Now with respect to conversations

11   with Lindsey Boylan, did Lindsey Boylan express to you a

12   dislike for Governor Cuomo?

13          A.   Yes.

14          Q.   Okay.  What did she say?

15          A.   I don't know specifically, I know

16   that I turned over some text messages I think, but she

17   thought he was a bad man.  And I don't remember any

18   verbal -- any vocabulary words that she used to describe

19   him.

20               I just know that she thought he was a bad

21   man, and that he surrounded himself with other bad

22   actors, and that she had made an allegation, and had

23   experienced something to that effect, and that was the

24   pretense under which she connected with me.

1          Q.   Did she ever suggest to you that she

2   wanted the Governor to be out of office, to resign, or

3   be impeached?

4          A.   Not that I can recall, I don't think

5   she used those words.  She certainly wanted there to be

6   a reckoning, I think, of some sort of consequences where

7   there was an acknowledgement of improper conduct.

8          Q.   Are you -- do you have any knowledge

9   -- any knowledge of the circumstances under which

10  Lindsay Boylan left employment with the executive

11  chamber?

12         A.   I have no knowledge whatsoever of

13  that.

14

1



1



1 ████████ ████████████████

████ ██████████ ██████ ████████████████

████████████████████████████████████

████████████████████████████ █

████████████████████████████

████████████

█ ████

█ ████████████████

██████████████

██ ██ ████

██ ██ ███████████ So can you just

12 tell me, what was Lindsay telling you, that the -- that

13 the Governor was having affairs with staffers?

14         A.    From what I can recall, and again,

15 and I -- my attorney had communicated this to you that I

16 have that setting -- I had that setting switched on, on

17 my iPhone where after thirty days all my digital

18 correspondence goes kaput.

19         So I would've had to go through Verizon

20 to get record of any text messages that had happened

21 more than thirty days before I was subpoenaed.  So I

22 don't currently have -- the only digital records or

23 existing physical records that I had had were whatever I

24 had turned over to the Attorney General's office.

1          I thought, who else might he be calling, and then, when

2          she contacted me, I thought, who else might she be

3          contacting?  Because who am I to speak to this matter.

4                         Q.   And so is it fair to say that you

5          think that Ms. Boylan may have been contacting you

6          because she was hoping to find other people who were

7          willing to talk to the press.  Is that correct?

8                         A.   That's correct.  I think anybody in

9          a position like that might look for other testimony to

10         back up their own testimony, so, yes.

11                        Q.   Did she tell you at that time who

12         else she had been speaking to in her attempt to get

13         other people to speak to the press?

14                        A.   No, she did not divulge any names.

15         She did say that as I mentioned that she had been --

16         that she was cultivating this platform by way of Rebecca

17         Traister in the New York Magazine piece and that she was

18         reaching out to others, she did indicate that.

19                        Q.   Let me ask you about Melissa DeRosa.

20         Did you ever speak to Ms. DeRosa?

21                        A.   No, I think perhaps there was one

22         word exchanged once, but nothing of any substance or

23         meaning.

24                        Q.   And so when you talk about Ms.

1    DeRosa in Exhibit, ███████████████████

██   ████████████████████████████████

██   ███████████████████  ████████████████████

██   ████████████████████████████████████

██   ███████████████████

6              You come to that conclusion without ever

7    speaking to her other than maybe a pleasantry, is that

8    what you said?

9              A.   Yes, as I testified to Ms. Glavin,

10   Lindsey had shared her own -- her opinions in some

11   narrative that I took to be true from which I made a

12   judgment. █████████████████████████

██   ████████████████████████████████

██   ████████████████████████████████████

██   ███████████████

16             But my -- yes, I never had any -- any

17   interaction with her.  She did not regard me, make eye

18   contact with me ever physically acknowledge that I was

19   in the same room as her and I was going off of with

20   Lindsey had shared with me, as well as, some others by

21   way of the office gossip mill or rumor mill that I also

22   referred to multiple times during my testimony today.

23             So all second hand -- all second hand and

24   hearsay nothing rooted in my own direct interpersonal

1      experience.

2                          Q.   And earlier today you said you did

3      not want to contribute to a narrative based on rumor,

4      that's something that you said in connection with when

5      you were talking about one of the publications.  I think

6      it might have been one of the publications tabloids.

7      Remember saying that?

8                          A.   Which exhibit are you referring to?

9                          Q.   I'm not referring to an exhibit.

10     I'm referring to your previous testimony about speaking

11     to one of the journalists you spoke to.  You said you

12     did not want to contribute to a narrative based on

13     rumor?

14                         A.   Yes, that's why I was very careful

15     in all of my comments to the media, which again, in some

16     cases, were taken out of context, but I always was

17     careful to say, I heard or through secondhand, I had

18     secondhand knowledge of this, that, or the other thing,

19     or it was my understanding that this or that may have

20     happened.

21                         I never said, this happened, that

22     happened.  I was as clear as I could be based on my own

23     knowledge and recollection of what I said.  But

24     oftentimes it just happens that a quote is taken and