UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


ANDREW CUOMO,                    *    Case No. 22-MC-03044(LDH)
                                 *
                                 *
              Movant,            *    Brooklyn, New York
                                 *    April 19, 2024
      v.                         *
                                 *
NEW YORK STATE ATTORNEY          *
  GENERAL,                       *
                                 *
              Respondent.        *
                                 *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *

       TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE AND
                        ORAL ARGUMENT
            BEFORE THE HONORABLE TARYN A. MERKL
               UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Movant:                  RITA M GLAVIN, ESQ.
                                 KATHERINE PETRINO, ESQ.
                                 LEO KORMAN, ESQ.
                                 Glavin PLLC
                                 156 West 56th Street
                                 Ste #2004
                                 New York, NY 10019

                                 ALLEGRA NOONAN, ESQ.
                                 THERESA TRZASKOMA, ESQ.
                                 Sher Tremonte LLP
                                 90 Broad Street
                                 Ste 23rd Floor
                                 New York, NY 10004


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**Shelton, CT 06484 (203)732-6461**

2

APPEARANCES:   (Cont'd)


For the Non-Party Respondent,  ANDREW STUART AMER, ESQ.
 NY State Attorney General:    SERENA MABEL LONGLEY, ESQ.
                               JAMES COONEY, ESQ.
                               MICHAEL JAFFE, ESQ.
                               New York State Office of the
                                Attorney General
                               28 Liberty Street
                               New York, NY 10005

3

1          (Proceedings commenced at 10:22 a.m.)

2          THE CLERK:  Good morning, everybody.

3          This is a civil cause for a status conference,

4     Docket No. 22-MC-03044, Cuomo vs. the Office of the New York

5     State Attorney General.

6          Before asking the parties to state their appearance,

7     I would like to note the following:

8          Persons granted remote to proceedings are reminded

9     of the general prohibition against photographing, recording

10    and rebroadcasting the proceedings.  Violation of these

11    prohibitions (indiscernible) sanctions including removal of

12    court-issued media credentials, restricted entry to future

13    hearings, denial of entry to future hearings, or any other

14    sanctions deemed necessary by the Court.

15         Will the parties please state your appearances for

16    the record starting with the plaintiff.

17         MS. GLAVIN:  Good morning, Your Honor.  Rita Glavin

18    for former New York Governor Andrew Cuomo, with Glavin, PLLC.

19    Joining me today are two of my colleagues from my law firm,

20    Katherine Petrino and Leo Korman in the back, and as well as

21    my co-counsel from Sher Tremonte.

22         MS. NOONAN:  Good morning, Your Honor.  Allegra

23    Noonan from Sher Tremonte for movant Governor Cuomo.  And

24    Theresa Trzaskoma from Sher Tremonte, LLP, is also on the line

25    participating telephonically.  Thank you.

4

```
 1              THE COURT:  Yes.  I think that we got the line
 2    working.  Are you able to hear us, Ms. Trzaskoma?
 3              MS. TRZASKOMA:  (No audible reply.)
 4              THE COURT:  Yes.  So this is -- I know how hard it
 5    is to schedule things, so this is -- I'm glad that you were
 6    willing to do it telephonically, so thank you also for that
 7    willingness.
 8              All right.  And on behalf of the defendants?
 9              MR. AMER:  Good morning, Your Honor.  Non party --
10              THE COURT:  Respondents, I should say.
11              MR. AMER:  Yes.
12              THE COURT:  Non-party respondents, how about that,
13    Mr. Amer?
14              MR. AMER:  Non party.  Thank you.  Andrew Amer with
15    the Attorney General's Office.
16              MS. LONGLEY:  Good morning, Your Honor.  Serena
17    Longley, also with non-party New York Attorney General's
18    Office.
19              MR. COONEY:  James Cooney, also for the Attorney
20    General's Office.
21              MR. JAFFE:  And Michael Jaffe, also for the Attorney
22    General's Office.  Good morning, Your Honor.
23              MR. AMER:  Your Honor, I'll just note that Mr.
24    Cooney is here from our office.  He's handling the FOIL
25    Article 78 proceeding.  Because I know Your Honor in your
```

1    order you indicated you would like an update on that

2    proceeding, so he's here for that purpose.

3         THE COURT:  Thank you.  Perfect.  That's one of my

4    very first questions.

5         All right.  So we obviously have a lot of history in

6    this case.  And what I am hoping we can accomplish this

7    morning is sort of figure out a path forward, figure out where

8    we are.

9         And before we proceed, I just wanted to note that my

10   law clerk who is assigned to this matter, she's not assigned

11   to the main Cuomo litigation, 22-CV-893, Ms. Simon,

12   congratulations, recently accepted a position at Morvillo.

13        So I don't particularly see a conflict in this

14   instance because I don't think Ms. Foti is actively

15   participating in this case, and Ms. Simon obviously is recused

16   from any and all Cuomo related matters when she gets to

17   Morvillo, but I just wanted to alert the parties and gauge

18   everybody's views, whether anybody has a concern about that.

19        So, Ms. Glavin, any concerns on behalf of Andrew

20   Cuomo?

21        MS. GLAVIN:  None, Your Honor.

22        THE COURT:  Okay.  Mr. Amer?

23        MR. AMER:  We have no concerns.

24        THE COURT:  All right.  Thank you.

25        Obviously my decision will be my decision.  Ms.

6

1    Simon is a wonderful researcher.  But at the end of the day,

2    it falls on me.  So thank you both for your willingness to

3    accommodate her.  I would hate to lose her valuable work.

4    She's done a lot of background and reviewing the documents.

5    It's just it would be difficult to sub in the other clerk.  So

6    thank you for that.

7           All right.  So the first question is really the

8    question of where are we on whether there have been any

9    disclosures at all with regard to documents?

10          In the distant past, there was a conversation about

11   turning over some very limited number of documents from the

12   OAG investigation that pertains specifically to Trooper 1.

13   And I don't know if that every happened.  I just wanted to

14   close that loop.

15          MS. LONGLEY:  Yes, Your Honor.  I can speak to that.

16          That did happen.  The Attorney General's Office

17   voluntarily produced documents that were collected by the

18   investigators that referenced Trooper 1 by name.  I believe it

19   was around 100 to 200 pages of documents.

20          I will note that after our office did that, we were

21   accused of waiving our sovereign immunity by Cuomo for doing

22   that, so we have not made any additional voluntary disclosures

23   in the wake of that -- of the fact of our trying to come to a

24   reasonable resolution of this being used against us.

25          THE COURT:  And do -- which documents specifically

7

1    were disclosed?  Do you have a list, and is there overlap with

2    the documents that the -- that Andrew Cuomo had identified as

3    the narrower list following my prior ruling?

4              MS. LONGLEY:  Your Honor, I don't believe there's

5    any overlap.

6              The documents that were called for in the narrow

7    request seek privileged information.  They seek interview

8    memos and unredacted transcripts.

9              The documents that were produced, those 100 to 200

10   pages of documents that were produced a while ago, those were

11   materials that the investigators collected.  So they were

12   documents that witnesses produced to the investigators in the

13   course of the investigation.  They didn't include any work

14   product or testimony.

15             THE COURT:  I see.  So it was no interview notes.

16             MS. LONGLEY:  No.

17             THE COURT:  Any interview notes as to Trooper 1's

18   interview produced?

19             MS. LONGLEY:  No.  No, Your Honor.

20             THE COURT:  Okay.  All right.

21             Ms. Glavin, do you agree with that summary?

22             MS. GLAVIN:  Yeah.  I just would like to add, with

23   respect to the documents that the A.G.'s Office produced in

24   response to our -- the subpoena, it's a handful of documents

25   that mention Trooper 1, and I think they primarily consist of

8

1    personnel records with respect to Trooper 1.

2              THE COURT:  Ms. Longley, any response?

3              MS. LANGLEY:  No real response.  I think those were

4    ones that could be reasonably construed as relevant, with a

5    broad view of relevance, to the actual claims in the case

6    because they related to Trooper 1.

7              THE COURT:  Okay.  All right.

8              And then, you know, at risk of duplicating efforts,

9    I am very curious as to how things are going in the FOIL

10   litigation.

11             So if Mr. Cooney is available to provide that

12   update, Mr. Cooney, I know that the briefing schedule may have

13   come and gone, but I certainly have no sense of the timeline

14   or what -- where you see this going, so anything you're able

15   to provide would be great.

16             MR. COONEY:  Yes.  Thank you, Your Honor.

17             So two things are sort of happening here, because in

18   our humble opinion the Article 78 is actually premature.  So

19   let me -- let me first just address our rolling production.

20             So we started our rolling production on March 1st.

21   We have produced a thousand pages of documents.  We gave the

22   next date as April 12th for the next traunch of documents and

23   we adhered to that producing another thousand pages of

24   documents.  The next production is scheduled for May 31st.

25             Now, that being said -- and so that's on the

9

1     administrative level.  I don't oversee that.  I don't

2     (indiscernible) state counsel.  I defend the agency.  I am not

3     a FOIL person per se.  So I would say that that is the

4     administrative stance as things stand within the office.

5          Now as for the actual Article 78, it's fully

6     submitted.  We made a cross-motion to dismiss based on

7     mootness because they only argued constructive denial, which

8     we have since mooted out under -- under all the case law there

9     is in FOIL land and we're waiting for the judge to either make

10    a decision or to schedule oral argument.

11         THE COURT:  And when you say there's a rolling

12    production, this is documents that the agency is deeming to

13    not be exempted, is that correct?

14         MR. COONEY:  Exempted to the extent that we are

15    making relevant redactions under FOIL analysis --

16         THE COURT:  Right.  Right.

17         MR. COONEY:  -- which is a totally separate thing.

18    And that's why this is taking so long.

19         I would note that, you know, it's out of our control

20    when they requested the FOIL request, but it's many years

21    after the start of things here.  So we --

22         THE COURT:  Oh, I know.

23         MR. COONEY:  -- we are trying.  We're doing our

24    best.  We have -- I believe only have one attorney and one

25    assistant and maybe a clerk or something that's doing this.

1          THE COURT:  Mm-hmm.

2          MR. COONEY:  And this is in light of, as you can

3    imagine, all the other FOIL requests that we get.  So again

4    I'm not really here to speak to that, but just on my general

5    knowledge, that is what is occurring.

6          THE COURT:  Okay.  And so your motion is fully

7    submitted and you don't have a -- I mean, I wouldn't expect

8    you to have a sense of when the judge may reach --

9          MR. COONEY:  State court?

10         THE COURT:  Can be unpredictable?

11         MR. COONEY:  I only -- counsel might also know this.

12   I think his rules say that he wants oral arguments on Article

13   78s, so that might be a condition (indiscernible) to him even

14   looking at this.  We have not heard anything.

15         THE COURT:  I see.  Okay.

16         Ms. Glavin, what is your view on how the FOIL

17   production is -- FOIL case is going and whether or not that's

18   solving any of the problems in this case?

19         MS. GLAVIN:  Okay.  I just -- Your Honor, I normally

20   stand to address you, but I'm being told if I don't speak into

21   the microphone --

22         THE COURT:  That Theresa can't hear you.

23         MS. GLAVIN:  -- Theresa cannot hear me.

24         THE COURT:  I think that's right.

25         MS. GLAVIN:  Okay.  So I've been told by my co-

1    counsel to speak into the microphone.

2            Here's the status.  The governor submitted FOIL

3    requests, I think it was like last summer or last fall.  What

4    the FOIL request seeks are unredacted interview transcripts.

5    So there's the 41 transcripts that were publicly released that

6    are redacted.  So one, unredacted transcripts.  And two, the

7    witness interview memos.

8            THE COURT:  And it was a much broader list --

9            MS. GLAVIN:  Yes.

10            THE COURT:  -- than in the narrowed --

11            MS. GLAVIN:  Yes.

12            THE COURT:  -- list you had submitted to me --

13            MS. GLAVIN:  Yes.

14            THE COURT:  -- following my sort of bigger ruling,

15    is that right?

16            MS. GLAVIN:  Yes.  Yes.

17            THE COURT:  Okay.

18            MS. GLAVIN:  And just to give context to this, the

19    New York Daily News had also made a FOIL request.  And this is

20    in our Article 78 petition.  They had made a FOIL request for

21    those same interview memos.  The Attorney General's Office

22    denied it.  And they denied it on appeal stating that this was

23    attorney-client privilege and work product.  So they refused

24    to produce the interview memos.

25            So the governor's request covers interview memos and

1    unredacted transcripts.

2              THE COURT:  Okay.

3              MS. GLAVIN:  The response from the AG's Office was

4    that they expected to produce, may begin produce responsive

5    documents on a rolling basis in I think it was March of 2024,

6    this year.

7              We filed the Article 78 in January and it was not on

8    grounds of constructive denial.  It was on grounds of both.

9    It was constructive and actual denial.  And the basis for the

10   actual denial is that the Attorney General's Office has

11   already said to another FOIL applicant we're not giving you

12   interview memos.  And then we proceeded to cite what the

13   Attorney General's Office's position has been in this case,

14   which is they have repeatedly said that this is -- these are

15   privileged materials.  And also with respect to the unredacted

16   witness interview transcripts, they're also claiming privilege

17   as well.

18             So the position that we took in the Article 78

19   petition is they're never going to give us this -- and what

20   was produced.  So we filed our petition.  The Attorney

21   General's Office did not answer.

22             They produced in March, I think it was around March

23   1st, six of the 41 transcripts that were publicly released and

24   they were still redacted.

25             I would note for one of the transcripts that they

13

1    produced to us, it was the Alphonso David transcript, they

2    added more redactions to that transcript than what they had

3    already publicly released in 2021.  And so the next batch that

4    they produced within the last week or so is three more

5    transcripts.  And again they have redactions.

6            So they moved and said it's moot.  We are producing.

7    So they moved to dismiss.

8            Our opposition says it's not moot because they're

9    not producing the interview memos.  They know it.  They've

10   already said that to somebody else.  They're saying it in this

11   litigation.  And it's ripe because we asked for unredacted

12   transcripts and we're not getting unredacted transcripts

13   (indiscernible) release.  They replied that is fully briefed

14   and pending.

15           So the state of the Article 78 is no interview memos

16   produced.  There is no commitment by the Attorney General's

17   Office to produce the interview memos.  And we know they have

18   already denied a FOIL application.

19           And so where I think we will end up is that I think

20   that we will have argument on the issue of whether it's moot

21   or not.  We don't think it is because we're not going to get

22   it.  So the judge is going to have to make a call on this.

23           And so if the judge makes the call and says I'm

24   denying this, we think there is a constructive for actual

25   denial, then the AG's Office has to answer and I can't give

1    you a timeline.

2         THE COURT:  I understand.

3         All right.  So, you know, I obviously didn't expect

4    to hear any earthshattering change in terms of the state of

5    play with regard to what had been produced or what is going to

6    be produced, but it is useful to know sort of what's going on.

7         So, you know, I will be very candid.  You know, we

8    undertook to begin privilege review looking at the documents

9    that Cuomo was seeking against the assertions of privilege

10   that the Attorney General's Office has included in the

11   privilege log, and on the basis of the prior briefing, but as

12   we all know that prior briefing was some time ago and it was

13   also not as squarely focused on the privilege issues as

14   perhaps it needs to be to provide a level of granularity that

15   a court would need to make a true ruling on the applicability

16   of the various privileges.

17        So we have many questions on -- about, you know,

18   sort of how we should proceed in this case.  And I have many

19   questions about the assertions of the privilege in various

20   contexts.

21        So, you know, in terms of next steps, Ms. Glavin,

22   what are you looking to accomplish?  I mean, I know -- I know

23   you want everything.  I get it.  But realistically, what are

24   you trying to actually get in this case and how do you want to

25   proceed procedurally here?

1          MS. GLAVIN:  So, Your Honor, in -- what is at issue

2      in the narrowed requests is at docket entry 51-1.  Okay.  And

3      there are four categories that are at issue.  And I think one

4      and three overlap, but 51-1 is what we're looking at.

5          THE COURT:  Mm-hmm.

6          MS. GLAVIN:  And we are looking for interview memos

7      of Trooper 1 herself.  She was informally interviewed in

8      April.  And then there was a -- April of 2021 -- and then

9      there was an on-the-record interview in May of 2021.

10          We are seeking the interview memos, unredacted

11      transcripts, for any of the state police witnesses.  And the

12      universe, as I see it, based on what was produced to Your

13      Honor, is we're talking about 36 total interview memos here.

14      Twenty-four of those memos, again, this is what I ascertained

15      in the privilege log, 24 of them are New York State Police

16      witnesses.  And then the remaining are the interview memos and

17      unredacted transcripts for the ten other complainants that are

18      included in the Trooper 1 lawsuit.  That's the universe.

19          And then, which I think -- so we're talking 36

20      memos, 24 of which are New York State Police members, and then

21      there are 12 transcripts that overlap some.  I think there are

22      two or three transcripts of state police witnesses and the

23      rest are of the complainants.

24          THE COURT:  It's true that we're having a universe

25      of many layers of issues, but with regard to your assertion of

16

1   relevance, you know, in looking at the, you know, the

2   privileged documents that have been submitted for my review, a

3   good number of the facts are already disclosed in the Attorney

4   General's reports.  There are also facts that I think I would

5   find to be clearly privileged.  You know, personal identifying

6   information, and details about security for the governor's

7   mansion.

8          And, you know, there's a lot of detail in these

9   memos particularly in the state police memos about their jobs,

10  what they're doing day to day, what their responsibilities are

11  with regard to the PSU.  And those -- that is not relevant to

12  this case and it is not -- it is privileged.  It is law

13  enforcement information.

14         And so, you know, there are many issues with trying

15  to seek the interview memos in which the sovereign immunity

16  issue is still of course looming.  In addition, there are many

17  layers of privilege that have been asserted.

18         And some of them are valid, Ms. Glavin.  And so I'm

19  just not sure what you procedurally think is realistic here.

20         MS. GLAVIN:  So with respect to the law enforcement

21  privilege, I want to talk about a couple of things.

22         One is we disagree about whether it applies

23  specifically, and I'm looking at the *In re City of New York*,

24  the Second Circuit case, because the law enforcement privilege

25  and what you're talking about in that case is it comes into

17

1    place where you're talking about law enforcement techniques.

2    Like in that particular case where it applied --

3            THE COURT:  As am I.  I'm talking about security

4    protocols for the governor's mansion.

5            MS. GLAVIN:  But the governor has familiarity with

6    those.  And those are --

7            THE COURT:  It doesn't mean he gets it from them.

8            MS. GLAVIN:  But there's a protective order in place

9    in this --

10           THE COURT:  It's still privileged.  That doesn't get

11   around privilege.

12           MS. GLAVIN:  So, Your Honor, to the extent you're

13   talking about the security precautions for the Governor of the

14   State of New York, he is familiar with those.

15           And so I -- I'm at a loss as to how, you know, the

16   former chief executive of the State of New York, who answer to

17   the governor, who is very familiar with what they're setting

18   up and the procedures.

19           THE COURT:  It doesn't waive their privilege.

20           MS. GLAVIN:  It doesn't waive --

21           THE COURT:  The fact that he has prior knowledge

22   does not waive their privilege.

23           MS. GLAVIN:  But, Your Honor, it could not be more

24   relevant here because it goes to a number of these witnesses

25   inside the Attorney General's report.  There are about 15 to

1   20 witnesses referred to in the Attorney General's report that

2   are New York State Troopers that are not identified by name

3   that are cited as either corroborating witnesses or witnesses

4   that don't remember with respect to or do not corroborate

5   Trooper 1.  They are material witnesses to her allegations,

6   which is why they're cited in the Attorney General's report.

7          To the extent they are fact witnesses about the

8   incidents that Trooper 1 is talking about in her complaint,

9   they are relevant.  And the problem we have is very few state

10  troopers were done, had interview transcripts.  I think it's

11  actually only three.  I think the only three people that they

12  did formal, on-the-record interviews with was Trooper 1, David

13  Dively, who was head of the detail, and we have deposed him,

14  as well as Vincent Straface, who was head of the detail and we

15  deposed him.

16         I would note that with respect to the troopers that

17  we have already taken depositions for nobody has come in and

18  asserted law enforcement privilege when we have asked them

19  about certain facts of the case.

20         So to the extent you're talking about law

21  enforcement privilege, one, I think it has been waived by the

22  fact that the Attorney General's Office hasn't objected to

23  testimony about security concerns or their techniques.  So

24  that's first and foremost.

25         Second, with respect to why it's relevant, it is

1    also relevant to which each of these troopers who are watching

2    him on a day-to-day basis what they saw, what they heard.

3    Some of these troopers know some of the other complainants.  I

4    will give you an example.

5          Vinny Straface who was head of the detail, he

6    testified he knew Lindsey Boylan.  He knew Kaitlin [NAME

7    REDACTED].  He testified about what he saw about what Lindsey

8    Boylan's interactions were with the governor.  He also

9    testified about having received a message from Lindsey Boylan

10   well after she left saying that tell the governor to the

11   extent, you know, I miss him, et cetera.

12         These are relevant to the extent Trooper 1 is

13   talking about where she was at a particular time, what

14   happened at a particular time.  What the other troopers have

15   to say about that is very vital to our defense.  Whether they

16   ever witnessed this behavior.  Their impressions of whether he

17   -- how he acted at the holiday parties or invited people

18   upstairs.  Yes.  I think they could not be more relevant.

19   These are the witnesses that the Attorney General cites in

20   their report which is exactly what Trooper 1 is relying upon.

21         The other issue we have is that Trooper 1 cites to a

22   number or state police troopers in her disclosures.  And we

23   talk about that at ECF 51-1.  They are witnesses to this case

24   which becomes vitally important.

25         I can tell you some of the core interview memos that

1    we know about.  Major Nevins, who used to be head of the

2    detail, we took his deposition.  But he talked about having

3    been interviewed by the Attorney General's Office.  And I

4    think he was the first person that brought allegations

5    relevant to Trooper 1, although he never overlapped with her,

6    so what he knows is hearsay or what he heard from Trooper 1,

7    he reports it to the Attorney General's Office.

8              It is important to us to know what did Trooper 1

9    tell him and what did he relay to the Attorney General's

10   Office in the first conversation that he had about it?  Does

11   that differ from what her allegations were now?  Did it

12   include all of the allegations?

13             THE COURT:  I understand you're looking for

14   inconsistencies --

15             MS. GLAVIN:  It's more than that.

16             THE COURT:  -- but it's -- how is somebody whistle

17   blowing to the top law enforcement officer of the state not

18   being protected in their disclosures to that officer

19   consistent with public policy?  You're going to create a chill

20   and nobody's going to want to the Attorney General's Office if

21   we turn all of this over.

22             MS. GLAVIN:  Your Honor --

23             THE COURT:  About anything.

24             MS. GLAVIN:  Your Honor --

25             THE COURT:  Not just about high-profile cases,

1    they're not going to have any confidence in the Attorney

2    General's ability to keep their identities or their interview

3    memos safe.

4                 MS. GLAVIN:  Your Honor, this is the Attorney

5    General's Office that released all of these witness

6    transcripts without getting their consent, so I'm a little

7    surprised that we're going down this road.

8                 THE COURT:  It's the privilege that may --

9                 MS. GLAVIN:  So you --

10                THE COURT:  That may have waived some privileges for

11   sure with regard to some of the facts, but does it waive all?

12   And what is your authority for that?

13                MS. GLAVIN:  With respect --

14                THE COURT:  No.  That's a very significant issue

15   here.

16                MS. GLAVIN:  Oh, I think it -- I think the very fact

17   -- look at the *Kidder* case.  The very fact that the Attorney

18   General's Office issued a report and cites what anonymous

19   troopers saw, and what they claimed to have heard, and what

20   they didn't see, and what they told her they didn't see, could

21   not be more relevant.  Once the Attorney General's Office

22   issues --

23                THE COURT:  It's not the question.  Relevance is not

24   the question.

25                MS. GLAVIN:  Thank you.

22

1          THE COURT:  The question is how does it waive

2     privilege?

3          MS. GLAVIN:  Okay.  So thank you on relevance not

4     being the question.

5          Going to privilege, look at the *Kidder* case.  The

6     very fact that the Attorney General's Office issued a report,

7     and it's not just a -- this was 165 pages with tons of

8     footnote citing to what was in all of these memos, they waived

9     it, and we think the case law is very good on our side.

10          But back to law enforcement privilege.  I would

11     note, okay, the New York State Police themselves has not

12     objected or waived law enforcement privilege in this case.

13     That speaks volumes.  That speaks absolutely volumes.  And we

14     already have documents that the New York State Police has

15     produced to us that go to the very security about how the

16     governor's protected and they have never claimed privilege.

17     That is telling.

18          THE COURT:  The New York State Police can't waive

19     the privilege for the Attorney General either.

20          MS. GLAVIN:  Of course the -- no --

21          THE COURT:  No, they cannot.

22          MS. GLAVIN:  Law enforcement privilege?

23          THE COURT:  The New York State Police cannot waive

24     the --

25          MS. GLAVIN:  They waived it by producing tons of

23

1    documents to us that --

2              THE COURT:  The New York State Police --

3              MS. GLAVIN:  But --

4              THE COURT:  -- is not controlled by the Attorney

5    General's Office or vice versa.

6              MS. GLAVIN:  We --

7              THE COURT:  What is your authority for the notion

8    that one agency action can waive a privilege for a different

9    agency within the executive branch?

10             MS. GLAVIN:  Because this is the exact -- Your

11   Honor, this is the exact agency --

12             THE COURT:  It's not the exact --

13             MS. GLAVIN:  -- that enforces this.  This is the

14   exact -- this would be if the New York State Police --

15             THE COURT:  That's not authority.  What is your

16   authority for the proposition --

17             MS. GLAVIN:  The authority is the cat is out of the

18   bag.

19             THE COURT:  It's not that simple.

20             MS. GLAVIN:  It's pretty simple.

21             THE COURT:  No, it's not.

22             MS. GLAVIN:  The cat is out of the --

23             THE COURT:  It's --

24             MS. GLAVIN:  If they release these publicly, the cat

25   would be out of the bag.  You have to weigh this.

24

1          THE COURT:  The facts might be out of the bag, but

2     that doesn't mean you're entitled to the underlying records --

3          MS. GLAVIN:  Going --

4          THE COURT:  -- and that's -- that's my question

5     about what is the authority that you rest on for that

6     position?

7          MS. GLAVIN:  That these have been turned over.

8          When you're looking at the law enforcement

9     privilege, Your Honor, one of the things you have to look at

10    is -- this would be like if this were a state police member

11    who's suing about something that happened, that state police

12    member knows these things, will be able to testify about them,

13    they've already been testifying about them in depositions and

14    nobody has claimed privilege, period.

15         THE COURT:  They are.  They're claiming privilege.

16         MS. GLAVIN:  On behalf of who?

17         THE COURT:  On behalf of their office.

18         They've conducted a lengthy investigation.  As an

19    executive branch, they are entitled to protect the integrity

20    of their information gathering techniques so as to provide

21    future witnesses assurances.

22         MS. GLAVIN:  Okay.

23         THE COURT:  And with regard to the 41 witnesses and

24    the transcripts that have been disclosed, there's -- they have

25    some problems.  And believe me, I'm going to be asking Mr.

25

1    Amer.

2            But I still am not hearing the authority for the

3    proposition that the actions of an executive branch official

4    or personnel person can somehow waive the privilege on behalf

5    of the top law enforcement officer of the State of New York.

6            MS. GLAVIN:  Let me separate this out.  Okay.

7            I now will have to go back in their briefs because I

8    don't think the Attorney General's Office, either in the

9    *Bennett* case, which is now fully briefed and pending before

10   Judge Cave, we have oral argument May 8th, or in this case

11   that they have been raising it discloses things about security

12   for the governor.  What they have focused on on their law

13   enforcement privilege is it goes to the techniques used in the

14   638 investigation.

15           THE COURT:  And I mentioned that as well.

16           MS. GLAVIN:  Okay.  So let's --

17           THE COURT:  But what -- what I have done, which I

18   don't think Judge Cave has undertaken at this juncture, is

19   actually read the documents.

20           MS. GLAVIN:  Okay.

21           THE COURT:  And in reviewing the documents, I think

22   there are many layers of privilege.  And the problem that I'm

23   having, which I plan to discuss with Mr. Amer and Ms. Longley,

24   is I don't actually know on the basis of the privilege review

25   which portions of which documents you're relying on which

1    privilege for.  If that makes sense.  And so I'm not in a

2    position to guess.

3            Perhaps you're relying on the full report as

4    privileged under the law enforcement privilege and/or

5    deliberative process privilege work product.  I don't know.

6            And I also don't know if it's also more granular.

7    And that's some of the issues that I wanted to discuss with

8    them.

9            MS. GLAVIN:  We also have from production from the

10   Albany County District Attorney's Office I think it -- I think

11   we have maybe two memos of state police troopers and nobody

12   raised the law enforcement privilege objection.

13           THE COURT:  They are raising it now, Ms. Glavin.  So

14   like the notion that other people aren't arguing in other

15   contexts is just not relevant to me.  It's just --

16           MS. GLAVIN:  They're not raising it on the grounds

17   that you're saying.  Point me to a page in the brief.

18           THE COURT:  That's one of the things I started with.

19   I specifically said to them I'm not certain as to the granular

20   basis for some of these objections and I plan to discuss it

21   with them.

22           MS. GLAVIN:  This is --

23           THE COURT:  I am conducting a privilege review

24   without sufficient factual basis, which is the first thing I

25   said, and I plan to address it with them.

1          And instead of focusing on the questions I have,

2     which are the authority for the notion that they have waived

3     their privilege writ large, you're arguing with me over things

4     that they have to answer.

5          THE COURT:  Okay.  So, Your Honor, first of all,

6     this actually, what you are raising, is something sua sponte

7     that has not been in the briefs.  I'm happy to brief that.

8          THE COURT:  100 percent.  100 percent.

9          MS. GLAVIN:  I'm happy to brief that for you.

10         THE COURT:  I am raising a whole bunch of things sua

11    sponte today that are not in the brief, because having looked

12    at the documents, I am adrift.

13         There are a lot of facts and I don't have a

14    sufficient factual predication to fully understand the basis

15    for some of the assertions because of concerns about waiver,

16    concerns about which litigation things were allegedly

17    anticipatory.  I have -- you know, there's -- I have a whole

18    list of questions regarding the applicable privileges.

19         I was giving one example, which I don't necessarily

20    need to have briefed depending upon what their basis for their

21    assertions are.

22         MS. GLAVIN:  But we may want to brief it because

23    we're hearing it for the first time.

24         THE COURT:  I am not necessarily even saying that

25    those portions of those reports would be withheld on that

28

1     basis.

2          I am saying that having done a privilege review in

3     the dark without a lot of factual predication as to the basis

4     of the OAG's assertion of privilege on a sort of line-by-line

5     or topic-by-topic analysis, certain things jumped off the page

6     to me as potentially problematic with regard to disclosing

7     these documents writ large.

8          And I don't think that the parties, because of the

9     way that this unfolded, I just don't think that we have a very

10    full record of what the OAG's position is with regard to the

11    assertion of privilege over different categories.

12         So these are questions for them.

13         MS. GLAVIN:  So I have another issue I want to raise

14    with you because you're talking about witnesses coming forward

15    and I want to separate this out.

16         Let's separate out, because what we're talking about

17    here, the categories, we're talking about New York State

18    Police witnesses, so interview memos and transcripts, and then

19    you're talking about the complainants.

20         THE COURT:  Mm-hmm.

21         MS. GLAVIN:  With respect to the complainants, their

22    transcripts have been released.  They were subpoenaed.

23    There's not going to be a chilling effect because the Attorney

24    General's Office has subpoena power under 638 for these

25    investigations.  Whether the witnesses like it or not, they

1    are subpoenaed.

2         And a number of those witnesses, the ten

3    complainants, they went and talked to CBS, New York Magazine,

4    New York Times, ABC, that was their choice.  And so with

5    respect to those ten complainants, the AG's Office had no

6    problem telling the world what they had to say.  We need those

7    interview memos.

8         Then let's talk about the state police.  Okay?

9    We're not talking --

10        THE COURT:  Pause.  Pause.

11        Mr. Amer, with regard to the complainants, what is

12   the basis?  Which privileges are you specifically relying on?

13   Because one of the things I found slightly frustrating about

14   the privilege log is sort of the mixed bag, multiple

15   privileges asserted over multiple documents.

16        And, you know, with regard to the attorney-client

17   privilege, for example, you know, what authority do you have

18   for the proposition that communications underlying the report

19   were attorney-client communications?  And the case law that

20   was included in the original briefing just doesn't really

21   answer these questions.

22        I recognize this is like the third issue in the

23   original briefing, but I have questions about the

24   applicability of the attorney-client privilege.  I have

25   questions about the applicability of the attorney work product

30

1    privilege.  Because it's unclear to me what litigation these

2    documents were prepared in anticipation of.  It feels like a

3    lot of these documents were prepared for the purposes of

4    preparing the report.  And I'm curious if you have any clear

5    authority that the work product privilege and the attorney

6    work product privileges apply in those contexts?

7              So I'm not sure who --

8              MR. AMER:  Well --

9              THE COURT:  -- wants to address these issues or --

10   sort of -- we just need to figure out a way to proceed.

11             MR. AMER:  Yeah.  Your Honor, let me make a few

12   preliminary observations.  I think Ms. Longley can address

13   some of the more pointed questions about the privilege issues.

14             Let me say first I think Your Honor's March 29th

15   decision denying the request to de-designate certain documents

16   produced in discovery by non parties has two points that are

17   relevant, at least in my view, in our view, to the law

18   enforcement privilege.

19             The first is Your Honor has recognized that a lot of

20   the information that was conveyed to our office during the

21   investigation was highly-sensitive information, personal

22   information, information about sexual histories, and medical

23   histories, and that is exactly the type of information that

24   the law enforcement privilege applies to, because the second

25   point of the decision was a recognition that the non parties

31

1    relied heavily on their right to designate material as

2    confidential in the protective order.        And I think there

3    is a strong parallel between non parties relying on a right to

4    designate material as confidential in discovery and the non

5    parties' right to rely on promises made by our office, by the

6    investigators, during the course of the investigation that

7    gave them comfort to be more forthcoming.

8            And I think, you know, one comment in Your Honor's

9    decision was that, you know, absent the right to rely on a

10   confidentiality designation, discovery would have stalled.

11           And I think there is a parallel here.  That absent

12   the ability of the Attorney General's Office to confer in a

13   meaningful way guarantee of confidentiality that our

14   investigation would stall, that the ability to get cooperation

15   from witnesses would be in jeopardy.

16           And that in this case if the law enforcement

17   privilege is not upheld, we are going to have issues going

18   forward, as Your Honor I think has already recognized, in

19   getting witnesses to be forthcoming and cooperate.

20           So I put that out there just so you understand with

21   respect to the law enforcement privilege.

22           I will say that I don't think much has changed.  I

23   don't think anything's changed since we addressed this issue

24   quite some time ago with respect to this narrowed request.

25           It includes the interview memos.  And I recall Your

32

1    Honor saying to Ms. Glavin there is no way that the Attorney

2    General's Office will voluntarily give you the interview

3    memos.  And you asked us if that was correct and we confirmed,

4    yes, that is correct.  And it remains the case today.  We will

5    not willingly, voluntarily provide the interview memos.

6    They're clearly covered by law enforcement privilege for all

7    the reasons we've said in our briefs already.

8              There is a second point that Your Honor made at that

9    last I can't recall if it was a conference or actually oral

10   argument on the motions that I think was in a -- a very

11   astute, practical observation, which is that we have a

12   threshold issue in this case on sovereign immunity that can be

13   appealed all the way up to the Second Circuit on an

14   interlocutory basis.  That is clear.  And your astute

15   observation was there is no way that that issue will be

16   briefed here in the district court and in the circuit court

17   and decided before this case gets tried.

18             So as a practical matter, that's just where we are.

19             And we do consider sovereign immunity a threshold

20   issue.  It's been decided in our favor by one judge in this

21   court already in the *Felix* case.  It's now been briefed to

22   Magistrate Judge Cave.

23             We think it's, you know, under Second Circuit

24   precedent that our position is correct because the circuit has

25   already decided that a subpoena against a government agency is

1   a proceeding under the *Dugan* case for purposes of triggering

2   sovereign immunity.

3          And then it all comes down to has it been waived.

4   And we just don't see how there are any facts in this case

5   that would permit a finding of waiver.  There has been no

6   waiver in this case.

7          So I guess, you know, from our perspective, I

8   appreciate Your Honor is rolling up your sleeves and digging

9   into the documents that have been submitted in camera.

10          I will note that I'm not sure if the -- if Your

11   Honor is aware, but the very fact that we provided these

12   documents in camera to this court is being raised as a basis

13   for arguing waiver before Magistrate Judge Cave.

14          THE COURT:  Yes.  I'm certain that Judge Cave will

15   see that for what it is.

16          MR. AMER:  I'm sure as well.

17          But the point being that, you know, I do think while

18   we want to engage in any questions the Court has about

19   documents that have been submitted in camera, we're very

20   reluctant to discuss them in any detail because we expect that

21   will be further basis for a waiver argument before Judge Cave

22   and we prefer not to provide that, you know, argument to be

23   made even though we understand what it's worth.

24          I think, you know, I appreciate Your Honor wants to

25   get into the detail of the privilege assertions, but I will

34

1    say candidly that, you know, we have our sovereign immunity

2    issue that we are not going to waive.  And so, you know, from

3    our perspective, that is a threshold issue that Your Honor

4    needs to address and decide if Your Honor's inclined to rule

5    against us on any aspect of our privilege defenses because the

6    ultimate result of that would be an order that compels

7    production and we can't get there unless the Court addresses

8    first the sovereign immunity issue.

9         THE COURT:  I fully understand and agree with you,

10    Mr. Amer, that that is -- that issue would have to be decided

11    if I were to conclude that there are no privileges.

12         MR. AMER:  Correct.

13         THE COURT:  But as I noted in my prior ruling, I

14    think that this is a very complex issue.

15         And although I have a great respect for Judge Locke,

16    I am not fully sold on the notion that the New York State

17    Attorney General's Office and the New York State apparatus has

18    -- any state apparatus has sovereign immunity for all of time

19    from all federal inquiries.

20         You're talking about federal question cases.  And

21    the fact that, you know, for example, the New York State

22    Legislature has to, you know -- the gerrymandering cases that

23    come on the political gerrymandering come to the federal

24    courts every decade for the courts to redraw the maps for New

25    York State.  If the New York -- if the courts were unable to

1    get documents from New York State in trying to rule on cases

2    of that ilk and trying to rule on cases involving significant

3    federal civil rights claims, I don't know that our system, our

4    federal system could work.

5            MR. AMER:  But I also don't see how a ruling here

6    gets you to that -- what I would call parade of horribles

7    because --

8            THE COURT:  No.  I think it's directly related.

9            MR. AMER:  Well, in these cases though, Your Honor,

10   federal -- state officers are named as defendants through *ex*

11   *parte Young* and discovery is conducted on a party basis.  I've

12   handled any number of Eighth Amendment claims against docs and

13   you name the superintendent of the facility and you get docs

14   documents by subpoena, by serving party notices on the

15   defendant in that case.

16           Anyway, I think --

17           THE COURT:  I understand.  But in the New York State

18   redistricting cases not every in-state entity with relevant

19   documents is a party.

20           MR. AMER:  Whether that means they don't have

21   custody, possession or control over the documents I think is

22   another matter.  And I do think that there is that avenue and

23   argument that is, you know, possible.

24           I think where we need to go here is we're going to

25   need to brief, if Your Honor requires it, brief again the

36

1    sovereign immunity issue because I just -- let me back up.

2            You know, the Court originally denied the motion to

3    compel on relevance and burden ground and on that basis didn't

4    need to reach these other issues.

5            THE COURT:  Correct.

6            MR. AMER:  That motion has now been fully resolved.

7            So I think what's before the Court is this motion --

8            THE COURT:  I actually --

9            MR. AMER:  -- our motion to quash.  I think that

10   remains the pending motion, and I think that can be the basis

11   for the Court to address these additional issues.

12           So we can respond to your questions on privilege.  I

13   know you have issues with some of the privilege.  I will just

14   say, you know, to the extent that the Court is not prepared to

15   grant our motion to quash in full based on the privilege

16   assertions and will then --

17           And by the way, the relevance and burden I think

18   still apply even to this narrowed request.  I think you've got

19   in the affidavits the amount of time it would take us to

20   redact for personal information even the interview memos and

21   all of the transcripts.

22           But at any rate, you know, if the result is going to

23   be anything other than granting our motion to quash based on

24   privilege and/or relevance burden, then we obviously need to

25   have the Court rule on sovereign immunity.  That's just the

1    reality of where we are.

2         And I will also point out that, you know, there's no

3    possible way we would put ourselves in a position where the

4    production of any document on a voluntary, consensual basis in

5    our view, you know, that's going to lead to a deposition

6    subpoena for sure.  And we are just not going to put ourselves

7    in a position where we're all of a sudden having to field

8    deposition subpoenas for the investigators and we're going to

9    have an even louder chorus of waiver of sovereign immunity

10   than we've had to date based on any additional documents that

11   we might provide.

12        So I'm just trying to be candid with Your Honor as

13   to all the reasons why we think we're just not going to be

14   able to resolve this short of getting a decision that deals

15   with all these issues.

16        THE COURT:  I understand.

17        And, you know, the reason that I was turning to the

18   privilege candidly is because the sovereign immunity question

19   in my mind is so very thorny that it's a constitutional

20   avoidance question.

21        As I set forth in my prior opinion, I don't think

22   it's -- I've been very transparent that, you know, I think

23   that it's a very complex issue.  I think the Fifth Circuit's

24   case is cabinable on its facts.  I mean, we're trying to

25   subpoena sitting judges.  I mean, it's -- you know.  And I

1      think that they could have easily just ruled on judicial

2      immunity, absolute judicial immunity, chose to go in a

3      different direction.

4           But I don't necessarily think that the Fifth Circuit

5      case, given the factual differences and the history

6      differences between, you know, the judiciary and the executive

7      branch with regards to level of involvement in investigations

8      and individual lives and policy choices that come to court for

9      litigation on a regular basis, I think they're very different,

10     so I think the Fifth Circuit case is very different than what

11     we have here.

12          MR. AMER:  All I'll say, and I know this shouldn't

13     be turned into an oral argument on either sovereign immunity

14     or privileges, but I will say that the Fifth Circuit was

15     relying on Second Circuit precedent in *UPA and Glodser* (ph),

16     and nobody's -- nobody's been able to explain to me how the

17     Second Circuit holding, which is binding obviously on this

18     court, somehow isn't applicable because there you were talking

19     about a subpoena served on a federal agency versus a subpoena

20     which is here served on a state agency.

21          The difference between a state agency and a federal

22     agency just has no bearing on the rationale that the Second

23     Circuit employed based on the *Dugan* case.  It was, you know, a

24     subpoena on a government agency is a suit for purposes of

25     sovereign immunity.  Many circuits have concluded otherwise.

39

1       And as the briefing before Magistrate Judge Cave has shown

2       those are the cases that the other side is relying on.

3             But, you know, this court doesn't have the option to, you

4       know, revisit the reasoning of the Second Circuit versus these

5       other circuits and say I think the other circuits make more

6       sense.  You know.

7                   THE COURT:  Well, with all respect, the federal

8       government is just different from the state.

9                   And when the -- you know, when the states entered

10      into the Union, you know, you made clear at our argument over

11      a year ago that you're relying on common law, sovereign

12      immunity that existed prior to ratification of the

13      Constitution.

14                  MR. AMER:  As well as the Eleventh Amendment, yes.

15                  THE COURT:  As well as the Eleventh Amendment,

16      right?

17                  MR. AMER:  Yes.  Yes.  Yes.

18                  THE COURT:  And I asked you that question very

19      purposefully because I wanted to understand exactly what your

20      position was.

21                  And the idea that states lost no rights whatsoever

22      when they entered into a federal system where the federal

23      government is supreme and the federal government has to

24      resolve issues involving state agencies on a regular basis, it

25      just doesn't sit well with me.  It doesn't sit correctly.

40

1          And it's -- it's borne out when you look at the

2     differences in how legislative privileges treat it with state

3     legislatures versus the federal legislature.

4          Legislative privilege in the state level is

5     considered to be a qualified privilege, whereas the federal

6     legislative privilege is significantly stronger I would posit

7     having done a very deep dive into that issue for the AJC

8     subpoena.

9          And my view is that the executive branch privilege

10    cannot possibly be absolute when the federal government has to

11    occasionally adjudicate issues involving the state.  And

12    sometimes those issues are of incredible federal importance.

13    And to say that the state has absolute immunity from federal

14    subpoena is really problematic in our system of government.

15         This is to fundamental stuff.  I've looked at

16    treatises.  I've read some of the federalist papers.  This is

17    fundamental and I'm not prepared to go there.

18         MR. AMER:  I understand.  You know.  I appreciate

19    too that every state has their form of freedom -- of Freedom

20    of Information Laws that are a, you know, clear, clear waiver.

21         THE COURT:  I mean, I am prepared to go there.  I

22    just don't think it's what you want.

23         MR. AMER:  Clear waiver.

24         THE COURT:  And I don't need to reach it if I -- if

25    I agree with you on the privileges.

41

1          MR. AMER:  Nobody would be happier than the people

2     on this side of the table if we could avoid reaching sovereign

3     immunity because you agree with us completely on our privilege

4     assertions or relevance and burden and, therefore, grant our

5     motion to quash.

6          So if the issue is, you know, do you, you know, are

7     we insisting that we get a ruling on sovereign immunity, of

8     course not.

9          But I do hear Your Honor saying that while you agree

10     with some of our privilege assertions you have problems with

11     other aspects of it.

12          And so I think the recognition here is that either

13     we can get a favorable ruling in its entirety on our motion to

14     quash through the privilege assertions, or if not then there's

15     just no way to avoid having to grapple with the harder,

16     thornier issues of sovereign immunity.

17          THE COURT:  I would love to write on it, but I

18     actually believe it has constitutional avoidance.

19          MR. AMER:  So maybe we should get to your detailed

20     questions on the privilege issues.  And hopefully between me

21     and Ms. Longley, who has more, you know, knowledge in the

22     weeds on the documents that we submitted in camera, we can try

23     and address your concerns and questions.

24          THE COURT:  All right.  So one thing you started to

25     touch upon was the procedural situation and that's one thing

42

1        that I did want to address.

2              We're kind of in this sort of murky, gray area.

3        Perhaps we're still operating on the motion to quash, we're

4        operating on, you know, this narrowed list that Cuomo

5        submitted at ECF 51-1, but, you know, there's -- it's the

6        briefing on these matters is a little old and it's a little

7        bit not exactly what's currently before the Court, which is

8        part of what I was struggling with in conducting this

9        privilege review.

10             And I certainly want to make sure that we figure out

11       a procedure to address giving the parties a full opportunity

12       to be heard.  And I'm not -- wou know, to your point, Ms.

13       Glavin, I'm not planning to do my (indiscernible) review in

14       the dark and dream up my own privileges.  I need them to tell

15       me what they're relying on for which pieces of which documents

16       and that's where I was having challenge in the -- with given

17       the current briefing.

18             Briefing on the privilege issues, as you know, is

19       small.  In the privilege review, any of the documents have

20       multiple privileges asserted.  And so it's hard for me to

21       discern with any clarity what you're relying on and how.

22             And so, Ms. Longley, you know, what are your -- I

23       don't know if you want to respond to anything I've asked so

24       far or if we just want to come up with a plan.

25             MS. LONGLEY:  I'd be happy to respond.  And

43

1    especially -- I mean, there was extensive discussion by Ms.

2    Glavin about the law enforcement privilege and focus on

3    security concerns.

4              And if I can start there, I would like to just

5    reframe it which is, you know, I think Your Honor's raising of

6    security issues was not sua sponte.  It's actually at document

7    20 in this case.  And it's in the declaration submitted in

8    support of our motion to quash where we lay out the types of

9    information that are covered by -- that the law enforcement

10   privilege is intended to protect, and we specifically cite

11   security plans, including security footage of government

12   buildings, and floor plans of government offices, as well as

13   something that Ms. Glavin didn't touch on, which is personal

14   information about the witnesses, including certain information

15   about some of their personal or romantic relationships.

16             And of course we are prepared to further brief and

17   put in more showings on this as long as we can do that in a

18   way that doesn't threaten any of our privileges on it.  So

19   it's a delicate dance perhaps.

20             But what I will say is I actually think there is

21   enough in briefing as it exists and on the documents on their

22   faces for the Court to look at the documents.

23             And what I can say is I think law enforcement

24   privilege is the easiest one because we are asserting it over

25   the documents in their entirety.  Not every single document

1    that we've submitted for in camera review has security plans

2    in it.   Some of them do.   But all of the documents have

3    personal and private information about witnesses, which is one

4    of the types of information that the law enforcement privilege

5    is intended to protect.

6            That can include identities of unknown witnesses.

7    It can also include private information just about witnesses

8    that are already known or their family members and that's in

9    every single document.   That's in every single interview memo.

10   That's in every -- and that's also the nature of the

11   redactions on the transcripts that have been provided to the

12   Court.

13           So I also would just say that the discussion there

14   on law enforcement privilege was pretty off base because it

15   was talking about whether this is -- this information is

16   relevant to the case and relevance is not the question.

17           It's actually in order to overcome the law

18   enforcement privilege, the party would have to show they have

19   a compelling need for the information, which is to say that

20   they can't actually litigate their case without it, without

21   that information, because it is actually at issue in the case.

22           And OAG is not on trial here.   The investigation is

23   not at issue.   I don't think anyone can seriously argue that

24   there's information in those interview memos that without that

25   information the case grinds to a halt, that the case can be

1    adjudicated without that information, and that's the standard

2    the Second Circuit set forth in the *In re City of New York*

3    case.  And in addition -- so they're nowhere near that.

4         I think that every single document there, I think

5    the Court could actually look at it and see information that

6    is covered by the types of information protected by the law

7    enforcement privilege.

8         THE COURT:  But what do we do about the waiver

9    problem?  Because, you know, in reviewing the report, looking

10   at the transcripts online, and comparing them to the

11   documents, so many of the facts have been publicly disclosed

12   by the Attorney General themselves?

13        MS. LONGLEY:  If I may, before you can get to

14   waiver, that actually completely undoes their argument about

15   overcoming law enforcement privilege, because to have a

16   compelling need, you have to show you can't get the

17   information somewhere else.  So if the information is

18   available somewhere else, then they don't have a compelling

19   need for it.

20        And a lot of the discussion about information that

21   the police have provided, that OAG has not objected to, even

22   though we didn't know about it and we're not party to those

23   depositions, or in a position to object, but in any event if

24   they're getting that information from the police, then they

25   don't have a compelling need to get that same information from

1    OAG.

2           So I think before you even get to waiver, you know,

3    they don't have a compelling need.

4           But in terms of information, you know, the law

5    enforcement privilege protects information itself.  And unless

6    that information that we've redacted or withheld in those

7    interview memos is actually in the report, then it hasn't been

8    waived.

9           And there was a very careful process, and it took a

10   lot of time and a lot of effort to redact the transcripts, to

11   do it in a way that protected confidentiality to the greatest

12   extent possible, which is what was -- which is the assurance

13   that was given to witnesses who agreed to cooperate.

14          And so I don't -- you know, I am not aware of -- and

15   if there was any information let's say that is actually in a

16   transcript and happens to be in a memo, one, they don't have a

17   need for it, but, I don't -- I don't -- it could have been --

18   you know, I can't even imagine what it is, I don't know what

19   it is -- and any attempts by them to say that it's there would

20   be speculative because they actually don't know what's in the

21   memos either.

22          So I don't -- I don't see a waiver.  We've

23   consistently asserted law enforcement privilege over these

24   materials.

25          So I don't know if I -- if there's something more

47

1    specific that Your Honor has concern about waiver, but I don't

2    see a basis for it.

3              THE COURT:  All right.  So, Ms. Glavin, would you

4    like to respond to any of that?

5              MS. GLAVIN:  Of course, Your Honor.  A couple of

6    things.

7              One is with respect to what's referred to as

8    personal information about witnesses, whether it's romantic

9    relationships, things about the kids.  I have an idea about

10   what some of this relates to with people's children, the

11   protective order easily covers that.  That's not part of the

12   law enforcement privilege.  People's personal information or

13   privacy concerns are addressed by the protective order.

14             Second, with respect to the law enforcement

15   privilege.  What we would ask is that the Attorney General has

16   made generalized claims of law enforcement privilege.  And we

17   would ask that on a witness-by-witness basis for each of these

18   -- so you separate it out.  You've got the ten complainants,

19   okay, which we don't think any law enforcement privilege

20   applies to that.  And I have looked at -- we probably have --

21   I don't know how many interview memos we have from the Albany

22   County District Attorney's discovery, but I don't think in

23   those interview memos people were promised confidentiality.

24   They couldn't.  Because they knew that they were going to be

25   doing a report.

48

1          What they did say to people that I saw repeatedly is

2     we would try to keep it confidential.  And we see that in some

3     of the interview transcripts.  So people were not given 100

4     percent assurances of confidentiality.  They couldn't.

5     Because they knew they were doing a report on this.  So that's

6     the -- I want to address that.

7          On law enforcement.  Trooper 1, here's the problem.

8     One is I don't think the exception applies, but I think they

9     have to make a particularized showing for each of the these

10    memos, because I think you're talking about -- if you're

11    talking about law enforcement techniques, then you're talking

12    about the 20 in a four state police witnesses.

13         The problem we have is that Trooper 1's complaint in

14    her allegations, she's making them about things that happen on

15    her day-to-day job as a member of the protective services

16    detail and, therefore, what they're doing, who's around, and

17    what the security was that day becomes part of the case.

18         Let's take one example.  Trooper 1 alleges that in

19    September of 2019, while she was at an event for Belmont, she

20    talks about herself and there is another PSU officer who are

21    in the front, that would be Fabrizio Kozkazinsky (ph).

22         THE COURT:  This the stomach touching?

23         MS. GLAVIN:  This is the stomach touch.

24         THE COURT:  Mm-hmm.

25         MS. GLAVIN:  And it has become very important to us

49

1    as to what the security was that day because we think there

2    would have been people behind that would have been there with

3    the governor.  It's rare that he doesn't have a circle around

4    him.  And so all of that becomes relevant in terms of who was

5    holding the door, who was in front of her that day.  So that

6    part of security becomes relevant.

7         What happens from when he gets out of the car, who

8    caught the car that day, where on the way in it happened, we

9    actually would be interested in what the floor plan was.

10   We've been trying to figure that out as to what the route was

11   for him that day going into Belmont --

12        THE COURT:  Relevance does not waive the privilege.

13        MS. GLAVIN:  No, but it's it's compelling need.  I

14   don't think A, that they have made it out, but it's a

15   qualified privilege.

16        But B, to defend what she is saying about what

17   happened that day, where she was, who saw what, who were the

18   witnesses that day, we have a need to understand throughout

19   that day because we don't think that what she is describing

20   could have happened the way it's been described.  And there's

21   also been several versions of this from other troopers that

22   day.  That becomes very important to us.

23        With respect to the elevator touch, that particular

24   day she talks about her job was to catch the governor that

25   day, so it becomes important to us why -- what that means, why

1    she was there, who is in front of the governor when you got on

2    the elevator, and why somebody's in the back, and what they're

3    job is that day.  Some of the other --

4               THE COURT:  But what --

5               MS. GLAVIN:  But all of that becomes important --

6               THE COURT:  But so much of this information is

7    already in the report.  I mean, what are you looking for

8    that's not in the report?

9               MS. GLAVIN:  What the other trooper said about these

10   particular events, because a lot of what is in the report --

11   Your Honor, we cite -- look at --

12              THE COURT:  So you're looking for what's not

13   included in the report?

14              MS. GLAVIN:  There was a lot that's not included in

15   the report with respect to -- look at 51-1.  Look at what we

16   ask for in number three.

17              THE COURT:  Yeah.  But I just want to understand

18   this.  I want to understand this.

19              So you're -- to the extent that the information is

20   included in the report, it's available.

21              MS. GLAVIN:  Right.

22              THE COURT:  To the extent that the information is

23   not included in the report, does -- isn't that the very -- is

24   that what you're looking for?  I mean, I'm trying to --

25              MS. GLAVIN:  There's a lot that's not included in

1    the report that we need.

2            They did not include in the report lots of

3    information that they had which we believe to be exculpatory

4    to the governor.  That's been one of the big problems that we

5    have with the report is that we believe it was a one-sided

6    recitation of the facts.  This will be the same from day one.

7            So you have in the report --

8            THE COURT:  But isn't the agency permitted to decide

9    what facts to include in their report?

10           MS. GLAVIN:  They obviously did.  But the problem

11   that we had is we are defending.

12           Trooper 1 is basically cut and pasted the

13   allegations from the report.  And in defending that report, we

14   know they spoke to a number of troopers.  It is in item three

15   of the documents we're looking for.

16           There are about 15 to 20 troopers that were

17   interviewed and cited in the report that we -- that they gave

18   us portions of what they may have said.  We need those

19   interview memos A, because we don't know who they are, but

20   they're witnesses to this.  And Trooper 1 would necessarily be

21   relying on some of them.

22           THE COURT:  The New York State Police didn't you

23   give you duty rosters for that day?  I mean, that's hard to

24   believe.

25           MS. GLAVIN:  There are more -- they don't have duty

52

1      rosters for who is on assignment.

2              We'll give you an example.  The elevator touch.  If

3      you go to footnote 287, it talks about a trooper that Trooper

4      1 claimed was sitting at the desk that day and corroborated

5      her.  It would appear from the report that trooper was not at

6      the desk that day, but we would like to talk to that trooper.

7      There is another trooper that apparently was at the desk that

8      day and doesn't remember --

9              THE COURT:  And you don't have the identities of --

10             MS. GLAVIN:  No.

11             THE COURT:  Why can't you get them from the New York

12     State Police?

13             MS. GLAVIN:  Because they don't know.  That's the

14     problem.  They don't know.  We've asked them.  This is the

15     problem.

16             THE COURT:  So identity information is one category.

17             MS. GLAVIN:  Okay.

18             THE COURT:  And that is different than their

19     underlying reports in a way.  Okay.  Go ahead.

20             MS. GLAVIN:  And it's also what -- what did they

21     say?  These are witness statements.  The other problem we have

22     is that these people were questioned when their memories were

23     fresh.

24              Take Trooper 1 for example.  It could not be more

25     relevant and meaningful and a compelling need in our case.

53

1    She's suing the governor saying these things happened.  She

2    had an informal interview in April of 2021.  That is her first

3    on-the-record statements factually.  We need that memo in

4    defending our case what she had to say then.  And it's not

5    just inconsistencies.  It's basically what her perceptions

6    were at the time when her memory was the freshest.

7            When she was put under oath in May, a lot of what we

8    have seen in some of the interview memos.

9            You know, I can talk about, you know, Lindsey

10   Boylan's.

11           What they asked people under oath was not always

12   what they asked them in the interview memos.  Howard Zemsky's

13   under oath testimony differed materially from what they asked

14   him in his informal interview memo.  Vincent Straface, who was

15   head --

16           THE COURT:  But doesn't the change in the interview

17   questions and the inclusion or lack of inclusion of

18   information in the report go directly to their assertion of

19   the deliberative process privilege?

20           MS. GLAVIN:  No.  Your Honor, there's no

21   deliberative process privilege when you're talking about --

22           Look at what the Attorney General said when she

23   announced what she was doing for this investigation in March

24   of 2021.  This is not deliberative process privilege.  They

25   had one job and one job only, which was to do an independent

1    review and do a public report.  Deliberative process privilege

2    talks about agency decision making and policy.

3              THE COURT:  Agency decisions and positions.  It's

4    not just decisions.  And --

5              MS. GLAVIN:  Agency decisions.  But agency decisions

6    and positions do not cover fact finding.  And there is --

7              THE COURT:  No, they don't cover the facts.

8              MS. GLAVIN:  -- there's pure --

9              THE COURT:  But under *Lead Industries*, isn't the

10   culling of the facts part of the deliberative process?

11             MS. GLAVIN:  It's not.  We actually can brief this.

12   There is case law on point that it does not apply to interview

13   memos which are just basically reciting what witnesses said.

14             THE COURT:  I notice that nobody has cited the *Lead*

15   *Industries* case, which is one of the most important Second

16   Circuit cases that I know of.

17             MS. GLAVIN:  Which case is this?

18             THE COURT:  *Lead Industries*.

19             MS. GLAVIN:  *Lead Industries*.

20             THE COURT:  Judge Friendly deliberative process.

21   Admittedly, it's an exemption five case under FOIA.  But in

22   the discussion of the common law privileges that are

23   applicable to the executive branch, Judge Friendly observed

24   that looking at a gargantuan volume of information, and

25   figuring out from trying to get access to that backdrop of

1    information and comparing it to what was ultimately included

2    in a public report, would evince the deliberative process of

3    the agency.

4            And so I'm struggling with your argument that this

5    is to get at what's not included.  Because to me that strikes

6    at the heart --

7            MS. GLAVIN:  It's the facts.

8            THE COURT:  -- of the deliberative process.

9            MS. GLAVIN:  No, Your Honor.  We want the facts.  We

10   want what the witnesses said and did not say happened that are

11   witnesses to events that Trooper 1 has put into her complaint.

12           THE COURT:  But won't that illustrate the AG's

13   deliberative process in drafting a report?

14           MS. GLAVIN:  Your Honor, if that is the case, this

15   would cover every single interview of every single

16   investigation the AG does.

17           THE COURT:  It might.

18           MS. GLAVIN:  Deliberative process privilege does not

19   go that far, and we will give you case law.  It's just it's

20   not.  That's not the law.  Otherwise --

21           THE COURT:  I'm asking questions because this hasn't

22   been briefed.  That's what I'm getting at.

23           MS. GLAVIN:  So here's what my proposal is.

24           With respect on the sovereign immunity issue, if you

25   want to just brief the privilege issues, we can do that.  But

56

1    I believe that the -- what has been cited are more

2    generalities by the AG's Office about why these privileges

3    apply.

4           But I think the briefing has to cover the specific

5    memos we are talking about.  Which is you're talking about the

6    ten complainants and their memos in unredacted transcripts

7    that are all included, every one of their allegations are

8    included in Trooper 1's complaint.  And then you are talking

9    about New York State Police officers who protect the governor,

10   who are necessarily now part of the case, because Trooper 1

11   has made these allegations in the context of her job, the

12   security protocols that are done every day in terms of driving

13   the governor, who is in the tail car, where that person in the

14   tail car would have been, you know, seen, what was said, et

15   cetera.  We need those facts.

16          We have so many witnesses that the AG cites that we

17   don't have their names or know who they are and they could not

18   be more important to our ability to defend this case.

19          If it wasn't Trooper 1 making these allegations

20   about what was happening in her job when she was in the car,

21   not in the car, when she was up at the house in Westchester,

22   and what she was doing there, and who was there, and who saw

23   what, UPC protocols would not have come into issue.  But if

24   they are making with respect to each of these 24 trooper

25   memos, then they have to articulate for each of those memos.

1        And I also just think it could be redacted if it's

2   talking about protocols, but protocols are going to be a big

3   part of this trial.  That's the reality.

4        MS. LONGLEY:  Your Honor, if I may ask a question?

5        MS. GLAVIN:  And then one -- one last point that I

6   do want to raise this, Your Honor, I do want to raise this

7   because this is bothering me.  Okay.  And I'm going to be --

8   I'm being straight with you here.

9        The comment about our argument on waiver of

10  sovereign immunity, which we believe is very much based on

11  solid legal ground that we --

12       THE COURT:  A court order -- excuse me.  A court

13  order telling you he had to give me something does not waive

14  his immunity.

15       MS. GLAVIN:  Your Honor --

16       THE COURT:  It does not.

17       MS. GLAVIN:  -- Your Honor, I get -- I understand

18  that may be your position.  You understand that I agree with

19  that position.  We have briefed that before Judge Cave in

20  another district.  The comment about Judge Cave will see that

21  for what it is concerned me, because I value my reputation,

22  and I make what I believe to be legal arguments that are in

23  good faith, based on facts and law.  And maybe I am

24  overreacting to your comment, but it hit me wrong and I -- it

25  gives me great concern.

58

1          THE COURT:  Okay.  You can take it up with Judge

2     Cave.  Judge Cave is an independent actor.  She'll do what she

3     chooses to do.  My view is that the attorney's general's

4     office complying with a valid court order, whether they object

5     to it or not, is not a basis to argue anything.  We learned in

6     civil procedure, in the *Shuttlesworth* case, that you have to

7     abide by a court order, even if it's unconstitutional.  Okay?

8     They can argue all they want that they -- they have immunity

9     and that my order does not impact any -- and there is no

10    voluntariness to their disclosure, because that's what

11    happened.

12          MS. GLAVIN:  I -- Your Honor, I respectfully

13    disagree.  Maybe I can read the *Shuttleworth* (sic) case from

14    civil procedure from 1993.

15          THE COURT:  It's actually from the '50s.  It was the

16    case involving, you know, Martin Luther King's march, and my

17    professor, Jack Greenberg, was the lawyer on the case, and I

18    will never forget the case because at the end of the questions

19    in the case book, he's like, imagine you were Martin Luther

20    King's lawyer.  What would you have told him to do?  And Jack

21    Greenberg's like, I was Martin Luther King's lawyer and I told

22    him to march, and I was wrong.

23          MS. GLAVIN:  Your Honor, I think when we're talking

24    about sovereign immunity, it is a different issue.  I think

25    our waiver argue is valid, but I really do -- the tone of your

59

1    comment about Judge Cave seeing it for what it is, I did feel

2    was maligning me as a lawyer.

3              THE COURT:  I no way intended it to malign you as a

4    lawyer, Ms. Glavin.

5              MS. GLAVIN:  I appreciate it.

6              THE COURT:  And with all respect, you know I value

7    your zealousness --

8              MS. GLAVIN:  Thank you.

9              THE COURT:  -- and I admire your passionate argument

10   every time you're here.  So please, please do not take that as

11   any type of malignment.  It was more of a comment that I don't

12   think my court order could do anything with regard to their

13   privilege, because they are an independent entity.

14             MS. GLAVIN:  I appreciate the clarification.

15             THE COURT:  All right.  Thank you.

16             MS. GLAVIN:  Thank you, Your Honor.

17             THE COURT:  All right.  Ms. Longley has a comment --

18             MS. LONGLEY:  I just had a quick question.

19             THE COURT:  -- or a question.

20             MS. LONGLEY:  Procedurally, because we don't know

21   everything that's going on in the Trooper One case.  Has the

22   trooper been deposed yet?

23             MS. GLAVIN:  No.

24             MS. LONGLEY:  Because what -- a lot of what I'm

25   hearing just for me begs the question of -- because it's what

60

1    -- you know, have you asked the trooper who was there, and

2    what information there, rather than asking us for privileged

3    and confidential reports on what people said.  And just, like,

4    that reflect the decisions on what to ask them, how that

5    information was treated, but also again, I'm hearing a lot of,

6    we want to know what was said to the investigators, which is

7    different than finding the facts, which I think they have

8    plenty of discovery tools to go after with parties to try to

9    get that information.  And it's concerning that they haven't

10   tried to depose the trooper yet to ask her who was there, and

11   instead want to get it through our interview memos and we're a

12   non-party.

13          And I do think -- I know where -- you know, we're

14   going to be happy to brief this, but I think to give a line-

15   by-line analysis of every assertion of privilege over every

16   page of a transcript and every interview memo is going to be

17   incredibly burdensome, and when they haven't even tried to get

18   that information which could be gotten from parties, I don't

19   -- I think that the burden on a non-party is undue.

20          THE COURT:  I hear you there, Ms. Longley.  And of

21   course, you know, as the party asserting the privilege, the

22   burden to establish the privilege of course lies with you.

23   And the current privilege log, as I noted at the outset, is a

24   little bit over broad in some areas and a little bit unclear,

25   because I -- my intuition is that your position is going to be

1     that various privileges, you know, cover different portions of

2     the documents, and I don't think it's appropriate in my role

3     to be guessing to what your position is with regard to the

4     various privileges.

5                MR. AMER:  May --

6                THE COURT:  Mr. Amer?

7                MR. AMER:  Yeah.  Just a couple points.  Maybe

8     there's a way for us to annotate the materials we've provided

9     in camera that would focus portions of the document -- that

10    would focus on portions of the document more specifically, or

11    figure out a way to code the privilege log in a way that would

12    make it more helpful to you.

13               I do think we have to be careful with what we say on

14    the public docket given Ms. Glavin's fervent view that things

15    we do in this courtroom, pursuant to court order, or for the

16    Court's edification are fertile ground for additional waiver

17    arguments, and I think it seems clear that that is a position

18    that she is going to continue to advocate.  And so, we just

19    need to be cognizant of it.

20               One other point -- well, two other points I want to

21    make.  Ms. Glavin said that the protective order here solves

22    problems because we can designate material as confidential on

23    a protective order, and I just think that misses the point

24    entirely, because the assurance of confidentiality, and this

25    is mainly on the -- you know, this is particularly on the law

62

1    enforcement privilege, you know, the assurances of

2    confidentiality were that the material would not be shared

3    with former Governor Cuomo, because he's the person that

4    people were concerned about in connection with retaliation,

5    and members of his staff who include some of the defendants

6    here.

7              So to say that we can provide it to the defendants

8    here, but they can't disclose it to others, doesn't solve the

9    problem of the fact that they get the documents.  And so --

10             THE COURT:  I understand the argument.

11             MR. AMER:  -- so that's an issue.

12             THE COURT:  The one question that I do have for you,

13   though -- and I'm sorry to cut you off.  If you want to finish

14   the thought, go ahead.

15             MR. AMER:  Well, I was going to make an unrelated

16   point, so why don't you go ahead?

17             THE COURT:  No, my question is with regard to this

18   identity information piece, right?  Because it's one thing to

19   -- you know, Ms. Glavin is vociferously arguing that she needs

20   to know who the witnesses are, right?  Because some of the New

21   York State Police witnesses in particular are actual witnesses

22   to some of these alleged events.

23             And I hear you loud and clear, Ms. Longley.  There

24   may be solutions to that in third -- in party discovery.

25   Perhaps Trooper One has a recollection of who was there,

63

1    perhaps some of the other -- Mr. Surfacci (ph), others might

2    have a recollection of who was there.  But if they don't, if

3    they don't know, if they can't remember, you know, what's your

4    position on identity information as opposed to the underlying

5    work product?

6         MR. AMER:  I think it's problematic, because as you

7    observed, and I'm always happy to follow the wisdom of Judge

8    Friendly, you know, when you -- when you start down that road,

9    this is information that was gathered from, you know, a larger

10   universe of material, and the focus of the office and what

11   they sought to elicit is itself protective under law

12   enforcement privilege, as well as, by the way, attorney/client

13   privilege to the extent that it was shared in discussions with

14   our office among the investigators.

15        And I think your comment, you know, is a segue to

16   the point I was going to make, which is, I hear Ms. Glavin

17   say, we need the memos and I don't think that's a correct

18   characterization.  I think the memos for them are helpful, and

19   I think it's a convenient way of getting the information, but

20   it's not that they need them.  It's that they don't want to do

21   the work that a normal party would do in discovery to get the

22   information the hard way, which is you take depositions of

23   fact witnesses, you, you know, collect material that's not

24   subject to privilege, and you -- you know, you learn the facts

25   of your case through the ordinary discovery tools, not trying

64

1    to get it from a law enforcement agency based on an

2    investigation that they conducted.

3            And I think, you know, the fact that a witness may

4    not recall something today in exactly the same way they

5    recalled it three years ago during our investigation, you

6    know, leads them to say, oh well, we have to have those memos,

7    because even if we take their depositions, we can't be certain

8    that they're saying the same exact things they told the AG's

9    office, so we need to have the interview memos.  We need to

10   compare.  We need to see if we can impeach them.

11           I mean, if that argument were correct, it would

12   swallow whole the law enforcement privilege, because it's an

13   argument that could be made in every investigation.  You could

14   always claim that because we're now talking to a witness years

15   after the investigation, how do we know that what they're

16   telling us now under oath is what they told the investigators

17   a few years ago, or maybe -- maybe they're lying, maybe their

18   memories are faded.  I just don't see that there's any way

19   that that argument doesn't completely eviscerate the law

20   enforcement privilege.  And the fact that it would be nice for

21   them to have it, or convenient, or useful, just doesn't get

22   them home on this argument.

23           MS. GLAVIN:  So on that point, and to address it

24   directly, Mr. Amer, we have tried to do this the hard way,

25   Your Honor.  And that one of the best examples of this, and we

65

1    briefed it for the Court, is a deposition we took of one of

2    the complainants, Ana Liss.  We had her AG interview

3    transcript, and we went over some of the things that were in

4    her redactions.  There were names that she mentioned.  She

5    couldn't remember who they were.  That's the problem we have

6    with what -- and this is something that she said under oath --

7         THE COURT:  But how important are these names?  I

8    mean, we're talking about compelling need.

9         MS. GLAVIN:  This is a transcript that they reviewed

10   -- released publically and --

11        THE COURT:  I understand.

12        MS. GLAVIN:  -- will redact a name.

13        THE COURT:  But how is that -- what is -- what are

14   the --

15        MS. GLAVIN:  Because she's talking about witnesses.

16        THE COURT:  Witnesses to what?  Ms. Jackson has

17   never met Trooper One.

18        MS. GLAVIN:  We're not -- but Ms. Liss's allegations

19   are complete -- are included in whole.  She's going to be in

20   this case.

21        THE COURT:  But what's the relevance of these other

22   witnesses?

23        MS. GLAVIN:  Because she's talking about witnesses

24   to events, to allegations that Trooper One included in her

25   complaint.  Ana Liss is part of this case.

1          THE COURT:  You're not going to be having a trial on

2     every single -- mini trial on every single complainant's

3          MS. GLAVIN:  If you want to --

4          THE COURT:  -- allegations.

5          MS. GLAVIN:  Your Honor, if you want to --

6          THE COURT:  It's not going to happen.

7          MS. GLAVIN:  -- rule and exclude it now, thank you

8     Lord.  This would save us a lot of work.

9          THE COURT:  Well, Mr. McCool isn't here, so we'd be

10    --

11         MS. GLAVIN:  Well, Mr. Crane is.

12         THE COURT:  We can't rule on anything in the NE-3

13    case.

14         MS. GLAVIN:  If you want to exclude all of that,

15    then that makes your job a lot easier.

16         THE COURT:  I just -- we're just -- I'm just being

17    realistic in terms of what's actually likely to happen at

18    trial.  It may well be that some of these complainants

19    testified.  But do you really think Judge Jorisell (ph) is

20    going to entertain trial within trial with regard to 10

21    different complainants with regard to collateral witnesses?

22         MS. GLAVIN:  I don't know, Your Honor.  If you want

23    to give me an advisory opinion, I don't know.  But part of us

24    being in a position to say, you should exclude these other 10

25    people, let's talk about Ana Liss.  Here are the six reasons

67

1    why you should exclude her, okay?  She cites these two people

2    as witnesses.

3            We then spoke to those people.  Those people say X,

4    Y, and Z.  It's not sufficiently like this.  Let's knock that

5    out of the case.

6            Lindsey Boylan, her name is mentioned 36 times in

7    the complaint, okay?  There are redactions on Lindsey Boylan's

8    testimony.  We will be asking Ms. Boylan about that.  But for

9    us to be in a position to make the arguments on 401 and 403,

10   we're going to need the information.

11           THE COURT:  I understand that, but I do think that

12   you need to try to get it from the parties and the non-party

13   witnesses in deposition.  And you still haven't exact -- you

14   haven't explained the relevance or import of the witnesses

15   that Ana Liss allegedly didn't remember.  I mean, like,

16   witnesses to what?

17           MS. GLAVIN:  Your Honor, I actually -- I haven't

18   read her deposition in a while, and I took her deposition last

19   summer so it's been a while.

20           THE COURT:  Fair enough.  Fair enough.

21           MS. GLAVIN:  But I can tell you, at the time, it was

22   important to me because I wanted to know who this staffer was,

23   that staffer was.  There were names that she's like, I can't

24   remember.

25           THE COURT:  Right.  And look, you know, I understand

1      that -- I don't -- even Mr. Amer concedes that some of this

2      information is relevant, right?  It had -- of course it's

3      relevant.

4                   MS. GLAVIN:  Trooper One's memo.

5                   THE COURT:  Nobody is contesting the relevance.

6      What we're talking about and trying to get at is a path

7      forward figuring out how to, you know, give the parties an

8      opportunity to be heard with regard to the pending issues

9      before the Court.

10                  And what I'm trying to figure out procedurally is

11     what mechanism we're looking at here, and Mr. Amer has

12     proposed that we, you know, reach the motion to quash, but I

13     -- my question to you is, is that appropriate?  Is the motion

14     to quash, you know, focused on the admitted list --

15                  MS. GLAVIN:  It's not.

16                  THE COURT:  -- at 51.1?  You know, so what

17     procedurally should we be doing here?

18                  MS. GLAVIN:  I think that we have to -- I think we

19     have to brief it on what these narrow issues are, based on

20     what's in the complaint.

21                  THE COURT:  Right.

22                  MS. GLAVIN:  And how -- and the privilege issues.

23                  THE COURT:  Uh-huh.

24                  MS. GLAVIN:  Focused on the narrower universe,

25     because a lot of this that you've asked about today, is very

1    fact specific, and that's what we tried to do in our narrow

2    requests, and I think it will highlight our issues with law

3    enforcement exception given what Trooper One has alleged in

4    her complaint, given how a lot of the protocols of PSU will

5    become an important part of the trial, and that there are a

6    lot of witnesses that we don't know who they are.

7          And with respect to, well, did Trooper One can tell

8    you this, well, yes, we have interrogatories where she's

9    listed people, but the -- but Trooper One doesn't know who all

10   the witnesses were necessarily, because they interviewed, you

11   know, it looks like two dozen troopers.

12         THE COURT:  Sure.

13         MS. GLAVIN:  And I don't think she even knows --

14         THE COURT:  Sure.

15         MS. GLAVIN:  -- who some of them are.

16         THE COURT:  But if she doesn't know who some of them

17   are and they weren't present for the incidents that she's

18   discussing, how are they relevant?

19         MS. GLAVIN:  No.  Or they were present, or they had

20   a conversation with her and said, she said nothing of the sort

21   and we discussed X, Y, and Z.  That becomes very important to

22   us.  Diane Porratta (ph) must have said to us -- I mean, the

23   other problem we have is, we don't have interview transcripts.

24   Most of the troopers were done by informal interviews.  Diane

25   Porratta, when she came in, I think asked us about 10 times

70

1    for her interview memo to refresh her recollection.  I mean,

2    it's just -- probably more than 10 times.  So this becomes

3    very relevant to us being able to fend -- to defend against

4    Trooper One's claims.

5                THE COURT:  Right.  I understand that argument with

6    regard to compelling need.  However, it does not answer the

7    questions or bigger picture in terms  of whether or not the

8    omissions, events, deliberative process -- there's a lot of

9    layers to this and --

10               MS. GLAVIN:  And so, we need to brief it.

11               THE COURT:  I guess we need to brief it.  The

12   question is, what's the briefing look like?  Is it a motion to

13   compel?  Is it you responding to the motion to quash?  Is he

14   -- the burden rests on the privilege with the OAG.  So what

15   are your thoughts on procedure?

16               MS. GLAVIN:  I would propose that we do a motion to

17   compel for the narrower universe, and they can do a cross-

18   motion to quash, and we end up with the -- with the same

19   briefing that we've done.  So we filed a motion to compel,

20   they oppose, do a cross-motion to quash, we do our reply, you

21   do your reply.

22               THE COURT:  Thoughts, Mr. Amer?

23               MR. AMER:  That's fine, Your Honor.  We do have to

24   procedurally do something with the outstanding motion to

25   quash.  I don't know whether you want to deny it as moot and

1    we'll move on and refile and do cross-motion to quash.  Maybe

2    that's the best way to handle it, because they've essentially

3    -- you've already denied the motion to compel on the larger

4    universe of material, and so now we're dealing with a narrower

5    universe.

6              I would say if it would be helpful to the Court --

7              MS. GLAVIN:  Actually, can we just confer for a

8    second?  I have an idea.

9              THE COURT:  Okay.

10             MS. GLAVIN:  Why don't you and I talk for a second?

11        (Counsel confer)

12             MS. GLAVIN:  All right, Judge.  So here's what I

13   proposed to the AG's office, is that we reissue a subpoena

14   that is the narrower category so we all know what we're

15   dealing with, okay?  And then they -- AGs would move to quash,

16   citing the privileges, given that this is going to be focused

17   on privilege, and then we would do the motion to compel,

18   cross-motion to compel.  So they would go for -- you guys

19   would move to quash, we would oppose --

20             MR. AMER:  I just don't think the motion to quash is

21   limited to just privilege issues.

22             THE COURT:  No, I think it includes sovereign

23   immunity.

24             MS. GLAVIN:  So do we want to -- that's what -- the

25   question.  We can brief --

72

1          MR. AMER:  I think you have to.

2          THE COURT:  The briefing on it is a year old.  I've

3     looked closely and the developments of the law as recently as

4     yesterday -- and you know, a whole bunch of district courts in

5     the Fifth Circuit are filing for Fifth Circuit, of course, but

6     other than that, other than Judge Locke, I haven't seen a lot

7     of --

8          MS. GLAVIN:  Okay.

9          THE COURT:  -- traction to the Fifth Circuit's

10    opinion.  Perhaps you have.  Perhaps you've done a more broad

11    search.

12         MR. AMER:  No, but --

13         MS. LONGLEY:  There's a -- there's an argument in

14    May in the Fourth Circuit as you --

15         THE COURT:  Uh-huh.  Okay.

16         MS. LONGLEY:  But it may not be exactly conterminous

17    with the -- with how it's presented in this case.

18         THE COURT:  Got it.

19         MR. AMER:  But the law takes time to evolve, Your

20    Honor.

21         THE COURT:  Yes, it does.

22         MR. AMER:  I would say one other -- so I think that

23    procedure makes sense.  I would say, Your Honor might consider

24    whether it makes sense to order that we choose an exemplar

25    interview memo, or maybe a few interview memos to annotate and

73

1   color code so that Your Honor can have a better sense as to --

2   I think you indicated, you know, just trying to figure out

3   what privileges apply to which portions, and if that makes

4   sense, then you can put that in your scheduling order and that

5   way we can comply without waiving anything.

6          THE COURT:  So it does make sense to me.  Obviously

7   the burden, again, rests with you.  If you think that you're

8   able to illustrate your points sufficiently in doing -- by

9   doing it in that fashion, I certainly would give you the

10  opportunity to try that in the initial instance, and then if

11  there are remaining questions, you know, this may be the topic

12  of additional, you know, filings that would be ex parte.

13          I note, you know, in *The New York Times Company v.*

14  *the United States Department of Justice* case that Judge Failla

15  handled in the Southern District about the Volkswagen

16  emissions, I don't know if anybody was tracking that case.

17  You know, she had -- I think they gave her like a chart of

18  like what -- you know, which privileges were being asserted

19  over which portions.  This is admittedly again, an Exception 5

20  FOIA case, but it is focused on deliberative process, and you

21  know, the Second Circuit affirmed her approach, you know, in a

22  summary order.  So that approached seemed to work well for

23  her.  It was a very lengthy report, but less voluminous, I

24  think, than the documents here.

25          MR. AMER:  I think if Your Honor wants to give us

74

1   some leeway we can figure out what works and is the most

2   sense.  I think the problem is that to do it for every memo

3   would be incredibly --

4                THE COURT:  I understand.

5                MR. AMER:  -- time consuming and burdensome.  So --

6                THE COURT:  You know, Ms. Longley, I suspect, has a

7   deeper familiarity with the nitty-gritty of every memo and

8   what your position would be as to the different portions, and

9   so if you find it sufficient to submit sort of an example set

10  of like, this person -- you know, this situation, this portion

11  would be the privileged, you know, law enforcement

12  information, this portion would be relevant security, this

13  portion would be, you know, events deliberative process

14  because we chose not to include this portion in an ultimate

15  report because it was irrelevant, or whatever, you know, that

16  would be helpful.

17               MR. AMER:  Okay.  Again, there was one other comment

18  that Your Honor made that I didn't respond to, so I just

19  wanted to circle back to it, which concerned anticipation of

20  litigation with respect to work product.

21               I do think the cases are clear that you don't have

22  to anticipate the specific litigation in which the doctrine is

23  being invoked, and I do think that certainly there was an

24  anticipation that there might be an impeachment proceeding,

25  which is considered litigation for purposes of work product,

75

1    and in fact, there was an impeachment proceeding that then

2    didn't need to go forward once the governor resigned.  Plus

3    there was certainly --

4            THE COURT:  But one of the questions that I --

5            MR. AMER:  Yeah.

6            THE COURT:  -- feel is not adequately addressed in

7    the anticipation of litigation case law is, is this

8    anticipatory litigation a litigation that you would be

9    involved in?  Because every case -- it makes sense, right?

10   Almost every case, the party who is the holder of the

11   documents is in the litigation.

12           And so, you're in this bizarre situation where

13   you're asserting anticipation of litigation where there's been

14   really -- been limited litigation that the attorney general

15   has actually been involved in.  The litigations would flow --

16   other prosecutors, the assembly as the prosecutor on the

17   impeachment proceedings, the prosecutor in Albany.  You know,

18   is the attorney general in the shoes of somebody who can

19   assert that litigation when they are not themselves in the

20   litigations?

21           MR. AMER:  Well, I do think we're involved in this

22   proceeding, which is --

23           THE COURT:  Involuntarily.

24           MR. AMER:  -- right.  And that is litigation that

25   was anticipated as well, that the target of the investigation

76

1    could potentially go after our office, which is what happen --

2    what's happening.

3            I do think, again, Second Circuit recognizes a

4    subpoena as a suit.  So I think we actually did anticipate

5    litigation against our office that actually came to fruition

6    and is what is occupying much of our time in now two different

7    district courts.

8            But I also think that anticipating other litigation

9    that our office is not involved in is still sufficient for

10   work product doctrine under, you know, the broad meaning of

11   litigation being anticipated.

12           MS. LONGLEY:  Can I -- can I also just add onto

13   that, that I believe it was Ms. Glavin, right, when the --

14   soon after the report was issued, made public statements that

15   Cuomo was exploring all legal options, and that was

16   interpreted -- and similar statements were made to the

17   investigators while they were investigating that led them to

18   believe that Cuomo was likely to challenge the investigation

19   itself, or sue the attorney general, take action against the

20   investigators.

21           He did file grievances against the attorney general

22   and the lead investigators of the case.  He has sued our

23   office multiple times related to the report.  And while he may

24   have made a decision not to directly file a suit challenging

25   the conclusions of the report through like an Article 78, he

77

1    certainly -- it was reasonably anticipated by our office that

2    he was going to do that, and the memos were drafted with that

3    very real possibility in mind, and that you do not need to

4    show that the exact litigation you anticipated is what bore

5    out to establish that the memos were prepared in anticipation

6    of litigation.

7                MS. GLAVIN:  So could I just respond to that

8    briefly?

9                THE COURT:  Yes, and I assume this is going to be

10   including in the briefing, right?

11               MS. GLAVIN:  Yes.

12               THE COURT:  Because we will order the transcript,

13   but at the end of the day, I need your legal authority for all

14   of this.

15               MS. GLAVIN:  Yes.

16               THE COURT:  On both sides.

17               MS. GLAVIN:  So let's just be clear what Governor

18   Cuomo sued the attorney general for.  Sued the attorney

19   general for refusing to advance his legal fees.  Okay?  That

20   was not about the report, and the Court agreed with us and --

21               THE COURT:  Yep.

22               MS. GLAVIN:  -- reversed the attorney general's

23   decision, which he made and missed it for reelection campaign.

24   The second thing that the governor is suing the attorney

25   general's office for is the denial of his FOIL request.  Those

78

1    are the lawsuits that Andrew Cuomo has sued Letitia James for.

2              MS. LONGLEY:  What about the grievance complaint?

3              MS. GLAVIN:  The grievance complaint isn't

4    litigation.  The grievance complaint, that can happen to any

5    lawyer in any case.  Gary Levine filed one against me, so the

6    ethics commission -- and we sued Gary Levine.

7              So it's -- the issue on work product, Your Honor,

8    and this will be briefed, is what was the substantial purpose

9    in preparing the document.  And the substantial purpose in

10   preparing those documents was to document what witnesses told

11   them to put into a report.

12             THE COURT:  Yep.

13             MS. GLAVIN:  The fact that you might anticipate that

14   the report you're going to issue is something that if, you

15   know, the target of the report may have issues with later on,

16   or people cited in the report may initiate lawsuits later on,

17   it doesn't make it work product for those purposes, but we

18   will brief it for the Court.

19             THE COURT:  I certainly want to see both sides'

20   legal authority.

21             So with regard to the strategy of reissuing the

22   subpoena and then there will be a motion to quash, cross-

23   motion to compel, replies, et cetera, what sort of timing are

24   we looking at, Ms. Glavin?

25             MS. GLAVIN:  I -- if it's possible --

1          THE COURT:  And I apologize.  I keep eating cough

2    drops.  I have this weird throat thing going on.  Last night I

3    couldn't talk at all.  I was like, am I going to be able to

4    talk by the morning?

5          MS. GLAVIN:  Yeah.  Yeah, so I -- we can reissue the

6    subpoena, I think probably within a few days.

7          THE COURT:  Okay.

8          MS. GLAVIN:  I can get that done.  And then, when do

9    you guys want to file?

10         THE COURT:  So today's April 19th, Friday.

11         MS. GLAVIN:  Keeping in mind when Passover is, but

12   --

13         THE COURT:  Passover is all next week.

14         MS. GLAVIN:  -- it will probably take a few weeks.

15         MR. AMER:  Should we propose a scheduling order?

16         THE COURT:  Sure.

17         MR. AMER:  Then we could then look at calendars and

18   not have to --

19         THE COURT:  Yeah, that would be fine.

20         MR. AMER:  -- do it here.

21         THE COURT:  If you want to submit a proposed

22   scheduling order.  I don't know who's observing and who's

23   going to be out Monday, Tuesday, those first two nights.  You

24   want to submit something like Wednesday or Thursday?  That's

25   fine with me.

1          MR. AMER:  Well, when are you going to have the

2     reissued subpoena?

3          MS. GLAVIN:  We'll be able to do it in a few -- it

4     will be next week.

5          MR. AMER:  Okay.

6          MS. GLAVIN:  Do you want to confer and then we

7     propose?

8          MR. AMER:  That's what I'm suggesting.

9          MS. GLAVIN:  Yeah.

10         THE COURT:  Yeah.  Maybe by next Friday?  If the

11    subpoenas could be issued by Wednesday or Thursday, maybe, you

12    could --

13         MS. GLAVIN:  That's fine.

14         THE COURT:  -- confer in the interim.

15         MR. AMER:  Submit the scheduling order by next

16    Friday.

17         THE COURT:  Submit the scheduling order by next

18    Friday.  Does that work?

19         MS. LONGLEY:  I'm going to be out through Tuesday,

20    but I can try to -- for this limited purpose, confer --

21         MR. AMER:  Yeah, it's just -- it's just --

22         MS. LONGLEY:  Yeah.

23         MR. AMER:  -- looking at calendars.

24         THE COURT:  You're out through Tuesday the 20th or

25    the 30th?

81

1          MS. LONGLEY:  The 30th.

2          THE COURT:  Oh, because that is the end of Passover.

3          MS. LONGLEY:  Yeah.

4          THE COURT:  What is your view on when you -- is the

5     week -- so --

6          MS. GLAVIN:  Yeah, we could submit it.  I think it's

7     just a matter of us conferring --

8          MR. AMER:  Yeah, it's a calendar --

9          MS. GLAVIN:  -- and looking at calendars.

10          MR. AMER:  -- it's a question of calendars.

11          THE COURT:  Okay.  You might be able to work it out

12     right now.

13          MS. LONGLEY:  Yeah.  Yes.

14          THE COURT:  Right after the conference.  Okay.

15          MS. LONGLEY:  Yeah.  Your Honor, could we also just

16     ask to be excused from the normal requirement for a meet and

17     confer on the subpoena once the subpoena is issued?

18          THE COURT:  Yes.  Yes, you are excused.

19          MS. GLAVIN:  They've been very productive so far.

20          THE COURT:  Yeah, they've been so productive.  Her

21     motion to quash is denied for lack of meet and confer.

22          MS. LONGLEY:  Okay.

23          THE COURT:  Can you imagine?

24          MS. GLAVIN:  Yes.

25          THE COURT:  So, yes, we will expect the parties'

82

1    proposed schedule by next Friday, October -- October.  April

2    26th, and I also note that we have some, like, currently

3    pending motions on this particular docket at ECF 53, which is

4    seeking disclosure of witness names, ECF 54 and 55, again

5    asking the Court to provide unredacted memos -- asking for me

6    to tell the OAG to provide me unredacted memos and the memos

7    that were redacted for privilege by the -- by Cleary, and I

8    believe it was the OAG's position on that one that there were

9    no such memos, Mr. Amer?  What is the story with, I think it's

10   ECF 54 and your response was at 55.

11            MR. AMER:  I think our -- they -- the interview

12   memos had been redacted solely -- and this is in the -- I

13   think this was in affidavits, but they were redacted solely

14   for work product.  And so, there is no version of the

15   interview memos that have already been redacted to address all

16   of the privileges we're asserting.  So we just don't see how

17   it would be helpful or useful to the Court to see anything

18   other than the set of interview memos you already have.

19            THE COURT:  Yeah, unredacted.

20            MR. AMER:  Which are unredacted.

21            THE COURT:  Now, I wasn't sure on why that was asked

22   of me, and I also have to confess, I'm not a human compare

23   right.  You know, I'm trying to go line by line and comparing

24   the two sets.  I wasn't sure what Ms. Trzaskoma was driving at

25   there.  Ms. Glavin, if you know?

1          MS. GLAVIN:  I do.  So because work product is one

2     of the privileges that was raised, the memo -- so again, the

3     universe we're talking about is 36 memos here.  The memos, as

4     we understand it, were already redacted for work product

5     privilege by Cleary, and there is an affirmation to that

6     effect in the *Bennett* case.

7          And so, the reason we wanted you to get the

8     unredacted memos is because that has already been done.  So if

9     you look at those redacted memos, which were redacted for work

10    product, then you're looking at what the other privileges

11    would be, beyond -- because they've been redacted for work

12    product.

13         THE COURT:  Mr. Amer?

14         MR. AMER:  Well, I just don't see how that's

15    helpful, because you have the memos completely unredacted, so

16    you can see the portions of the memos that all the privileges

17    apply to.

18         My understanding of what they were trying to suggest

19    is that you could somehow just say, well, I agree with the

20    work product redactions, so give them the redacted memos, but

21    that doesn't work because we're not relying solely on work

22    product, we're relying on all these other privileges.  So it's

23    not as though this is some sort of shortcut for getting them

24    the interview memos.  It's not.  And so, it just seems

25    pointless.

84

1          THE COURT:  It's really burdensome, to be candid,

2    Ms. Glavin.  If they -- because they aren't just asserting

3    work product, as you know.  They're asserting a whole host of

4    privileges, and in looking at the unredacted memos, again, I

5    don't want to -- I'm not the lawyer for the attorney general.

6    I don't want to devine what your assertions of privilege are

7    based upon the privilege log over different portions of the

8    memos.  That's your burden.

9          So I'm not inclined to try to do an interim review

10   of partially redacted memos.  If the assertions are the work

11   product -- you know, you'll illustrate in your submission

12   which portions of the documents you think are protected by law

13   enforcement privilege, deliberative process, attorney/client,

14   work product, whatever.  Whatever it is.  And if it gets to

15   the point where I think I need to somehow read this other set,

16   perhaps I'll take that step at some future date, but I don't

17   see that as particularly productive at this point.  So --

18          MS. GLAVIN:  I don't want to make things

19   unproductive for you, Judge.

20          THE COURT:  Yes, Ms. Trzaskoma.

21     (No audible response)

22          THE COURT:  But are you conceding that their work --

23   but, Ms. Trzaskoma, are you impliedly conceding that their

24   work product redactions are correct?  I mean, to me, the

25   letter was like, we want you to compare two sets of documents

85

1      to each other, and I didn't understand why.

2          (No audible response)

3              THE COURT:  Mr. Amer?

4              MR. AMER:  I don't understand how it eases anybody's

5      burden, because we're not just asserting work product

6      privilege, nor do I hear Ms. Trzaskoma agreeing that they will

7      accept our work product redactions as being correct.  So I

8      just don't understand what purpose it serves, honestly.

9              THE COURT:  Would you be willing to accept the

10     notion that the work product redactions are accurate and I

11     don't need to reach that issue?  Is that what you're implying,

12     Ms. Trzaskoma?

13         (No audible response)

14             THE COURT:  All right.  I don't even know what

15     universe as redacted documents even exists.  Do you, Mr. Amer?

16             MR. AMER:  We have -- Cleary has redacted the

17     interview memos solely for work product.  Again, this is just,

18     you know, death by 1,000 cuts.  So then they're going to --

19     you know, as if, you know, this will lead to the production of

20     this redacted set.  Then they're going to look at them and

21     decide whether their initial belief, based on the limited set

22     they had seen, bears out with the rest of them.  What's the

23     point of this?

24             Your Honor should be looking at the unredacted memos

25     in camera to determine whether all the privileges, not just

1    work product, are ones that you think should be upheld.  And

2    we will endeavor to provide a roadmap, without undertaking a

3    huge burden, to steer you to which portions of the -- of a

4    sample set of memos you can review to see illustrative

5    examples of the information that falls within the various

6    categories of documents.

7          So I just -- based on that, I think, you know,

8    looking at the unredacted set is far more helpful than for you

9    to see a set that is only redacted for work product.

10          And certainly in our example set, we'll identify

11   what is the work product portion, but that doesn't even seem

12   to be in contention because what I'm hearing from the other

13   side is that based on the interview memos they've already

14   reviewed, they don't really have an issue with what we've

15   claimed as work product.  So that should be the easy one.

16          THE COURT:  That -- it may be.  If it is -- if the

17   memos are shorter as a result of --

18          MS. GLAVIN:  They are.

19          THE COURT:  -- having some of the redactions already

20   in place and you want to use that set as your starting point,

21   it's up to you.

22          Ms. Longley is shaking her head no.

23          MS. LONGLEY:  Your Honor, the context in which those

24   memos was redacted was for sharing with fellow law enforcement

25   entities and government investigators, and it was pursuant to

87

1    confidentiality agreements, and it was done in a way to not --

2    to preserve our privilege as much as possible.

3          I'm not sure, and I'd have to relook at the

4    documents, that we would agree or concede that the parameters

5    of the work product would be exactly the same as they were

6    redacted for those purposes and at that point in time as we

7    are asserting here.  And we take the position that we didn't

8    waive any privilege by sharing them with other investigative

9    bodies, and those are the only -- only recipients who have

10   gotten them from us.

11         So I just -- I think it's problematic to use those

12   documents as the basis for arguing and ruling on the

13   privileges before Your Honor.

14         THE COURT:  All right.  So -- okay.  Ms. Trzaskoma.

15   Ms. Trzaskoma.  Ms. Trzaskoma.  I need you to start over.  For

16   some reason the FTR machine isn't picking you up.  I'm going

17   to put my mic by the speaker.  Go ahead.  Go ahead now, Ms.

18   Trzaskoma.

19         MS. TRZASKOMA:  The provision -- to the attorney

20   general -- attorney --

21         THE COURT:  Okay.  Ms. Trzaskoma.  Ms. Trzaskoma.

22   Ms. Trzaskoma.  For some reason our court recording equipment

23   is just not getting you, even with my microphone directly next

24   to the speaker.  So I'm just -- we're not catching this for

25   the record.

88

1          Ms. Glavin, would you like to repeat anything that

2    Ms. Trzaskoma just said so that we have a clear record?

3          MS. GLAVIN:  Yes, Your Honor.  With respect to the

4    memos, Cleary Gottlieb submitted an affidavit and said, we

5    have redacted 155 -- the memos, for work product privilege.

6    They were very clear, it was for work product privilege.

7          The fact -- we've seen, I don't know, maybe -- I

8    don't have the number -- a couple dozen of these, and just

9    based on my own familiarity with how memos are done and law

10   enforcement documents these, I didn't see anything in there

11   that bothered me that was an overreach on work product

12   privilege.  I really didn't.  I was fine with that, and I

13   think we would be willing to -- so we just viewed it as, it

14   would be a starting point because Cleary is on record, under

15   oath, telling Judge Cave there's 155 memos we already redacted

16   for work product.  And so that would be the starting point,

17   and we actually think that would narrow the issues for you,

18   because then you -- beyond those, then you're dealing with

19   attorney/client privilege, whether that applies deliberative

20   process or law enforcement privilege.

21          MR. AMER:  Can I make a --

22          THE COURT:  I think that you're -- I'm sorry.  Go

23   ahead, Mr. Amer.

24          MR. AMER:  I'm totally confused about this, and let

25   me just give you a quick example for why I think this is

1      totally unhelpful, and I think counterproductive.

2             You're going to get an interview memo that has

3      portions blacked out because they're redacted for work

4      product.  Some of what's blocked out may also be privileged on

5      other grounds.  There may be overlap.  So what are you going

6      to do with that.  You're going to -- you're going to have

7      privileges that apply to portions of a memo that are blacked

8      out.

9             Doesn't it make more sense for the Court to only

10     focus on the unredacted memos so that you can see the entirety

11     of what's there.  And to the extent that there are portions of

12     the memo that are privileged for multiple reasons, you'll have

13     that, plus you'll have the context of what surrounds what's

14     been redacted.  I just don't see how staring at a memo that's

15     got a bunch of blacked out portions is going to make things

16     better, not worse.

17            THE COURT:  Well, at the end of the day, as much as

18     I appreciate the efforts to streamline the questions and

19     reduce the burden on the Court to review the memos, it is the

20     attorney general's burden to establish the applicability of

21     these privileges, and it is their -- in their court in terms

22     of what they want to submit to support that.  And I would just

23     note, you know, there's a legion of cases talking about how,

24     in establishing that burden, the person asserting the

25     privilege of course has to provide sufficient factual

1    information to justify the privilege and the protection

2    claimed for each document.

3         And so I really encourage you to make your best

4    efforts to pick appropriate exemplars and explain with regard

5    to the ones that aren't used as exemplars, you know, sort of

6    which example they go with in terms of, you know, this memo is

7    a similar structure and format to the Example 1, and so that I

8    can understand what the attorney general's position is.

9         I'm not inclined to review two sets of documents at

10   this juncture.  I don't find that to be efficient, as there's

11   also a legion of cases talking about how ex parte review of

12   documents is the exception, not the rule, and this is already

13   a very burdensome endeavor for the OAG and for the Court, and

14   to the extent that the work product privilege becomes an

15   overwhelming piece of this and I need to understand what

16   Cleary's position was with regard to disclosure to the Albany

17   District Attorney's Office, I'm sure that I will be able to

18   get that information if and when it becomes relevant.  But I

19   just don't see the relevance at this point, given the broader

20   assertions of privilege at issue here.

21        So at this point, with the current briefing schedule

22   that we just set on the hopeful path forward -- we didn't set

23   the briefing schedule.

24        The briefing schedule I'm expecting to get next

25   week, I am going to just deny Exhibit at ECF 53, 54, and 59

1    without prejudice.  I don't find the suggestions particularly

2    helpful, given the posture that we've decided to undertake

3    today, and I'm not going to conduct a review of the documents

4    twice.

5              MR. AMER:  Procedurally, what will be the effect of

6    the new subpoena on the present subpoena?  Is that prior

7    subpoena going to be withdrawn?

8              THE COURT:  Ms. Glavin?

9              MS. GLAVIN:  Yeah.  We'll -- yeah, we'll withdraw it

10    and we will notice a new subpoena to you.

11             MR. AMER:  And then I guess that technically moots

12    our motion to quash that's already on file, so perhaps that

13    just, loose end needs to be tied up as well.

14             THE COURT:  Okay.  So if Governor Cuomo is

15    withdrawing the large subpoena, the prior subpoena that was

16    the topic of the original motion to compel, we will note that

17    as part of the minute entry and order and we will, as a formal

18    matter, deny the motion to quash as moot, we will deny ECF 53,

19    54, and 59 without prejudice, and we will expect the parties'

20    proposed briefing schedule next Friday.

21             In, you know, preparing your briefing, I really do

22    need this to be granular, unfortunately, because that is the

23    nature of any privilege review and it -- you know, looking at

24    the documents, a lot of the facts are out there.  And so in

25    addition to that, I need to understand your arguments as to

92

1      waiver.

2                MR. AMER:  We probably will need some expansion of

3      the page limit, given that we need to cover sovereign immunity

4      as well as privilege, so perhaps in your scheduling order you

5      can give the parties leave to file in large briefs, depending

6      on what you think would be appropriate.

7                THE COURT:  What page limit are you operating under,

8      Mr. Amer?

9                MS. GLAVIN:  Can we talk about that too, because I

10     think just the sovereign immunity alone is pretty hefty?

11               THE COURT:  No, I'm just asking what page --

12               MS. GLAVIN:  No.

13               THE COURT:  -- limits you're referring to, because

14     my individual rules don't have page limits.

15               MR. AMER:  I guess  I thought that --

16               THE COURT:  My individual rules incorporate the

17     district judge's rules.

18               MR. AMER:  Yes.

19               MS. LONGLEY:  Yeah.

20               MR. MARKEY:  Yes, that's what I thought.

21               THE COURT:  So I have to confess, I don't have Judge

22     DeArcy Hall's page limit off the top of my head.  Probably 25

23     would be my guess.

24               MR. AMER:  I think it's probably 25.

25               THE COURT:  So, discuss that amongst yourselves.

93

1    And I do think that that was part of the issue with regard to

2    the first sets of briefs.  The privileges were very, very

3    brief.  You know, the briefs on the privilege were very short

4    because you guys were very busy, you know, arguing the

5    sovereign immunity and the relevance in proportionality

6    points.  And so -- you know, when I went back to review all of

7    the briefing with regard to privilege, it just was, you know,

8    kind of -- I thought the little bit of drift on the facts, and

9    also it certainly could use a little bit more of a deep dive

10   into the law.

11            Ms. Glavin, so you guys want to talk about page --

12   pages and --

13            MS. GLAVIN:  Yeah.

14            MR. AMER:  We'll -- we'll --

15            THE COURT:  -- agree upon page limits?

16            MR. AMER:  We'll include it, a proposal, in our

17   Friday submission.

18            THE COURT:  That's fine.  That's fine.  All right.

19            Anything else, Mr. Amer?

20            MR. AMER:  Nothing from our side.

21            THE COURT:  Ms. Glavin?

22            MS. GLAVIN:  No, Your Honor.  Good to see you as

23   always.

24            THE COURT:  Nice to see you too, and sincerely know

25   -- really, no offense intended.

1          MS. GLAVIN:  Thank you.  I appreciate it.

2          THE COURT:  Okay.

3          MS. GLAVIN:  All right.  Yeah.

4          THE COURT:  All right.  Have a good afternoon,

5   everybody.

6          MR. AMER:  Thank you, Your Honor.

7          MS. GLAVIN:  You too, Judge.  Have a good weekend.

8   (Proceedings concluded at 12:17 p.m.)

9              I, CHRISTINE FIORE, Certified Electronic Court

10  Reporter and Transcriber, certify that the foregoing is a

11  correct transcript from the official electronic sound

12  recording of the proceedings in the above-entitled matter.

13

14  *Christine Fiore*

15  _____          April 21, 2024

16      Christine Fiore, CERT-410

17          Transcriber

18

19

20

21

22

23

24