UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ANDREW M. CUOMO,

                          Movant,

            - against -

OFFICE OF THE NEW YORK STATE
ATTORNEY GENERAL,

                          Defendant.

---

22-mc-03044 (LDH)(TAM)

# DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO QUASH MOVANT'S SUBPOENA

LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
New York, New York 10005

*Attorney for Defendant*

Andrew Amer
Michael Jaffe
James Cooney

    *of Counsel*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................... 3

    A.    The Referral And OAG Investigation Report ........................................ 3

    B.    Cuomo's Relentless Campaign To Attack OAG's Investigation ........................ 5

    C.    Trooper 1's Amended Complaint ........................................................ 5

    D.    Procedural History .......................................................................... 6

ARGUMENT ..................................................................................................... 8

I.    THE COURT LACKS SUBJECT MATTER JURISDICTION BASED
    ON OAG'S BROAD STATE SOVEREIGN IMMUNITY ................................. 8

    A.    In This Circuit, A Subpoena Triggers Sovereign Immunity ................................. 9

    B.    OAG's Sovereign Immunity Has Been Neither Abrogated
    Nor Waived .................................................................................. 17

        1.    *Congress Has Not Abrogated New York's Sovereign Immunity* ........................ 17

        2.    *New York Has Not Waived Its Sovereign Immunity* ................................. 18

II.    THE MATERIALS SOUGHT ARE IRRELEVANT AND NOT
    PORPORTIONAL TO THE NEEDS OF THE CASE ................................... 21

    A.    The Materials Sought Have No Relevance To Trooper 1's
    Causes Of Action .......................................................................... 21

    B.    Cuomo's Subpoena Imposes A Burden That Is Not Proportional
    To The Needs Of The Case ................................................................ 23

III.    THE MATERIALS SOUGHT ARE PRIVILEGED ................................... 25

    A.    The Interview Memoranda Are Protected Under The Attorney
    Client Privilege ............................................................................ 25

    B.    The Interview Memoranda Are Protected Attorney Work
    Product ...................................................................................... 27

C.   The Interview Memoranda And Unredacted Transcripts Are
     Protected By The Law Enforcement Privilege ........................................ 28

   1.   *The Law Enforcement Privilege Protects The Requested
        Documents In Their Entirety* ................................................................ 28

   2.   *There Is No Compelling Reason To Override OAG's Valid
        Assertion Of The Law Enforcement Privilege* .................................... 31

D.   The Interview Memoranda Are Protected By The Deliberative
     Process Privilege ............................................................................................ 33

E.   The Public Interest Privilege Protects The Interview
     Memoranda And Unredacted Transcripts ............................................ 35

CONCLUSION ............................................................................................................... 36

# TABLE OF AUTHORITIES

## Cases

*Abdou v. Gurrieri*, No. 05-cv-3946, 2006 WL 2729247 (E.D.N.Y. Sept. 25, 2006) .................................................................................................... 9

*Adams v. Texas Comm'n on Env't Quality*, No. A-06-ca-281-SS, 2007 WL 9701381 (W.D. Tex. May 29, 2007) ........................................................ 21

*Alden v. Maine*, 527 U.S. 706 (1999) ................................................. 8, 13, 18

*Allen v. Woodford*, 544 F. Supp. 2d 1074 (E.D. Ca. 2008) ........................ 14

*Alltel Comm'ns, LLC v. DeJordy*, 65 F.3d 1100 (8th Cir. 2012) ................. 12

*Beaulieu v. Vermont*, 807 F.3d 478 (2d Cir. 2015) ................. 8, 17, 18, 20, 21

*Blatchford v. Native Village of Noatak and Circle Village*, 501 U.S. 775 (1991) .................................................................................................... 18

*Blue Angel Films, Ltd. v. First Look Studios, Inc.*, No. 08-cv-6469, 2011 WL 830624 (S.D.N.Y. March 9, 2011) ..................................................... 23

*Bonnet v. Harvest (U.S.) Holdings, Inc.*, 741 F.3d 1155 (10th Cir. 2014) ................... 12

*Boron Oil Co. v. Downie*, 837 F.2d 67 (4th Cir. 1989) ......................... 10, 17

*Brown v. State*, 89 N.Y.2d 172 (1996) ...................................................... 16

*Cartica Management, LLC v. Corpbanca, S.A.*, 50 F. Supp. 3d 477 (S.D.N.Y.  2014) ............................................................................ 12

*Catskill Dev't, LLC v. Park Place Entertainment Corp.*, 206 F.R.D. 78 (S.D.N.Y. 2002) .......................................................................... 11, 13

*Cirale v. 80 Pine Street Corp*, 35 N.Y.2d 113 (1974) ................................. 35

*City of New York v. Blue Rage Inc.*, No. 17-cv-3480, 2018 WL 2709203 (E.D.N.Y. June 5, 2018) ........................................................................ 23

*Close v. State of N.Y.*, 125 F.3d. 31 (2d Cir. 1997) .................................... 18

*College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666 (1999) ..................................................................... 20

*Color of Change v. United States Department of Homeland Security*, 325 F. Supp. 3d 447 (S.D.N.Y. 2018) ......................................................... 33

*Corbett v. eHome Credit Corp*, No. 10-cv-26, 2010 WL 3023870
(E.D.N.Y. August 2, 2010) ........................................................................ 24

*Dekom v. New York*, No. 12-cv-1318, 2013 WL 3095010 (E.D.N.Y. June
18, 2013) .................................................................................................... 16

*Dorsett v. County of Nassau*, 762 F.Supp.2d 500 (E.D.N.Y. 2011) ........................... 31

*Dugan v. Rank*, 372 U.S. 609 (1963) .......................................................... 9, 10, 11, 13

*EPA v. General Elec. Co.*, 197 F.3d 592 (2d Cir. 1999), *amended on
reh'g on other grounds*, 212 F.3d 689 (2d Cir. 2000) ........................ 1, 9, 10, 11, 12, 13, 17

*Estate of Gonzalez v. Hickman*, 466 F. Supp. 2d 1226 (E.D. Ca. 2006) .............................. 14, 15

*Felix v. County of Nassau*, 344 F.R.D. 441 (E.D.N.Y. 2023)...................................... 1, 10, 12, 13

*Garrett v. Metro. Life Ins. Co.,* No. 95-cv-2406, 1996 WL 325725
(S.D.N.Y. June 12, 1996)............................................................................ 27

*Green v. Mansour*, 474 U.S. 64 (1985)............................................................ 18

*Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of New York*, No.
96-cv-8414, 2016 WL 7320775 (S.D.N.Y. July 18, 2016), *report and
recommendation adopted*, No. 96-cv-8414 (KMW), 2016 WL 7243544
(S.D.N.Y. Dec. 14, 2016) .......................................................................... 15, 21

*Gunter v. Atlantic Coast Line R. Co.*, 200 U.S. 273 (1906) ........................................ 20

*Haber v. United States*, 823 F.3d 746 (2d Cir. 2016) .............................................. 20

*Hans v. Louisiana*, 134 U.S. 1 (1890)............................................................. 8

*Henry v. New Jersey Transit Corp.*, 39 N.Y.3d 361 (2023) ........................................ 19

*Hickman v. Taylor*, 329 U.S. 495 (1947)........................................................... 27

*In re Cnty. of Erie*, 473 F.3d 413 (2d Cir. 2007)................................................. 25, 26

*In re Franklin Nat. Bank Securities Litigation*, 471 F. Supp. 577
(E.D.N.Y. 1979)......................................................................................... 34

*In re General Motors LLC Ignition Switch Litigation*, 80 F. Supp. 3d 521
(S.D.N.Y. 2015).......................................................................................... 28

*In re Grand Jury Investigation*, 399 F.3d 527 (2d Cir. 2005) ...................................... 26

iv

*In re Missouri Dept. of Natural Res.*, 105 F.3d 434 (8th Cir. 1997) ............................................ 12

*In re S.E.C. ex rel. Glotzer*, 374 F.3d 184 (2d Cir. 2004)................................................................ 9

*In re The City of New York*, 607 F.3d 923 (2d Cir. 2010)................................................ 29, 31, 32

*Jennings v. Moreland*, No. 08-cv-1305, 2012 WL 761360 (E.D. Ca. March 6, 2012) ........................................................................................................................ 14

*Kelly v. City of New York*, No. 01-cv-8906, 2003 WL 548400 (S.D.N.Y. Feb. 24, 2003) ........................................................................................................................ 31

*Land v. Dollar*, 330 U.S. 731 (1947) ........................................................................................... 11

*Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682 (1949) ............................................... 11

*Lazarou v. Mississippi State Univ.*, No. 1:07-cv-00060, 2012 WL 1352890 (N.D. Miss. Apr. 17, 2012) ................................................................................. 21

*Lead Industries Ass'n, Inc. v. OSHA*, 610 F.2d 70 (2d Cir. 1979)................................................ 33

*Lewis v. Clarke*, 581 U.S. 155 (2017)........................................................................................... 13

*Lora v. Board of Ed. Of City of New York*, 74 F.R.D. 565 (E.D.N.Y. May 12, 1977) ...................................................................................................................................... 35

*Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000) ........................................................... 20

*McGinty v. New York*, 251 F.3d 84 (2d Cir. 2001) ..................................................................... 20

*Milord-Francois v. New York State Off. of Medicaid Inspector Gen.*, No. 19-cv-00179, 2022 WL 10653757 (S.D.N.Y. Oct. 18, 2022) ................................................. 18

*Mixon v. State of Ohio*, 193 F.3d 389 (6th Cir.1999)), *aff'd*, 583 F. App'x 15 (2d Cir. 2014)............................................................................................................... 16

*Morrison v. Budget Rent A Car Sys.*, 657 N.Y.S.2d 721 (2d Dep't 1997) ................................. 19

*Nat'l Sec. Archive v. C.I.A.*, 752 F.3d 460 (D.C. Cir. 2014)........................................................ 34

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975)................................................................... 33

*Papasan v. Allain*, 478 U.S. 265 (1986) ........................................................................................ 8

*Pearlestein v. Blackberry Ltd.*, Index No. 13-cv-07060, 2019 WL 1259382 (S.D.N.Y. March 19, 2019) ................................................................................................ 26, 27

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) .................................. 8, 14, 20

*Regents of the Univ. of Cal. v. Doe,* 519 U.S. 425 (1997) ............................................................. 9

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.,* 421 U.S. 168 (1975)................................... 33

*Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426 (2d Cir. 1999) ................................................................................................................................................ 8

*Russell v. Jones,* 49 F.4th 507 (5th Cir. 2022) ................................................... 11, 12, 13

*Santa Clara Pueblo v. Martinez*, 436, U.S. 49 (1978)............................................... 12

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996)................................... 8, 11, 17, 18

*Solomon v. Nassau County*, 274 F.R.D. 455 (E.D.N.Y. May 24, 2011) ..................... 25

*Spectrum Sys. Int'l Corp. v. Chem. Bank*, 78 N.Y.2d 371 (1991) ............................ 26

*Springfield Hospital Inc. v. Guzman*, 28 F.4th 403 (2d Cir. 2022)............................... 8

*Texas LDPC, Inc. v. Broadcom, Inc*, No. 4:22-cv-01781, 2023 WL 3293291 (S.D. Tex. May 5, 2023) ....................................................................................... 21

*Torres v. Texas Dep't of Pub. Safety*, 597 U.S. 580 (2022)........................................ 17

*United States v. Adlman*, 134 F.3d 1194 (2d Cir.1988)............................................... 27

*United States v. Georgia*, 546 U.S. 151 (2006) ......................................................... 16

*United States v. Hossain*, No. 19-cr-606, 2021 WL 4272827 (S.D.N.Y. September 21, 2021) ..................................................................................................... 31

*United States v. Int'l Bus. Mach. Corp.*, 83 F.R.D. 97 (S.D.N.Y. 1979)..................... 24

*Unkechaug Indian Nation v. New York State Dep't of Env't Conservation*, 677 F. Supp. 3d 137 (E.D.N.Y. 2023) ............................................................................ 17

*Vega v. Semple*, 963 F.3d 259, 280 (2d Cir. 2020) .................................................... 14

*Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247 (2011) ................................ 14, 15, 17

*Woodard v. City of New York*, No. 99-cv-1123, 2000 WL 516890 (E.D.N.Y. March 10, 2020) ..................................................................................... 35

*Yul Chu v. Mississippi State Univ.*, 901 F. Supp. 2d 761 (N.D. Miss. 2012) .............. 21

**Statutes**

Executive Law § 63 ............................................................................................................... 37, 43

Public Officers Law § 87 ........................................................................................................... 18

**Other Authorities**

Sisk, *A Primer on the Doctrine of Federal Sovereign Immunity*, 58 Okla.
    L. Rev. 439 (2005) ............................................................................................................... 13

**Rules**

Federal Rule of Civil Procedure 45 ......................................................................................... 14

**PRELIMINARY STATEMENT**

In a report published on August 3, 2021 ("Report"), investigators with the Office of the New York Attorney General ("OAG") concluded that then-Governor Cuomo had sexually harassed numerous women who were current and former state employees, including Trooper 1. Following the issuance of the Report, and in the midst of an open impeachment investigation, Cuomo announced he would resign as governor on August 24, 2021.

Starting months before OAG issued its Report and continuing to this day, Cuomo has pursued a relentless campaign to undermine and discredit the Report and OAG's investigation and to rehabilitate his reputation. The "narrowed" nonparty subpoena Cuomo served on OAG on April 23, 2024 in this action ("Subpoena") to obtain attorney interview memoranda and redacted portions of witness transcripts generated as part of the investigation underlying the Report ("Investigation") is just part of this strategy; it has nothing to do with any legitimate effort to obtain documents and information necessary for Cuomo to defend himself against the harassment and retaliation claims asserted by Trooper 1 in the underlying action ("Trooper 1 Action"). Cuomo already has access to a vast amount of information related to OAG's Investigation that has been publicly released by OAG on its website, including minimally redacted transcripts of all testimony taken under oath by the agents of OAG who conducted the Investigation on OAG's behalf. The Court should quash the Subpoena for multiple, independent reasons.

As a threshold matter, under Second Circuit precedent, enforcement of the Subpoena triggers OAG's broad state sovereign immunity. *See EPA v. General Elec. Co.*, 197 F.3d 592 (2d Cir. 1999), *amended on reh'g on other grounds*, 212 F.3d 689 (2d Cir. 2000). Because OAG's sovereign immunity has not been abrogated by Congress or waived by the State of New York, OAG is immune from this action to enforce the Subpoena. *Felix v. County of Nassau*, 344 F.R.D. 441 (E.D.N.Y. 2023).

But even if the Court were to conclude OAG has no immunity, the Subpoena should still be quashed because the materials sought by Cuomo are wholly irrelevant to the claims and defenses in the Trooper 1 Action. Trooper 1 alleges in her Amended Complaint ("AC") that Cuomo sexually harassed her and retaliated against her after she came forward with her allegations. Trooper 1's claims of being sexually harassed by Cuomo rest on her own personal experiences being harassed by him—not on an investigation conducted months and years after the alleged harassment. The OAG Investigation did not impact—and as a practical matter could not have impacted—the alleged sexual harassment that occurred prior to the Investigation. Cuomo is not seeking the materials for any legitimate purpose, but rather to advance his personal crusade to attack the Investigation. Litigants have no entitlement to use nonparty discovery to advance their agendas on matters unrelated to the defense of the underlying claims against them.

In any event, even if the Court were to conclude that sovereign immunity does not apply or that some of the requested materials could have some possible relevance to Trooper 1's claims, the demand for such materials is not proportional to the needs of the case. Producing the materials would impose an undue burden on OAG given the marginal utility of the materials sought, if any, to the prosecution or defense of the case, weighed against the significant taxpayer expense that would be expended to produce the materials—a process that would require a time-consuming review and redaction process to protect highly sensitive information, including sensitive details about witnesses (such as medical information, sexual histories, details about their family, addresses and other personally identifying information, and confidential employment information) as well as security protocols, floorplans, and security footage.

Finally, beyond these determinative issues, the interview memoranda and unredacted transcripts are protected from disclosure under numerous applicable privileges. First, the

interview memoranda, which were shared amongst the Investigative Team to advance the Investigation and form legal advice and conclusions to be shared with OAG, are protected from disclosure by the attorney client privilege and the attorney work product doctrine. Second, the interview memoranda and unredacted portions of the transcripts contain information pertaining to law enforcement techniques as well as sensitive information about witnesses that would, if disclosed, impair the ability of OAG to conduct future investigations, and are therefore protected from disclosure under the law enforcement privilege and public interest privilege. Third, the interview memoranda reflect opinions, recommendations, and deliberations relating to the findings and conclusions incorporated into the Report and are therefore protected from disclosure under the deliberative process privilege.

\*    \*    \*

The Court should not permit Cuomo to use the procedural device of nonparty discovery in the Trooper 1 Action as a pretext to continue his personal attacks on OAG's Investigation (at taxpayer expense) in an attempt to rehabilitate his reputation. The Subpoena should be quashed.

## BACKGROUND

### A. The Referral And OAG Investigation Report

By letter dated March 1, 2021, then-Governor Cuomo referred allegations of sexual harassment against him to OAG for investigation pursuant to New York Executive Law § 63(8) ("§ 63(8)") (the "Referral Letter"). Declaration of Serena Longley, dated June 6, 2024 ("Longley Decl."), Ex. 1. In the Referral Letter, Cuomo directed OAG to select an independent law firm to conduct the § 63(8) Investigation, while acknowledging "that nothing in this letter is intended to constrain or limit the powers inherent in § 63(8)," which grants OAG discretion to appoint, employ and determine the duties of non-governmental "deputies" for the purpose of inquiring into referred

3

matters. *Id.*

Starting on March 8, 2021, OAG began appointing a team of investigators, led by private attorneys Joon Kim of Cleary Gottlieb Steen & Hamilton LLP and Anne Clark of Vladeck, Raskin & Clark, P.C., (the "Investigative Team") and empowered them to issue subpoenas to investigate and report on allegations of sexual harassment by Cuomo and surrounding circumstances. *Id.* ¶ 13 , Ex. 4. The Investigation closed on August 3, 2021 with the release of the Report and 111 exhibits, concluding that Cuomo sexually harassed several women. *Id.* ¶ 19. The Investigative Team interviewed 179 individuals, taking testimony under oath from 41, and collected over 74,000 documents. *Id.* ¶¶ 19, 22; Declaration of Ye Eun Charlotte Chun, dated June 7, 2024 ("Chun Decl.") ¶ 5.

Given the public significance and interest in the Report, OAG decided to make available to the public certain materials from the Investigation, specifically on-the-record testimony and approximately 1,000 exhibits to that testimony, but to do so in redacted form to protect witness confidentiality and privacy. Longley Decl. ¶ 24. The review and redaction process for public release of transcripts and just over 1,000 of the 74,000 collected documents took the Investigative Team approximately 3,600 hours to complete due to the highly sensitive and confidential nature of the information contained in the materials. Chun Decl. ¶¶ 10-12. Without waiving any privileges, OAG cooperated with several other governmental agencies conducting their own investigations into overlapping allegations against Cuomo. Longley Decl. ¶¶ 26-30. As part of those cooperative efforts, OAG provided to government agencies certain investigative materials subject to agreements preserving the confidentiality of OAG's documents to the greatest extent possible. *Id.*

4

### B.  Cuomo's Relentless Campaign To Attack OAG's Investigation

Facing multiple allegations of sexual harassment in March 2021, Cuomo announced he would not resign and asked the public to reserve judgment until OAG concluded its Investigation. Longley Decl. ¶¶ 10-12, Exs. 2, 3. Yet within days of the § 63(8) appointments of Kim and Clark, OAG learned that members of Cuomo's inner circle were privately seeking out negative information about Kim and Clark to prepare a counteroffensive attack on the Investigation in the event the outcome was not favorable. *Id.* ¶ 21; Chun Decl. ¶ 6.  Throughout the Investigation, the Investigative Team learned of multiple efforts by Cuomo's advisors to obtain negative information about the Investigative Team and women who had accused Cuomo of misconduct. Chun Decl. ¶ 6. The day after the Report was issued, counsel to the Executive Chamber (part of the Office of the Governor) wrote to OAG attacking the findings in the Report, largely based on purportedly negative information about, and attacks on, Kim and Clark, and also complaints about Cuomo's lack of access to underlying materials from the Investigation. Longley Decl. ¶¶ 42-44, Ex. 6. As part of this continuing campaign, Cuomo has sought the non-public materials underlying the Report repeatedly without success. *Id.* ¶¶ 44, 48-60.

### C.  Trooper 1's Amended Complaint

In her AC, Trooper 1 asserts three causes of action for discrimination against Cuomo based on her own personal account that during the period 2018 through 2021, Cuomo sexually harassed her by making sexually suggestive comments and jokes and initiating inappropriate physical contact, including running his fingers down her back and across her stomach. *Trooper 1 Action*, ECF No. 7, Amended Complaint ("AC") ¶¶ 39, 54. Trooper 1 further asserts three causes of action for retaliation against Cuomo based on a press statement he made asserting that he would seek criminal charges against victims, including Trooper 1. *Id.* ¶¶ 151-53, 155-59. These causes of

action, and the underlying allegations that support them, are based on Trooper 1's personal knowledge of what Cuomo said and did to her, not any subsequent investigation of her allegations or the Report. *Id.* ¶¶ 31-61, 68-74, 151- 53, 155-59. Indeed, the AC refers to the Report only in a single background paragraph contained in the "Preliminary Statement"; the Report is not incorporated into the "Factual Allegations" upon which Trooper 1 bases her legal claims. *Id.* ¶ 4.

The AC contains extensive, unsourced quotations, which appear to be based on Trooper 1's personal knowledge or largely taken from testimony and exhibits from the Investigation that are publicly available on OAG's website. *See Id* ¶¶ 75-143; *compare* Report[1]. All parties to the Trooper 1 Action have equal access to these materials and can use them to develop their claims and defenses in the case. In addition, virtually all of Trooper 1's allegations of sexual harassment against Cuomo concern conduct that occurred well before Cuomo referred the matter to OAG for investigation. *See* AC. Cuomo's defense in the Trooper 1 Action depends on what Cuomo did or did not do to Trooper 1, not on what happened during the Investigation or the findings of the Report. As much as Cuomo would like it to be, the OAG Investigation is not on trial in the Trooper 1 Action. That suit is solely about what Cuomo did or did not do to Trooper 1.

### D.  Procedural History

On July 11, 2011, Cuomo served a subpoena on OAG ("Original Subpoena"). Longley Decl. ¶ 48, Ex. 7. The Original Subpoena sought expansive discovery into virtually every record created or collected in connection with the Investigation. *Id.* at ¶ 49, Ex. 7. OAG timely objected to the Original Subpoena and, after meeting and conferring, served additional responses and objections on August 12, 2022. *Id.* ¶ 50. Cuomo moved to compel compliance with the Original

---

[1] https://ag.ny.gov/press-release/2021/independent-investigators-find-governor-cuomo-sexually-harassed-multiple-women (last accessed 6/6/2024)

Subpoena and OAG cross-moved to quash. ECF Nos. 1, 17-23. After extensive briefing and oral arguments on the cross-motions, the Court issued a Decision and Order on July 21, 2023 denying Cuomo's motion to compel on the grounds that Cuomo failed to establish the relevance of the materials sought in the subpoena such that his requests were disproportionate to the needs of the case; the Court did not rule on OAG's cross-motion to quash. ECF No. 37 at 1, 33-34. On July 31, 2023, Cuomo moved for reconsideration of the Court's Order denying his motion to compel. ECF No. 40.

While Cuomo's motion for reconsideration was *sub judice*, on October 4, 2023, Cuomo "narrowed" the scope of the Original Subpoena via email to OAG, primarily seeking interview memoranda prepared by the Investigative Team for New York State Police ("NYSP") witnesses and those of any complainant to the Report, as well as unredacted transcripts of sworn testimony taken by the Investigators. ECF No. 51-1. As ordered by the Court, OAG submitted the interview memoranda *in camera* to the Court on December 19, 2023. *See* ECF Minute Entry and Order, December 12, 2023. Thereafter, on March 29, 2024, the Court denied Cuomo's pending motion for reconsideration "to the extent it is seeking to compel compliance" with the Original Subpoena and scheduled a status conference "to address Cuomo's narrowed requests to the OAG." ECF. No. 57. At the status conference, Cuomo agreed to withdraw the Original Subpoena, rendering OAG's cross-motion to quash moot, and to serve on OAG the narrower Subpoena seeking only the interview memos and unredacted transcripts from the Investigation; and the parties agreed to submit a proposed briefing schedule to tee up cross-motions to compel and quash the Subpoena. *See* ECF Minute Entry and Order April 19, 2024. On April 23, 2024, Cuomo served OAG with the narrower Subpoena. *See* Longley Decl. ¶ 60.

**ARGUMENT**

**I.    THE COURT LACKS SUBJECT MATTER JURISDICTION BASED ON OAG'S BROAD STATE SOVEREIGN IMMUNITY**

The Court should quash the Subpoena because enforcement is barred by OAG's sovereign immunity under the Eleventh Amendment and at common law.[2]

The Eleventh Amendment "bars suits against a State by citizens of that same State" in addition to citizens of other states. *Papasan v. Allain*, 478 U.S. 265, 276 (1986) (citing *Hans v. Louisiana*, 134 U.S. 1 (1890)). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.'" *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 447-48 (2d Cir. 1999) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984)). The Eleventh Amendment is but one "species" of sovereign immunity. *Beaulieu v. Vermont*, 807 F.3d 478, 483 (2d Cir. 2015) (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996)). States also enjoy a broader species of common law sovereign immunity, independent of the Eleventh Amendment, that applies against all private suits, whether in state or federal court. *Alden v. Maine*, 527 U.S. 706, 713, 721 (1999) (noting state immunity from suit is a fundamental aspect of sovereignty that existed at common law before ratification of the Constitution that "neither derives from, nor is limited by, the terms of the Eleventh Amendment"); *Beaulieu*, 807 F.3d at 483 (citing *Alden*). Both forms of sovereign immunity—under the Eleventh Amendment and at common law pre-ratification—apply not only

---

[2] OAG's broad sovereign immunity poses a jurisdictional bar to the Court compelling OAG to comply with the Subpoena. However, if the Court determines that the Subpoena should be quashed based on the non-jurisdictional grounds raised by OAG in Points II and III below, the Court need not reach this jurisdictional question. *Springfield Hospital Inc. v. Guzman*, 28 F.4th 403, 416 (2d Cir. 2022) (noting sovereign immunity need not be decided if the Court can resolve the motion on the merits in the government's favor); *Cuomo v. Office of the New York State Attorney General*, 683 F. Supp. 3d 258, 280-81 (E.D.N.Y. 2023) (denying Cuomo's motion to compel on relevance and burden grounds, thereby obviating the need to reach OAG's sovereign immunity defense), *reconsideration denied*, 2024 WL 1345529 (E.D.N.Y. Mar. 29, 2024).

to a state but also to a state agency acting as an arm of the state, such as OAG. *Regents of the Univ. of Cal. v. Doe,* 519 U.S. 425, 429 (1997) (recognizing sovereign immunity extends to state agencies). Both forms of sovereign immunity compel the Court to quash the Subpoena.

Adjudicating OAG's sovereign immunity defense requires the Court to conduct a two-part analysis: (1) whether this proceeding to enforce the Subpoena triggers OAG's sovereign immunity; and (2) if so, whether OAG's sovereign immunity has been abrogated or waived. Applying this analysis, the Court should hold that enforcement of the Subpoena is barred by OAG's sovereign immunity.

### A.  In This Circuit, A Subpoena Triggers Sovereign Immunity

The Second Circuit has answered the first part of the analysis in the affirmative, holding in the analogous context of a subpoena served on a federal agency that enforcement of the subpoena is a "judicial proceeding" that "would compel [the government] to act and therefore is barred by sovereign immunity in the absence of a waiver." *EPA v. General Elec. Co.*, 197 F.3d at 597 (cited by *In re S.E.C. ex rel. Glotzer*, 374 F.3d 184, 190 (2d Cir. 2004)); *see also Abdou v. Gurrieri*, No. 05-cv-3946, 2006 WL 2729247, at *3 (E.D.N.Y. Sept. 25, 2006) (relying on *EPA* and *Glotzer* in holding that absent waiver, federal sovereign immunity divests the court of jurisdiction to compel a federal agency to comply with a subpoena).

In *EPA*, the parties cross-moved to compel and quash a subpoena served on the EPA by GE in the Southern District of New York after the EPA refused to comply fully with GE's subpoena served in connection with a pending action in the District of New Jersey. 197 F.3d at 594-95. On appeal, the Second Circuit followed Supreme Court precedent holding that a "judicial proceeding is considered brought against the sovereign if the result could serve 'to restrain the Government from acting, or to compel it to act.'" *Id*. at 597 (quoting *Dugan v. Rank*, 372 U.S. 609, 620 (1963)). Finding that

enforcement of GE's subpoena "would compel the EPA to act," the Second Circuit held the subpoena was "barred by sovereign immunity in the absence of a waiver." *EPA*, 197 F.3d at 597;[3] *accord Boron Oil Co. v. Downie,* 837 F.2d 67, 71 (4th Cir. 1989) (applying *Dugan* to hold that a subpoena proceeding against a federal employee "is inherently that of an action against the United States" triggering federal sovereign immunity because it "compels the federal agency to act in a manner different from that in which the agency would ordinarily choose to exercise its public function").

In a case directly on point, another judge of this Court recently applied the holding in *EPA* to bar enforcement of a subpoena served on OAG based on state sovereign immunity. *See Felix* 344 F.R.D. 441. In *Felix*, the plaintiff served a subpoena on nonparty OAG in a wrongful death action seeking OAG's investigative materials beyond what was already published on OAG's website. *Id*. at 442. Noting that states enjoy a broader sovereign immunity "beyond that addressed in the Eleventh Amendment" that extends to "all proceedings where the result could be an order restraining the . . . government entity or requiring it to act," *id*. at 444, the *Felix* court held that the subpoena served on OAG triggered OAG's broad state sovereign immunity, *id*. at 445. The court applied the language from *Dugan* quoted by the Second Circuit in *EPA* to conclude that "when the OAG is served with a third-party subpoena, this is exactly the type of coercive judicial process that the Supreme Court cases seem to envision being protected against by sovereign immunity with its recognition that the doctrine covers more than lawsuits in which the State is named as a defendant." *Id* at 445.

The Fifth Circuit reached the same conclusion in *Russell v. Jones*, 49 F.4th 507 (5th Cir.

---

[3] The court went on to hold that the EPA's sovereign immunity was waived by the Administrative Procedures Act, 5 U.S.C. § 702, *see* 197 F.3d at 599, a statute that has no application here.

2022), another case directly on point. In *Russell*, the plaintiffs issued subpoenas to nonparty state court judges seeking information about their role in creating and enforcing a bail schedule being challenged by the plaintiffs. *Id*. at 510. After concluding that the judges were acting in their official capacities "such that the subpoenas were really served against the state," the Fifth Circuit adopted the Second Circuit's rationale in *EPA* to hold that state sovereign immunity applied to the state judges as recipients of subpoenas based on the general rule announced in *Dugan* that a suit is against the sovereign if "the judgment sought . . . would be to . . . compel [the Government] to act." *Id*. at 513-14 (internal quotations omitted) (citing *EPA,* 197 F.3d at 597, *Dugan*, 372 U.S. at 620, *Land v. Dollar*, 330 U.S. 731, 738 (1947), and *Larson v. Domestic & Foreign Com. Corp*., 337 U.S. 682, 704 (1949)). Rejecting any distinction between officials sued as defendants and officials served with a nonparty subpoena, the Fifth Circuit held that "[b]y compelling a state to produce its papers, a *subpoena duces tecum* subjects a sovereign to the 'coercive process of judicial tribunals at the instance of private parties,'" thereby triggering the state's sovereign immunity. *Id*. at 515 (emphasis in original, internal citations omitted) (quoting *Seminole Tribe,* 517 U.S. at 58).

Further supporting the conclusion that Cuomo's Subpoena triggers OAG's sovereign immunity, the Southern District of New York and the Eighth and Tenth Circuits have held, relying on the Second Circuit's rationale in *EPA*, that subpoenas served on tribal officials trigger tribal sovereign immunity. In *Catskill Dev't, LLC v. Park Place Entertainment Corp*., 206 F.R.D. 78 (S.D.N.Y. 2002), the plaintiffs sought to enforce subpoenas served on members of the St. Regis Mohawk Tribe and their attorneys. *Id*. at 82. Applying the reasoning in *EPA,* Judge McMahon held that enforcement of the subpoenas was barred by tribal sovereign immunity absent waiver. *Id*. at 88-89 ("The same rule [applied in *EPA*] should apply here, since 'Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign

powers,' such as the United States.") (quoting *Santa Clara Pueblo v. Martinez*, 436, U.S. 49, 58 (1978)). Similarly, the Eighth and Tenth Circuits have applied the reasoning of *EPA* and *Dugan* to hold that subpoenas served on tribal officials trigger tribal sovereign immunity. *Alltel Comm'ns, LLC v. DeJordy*, 65 F.3d 1100, 1103 (8th Cir. 2012) (holding effort to compel compliance with a subpoena triggers tribal sovereign immunity);[4] *Bonnet v. Harvest (U.S.) Holdings, Inc.,* 741 F.3d 1155, 1159-60 (10th Cir. 2014) (same).

The Second Circuit's holding in *EPA* is binding authority,[5] requiring the Court to hold this miscellaneous action is a "judicial proceeding" that triggers OAG's sovereign immunity and bars enforcement of the Subpoena absent abrogation or waiver. *EPA*, 197 F.3d at 597; *Felix*, 344 F.R.D. at 442; *see also Russell*, 49 F.4th at 513-14. Any attempt by Cuomo to distinguish *EPA* from this case because here the Subpoena was served on a state agency rather than a federal agency is without merit for two reasons.

**First**, the holding in *EPA* that a subpoena triggers sovereign immunity turns on the nature of the relief that could be granted by enforcing the subpoena and not on the fact that the subpoenaed agency was part of the federal, not state, government; the Second Circuit applied the standard in *Dugan*, which focuses on whether the judicial proceeding brought against the sovereign could result in an order "compel[ling] it to act," without regard to whether the sovereign is a state or

---

[4] Fifteen years earlier, the Eighth Circuit rejected a nonparty state agency's claim of immunity from discovery subpoenas based on the Eleventh Amendment. *See In re Missouri Dept. of Natural Res.*, 105 F.3d 434, 436 (8ᵗʰ Cir. 1997). But as the Fifth Circuit noted in *Russell*, the Eighth Circuit's more recent decision in *Alltel* "casts considerable doubt" on its earlier decision in *In re Missouri DNR*. *Russell*, 49 F.4th at 518 n.12. In any event, the decision in *In re Missouri DNR* involved an analysis of only the state agency's Eleventh Amendment immunity and not its broader form of sovereign immunity relied on here, so the case is distinguishable on that basis. 105 F.3d at 436.

[5] *See Cartica Management, LLC v. Corpbanca, S.A.*, 50 F. Supp. 3d 477, 486 (S.D.N.Y.  2014) ("[D]istrict courts and other inferior courts are bound by decisions of the Court of Appeals in the appropriate circuit unless overruled by an intervening Supreme Court decision or other change in law."). Accordingly, to the extent Cuomo relies on out-of-circuit cases holding that a subpoena is not a "judicial proceeding" or "suit" for purposes of triggering a state's sovereign immunity, such authority conflicts with Second Circuit precedent and should not be followed.

federal entity. *EPA*, 197 F.3d at 597 (quoting *Dugan*). Judge McMahon's reliance on *EPA* in the context of subpoenas served on tribal officials in *Catskill* confirms that *EPA* is not limited in its application to subpoenas served just on federal agencies. 206 F.R.D. at 88-89.

**Second**, in any event, there is no daylight between federal sovereign immunity and broad state sovereign immunity to suggest the Second Circuit would not reach the same result here that it reached in *EPA*—namely, that enforcement of the Subpoena is a "suit" that triggers sovereign immunity under *Dugan* because the resulting order could compel OAG to act. Both federal and state sovereign immunity trace back to the well-established English common-law rule, existing at the time the U.S. Constitution was ratified, that "the Crown could not be sued without consent in its courts." Sisk, *A Primer on the Doctrine of Federal Sovereign Immunity*, 58 Okla. L. Rev. 439, 443 (2005) (quoting *Alden v. Maine*, 527 U.S 706, 715 (1999)). The framers relied on this rule to endorse the concepts of both federal and state sovereign immunity; "[i]f the states were exempt from unconsented suit on this historical account [of English law], then all the more so was the federal government." *Id*. at 443-44 (citing Alexander Hamilton, *The Federalist No. 81*, at 487-88 (Clinton Rossiter ed., 1961) (1788)). As the Supreme Court has recognized, immunity for state and federal employees are both based on "common-law sovereign immunity principles." *Lewis v. Clarke*, 581 U.S. 155, 163-64 (2017). Simply put, if a judicial proceeding that would result in an order compelling a federal agency to act is a "suit" for purposes of triggering sovereign immunity, then so too is a judicial proceeding that would result in an order compelling a state agency to act. *Russell*, 49 F.4th at 513-14; *Felix*, 344 F.R.D. at 442.

Just as Cuomo cannot distinguish *EPA* from this case, neither can he avoid application of the holding in *EPA* by relying on the *Ex parte Young* doctrine, which provides an exception to sovereign immunity for suits seeking "prospective [injunctive] relief against an *individual acting*

*in his official capacity . . .* to end an *ongoing violation of a federal law.*" *Vega v. Semple*, 963 F.3d 259, 280 (2d Cir. 2020) (emphasis added). The *Ex parte Young* exception to sovereign immunity "is a fiction that has been narrowly construed," *Pennhurst*, 465 U.S. at 114 n.25, and applies only to the "precise situation" of "a federal court command[ing] a state official to do nothing more than refrain from violating federal law," *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011). The *Ex parte Young* exception does not apply here for two independent reasons: (1) the Subpoena names a state agency (OAG) rather than an individual acting in his or her official capacity; and (2) Cuomo does not and cannot plausibly assert that OAG is engaging in *an ongoing violation of federal law*. *See Estate of Gonzalez v. Hickman*, 466 F. Supp. 2d 1226, 1229 (E.D. Ca. 2006) (holding in a challenge to subpoenas served on a state agency "[t]here is no on going violation that could support a finding that the present issue falls within the *Ex Parte Young* exception to the Eleventh Amendment bar").[6]

To the extent that Cuomo will argue OAG is violating the Rules Enabling Act, 28 U.S.C. § 2072(a), by refusing to produce documents in response to the Subpoena, any such argument is without merit. The Federal Rules of Civil Procedure do no mandate abject compliance with a subpoena, but rather lay out procedures for opposing a subpoena where appropriate and necessary to avoid undue burden or expense, interpose objections and privileges, and move to quash or modify the subpoena. Fed. R. Civ. Pro. 45(d). OAG has followed these procedures in opposing the Subpoena,[7] and Cuomo cannot identify any provision of the federal discovery rules that OAG is

---

[6] While other district courts within the Ninth Circuit have declined to follow the holding in *Estate of Gonzalez*, they have done so because they have concluded—contrary to Second Circuit precedent—that a subpoena served on a state agency is not a suit that triggers a state's sovereign immunity under *Dugan. See Allen v. Woodford*, 544 F. Supp. 2d 1074, 1079 (E.D. Ca. 2008); *see also Jennings v. Moreland*, No. 08-cv-1305, 2012 WL 761360, at *3 (E.D. Ca. March 6, 2012) (following the reasoning of *Allen* over *Estate of Gonzalez* based on finding that a subpoena is not a suit triggering Eleventh Amendment immunity).

[7] By Order entered on May 3, 2024, on consent of the parties, the Court deemed OAG's statements on the record at the April 19, 2024 status conference to satisfy OAG's obligation to respond to the Subpoena under Federal Rule of

presently violating that could even arguably support application of *Ex parte Young*. *See Estate of Gonzalez*, 466 F.Supp.2d at 1229 ("The purpose of the relief sought here, production of documents that could lead to admissible evidence in a suit seeking relief for a past wrong, is clearly retrospective. There is no ongoing violation that could support a finding that the present issue falls within the *Ex parte Young* exception to the Eleventh Amendment bar."); *see also Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of New York*, No. 96-cv-8414, 2016 WL 7320775, at *8 (S.D.N.Y. July 18, 2016), *report and recommendation adopted*, No. 96-cv-8414 (KMW), 2016 WL 7243544 (S.D.N.Y. Dec. 14, 2016) ("Because there has been no allegation or determination that [state government] officials are violating federal law . . . , the proposed order amounts to interference with public administration and goes beyond the relief available under *Ex parte Young*.") (citing *Stewart*, 563 U.S. at 253–54).

Finally, any contention that upholding OAG's state sovereign immunity here would lead to untenable results in other circumstances should be rejected. First, this is a policy argument that is foreclosed by the Second Circuit's decision in *EPA*. Second, any dire prediction of untenable results in other contexts is overblown for multiple reasons: (i) a civil litigant in a Section 1983 action will typically name one or more state officials as defendants in their individual capacities, and in that procedural posture may obtain party discovery by serving discovery notices on those officials, who can then be compelled to produce material within their custody, possession, or control; (ii) civil litigants can seek relevant documents from state agencies under New York's Freedom of Information Laws (*e.g.* New York Public Officers Law § 87 (Access to Agency Records)), as Cuomo has belatedly done here (*see Matter of Cuomo v. Office of the New York Attorney General*, Index No. 150515/2024 (Sup. Ct. N.Y. Cnty.), NYSCEF No. 1 (Verified

Civil Procedure 46. *See ECF Minute Entry and Order,* May 3, 2024.

Petition ¶ 4)); (iii) New York has waived its sovereign immunity under the New York Court of Claims Act, so any litigant with a claim pending in the New York Court of Claims may obtain discovery from state agencies in that forum;[8] and (iv) parties may sue states and obtain discovery of state files under federal statutes that abrogate state sovereign immunity, such as Title II of the Americans with Disabilities Act or the Voting Rights Act. *See United States v. Georgia*, 546 U.S. 151, 159 (2006) ("[I]nsofar as Title II [of the Americans with Disabilities Act of 1990] creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity.") (emphasis in original); *Dekom v. New York*, No. 12-cv-1318, 2013 WL 3095010, at *10 (E.D.N.Y. June 18, 2013) (noting "Congress has abrogated the States' sovereign immunity on claims arising under the Voting Rights Act") (citing *Mixon v. State of Ohio*, 193 F.3d 389, 398-99 (6th Cir.1999)), *aff'd*, 583 F. App'x 15 (2d Cir. 2014).

Far from producing untenable results, recognizing OAG's sovereign immunity in the specific circumstances of this case—where the target of an OAG investigation seeks portions of OAG's nonpublic investigative file to serve his own interests in rehabilitating his political career—avoids an unwarranted burden on OAG at taxpayer expense. The Fourth Circuit's observations in *Boron Oil* about the impact of a nonparty subpoena on the federal agency involved in that case ring true here:

> Because of the nature of the duties it exercises and programs it administers, the [agency] is *particularly vulnerable* to the demands of private parties seeking information acquired *as a result of official investigations* concerning incidents such as that in the case *sub judice*. If [agency employees] were routinely . . . compelled

---

[8] *Brown v. State*, 89 N.Y.2d 172, 179-80 (1996) (noting Court of Claims Act "confers jurisdiction on the court to hear and determine 'almost every conceivable kind of action against the State' . . . [including] 'a claim of any person, corporation or municipality against the state for the appropriation of any real or personal property or any interest therein, for the breach of contract, express or implied, or for the torts of its officers or employees while acting as such officers or employees.'").

to [comply with subpoenas] in private civil actions, significant loss of manpower hours would predictably result and agency employees would be drawn from other important agency assignments.

873 F.2d at 70 (emphasis added).

Based on the Second Circuit's controlling decision in *EPA*, enforcement of the Subpoena is a "judicial proceeding" that is "barred by [OAG's] sovereign immunity in the absence of a waiver." *EPA*, 197 F.3d at 597.

**B.  OAG's Sovereign Immunity Has Been Neither Abrogated Nor Waived**

A state's broad sovereign immunity is not absolute; states remain subject to suit despite their sovereign immunity where Congress abrogates the state's immunity through appropriate legislation or where the State itself "consent[s] to suit." *Torres v. Texas Dep't of Pub. Safety*, 597 U.S. 580, 587 (2022); *see also Stewart*, 563 U.S. at 253-54 ("A State may waive its sovereign immunity at its pleasure, and in some circumstances Congress may abrogate it by appropriate legislation.") (cleaned up); *Beaulieu*, 807 F.3d at 484 (2d Cir. 2015) (noting states "may elect to waive" their sovereign immunity or "Congress may override state sovereign immunity by exercising its Fourteenth Amendment enforcement powers"); *Unkechaug Indian Nation v. New York State Dep't of Env't Conservation*, 677 F. Supp. 3d 137, 147 (E.D.N.Y. 2023) (noting exceptions to sovereign immunity where "a state waives its immunity" and "Congress clearly abrogates state sovereign immunity").

*1.  Congress Has Not Abrogated New York's Sovereign Immunity*

In order to determine whether Congress has abrogated a state's sovereign immunity, a court must ask two questions: (1) whether Congress has "unequivocally expresse[d] its intent to abrogate the immunity;" and (2) whether Congress has acted "pursuant to a valid exercise of power." *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 55 (1996) (quoting *Green v. Mansour*, 474 U.S. 64,

68 (1985)). Congress' intent to abrogate a state's immunity from suit must be obvious from "a clear legislative statement." *Blatchford v. Native Village of Noatak and Circle Village*, 501 U.S. 775 (1991).

Here, there is no basis to find that Congress has abrogated New York's sovereign immunity through any "clear legislative statement." *Id*. Certainly the Rules Enabling Act indicates no congressional "intent to abrogate [New York's] immunity" in any manner, much less "unequivocally," *Seminole Tribe*, 517 U.S. at 55, and, in any event, it is not appropriate legislation for overriding state sovereign immunity because it was not enacted by Congress in the "exercise[e] [of] its Fourteenth Amendment enforcement powers," *Beaulieu*, 807 F.3d at 484; *see also Close v. State of N.Y.*, 125 F.3d. 31, 38 (2d Cir. 1997) (holding Congress "cannot abrogate the States' Eleventh Amendment sovereign immunity pursuant to any Article 1 power"). And there is no other federal legislation Cuomo can point to as a basis for asserting abrogation.

### 2.   *New York Has Not Waived Its Sovereign Immunity*

Any assertion that New York has waived its sovereign immunity defense by OAG's litigation conduct is wrong for multiple reasons. As a threshold matter, unlike waiver of Eleventh Amendment immunity, waiver of a state's broader common law sovereign immunity is governed by state law. *See Alden*, 527 U.S. at 757-58 (1999) (referring to state law to determine waiver of common law sovereign immunity); *Beaulieu*, 807 F3d at 484 ("The question of whether a state has waived its immunity . . . is answered, in the first instance, by reference to state law."). Under New York law, the State's sovereign immunity to suits in New York "is considered to be an issue of subject matter jurisdiction that *may not be waived*" by litigation conduct. *Milord-Francois v. New York State Off. of Medicaid Inspector Gen.*, No. 19-cv-00179, 2022 WL 10653757, at *6 (S.D.N.Y. Oct. 18, 2022) (emphasis added) (citing *Morrison v. Budget Rent A Car Sys.*, 657 N.Y.S.2d 721,

726–27 (2d Dep't 1997)).

The recent decision of the New York Court of Appeals in *Henry v. New Jersey Transit Corp.*, 39 N.Y.3d 361 (2023), did not change New York law on this point. In *Henry*, the plaintiff was injured while riding on a bus owned by defendant New Jersey Transit Corporation ("NJT") and sued NJT in New York state court. *Id*. at 365. After a jury returned a verdict in plaintiff's favor, NJT raised for the first time on appeal the defense of sovereign immunity, contending that as an arm of the State of New Jersey, it was not subject to suit in New York's courts. *Id*. The court first noted that "[s]overeign immunity encompasses three distinct concepts: the immunity that states enjoy from suits in federal courts, the immunity they enjoy from suits in other states' courts (or 'interstate sovereign immunity'), and the immunity they enjoy in their own courts." *Id*. at 368. After remarking that the case "implicated" only *interstate* sovereign immunity, the court held that such immunity "closely aligns" with personal jurisdiction and thus can be waived by litigation conduct if not preserved at trial. *Id*. at 372.

Relevant here, however, the *Henry* court distinguished cases like this one involving the immunity states enjoy *in their own courts* as opposed to interstate sovereign immunity. The court reasoned that because New York's waiver of immunity in its own courts is based on the limited subject matter jurisdiction of the Court of Claims as set forth in the Court of Claims Act, such immunity was unlike interstate sovereign immunity, where "there is no similar statutory limitation on the ability of New York courts to hear disputes involving another state." *Id*. at 373. Accordingly, *Henry* confirms that while interstate sovereign immunity is aligned with personal jurisdiction that may be waived by litigation conduct, New York's immunity to suit in New York courts is a function of subject matter jurisdiction vested in the Court of Claims pursuant to the Court of Claims Act and therefore cannot be waived by litigation conduct.

19

But even if OAG's sovereign immunity from suit in New York courts could be waived by litigation conduct (which is not the case), the facts here are easily distinguishable from *Henry* and cannot possibly support a finding of waiver. As the party seeking to enforce the Subpoena, Cuomo bears the burden of establishing waiver. *Haber v. United States*, 823 F.3d 746, 751 (2d Cir. 2016) (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). An effective waiver of sovereign immunity requires an "intentional relinquishment or abandonment of a known right or privilege." *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 682 (1999). The standard for finding waiver of a state's sovereign immunity is "stringent." *McGinty v. New York*, 251 F.3d 84, 95 (2d Cir. 2001). A state must unequivocally invoke its intention to be subject to the court's jurisdiction. *See College Savings Bank*, 527 U.S. at 676 (citing *Gunter v. Atlantic Coast Line R. Co*., 200 U.S. 273, 284 (1906) and *Pennhurst State School and Hosp.* 465 U.S. 89). And in assessing whether a state has made a knowing and intentional waiver, the Supreme Court has instructed that "every reasonable presumption against waiver" is to be indulged. *College Savings Bank*, 527 U.S. at 682 (internal quotation marks omitted).

The Second Circuit's decision in *Beaulieu* is instructive. In that case, Vermont expressly renounced in the early phases of the litigation a defense invoking the state's sovereign immunity, but then changed its position and raised the defense "more than two years after the beginning of the lawsuit" and after filing interrogatory responses. *Id*. at 482. The court nevertheless held there was *no waiver of sovereign immunity* based on Vermont's litigation conduct:

> It is true that [the state] Defendants changed their strategy and that earlier invocation of Vermont's immunity might have resulted in earlier dismissal, sparing Plaintiffs some burden and expense. But there is no record of *duplicitous conduct* by Defendants or of *serious unfairness* to Plaintiffs resulting from the tardy invocation of immunity. . . . Accordingly, we reject Plaintiffs' final argument that Defendants waived Vermont's general sovereign immunity by their litigation conduct.

*Id.* at 491 (emphasis added); *see also Gulino*, 2016 WL 7320775, at *7 ("[T]he cases involving waiver-by-litigation premise the waiver on a State actually appearing as a party and submitting its rights for judicial determination.") (collecting cases).[9]

Here, OAG's litigation conduct has been clear and consistent; at every turn OAG has objected to the enforcement of Cuomo's subpoenas seeking OAG's investigative materials based on the state's sovereign immunity, as well as other grounds. If Vermont's litigation conduct in *Beaulieu* did not result in waiver of Vermont's sovereign immunity, then *a fortiori* OAG's litigation conduct here cannot possibly result in a finding of waiver.

## II.     THE MATERIALS SOUGHT ARE IRRELEVANT AND NOT PORPORTIONAL TO THE NEEDS OF THE CASE

The materials sought by Cuomo in the Subpoena are simply not relevant to Cuomo's defense in the Trooper 1 Action as they are not tailored to Trooper 1's claims, nor are they proportional to the needs of the case. Cuomo has utterly failed to satisfy *his burden* of demonstrating the relevance and proportionality for the documents sought. Rather, Cuomo's real motive for seeking the interview memos and unredacted transcripts is to further his illegitimate purpose of attacking the Report, the witnesses who cooperated with OAG, and the Investigative Team.

### A.  The Materials Sought Have No Relevance To Trooper 1's Causes Of Action

The allegations in Trooper 1's AC, and thus Cuomo's corresponding defenses, are limited

---

[9] Consistent with *Beaulieu*, courts in other circuits routinely hold that voluntary participation in discovery does not waive sovereign immunity. *See Texas LDPC, Inc. v. Broadcom, Inc*, No. 4:22-cv-01781, 2023 WL 3293291, at *2 (S.D. Tex. May 5, 2023) (applying the holding in *Russell,* the court determined that "[p]articipating in discovery does not provide the clear, unambiguous consent to suit that is required to waive sovereign immunity); *Yul Chu v. Mississippi State Univ.*, 901 F. Supp. 2d 761, 774 (N.D. Miss. 2012) (holding no waiver despite state entity "engaging in extensive discovery"); *Adams v. Texas Comm'n on Env't Quality*, No. A-06-ca-281-SS, 2007 WL 9701381, at *1 (W.D. Tex. May 29, 2007) (finding no waiver despite a state entity "participating in discovery, depositions, and other pretrial matters"); *Lazarou v. Mississippi State Univ.*, No. 1:07-cv-00060, 2012 WL 1352890, at *5 (N.D. Miss. Apr. 17, 2012) (holding no waiver despite a state entity "engaging in extensive discovery").

to a discrete number of events that Trooper 1 herself experienced. Yet the Subpoena seeks all interview memoranda "reflecting" information "related to any witness statement of any current or former New York State Police employee, or from any of the complainants to the Report, regardless of their first-hand knowledge of Trooper 1's allegations.[10] *See* Longley Decl. Ex. 8. Moreover, Cuomo has not made even a superficial attempt to explain the relevance of the vast majority of the materials he seeks. Rather, Cuomo has made his true intentions for seeking these materials plain, admitting that he seeks discovery from OAG to relitigate the Report *See* Longley Decl. ¶¶ 42-47.

Cuomo cannot articulate how the material he seeks has any relevance to his ability to defend himself against Trooper 1's claims because they are simply not relevant. Confidential memos concerning interviews of witnesses conducted after-the-fact by OAG investigators are irrelevant to Trooper 1's allegations; they cannot impact her testimony because she has never seen them, and in any event, she will have to establish her claims through first-hand evidence. Moreover, the thoroughness of OAG's Investigation and whether or not the Report correctly concluded Cuomo engaged in sexual harassment are not relevant to Trooper 1's claims, all of which center on events that occurred before the issuance of OAG's Report in August 2021.

Further, Cuomo has the same access to information about the witnesses interviewed by OAG as Trooper 1 has and can seek to obtain their testimony if he so chooses, which would arguably at least not be hearsay like the statements of OAG investigators contained in their privileged memoranda. *See City of New York v. Blue Rage Inc.*, No. 17-cv-3480, 2018 WL

---

[10] The language in the Subpoena requesting "[a]ll documents reflecting Witness statements… including but not limited to memos…" can, in theory, arguably be read to extend to a broad swath of materials. However, based on representations made by Cuomo's counsel at the recent April 19, 2024 status conference, Cuomo is seeking through the Subpoena only interview memoranda summarizing witness statements made by those specified in sections 1.a-c of the Subpoena and unredacted transcripts of the complainants to the Report (section 2). *See* ECF No. 63, Tr. of Conference, April 19, 2024, at 15:6-18. (Cuomo's counsel describing the "universe" of documents Cuomo seeks as comprising 3 categories: (1) interview memo of Trooper 1; (2) interview memos and unredacted transcripts of all NYSP witnesses; and (3) unredacted interview transcripts and interview memoranda for all complainants to the Report).

2709203, at *2 (E.D.N.Y. June 5, 2018) ("a court must limit a party's discovery if it determines that [the material] is obtainable from some other source that is more convenient, less burdensome, or less expensive …"). The Report is not direct evidence of anything relevant to this case, and thus has no bearing on Cuomo's defense of the claims asserted against him by Trooper 1. *See id.*

It is all too obvious that Cuomo's real purpose in pursuing the materials sought in the Subpoena is to continue his attack on the Report as part of his ongoing campaign to restore his reputation. Longley Decl. ¶¶ 42-47; *see also Trooper 1 Action,* ECF No. 225, Decision and Order on Motion to de-designate discovery as confidential, at pg. 23 (Magistrate Judge Merkl March 29, 2024) ("Rather, Defendants essentially admit that they are seeking de-designation to continue their attack on the OAG investigation and in furtherance of efforts to try this case in the court of public opinion."). "[W]hen the purpose of a discovery request is to gather information for use in proceedings other than the pending suit, discovery is properly denied." *Blue Angel Films, Ltd. v. First Look Studios, Inc.*, No. 08-cv-6469, 2011 WL 830624, at *1 (S.D.N.Y. March 9, 2011). The disconnect between Cuomo's desire to obtain the materials sought for his own political motives and his need for them in defense of this particular lawsuit is evidenced by the fact that Cuomo has unsuccessfully sought these same materials on numerous occasions in many different forums, including as early as *before* the commencement of the Trooper 1 Action and the issuance of the OAG Report. Longley Decl. ¶¶ 44.[11]

### B.  Cuomo's Subpoena Imposes A Burden That Is Not Proportional To The Needs Of The Case

Rule 45(d)(3)(A)(iv) *requires* a court to quash a subpoena if it imposes an "undue burden"

---

[11] Cuomo has sought materials underlying the OAG Investigation, including the privileged interview memoranda and unredacted transcripts he now seeks, through: (i) nonparty subpoenas as defendant in another sexual harassment lawsuit (*Bennett v. Cuomo et. al.*, No. 22-cv-7846 (S.D.N.Y.); (ii) multiple written requests to OAG (Longley Decl. ¶ 44); (iii) a complaint to the Attorney Grievance Committee (*Id.*); and (iv) NY's FOIL statute *Cuomo v. OAG*, Index No. 150515/2024 (Sup. Ct. N.Y. Cnty.).

23

on the subpoena recipient. In determining if a subpoena is unduly burdensome, the reviewing court should look at a number of factors, including "relevance, the need of the party for the documents, the breadth of the document, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Ebbert v. Nassau Cty.,* No. 05-cv-5445, 2007 WL 674725, at *4 (E.D.N.Y. March 5, 2007) (*citing United States v. Int'l Bus. Mach. Corp.*, 83 F.R.D. 97, 104 (S.D.N.Y. 1979)). Courts should "accord special weight" to the burden of production on nonparties." *Id*. Here, each of these factors clearly weighs in favor of quashing the Subpoena.

As discussed more fully above, because the materials sought are of no discernable relevance to this case, any burden imposed by the Subpoena compels granting OAG's motion. *See Corbett v. eHome Credit Corp*, No. 10-cv-26, 2010 WL 3023870, at *3 (E.D.N.Y. August 2, 2010) (holding subpoena seeking information with "little apparent or likely relevance" should be quashed even where burden is not onerous). Here, the interview memoranda sought are replete with privileged and confidential information that would require resource-intensive review and redaction (*see*, *infra,* Point III); such a consumption of nonparty OAG's taxpayer-funded resources (Chun Decl. ¶ 18) is not proportional to this case given the lack of any relevance the materials have to Cuomo's defense.

A review of the remaining proportionality factors weighs against compelling OAG to comply with the Subpoena. The parties in this action have equal access to the evidence collected by OAG and thus the parties are on equal footing. Furthermore, while the allegations in the Trooper 1 Action are serious and the amount in controversy is not negligible, those factors must be weighed against the fact that the requested materials are irrelevant and thus will not assist Cuomo in his defense of the claims. Furthermore, OAG has a "serious and legitimate concern that its

24

employees and resources not be commandeered into service by private litigants to the detriment of the smooth functioning of government operations." *Solomon v. Nassau County*, 274 F.R.D. 455, 460 (E.D.N.Y. May 24, 2011). Here, the burden on the State would be enormous, both in the time and attention it would take from OAG's employees to oversee the review and production of materials, and the tax dollars that would be expended employing outside counsel to conduct the review. *See* Chun Decl. ¶ 18.

### III.    THE MATERIALS SOUGHT ARE PRIVILEGED

The materials sought in the Subpoena are privileged in their entirety, with much of their contents being protected by numerous overlapping privileges. In particular (and as discussed more fully below), all of the interview memos sought are protected from disclosure by the attorney client privilege and attorney work product doctrine, and are also covered by the law enforcement and deliberative process privileges.[12] The nature of these interlocking privileges demonstrate the compelling state interest OAG has in preserving the confidentiality of the materials sought. This stands in stark contrast to the extremely marginal relevance, if any, the materials would have to Cuomo's defense in the Trooper 1 Action.

#### A.  The Interview Memoranda Are Protected Under The Attorney Client Privilege

"The attorney client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance." *In re Cnty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007) (citation omitted). By "encourag[ing] attorneys and their clients to communicate fully and frankly," it allows the "availability of sound legal advice." *Id.* (citations omitted). This rationale "applies with special force" to the government. *Id.* at 419 (citing *In re*

---

[12] Pursuant to the Court's request and to aid the Court in its review of OAG's assertions of privilege, simultaneous with the filing of this motion, OAG is providing the Court with *in camera* submissions of exemplar interview memoranda annotated to show the specific portions of each memo that support the application of each privilege.

*Grand Jury Investigation*, 399 F.3d 527, 534 (2d Cir. 2005)). The privilege protects materials prepared in "*factual* investigations conducted or directed by an attorney" in connection with providing legal advice. *Pearlestein v. Blackberry Ltd.*, Index No. 13-cv-07060, 2019 WL 1259382, at *4 (S.D.N.Y. March 19, 2019) (emphasis added). This is because the "first step" in resolving "any legal problem is ascertaining the fact[s]" and "sifting through [them] with an eye to the legally relevant." *Upjohn Co. v. United States*, 449 U.S. 383, 390-91 (1981); *see also Spectrum Sys. Int'l Corp. v. Chem. Bank*, 78 N.Y.2d 371, 378-79 (1991) (attorney client privilege applies to "narration [that] relates and integrates the facts with the law firm's assessment of the client's legal position."). To invoke the attorney client privilege, a party "must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *In re Cnty. of Erie*, 473 F.3d at 419 (citation omitted).

Here, the circumstances giving rise to the Referral and the nature of services performed make clear that OAG engaged and deputized the Investigative Team attorneys to provide legal advice to OAG and thus their interview memoranda are absolutely privileged. *See id.;* Longley Decl.  ¶¶ 14-16, Exs. 4-5; Chun Decl. ¶14. In the context of the OAG Investigation, "the privilege [] protect[s] not only the giving of professional advice to [OAG to] act on it but also the giving of information to the [Investigative Team] to enable [them] to give sound and informed advice." *Upjohn*, 449 U.S. at 390-91. The interview memoranda were created for the primary purpose of allowing members of the Investigative Team to share information collected with other team members who were not present for those interviews. Chun Decl. ¶ 14. This sharing of information was vital for enabling the whole Investigative Team to be aware of the full set of information before deciding on future investigative steps, crafting questions to ask other witnesses, and

forming legal conclusions to be relayed to OAG, the client. *Id*; *see Pearlstein*, 2019 WL 1259382, at *4.

### B.  The Interview Memoranda Are Protected Attorney Work Product

For the same reasons the interview memoranda are protected by the attorney client privilege, they are also protected by the attorney work product doctrine. *See Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947) (acknowledging that attorney work product is reflected in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other ways). Rule 26 (b)(3) codified *Hickman* and provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial. Fed. R. Civ. P. 26(b)(3); *see also United States v. Adlman*, 134 F.3d 1194, 1198-99 (2d Cir. 1988) ("[n]othing in Rule 26(b)(3) states or suggests that documents prepared 'in anticipation of litigation' with the purpose of assisting in the making of a business decision do not fall within its scope.").

There can be no serious doubt that the interview memoranda were prepared in connection with pending or anticipated litigation. Under the "in anticipation of litigation" requirement, the question is whether "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Adlman*, 134 F.3d at 1198-99 (internal quotations and citation omitted). A party invoking the work product doctrine need not have anticipated the specific litigation in which the protection is actually invoked. *See Garrett v. Metro. Life Ins. Co.,* No. 95-cv-2406, 1996 WL 325725, at *4 (S.D.N.Y. June 12, 1996). Here, OAG and the Investigative Team reasonably anticipated litigation upon receiving the § 63(8) referral, including potential impeachment proceedings (threatened but abandoned when Cuomo resigned), litigation from the victims (as

27

came to pass), and litigation by Cuomo himself against OAG (which his counsel has acknowledged considering, and which also came to pass with Cuomo's filing of an Ethics Complaint). Chun Decl. ¶ 14; Longley Decl. ¶ 21, 23.

The Investigative Team created memoranda concerning their witness interviews, which OAG has not shared with the public or the witnesses themselves. Longley Decl. ¶ 41; Chun Decl. ¶14. The memos reflect the opinions and mental impressions of the Investigative Team as to the merits and veracity concerning witness statements and were used by the members of the Investigative Team to communicate amongst themselves relevant information gleaned from the interviews and provide advice to OAG on investigative next steps. Chun Decl. ¶ 13. OAG has taken deliberate steps to preserve privilege over these memoranda. For example, to the extent any interview memos were shared with other law enforcement entities conducting parallel investigations, they were provided subject to strict confidentiality terms to preserve OAG's privileges. Longley Decl. ¶¶ 26-29. OAG intended to keep nonpublished materials confidential and the disclosure of facts and findings in the Report does not remove the protection afforded to those confidential materials. Chun Decl. ¶ 13; *see In re General Motors LLC Ignition Switch Litigation*, 80 F. Supp. 3d 521, 528-529 (S.D.N.Y. 2015) (rejecting a claim that interview materials were not intended to be kept confidential because of a promise (and act) to disclose facts in a report).

## C. The Interview Memoranda And Unredacted Transcripts Are Protected By The Law Enforcement Privilege

### 1. *The Law Enforcement Privilege Protects The Requested Documents In Their Entirety*

Materials that could jeopardize law enforcement investigations and safety are protected from disclosure by the law enforcement privilege upon a showing that the requested documents contain information that: (1) pertain to law enforcement techniques and procedures; (2) would

undermine the confidentiality of sources; (3) would endanger witnesses and law enforcement personnel; (4) would undermine the privacy of individuals involved in an investigation; or (5) would seriously impair the ability of a law enforcement agency to conduct future investigations. *See In re The City of New York*, 607 F.3d 923, 940 (2d Cir. 2010). The privilege applies to investigative materials even when the investigation is no longer ongoing. *Id.* at 944. Where applicable, the law enforcement privilege protects from disclosure the entirety of the documents sought, not just those portions containing the information that triggers the privilege. *Id.* (noting it is entirely ineffective to attempt to discern what information would or would not lead to the identification of a witness and thus it is more prudent to withhold material covered by the law enforcement privilege in its entirety). Here, the information contained in the interview memoranda and the redacted portions of the transcripts involve one or more of the types of sensitive and personal information that satisfy the test for applying the privilege.

The Investigative Team carefully guarded the confidentiality of the interview memoranda and redacted portions of the transcripts to encourage witness cooperation as witnesses tend to be reluctant to share information if not assured of confidentiality out of fear that private information about them will become public or will be shared with the subject of the investigation, resulting in negative consequences for them or their family, including retaliation. Chun Decl. ¶ 11; Longley Decl. ¶¶ 36, 42-47. The Investigative Team communicated with over 100 witnesses whose identities are not known to the public as well as a number of on-the-record witnesses, many of whom expressed credible fears of retaliation and were hesitant to cooperate with the Investigation for fear of having their identities disclosed. Chun Decl. ¶ 11. Many cooperating witnesses requested that their identity and cooperation be protected, and they might not have cooperated as fully had they believed the substance of their information would be provided to Cuomo and his

counsel. *Id*. Disclosing the interview memoranda and unredacted portions of the transcripts would reveal the identities of nonparty confidential witnesses involved in the Investigation and invade the privacy of public and nonpublic witnesses. Longley Decl. ¶¶ 36, 39-40. Further, Cuomo has a history of making publicly damaging remarks about witnesses to the Investigation. Longley Decl. at ¶ 44-45. Even if the personal and confidential information is not directly used by Cuomo in a way to disparage or harm witnesses, the mere fact that Cuomo obtains access to this information will be a matter of public record and will send a message to future potential witnesses that the most sensitive information they provide OAG can be disclosed to the very subjects of an investigation. This could have a permanent chilling effect on witness cooperation in future OAG investigations. *Id*. ¶¶ 39-40.

Protecting the confidentiality of cooperating witnesses as well as confidential materials collected and created to further the Investigation is not only a law enforcement priority for OAG, but also is the clear legislative intent of the statute under which OAG conducted the Investigation. *See* § 63 (8); Longley Decl. ¶ 9. Section 63(8) levies a misdemeanor criminal penalty against anyone participating in an investigation conducted under this provision who discloses "the name of any witness examined or any information obtained upon such inquiry." Accordingly, the New York State Legislature, in enacting this statute, codified the very law enforcement interests asserted here by OAG, including the interest in protecting the privacy and confidentiality of witnesses who cooperate with sensitive investigations and fostering cooperation with law enforcement.

The statutory framework of § 63(8)—a provision that Cuomo himself consented to be investigated under (*See* Longley Decl. Ex. 1)—clearly prioritizes the facilitation of gathering information from witnesses for investigations and provides strong confidentiality provisions to ensure that the flow of information occurs without outside interference. Here, there is no plausible

justification to override the State's interest in protecting the privacy of cooperating witnesses to the Investigation, which would jeopardize the ability of OAG to conduct future investigations.

### 2. There Is No Compelling Reason To Override OAG's Valid Assertion Of The Law Enforcement Privilege

To defeat the assertion of law enforcement privilege, the party seeking disclosure must show that: (1) the suit is non-frivolous and brought in good faith; (2) the information sought is not available through other discovery or from other sources; and (3) there is a compelling need for the privileged information. *See City of New York*, 607 F.3d at 948; *United States v. Hossain*, No. 19-cr-606, 2021 WL 4272827, at *7 (S.D.N.Y. September 21, 2021). "In addition, the privacy interests of third parties carry great weight in the balancing of interests." *Dorsett v. County of Nassau*, 762 F.Supp.2d 500, 521 (E.D.N.Y. 2011); *Kelly v. City of New York*, No. 01-cv-8906, 2003 WL 548400, at *5 (S.D.N.Y. Feb. 24, 2003) (holding sensitive investigation records of nonparty individuals should be "guarded against disclosure that has the potential to invade their privacy and impair their personal reputations").

Weighing these factors, Cuomo cannot overcome OAG's interest in preserving the confidentiality and sensitive nature of the requested materials because there is simply no compelling need that justifies disclosing the interview memoranda or redacted portions of the transcripts. Far from establishing a "compelling need" for this material, Cuomo cannot articulate even the basic relevance of these documents because they have none (*see, supra*, Point II). Nor can Cuomo dispute that the information can be obtained through other sources. Cuomo has the full range of discovery tools at his disposal and can seek depositions of witnesses who have first-hand knowledge of the events at issue in the Trooper 1 Action whose identities are learned through the ordinary discovery process.

Nor would a protective order mitigate the harm done by disclosure of the materials sought

because it is the disclosure of the sensitive and confidential information to Cuomo himself that gives rise to the harm. *See* Longley Decl. ¶¶ 42-47; *See City of New York,* 607 F.3d at 935-937 (Holding that an "attorneys' eyes only" protective order was inadequate to safeguard privileged law enforcement material). Further, the documents cannot be redacted to satisfy the concerns underlying the law enforcement privilege because it would not be feasible to discern precisely what information can be revealed without enabling Cuomo to identify witnesses. As discussed in *City of New York*, it is entirely ineffective to attempt to discern what information would or would not lead to the identification of a witness and thus it is more prudent to withhold the entirety of a document to which the law enforcement privilege applies. *Id.* at 944. In that case, the Second Circuit held that the entirety of undercover reports were protected by law enforcement privilege and found that the District Court's attempt to redact only that information which the court believed could be used to identify undercover police officers would put the identity of the undercover officer who wrote the report in jeopardy. *Id.* ("Additionally, even the redacted documents contain some information that could disclose the identity of an NYPD undercover officer. Pulling any individual 'thread' of an undercover operation may unravel the entire 'fabric' that could lead to identifying an undercover officer.").

The logic applied by the Second Circuit applies with equal force here. It would be pure speculation to attempt to discern what information contained in the interview memoranda or redacted portions of the transcripts would or would not reveal the identity of the witness who provided that information. Further, even where Cuomo is already aware that a witness was interviewed by OAG, the disclosure of their interview memoranda would reveal to Cuomo the degree to which they cooperated, which could subject that witness to retaliation. *See* Longley Decl. ¶ 45.

**D.  The Interview Memoranda Are Protected By The Deliberative Process Privilege**

The deliberative process privilege is a subspecies of work-product that covers "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150 (1975). The privilege extends to material "prepared in order to assist an agency decision maker in arriving at [their] decision" and related to the agency's decision-making process and policies. *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.,* 421 U.S. 168, 184 (1975). Even purely factual statements that are contained in a deliberative document may be protected if those facts could reveal aspects of the deliberative process. *See Lead Industries Ass'n, Inc. v. OSHA*, 610 F.2d 70, 85 (2d Cir. 1979) ("Disclosing factual segments from the [] summaries would reveal the deliberative process of summarization itself by demonstrating which facts in the massive rule-making record were considered significant by the decisionmaker and those assisting her.")

Here, the interview memoranda are not verbatim transcripts of the Investigators' interviews with witnesses. *See* Chun Decl. ¶ 13. The information contained in the memoranda reflect the interviewing attorneys' impressions of what information was relevant and material to be culled and shared with other members of the Investigative Team and ultimately the client. *Id*. Because the memoranda reflect the distillation of information by the Investigative Team as part of the Investigation, they are protected by the deliberative process privilege. *See Color of Change v. United States Department of Homeland Security*, 325 F. Supp. 3d 447, 455 (S.D.N.Y. 2018) (holding factual portions of a draft report were deemed to be expositional of the agency's deliberative process because "[t]hey show the authors' judgment in "cull[ing] the relevant documents, extract[ing] the pertinent facts, [and] organiz[ing] them to suit a specific purpose.")

33

(citing *Nat'l Sec. Archive v. C.I.A.*, 752 F.3d 460, 463 (D.C. Cir. 2014)).

Here, disclosure of the interview memoranda would undoubtedly reveal the information the Investigators culled from their conversations with witnesses as relevant and worthy of passing on to other members of the Investigative Team. *See* Chun Decl. ¶ 13. Further, disclosing the memoranda would reveal the techniques employed by the Investigators and the focus of the Investigators, and follow-up questions would reveal the inferences they drew from witness answers. Finally, the information contained in the memoranda was directly used by the Investigative Team to form legal conclusions that were employed in OAG's Report. *Id*. The factual portions of the interview memoranda are inextricably entwined with the Investigative Team deliberative process.

In assessing the deliberative process privilege, courts consider: (1) the relevance of the material sought; (2) the availability of other evidence; (3) the seriousness of the litigation and issues involved; (4) the government's role in the litigation; and (5) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable. *See In re Franklin Nat. Bank Securities Litigation*, 471 F. Supp. 577, 583 (E.D.N.Y. 1979) (indicating courts must balance competing interests). A review of these factors weighs in favor of applying the deliberative process privilege here. As articulated more fully in Point II above, the materials sought have extremely marginal relevance, if any. The information contained in the interview memoranda can, and should, be obtained directly from witnesses identified by the parties to the Trooper 1 Action through the normal discovery process. OAG is not party to the Trooper 1 Action and has no role in it beyond this Subpoena. Finally, the ability of OAG to conduct future investigations will be seriously hampered if Investigators know that pre-decisional informational interviews with confidential sources disclosing sensitive information will be revealed. *See, supra,* Point III.C.

34

**E. The Public Interest Privilege Protects The Interview Memoranda And Unredacted Transcripts**

For the same reasons that the requested materials are protected from disclosure by law enforcement privilege, they are also protected from disclosure by the public interest privilege.

The public interest privilege attaches to "'confidential communications between public officers, and to public officers, in the performance of their duties, where the public interest requires that such confidential communications or the sources should not be divulged . . . [because] the public interest would be harmed if the material were to lose its cloak of confidentiality.'" *Woodard v. City of New York*, No. 99-cv-1123, 2000 WL 516890, at *4 (E.D.N.Y. March 10, 2020) (quoting *Cirale v. 80 Pine Street Corp*, 35 N.Y.2d 113 (1974)). To assert the public interest privilege in a federal action, a governmental entity must make a particularized showing of the public interest and privacy concerns at stake in disclosure. *See Woodward*, 2000 WL 516890, at *5; *see also Lora v. Board of Ed. Of City of New York*, 74 F.R.D. 565, 576 (E.D.N.Y. 1977).

The protection of witnesses who cooperated with OAG's Investigation and the shielding of OAG's investigative techniques clearly fall within the scope of this privilege. Section 63(8), in making it a criminal offense to disclose information obtained in an investigation, without authorization of the Governor or Attorney General, clearly demonstrates the intent of the Legislature to shield investigative materials from disclosure. *See* § 63(8). It is also manifestly in the public interest for government investigating agencies to be able to share information and materials with one another without waiving privilege or confidentiality of the shared materials. Accordingly, the public interest privilege provides an additional basis for quashing the Subpoena.

35

**CONCLUSION**

For the reasons set forth above, nonparty OAG respectfully requests that the Court grant

its motion to quash the Subpoena, and grant such other and further relief as the Court deems just

and proper.


Dated: New York, New York
        June 7, 2024


                                          Respectfully submitted,

                                          LETITIA JAMES
                                          Attorney General
                                          State of New York

                                          By:   /s/  Andrew Amer
                                          Andrew Amer
                                          Michael Jaffe
                                          James Cooney

                                          28 Liberty Street
                                          New York, NY 10005
                                          Phone: (212) 416-6127
                                          andrew.amer@ag.ny.gov

                                          Attorney for Defendant

36