UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
ANDREW M. CUOMO,

                          Plaintiff,

          -against-                                         **MEMORANDUM AND ORDER**
                                                            22-MC-3044 (LDH) (TAM)
OFFICE OF THE NEW YORK STATE
ATTORNEY GENERAL,

                          Defendant.
--------------------------------------------------------X

**TARYN A. MERKL**, United States Magistrate Judge:

Former Governor Andrew M. Cuomo seeks interview memoranda and

unredacted transcripts from an investigation conducted by the New York State Office of

the Attorney General into allegations of his involvement in sexual harassment while he

was in office. To that end, he has issued a subpoena and moved to compel compliance.

The Attorney General contends that the subpoena should be quashed because the

documents sought are protected by various privileges and because the Office of the

Attorney General enjoys sovereign immunity. For the reasons discussed herein, the

Attorney General's motion to quash is granted in part and denied in part and Cuomo's

cross-motion to compel the Office of the Attorney General is granted in part and denied

in part.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**I.  The Office of the Attorney General Investigation**

This opinion assumes general familiarity with the substance and history of this

case and the Court's prior opinions and orders, as well as the fact that the New York

State Attorney General's Office and the New York State Assembly Judiciary Committee

conducted investigations into allegations of sexual harassment by former Governor

Cuomo, resulting in public reports that were published in August 2021 and November 2021, respectively. (*See* OAG Report, ECF No. 3-10; *see also* AJC Report, *Cuomo v. New York State Assembly Judiciary Comm.*, No. 22-MC-3027, ECF No. 3-12.) Only the background relevant to the instant motion is included herein.

In December 2020 and February 2021, two women accused former Governor Cuomo of sexual harassment. (Cuomo Mot. to Compel Mem., ECF No. 2, at 3.) On March 1, 2021, then-Governor Cuomo issued a formal referral to the New York Office of the Attorney General ("OAG" or the "AG's Office") to appoint an independent law firm to investigate the claims, in accordance with New York Executive Law § 63(8). (Mar. 1, 2021 Letter, ECF No. 3-8.) On August 3, 2021, the OAG issued its report (herein the "Report"), which detailed the investigation's findings (herein the "Investigation"), and also published 111 exhibits, including approximately 400 pages of evidence. (OAG Resp. to Cuomo's Subpoena, ECF No. 3-6, at 2; *see* OAG Report, ECF No. 3-10.) The OAG Report indicates that, as part of their inquiry, the investigators "issued over 70 subpoenas for documents and other information, and received over 74,000 documents" and "interviewed 179 individuals and took testimony under oath from 41 of them." (OAG Report, ECF No. 3-10, at 15.)

Former Governor Cuomo announced his resignation one week later, on August 10, 2021, effective August 24, 2021. (Cuomo Mot. to Compel Mem., ECF No. 2, at 5.) In the meantime, between August 3, 2021, and January 20, 2022, the OAG published "more than 20 videos, 40 transcripts, and 1,000 exhibits" on its website. (OAG Resp. to Cuomo's Subpoena, ECF No. 3-6, at 2.)

## II.  The *Trooper 1* Case

On February 17, 2022, Trooper 1, a member of former Governor Cuomo's Protective Service Unit ("PSU"), initiated an action alleging that former Governor

Cuomo sexually harassed her. (*See Trooper 1 v. New York State Police*, No. 22-CV-893 (LDH) (TAM) (E.D.N.Y.) (referred to herein as "*Trooper 1*"), Compl. ("Trooper 1 Compl."), ECF No. 1.) In that case, Trooper 1 named as Defendants the New York State Police ("NYSP"), former Governor Cuomo ("Cuomo"), Melissa DeRosa ("DeRosa"), and Richard Azzopardi ("Azzopardi") (collectively referred to as "Trooper 1 Defendants"). (*See id.*; *see also* 22-CV-893, Trooper 1 First Am. Compl. ("Trooper 1 FAC"), ECF No. 7; 22-CV-893, Trooper 1 Second Am. Compl. ("Trooper 1 SAC"), ECF No. 71.)

As alleged in *Trooper 1*, Plaintiff Trooper 1 is a member of the NYSP who was on Cuomo's PSU starting in January 2018. (*See* 22-CV-893, Trooper 1 SAC, ECF No. 71, ¶¶ 3, 11, 20, 29.) Trooper 1 alleges that Cuomo sexually harassed her while he was in office. (*Id.* ¶¶ 3, 31–61, 68–74.) Of relevance here, Trooper 1 includes allegations in her second amended complaint that stem from findings reached following the OAG Investigation. For example, the *Trooper 1* second amended complaint states:

> 4. An exhaustive investigation by independent attorneys appointed by the New York State Attorney General concluded that "the Governor sexually harassed a number of current and former New York State employees by, among other things, engaging in unwelcome and nonconsensual touching, as well as making numerous offensive comments of a suggestive and sexual nature that created a hostile work environment for women." The investigation further concluded that "the Executive Chamber's culture — one filled with fear and intimidation, while at the same time normalizing the Governor's frequent flirtations and gender-based comments — contributed to the conditions that allowed the sexual harassment to occur and persist."

(22-CV-893, Trooper 1 SAC, ECF No. 71, ¶ 4.) Trooper 1's second amended complaint also includes detailed allegations regarding her experiences with Cuomo, including how he asked for her to be transferred to his detail, and her interactions with him that she claims amounted to, *inter alia*, sexual harassment and a hostile work environment. (*See id.* ¶¶ 19–61, 68–74.) In addition, Trooper 1's second amended complaint includes background allegations regarding Cuomo's harassment of other women, including

Brittany Commisso, Charlotte Bennett, Lindsey Boylan, Alyssa McGrath, Ana Liss, Kaitlin, and others. (*See id.* ¶¶ 75–143 (describing incidents of harassment).)

The claims asserted by Trooper 1, which are alleged solely on her behalf, include the following: discrimination and retaliation in violation of the Equal Protection Clause (against Cuomo in his individual capacity); discrimination and retaliation in violation of the New York State Human Rights Law ("NYSHRL") (variously alleged against the NYSP, Cuomo, DeRosa, and Azzopardi); discrimination and retaliation in violation of the New York City Human Rights Law ("NYCHRL") (variously alleged against Cuomo, DeRosa, and Azzopardi); and discrimination in violation of Title VII (against the NYSP). (22-CV-893, Trooper 1 SAC, ECF No. 71, ¶¶ 160–94.) The Honorable LaShann DeArcy Hall has dismissed the claims against DeRosa and Azzopardi, as well as the retaliation claims brought under the NYSHRL and NYCHRL against Cuomo, for failure to state a claim. *See Trooper 1 v. New York State Police*, No. 22-CV-893 (LDH) (TAM), 2024 WL 3401196 (E.D.N.Y. July 12, 2024).[1]

## III. The First Motion to Compel the OAG

On July 11, 2022, Cuomo served a Rule 45 subpoena on the AG's Office (the "July 2022 Subpoena"), seeking documents related to its Investigation and Report. (Cuomo Mot. to Compel Mem., ECF No. 2, at 2.) Specifically, the subpoena demanded, among other things, (1) all documents concerning efforts to investigate sexual harassment allegations against Cuomo before February 28, 2021; (2) all subpoenas or information requests issued by the AG's Office in connection with their investigation; (3) documents

---

[1] Trooper 1 has since sought leave to file a third amended complaint, which, if granted, would reinstate discrimination and retaliation claims against DeRosa. (*See* 22-CV-893, Mot. to Amend, ECF No. 270; 22-CV-893, Proposed Third Am. Compl., ECF No. 270-2.) Cuomo is also seeking leave to file a motion for a partial judgment on the pleadings in *Trooper 1*. (*See* 22-CV-893, Pre-Mot. Conf. Letter, ECF No. 268.)

provided to, and records of statements made to, the AG's Office by third parties, including unredacted transcripts and videos of testimony; (4) records of communications with third party witnesses or their attorneys, and all communications between the AG's Office and law enforcement, including any district attorney's office and the U.S. Department of Justice; (5) all drafts of the OAG Report; and (6) reports by OAG deputies to the Attorney General or First Deputy Attorney General on the investigation (described in Cuomo's memorandum of law as "any periodic reports summarizing the investigation"). (App. to Cuomo Mot. to Compel Mem., ECF No. 2, at 31–33; Cuomo Mot. to Compel Mem., ECF No. 2, at 2–3.) The AG's Office objected to the documents sought by the July 2022 Subpoena, leading Cuomo to file a motion to compel the OAG to provide the documents pursuant to the subpoena on October 5, 2022. (*See* Cuomo Mot. to Compel Mem., ECF No. 2, at 9; *see also* Mot. to Compel, ECF No. 1.) Following extensive oral argument on the original motion, Cuomo filed a letter indicating a willingness to "consent to narrowing" his requests. (Cuomo Letter, ECF No. 28, at 1.) On July 21, 2023, the Court denied Cuomo's motion to compel enforcement of the subpoena issued to the OAG and quashed a similar subpoena that had been issued to the New York State Assembly Judiciary Committee. (Mem. & Order, ECF No. 37.) *Cuomo v. New York State Assembly Judiciary Comm.*, 683 F. Supp. 3d 258 (E.D.N.Y. 2023) (hereinafter "*Cuomo I*").

**IV. The Motion for Reconsideration of the Court's Decision in *Cuomo I***

On July 31, 2023, Cuomo filed a motion for reconsideration of the Court's July 21, 2023 Order. (Mot. for Recons., ECF No. 41.) The OAG objected. (*See* Mem. of Law in Opp'n, ECF No. 44; Reply in Further Supp. of Mot. for Recons., ECF No. 46.) Following a status conference and further argument on the motion for reconsideration, the Court directed the parties to file a joint status report by October 10, 2023, including an update

regarding, *inter alia*, "any resolution or narrowing of the parties' disputes." (Sept. 26, 2023 ECF Min. Entry & Order.) Notwithstanding the parties' efforts and this Court's encouraging the OAG to provide documents to Cuomo voluntarily, they remained at an impasse. (*See* Joint Status Report, ECF No. 51, at 1.)

Accordingly, on November 3, 2023, the Court ordered the AG's Office to "file a document-by-document privilege log for the requested documents, pursuant to Fed. R. Civ. P. 26(b)(5)," "[i]n light of Defendant OAG's indication that the narrowed requests seek privileged material." (Nov. 3, 2023 ECF Order.) On November 17, 2023, the OAG submitted a document-by-document privilege log "detail[ing] each of the privileged documents responsive to [Cuomo]'s four narrowed requests and stat[ing] the grounds under which OAG asserts privilege over such materials." (*See* OAG Letter, ECF No. 52.) On December 12, 2023, the Court directed the OAG to "provide the Court with the following documents for *in camera* inspection: (1) the Trooper 1 interview memo; (2) the Trooper 1 testimony transcript; and (3) all other interview memos and interview summaries identified in the privilege log."[2] (Dec. 12, 2023 ECF Order.)

On March 29, 2024, the Court denied Cuomo's motion for reconsideration to the extent it was seeking to compel compliance with Cuomo's July 2022 Subpoena to the OAG. (Mem. & Order, ECF No. 57.)

## V.  The OAG's Pending Motion to Quash and Cuomo's Cross-Motion Compel

The Court later held a status conference to discuss Cuomo's narrowed discovery demands and the OAG's assertions of privilege. (*See* Apr. 19, 2024 Min. Entry & Order; Mar. 29, 2024 ECF Order.) During that conference, Cuomo agreed to withdraw the

---

[2] On August 22, 2024, in connection with the instant motions, the Court directed the OAG "to submit the remaining transcripts of testimony indicated on the privilege log." (Aug. 22, 2024 ECF Order.)

previous subpoena issued to the OAG and to issue a narrower subpoena, and the parties agreed that the original motion to quash was moot. (Apr. 19, 2024 ECF Min. Entry & Order.) On April 23, 2024, Cuomo served the narrowed subpoena (the "Subpoena") on the OAG. (Decl. of Serena Longley, ECF No. 70, ¶ 60 (hereinafter "Longley Decl.").) The Subpoena seeks two primary categories of documents. First, it seeks all documents reflecting witness statements made by: (1) Trooper 1, (2) all complainants in Trooper 1's amended complaint, and (3) "[a]ny current or former NYSP member listed in the OAG's privilege log,[] referenced by the Court's order dated December 12, 2023 at *Cuomo v. Office of the New York State Attorney General*, No. 1:22-mc-03044 (E.D.N.Y.)." (Subpoena, ECF No. 70-8, at 5.) The Subpoena also seeks "[u]nredacted transcripts of Witness testimony for all Complainants in Trooper 1's Amended Complaint." (*Id.*)

On June 7, 2024, the OAG filed the pending motion to quash. (Mot. to Quash, ECF No. 68; *see also* Mem. in Supp. of Mot. to Quash, ECF No. 69 (hereinafter "OAG Mem."); Longley Decl., ECF No. 70; Decl. of Ye Eun Charlotte Chun, ECF No. 71 (hereinafter "Chun Decl.").) Cuomo then filed a cross-motion to compel compliance with the Subpoena and in opposition to the motion to quash. (Cross-Mot. to Compel, ECF No. 75; *see also* Mem. in Supp. of Cross-Mot. to Compel & in Opp'n to Mot. to Quash, ECF No. 83 (hereinafter "Cuomo Mem.") (sealed version filed at ECF No. 82); Decl. of Theresa Trzaskoma, ECF No. 83-1 (hereinafter "Trzaskoma Decl.") (sealed version filed at ECF No. 79-2).) In response, the OAG filed a memorandum of law in further support of its motion to quash and in opposition to Cuomo's cross-motion to compel. (Mem. in Further Supp. of Mot. to Quash & in Opp'n to Cross-Mot. to Compel, ECF No. 81 (hereinafter "OAG Reply").) Lastly, Cuomo filed a memorandum in further

support of his cross-motion to compel. (Reply Mem. in Further Supp. of Cross-Mot. to Compel, ECF No. 84 (hereinafter "Cuomo Reply").)

For the reasons discussed herein, the OAG's motion to quash is granted in part and denied in part, and Cuomo's cross-motion to compel is granted in part and denied in part. As a threshold issue, the Court first finds that sovereign immunity does not provide the Attorney General with a shield from providing documents in response to the Subpoena in this case. Having conducted a review of all of the documents submitted to the Court for *in camera* inspection, however, the Court upholds the OAG's assertion that the interview memoranda are protected by the attorney-client privilege. As to the redacted transcripts, however, the AG's Office has not met its burden to establish that the redacted information is protected by the law enforcement or public interest privileges on the present record.

## DISCUSSION

### I. Sovereign Immunity

The OAG argues that sovereign immunity protects it from the Subpoena and any motion to compel compliance with the Subpoena. In the Court's original decision denying the motion to compel, the Court declined to reach this issue. First, the Court concluded that since the question of sovereign immunity is a waivable defense that does not go to the Court's Article III authority, state sovereign immunity did not need to be addressed as a threshold matter. *Cuomo I*, 683 F. Supp. 3d at 280–82; *see Calderon v. Ashmus*, 523 U.S. 740, 745 n.2 (1998) ("While the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power, and therefore can be raised at any stage of the proceedings, we have recognized that it is not coextensive with the limitations on judicial power in Article III."). In addition, the Court observed that "Respondents' argument that the state is immune from federal subpoenas presents

8

a novel and complex question of constitutional law," and given the ample bases for denying Cuomo's original motion to compel, determined that the constitutional question did not need to be reached. *Cuomo I*, 683 F. Supp. 3d at 282 (quoting *Hutchinson v. Proxmire*, 443 U.S. 111, 122 (1979), for the proposition that "[o]ur practice is to avoid reaching constitutional questions if a dispositive nonconstitutional ground is available").

The Court now concludes that sovereign immunity does not provide the OAG with protection from being required to respond to a subpoena in the context of this case, which involves discovery sought for a suit brought under Title VII of the Civil Rights Act involving allegations arising out of a complainant's state employment.[3]

## A. Legal and Historical Background

Commentators have described the case law concerning the Eleventh Amendment and state sovereign immunity as "tortuous,"[4] "confusing,"[5] and, as Dean Erwin Chemerinsky has described it, "conflicting and inconsistent as the Court has struggled to articulate a standard that protects state autonomy while still ensuring state compliance with federal law."[6] The tension between state autonomy and the effective enforcement and adjudication of alleged violations of federal law permeates the dispute presented by the subpoenas in this case.

---

[3] Finding that the OAG is not protected from the Subpoena by state sovereign immunity, the Court need not reach Cuomo's argument that the OAG has waived its immunity claim. (*See* Cuomo Mem., ECF No. 83, at 16–19.) *Cf. Bennett v. Cuomo*, No. 22-CV-7846 (VSB) (SLC), 2024 WL 2963714, at *15–18 (S.D.N.Y. June 12, 2024) (concluding that OAG had not waived its sovereign immunity under very similar circumstances to this case).

[4] John R. Pagan, *Eleventh Amendment Analysis*, 39 Ark. L. Rev. 447, 449 (1986).

[5] John J. Gibbons, *The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation*, 83 Colum. L. Rev. 1889, 1891 (1983).

[6] Erwin Chemerinsky, *Federal Jurisdiction* at 446 (8th ed., 2021).

As discussed above, in the underlying case for which Cuomo seeks discovery, Trooper 1 alleges claims brought under Title VII of the Civil Rights Act of 1964, a supremely important federal law. At the time of her alleged harassment, Trooper 1 was employed by the New York State Police, a state entity, and was, she claims, harassed by the then-Governor, Andrew Cuomo, who was serving as the Chief Executive of the State of New York. Former Governor Cuomo is, however, no longer employed by the state. At the same time, Cuomo contends that the Office of the Attorney General, an arm of the state, possesses documents that are relevant to the *Trooper 1* case. At its core, the question presented in this case can be simply stated: Where a party in a Title VII case seeks documents related to alleged violations of the Civil Rights Act that occurred during state employment, but the state entity in possession of the documents is not a party to the lawsuit, does sovereign immunity preclude a federal document subpoena to the state entity that holds the documents?

The answer is no.

## B. Civil Suits and Sovereign Immunity

It is well established that "there are two types of [state] sovereign immunity" — "Eleventh Amendment immunity from suit in federal court" and states' "broader sovereign immunity . . . against *all* private suits, whether in state or federal court." *Beaulieu v. Vermont*, 807 F.3d 478, 483 (2d Cir. 2015) (quotation marks omitted) (emphasis in original). The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const., amend. XI.

At its core, the Eleventh Amendment provides "immunity of a state's treasury from claims for damages brought by private entities in federal courts." *Beaulieu*, 807

F.3d at 483 (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996)). "Although the Amendment, by its terms, bars only federal suits against state governments by citizens of another state or foreign country, it has been interpreted also to bar federal suits against state governments by a state's own citizens." *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006); *accord Vega v. Semple*, 963 F.3d 259, 281 (2d Cir. 2020); *see also Hans v. Louisiana*, 134 U.S. 1, 13 (1890) ("'It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent.'" (quoting The Federalist No. 81 (Alexander Hamilton))).

Although the Supreme Court has "recognized that the States' sovereign immunity is not limited to the literal terms of the Eleventh Amendment," the Supreme Court has concluded that state sovereign immunity is not absolute and that states "may still be bound by some [federal] judicial actions without their consent." *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 446 (2004); *see id.* at 448 (discussing the longstanding precedent that states "are bound by a bankruptcy court's discharge order" regardless of whether they choose to participate in federal bankruptcy proceedings); *see also California v. Deep Sea Rsch., Inc.*, 523 U.S. 491, 494–95 (1998) (holding that state sovereign immunity does not bar federal jurisdiction over *in rem* admiralty actions involving a state when the state does not possess the property at issue).

It is also clear that although states "did not consent to become mere appendages of the Federal Government," upon ratification of the Constitution, states "did surrender a portion of their inherent immunity by consenting to suits brought by sister States or by the Federal Government." *Fed. Mar. Comm'n v. South Carolina State Ports Auth.*, 535 U.S. 743, 752 (2002). Further inherent in that surrender of a portion of their sovereign immunity, by ratifying the Constitution, states unequivocally consented to federal court jurisdiction for certain types of suits. *See* U.S. Const. Art. III, § 2. In evaluating whether

11

state sovereign immunity protects a state from being required to participate in federal court proceedings as to which it is not a party, the Supreme Court has "applied a presumption since *Hans v. Louisiana*, 134 U.S. 1 (1890), 'that the Constitution was not intended to "rais[e] up" any proceedings against the States that were "anomalous and unheard of when the Constitution was adopted."'" *Tenn. Student Assistance Corp.*, 541 U.S. at 452 (quoting *Fed. Mar. Comm'n*, 535 U.S. at 755 (quoting *Hans*, 134 U.S. at 744)). Phrased another way, the Supreme Court has observed that "we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms." *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779 (1992).

In evaluating our constitutional structure, the Supreme Court has expressly held that "the Eleventh Amendment, and the principle of state sovereignty which it embodies, see *Hans v. Louisiana*, 134 U.S. 1 (1890), are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment." *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). Accordingly, the Supreme Court has thus far concluded that there are "two circumstances in which an individual may sue a State." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999). They are:

> First, Congress may authorize such a suit in the exercise of its power to enforce the Fourteenth Amendment — an Amendment enacted after the Eleventh Amendment and specifically designed to alter the federal-state balance. *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976). Second, a State may waive its sovereign immunity by consenting to suit. *Clark v. Barnard*, 108 U.S. 436, 447–448 (1883).

*Id.* In *Fitzpatrick*, the Supreme Court explained the reasons for this rule as follows:

> When Congress acts pursuant to § 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on state authority. We think that Congress may, in determining what is "appropriate legislation" for the purpose of enforcing the provisions of

12

the Fourteenth Amendment, provide for private suits against States or
state officials which are constitutionally impermissible in other contexts.

*Fitzpatrick*, 427 U.S. at 456. Accordingly, when confronted with the question of whether
Congress could use its § 5 power to abrogate state sovereign immunity to hold states
liable under Title VII of the Civil Rights Act of 1964, the Supreme Court answered that
question in the affirmative. *Id.* Given the Supreme Court's clear holding in *Fitzpatrick*
that, with the passage of Title VII, Congress abrogated sovereign immunity such that a
state may be *sued*, this Court concludes that federal court jurisdiction must also extend
to issuing and enforcing a *subpoena* in a case brought under Title VII that involves state
employment. Without enforcement authority to procure needed non-party documents
and evidence held by state entities, courts could effectively be left without the ability to
preside over cases that the Supreme Court has already held are within the federal
courts' power. This would create an entirely untenable situation, as discussed further
below.

The Second Circuit has observed that there are "two purposes underlying the
Eleventh Amendment — protection against state liability and respect for state
sovereignty." *Mancuso v. New York State Thruway Auth.*, 86 F.3d 289, 296 (2d Cir. 1996).
The case law makes clear, however, that the doctrine of sovereign immunity provides
greater protection against infringement on a state's treasury than prospective relief
directing a state (or state actor) to act. This distinction is apparent from *Edelman v.
Jordan*, 415 U.S. 651 (1974), *Ex parte Young*, 209 U.S. 123 (1908), and *Quern v. Jordan*, 440
U.S. 332 (1979). *See Quern*, 440 U.S. at 337, 346 (observing that "[t]he distinction between
that relief permissible under the doctrine of *Ex parte Young* and that found barred in
*Edelman* was the difference between prospective relief on one hand and retrospective
relief on the other" and concluding that requiring a state to send out a notice to

13

individuals who may have been owed money by the state was not violative of the Eleventh Amendment in part because "this relief falls on the *Ex parte Young* side of the Eleventh Amendment line rather than on the *Edelman* side").[7]

As set forth above, the Attorney General argues that enforcement of the subpoena is "barred by OAG's sovereign immunity under the Eleventh Amendment and at common law."[8] (OAG Mem., ECF No. 69, at 8.) The OAG further argues that this Court is bound to extend the rationale of a Second Circuit case discussed below, *U.S. E.P.A. v. Gen. Elec. Co.*, 197 F.3d 592, 597 (2d Cir. 1999) (hereinafter "*U.S. E.P.A.*"), in which the court found a federal subpoena to a federal agency barred by *federal* sovereign immunity, to conclude that the Subpoena here is barred by *state* sovereign immunity. (OAG Mem., ECF No. 69, at 9–13.) This argument, however, rests on the incorrect premise that federal and state sovereign immunity are the same. As *Fitzpatrick* made clear, that assumption does not hold when Congress acts under its Section 5 powers as it did in enacting Title VII, the basis for Trooper 1's lawsuit. In addition, as the Seventh Circuit has observed, providing documents in the state's possession during

---

[7] At the same time, contrary to Cuomo's argument, *Ex parte Young* does not provide authority for district courts to enforce a federal subpoena. *See Bennett*, 2024 WL 2963714, at *12– 13 (discussing inapplicability of *Ex parte Young* to a Rule 45 subpoena and motion to compel). (*See* Cuomo Mem., ECF No. 83, at 24–25.)

[8] The OAG also acknowledges in its brief that "parties may sue states and obtain discovery of state files under federal statutes that abrogate state sovereign immunity, such as Title II of the Americans with Disabilities Act or the Voting Rights Act." (OAG Mem., ECF No. 69, at 16.) It is unclear from the OAG's brief whether the AG's Office is thus conceding that the federal courts may require the production of documents and evidence in cases brought under these laws when the state or state entity in possession of the information sought via subpoena is not a party.

federal discovery does "not compromise state sovereignty to a significant degree." *Barnes v. Black*, 544 F.3d 807, 812 (7th Cir. 2008).[9]

Accordingly, the Subpoena in this case is not barred by sovereign immunity due to Congress's abrogation of state sovereignty in cases brought under Title VII of the Civil Rights Act.

### C. Civil Document Subpoenas and Sovereign Immunity

On the much more abstract and vexing question of whether states have sovereign immunity from a federal subpoena more broadly, the Supreme Court and the Second Circuit have not weighed in and the Court has found no case law examining the precise question at issue in this case.[10] The Court also finds the historical record to be lacking as to whether the framers would have found compliance with a subpoena to be

---

[9] The Court notes that the conclusion that sovereign immunity does not apply is not dispositive of whether a state must actually respond to a subpoena in light of the many privileges that state government officials and entities enjoy, as discussed *infra* and in *Cuomo I*, in which the Court previously quashed a subpoena issued by Cuomo to the New York State Assembly Judiciary Committee on legislative privilege grounds. *Cuomo v. New York State Assembly Judiciary Comm.*, 683 F. Supp. 3d 258 (E.D.N.Y. 2023). Participating in federal proceedings as a non-party to determine relevance, scope, and whether state-entity-held materials are subject to disclosure is not so burdensome as to cause the state to suffer a constitutionally cognizable indignity. The Court of course acknowledges that two courts in our Circuit recently came to a different conclusion on this question. *See Felix v. County of Nassau*, 344 F.R.D. 441 (E.D.N.Y. 2023); *Bennett*, 2024 WL 2963714 (examining historical evidence and case law and concluding that a subpoena issued to the OAG by Cuomo in another lawsuit against him by a different plaintiff was barred by sovereign immunity in the absence of waiver (discussing *U.S. E.P.A. v. Gen. Elec. Co.*, 197 F.3d 592 (2d Cir. 1999))). For the reasons discussed herein, this Court respectfully reaches the conclusion that the Subpoena at issue *in this case* is not barred by sovereign immunity.

[10] Notably, it is well settled in the criminal context that "the public has a right to every man's evidence." *Trump v. Vance*, 591 U.S. 786, 791 (2020) (quotation marks omitted); *see also Trump v. United States*, ___ U.S. ___, 144 S. Ct. 2312, 2330 (2024) (observing that "when prosecutors have sought evidence from the President, we have consistently rejected Presidential claims of absolute immunity"). Since the time of the founding fathers, even "Presidents have uniformly testified or produced documents in criminal proceedings when called upon by federal courts." *Trump v. Vance*, 591 U.S. at 791. Although certainly not controlling of the issue before the Court, it is instructive that the federal *President* does not enjoy absolute immunity from a federal subpoena.

"anomalous and unheard of when the Constitution was adopted." *Tenn. Student Assistance Corp.*, 541 U.S. at 452 (quotation marks omitted).

> 1.    *The Current Legal Landscape*

As an initial matter, the Court recognizes that, in the context of a civil subpoena to a federal agency, the Second Circuit has held that the doctrine of *federal* sovereign immunity prohibits a federal court from enforcing a subpoena against a federal agency because doing so would compel it to act. *In re S.E.C. ex rel. Glotzer*, 374 F.3d 184, 190 (2d Cir. 2004) (citing *U.S. E.P.A.*, 197 F.3d at 597). In reaching this conclusion in *U.S. E.P.A.*, the Circuit relied upon *Dugan v. Rank*, in which the Supreme Court observed that "a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration . . . or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." 372 U.S. 609, 620 (1963) (quotation marks and citation omitted); *see U.S. E.P.A.*, 197 F.3d at 597. The Second Circuit has not, however, extended *U.S. E.P.A.* to *states* seeking to assert sovereign immunity in response to a federal civil subpoena and, to this Court's knowledge, no court has considered how the abrogation of state sovereign immunity that was recognized in *Fitzpatrick* with the passage of the Civil Rights Act would impact the analysis in a case involving a Title VII claim arising out of state employment.

The circuits that have considered the issue of state sovereign immunity in the context of a federal discovery subpoena are split. The First, Seventh, and Eighth Circuits have held that sovereign immunity does not shield state officials from document production in federal discovery. For example, in *U.S. Dep't of Just. v. Ricco Jonas*, 24 F.4th 718, 726 (1st Cir. 2022), the First Circuit "rejected the invitation by state officers to blur the distinction between state officers and the states" and observed that "courts have validated the service of process to state officers for the production of documents or

16

objects in their possession or control as persons independent of the states, and regardless of whether the states elect to defend on behalf of their officers."[11] *See also Barnes*, 544 F.3d at 812 (observing that an order commanding a "state official who is not a party to a case between private persons to produce documents in the state's possession during the discovery phase of the case" does "not compromise state sovereignty to a significant degree" and that ordering the state to produce to court a person incarcerated by the state on a writ *ad testificandum* would not violate the Eleventh Amendment); *In re Missouri Dep't of Nat. Resources*, 105 F.3d 434, 436 (8th Cir. 1997) (hereinafter "*In re Missouri*") (holding that state "[g]overnmental units are subject to the same discovery rules as other persons and entities having contact with the federal courts"). And in *In re Missouri*, decided almost 30 years ago, the Eighth Circuit observed: "There is simply no authority for the position that the Eleventh Amendment shields [state] government entities from discovery in federal court." *In re Missouri*, 105 F.3d at 436.[12]

---

[11] The Court notes that the Subpoena here is directed to the Office of the Attorney General, not Attorney General Letitia James or any specific official. Given that this is not a case where *Ex parte Young* squarely applies, and in light of the fact that government offices may only operate through their officials, whether a subpoena is to a specific official or the office itself is a distinction without a constitutional difference in this Court's view. Whether analyzed as a subpoena to Ms. James or a subpoena to the AG's Office, the Court reaches the same conclusion with respect to sovereign immunity. (*Cf.* OAG Mem., ECF No. 69, at 14 (arguing that *Ex parte Young* does not apply because, among other reasons, the subpoena is to the OAG, not "an individual acting in his or her official capacity").)

[12] Following the Eighth Circuit's conclusion in *In re Missouri Dep't of Nat. Resources*, 105 F.3d 434, 436 (8th Cir. 1997), that there is no authority shielding state entities from federal court discovery, the Eighth Circuit decided *Alltel Communications v. DeJordy*, 675 F.3d 1100, 1105 (8th Cir. 2012), in which the court held that tribal immunity barred enforcement of a federal discovery subpoena, finding that it constituted a "'suit' that is subject to Indian tribal

Most recently, the Fifth Circuit found that sovereign immunity shielded non-party state judges, who had previously been named as defendants, from having to respond to discovery subpoenas. *See Russell v. Jones*, 49 F.4th 507, 513 (5th Cir. 2022). The context of the underlying lawsuit in *Russell* presents a unique set of facts. In a nutshell, the plaintiffs had "sued Harris County and its Sheriff to enjoin enforcement of Harris County's allegedly unconstitutional felony-bail system." *Id.* at 510. In connection with that case, the "plaintiffs served *subpoenas duces tecum* on county district judges . . . seeking information about their roles in creating and enforcing Harris County's bail schedule." *Id.* Under those circumstances, the Fifth Circuit found that sovereign immunity protected the judges from participating in discovery. In *Russell*, the Fifth Circuit also discussed *Bonnet v. Harvest (U.S.) Holdings, Inc.*, 741 F.3d 1155 (10th Cir. 2014), in which the Tenth Circuit found that tribal sovereign immunity protected the tribe from a subpoena *duces tecum*. *See id.* at 1159 (observing that "interpreting the term suit broadly comports with the core notion of sovereign immunity that in the absence of governmental consent, the courts lack jurisdiction to restrain the government from acting, or to compel it to act" (quotation marks and modification omitted)). Although there is no doubt that receiving and complying with a subpoena requires the respondent to act, that is not the end of the inquiry in this Court's view.

---

immunity." The Eighth Circuit expressly observed that "tribal immunity, a federal common-law doctrine, may well confer greater immunity than that enjoyed by federal officers and agencies, or by the States, whose sovereign immunity is protected by the Eleventh Amendment." *Alltel*, 675 F.3d at 1104. The Fifth Circuit has suggested that, with *Alltel*, *In re Missouri* has been called into question. *See Russell v. Jones*, 49 F.4th 507, 518 n.12 (5th Cir. 2022). That is far from clear, however, given the Eighth Circuit's express discussion of its prior precedent and the fact that the *Alltel* court purposefully distinguished state sovereign immunity from tribal immunity, which have different origins. *Alltel*, 675 F.3d at 1104.

2. *Historical Considerations*

As framed by the Supreme Court, the relevant question is not whether the federal courts possess the authority to require the states to act (which the federal courts clearly do); the question is whether the action the court is requiring would have been "anomalous and unheard of when the Constitution was adopted." *Tenn. Student Assistance Corp.*, 541 U.S. at 452 (quotation marks omitted). But here, we run into a problem. As Justice Amy Coney Barrett observed recently in the context of a case looking to historical precedent to interpret the contours of the Second Amendment, the usage of historical evidence can present a challenge: "One difficulty is a level of generality problem: Must the government produce a founding-era relative of the challenged regulation — if not a twin, a cousin? Or do founding-era gun regulations yield concrete principles that mark the borders of the right?" *United States v. Rahimi*, ___ U.S. ___, 144 S. Ct. 1889, 1925 (2024) (Barrett, J., concurring).

In evaluating the historical foundation for whether a state should respond to a subpoena, what evidence is the Court to consider, and need any historical evidence be precisely on point? As to the latter possibility, the Court posits that such a requirement would be near-impossible because, at least in this Court's view, the degree of involvement by the states in citizens' everyday lives and the resultant volume of records and documents held by state-controlled entities would have been almost unfathomable at the time the Constitution was ratified. In addition, that approach fails to consider the context in which a subpoena is sought and whether the requested documents or evidence are needed in connection with a suit as to which Congress and the Supreme Court have recognized federal court jurisdiction or an abrogation of state sovereign immunity. Indeed, as the Supreme Court very recently observed, in

interpreting the Constitution and its amendments, the law is not "trapped in amber."

*Rahimi*, ___ U.S. ___, 144 S. Ct. at 1897.

At the highest level of generality, one of the questions presented by this case is whether a subpoena is akin to a "suit" and thus barred by sovereign immunity under the Eleventh Amendment and the states' residual sovereign immunity. There is little question in this Court's mind that the framers of the Constitution and ratifiers of the Eleventh Amendment had a clear understanding of the distinction between a suit and a subpoena. It is generally accepted that use of the word subpoena as a form of court process dates back to the 14th century Court of Chancery, having been devised by John Waltham, who served as bishop of Salisbury and chancellor to King Richard II. *See* III William Blackstone, Commentaries, *51–52. Subpoenas *ad testificandum* and subpoenas *duces tecum* were later used in England to secure the testimony of witnesses or to require them to produce documents, respectively. As Blackstone observed, with respect to documents "[i]n the hands of third persons they can generally be obtained by rule of court, or by adding a clause of requisition to the writ of subpoena, which is then called a subpoena *duces tecum*." *Id.* at *382; *see also id.* at *369 (discussing subpoenas *ad testificandum*). Significantly, Blackstone's discussion of these two types of subpoenas provides explanation and context for how trials proceed; in Blackstone's commentary, a subpoena is clearly described as a mechanism for obtaining needed evidence for a case where the evidence was held by a third party, and not equivalent to a lawsuit or trial itself. *See id.* at *382; *see generally id.* at *349–385 (Chapter XXIII, Of the Trial by Jury). Further evidence that the Constitution's framers distinguished between suits and subpoenas *duces tecum* specifically may be found in the case involving Aaron Burr. As the Fifth Circuit observed in *Russell*, in *United States v. Burr*, Aaron Burr "moved for a *subpoena duces tecum* ordering President Jefferson to produce his correspondence,"

20

which motion was granted. *Russell*, 49 F.4th at 519. In *Russell*, the Fifth Circuit found that this provided some evidence for the position that sovereign immunity does not apply to third-party federal subpoenas, but ultimately determined that it was not "enough to tip the scales" in favor of the conclusion that sovereign immunity did not bar the third-party subpoenas at issue in that case. *Id.* (citing *United States v. Burr*, 25 F. Cas. 30, 32, 34 (C.C.D. Va. 1807)).

Notwithstanding the subpoena *duces tecum* in *Burr*, the Fifth Circuit concluded that history did "not disturb" its conclusion that sovereign immunity applied to the subpoenas issued to the state judges in *Russell*. *Russell*, 49 F.4th at 519. At the same time, however, the *Russell* decision did not rest on historical precedent indicating that sovereign immunity necessarily bars a subpoena to a state or state official. *See id.* In his brief, Cuomo marshals examples in support of the conclusion that historical case law permits the service of a subpoena on governmental entities. (*See* Cuomo Mem., ECF No. 83, at 20–21 (citing *United States v. Caldwell*, 2 U.S. 333, 334, footnote (1795) (observing, in a case where two county judges were subpoenaed, that "[t]he law operates equally upon all; the high and low, the rich and poor. If we issue a subpoena to a Justice or a Judge, and it is not obeyed, we should be more strict in our proceedings against such characters"); *Winn v. Patterson*, 34 U.S. 663 (1835) (discussing the "common practice" of producing documents from a governmental entity with a subpoena *duces tecum*); *Polk's Lessee v. Wendell*, 19 F. Cas. 940, 941 (C.C.D. Tenn. 1817) (Todd, C.J.) (suggesting that records could be obtained from North Carolina with a subpoena *duces tecum*), *rev'd on other grounds,* 18 U.S. 293 (1820)).) *But see Russell*, 49 F.4th at 513–14 (collecting cases including, *inter alia*, *Ex parte Ayers*, 123 U.S. 443, 505 (1887) and *The Siren*, 74 U.S. (7 Wall.) 152, 154 (1868)). Having reviewed the available cases, the historical practice is, unfortunately, less than clear — as are many questions when examining the Eleventh

Amendment. *See, e.g., Welch v. Tex. Dep't of Highways and Public Transp.*, 483 U.S. 468, 483–84 (1987) (observing, as to the question of whether state sovereign immunity bars federal jurisdiction in federal question cases, that "the historical materials show that — to the extent this question was debated — the intentions of the Framers and Ratifiers were ambiguous").

Given the long common law tradition of acquiring evidence via subpoena and precedent dating from between the late 1700s and early 1800s that discuss subpoenas directed at governmental officials that were utilized by our earliest courts, the Court finds that the historical evidence suggests that issuance of a subpoena to a state official would not have been "anomalous and unheard of when the Constitution was adopted." *Tenn. Student Assistance Corp.*, 541 U.S. at 452 (quotation marks omitted).

### 3. *Additional Considerations*

The Court has grave concerns about the rule the OAG would have this Court adopt. Absolute sovereign immunity for states from federal court subpoenas could lead to truly absurd results. If the Court were to adopt the rule espoused by the Attorney General, it would be up to the states to decide whether to produce documents and evidence to the federal courts in cases where the state entity controlling those documents is a non-party, with no check by the federal court that is adjudicating the underlying suit. From records generated by state-run colleges and universities, to employment records for state employees, to documents generated by state entities related to redistricting every ten years following the national census, to documents touching upon state environmental enforcement, to documents pertaining to the operation of state hospitals, prisons, and other facilities, to physical evidence held by state-level investigators that is needed in a case alleging a former state official's official misconduct under § 1983, the list of documents and evidence that could be precluded

from federal discovery if held in the hands of a non-party state actor goes on and on. *See, e.g., Allen v. Woodford*, 544 F. Supp. 2d 1074, 1079 (E.D. Cal. 2008) (observing that the recognition of state sovereign immunity as a bar to federal subpoenas would "mean that a plaintiff who sues a state official in his individual capacity, a lawsuit specifically authorized by the United States Supreme Court, will never be able to prove his or her case, if any required proof is in the hands of the State's custodian of records"). As the court in *Allen* succinctly stated: "Such a result is ludicrous." *Id.*

These concerns are not hypothetical. *See, e.g., Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, No. 11-CV-5065 (JDT), 2011 WL 4837508 (N.D. Ill. Oct. 12, 2011) (regarding a challenge to Illinois's congressional district map, plaintiffs served subpoenas on various non-parties, including the Illinois House of Representatives and the state Senate and House redistricting committees); *Baldus v. Brennan*, No. 11-CV-562 & 11-CV-1011 (JPS) (DPW), 2011 WL 6122542 (E.D. Wis. Dec. 8, 2011) (concerning challenges to the Wisconsin state redistricting plan, plaintiffs served third-party subpoenas on a lawyer hired by the Wisconsin Legislature as a consulting expert and a legislative aide to a Wisconsin State Senate Majority Leader), *order clarified*, 2011 WL 6385645 (E.D. Wis. Dec. 20, 2011); *see also Allen*, 544 F. Supp. 2d 1074 (denying reconsideration of magistrate judge's conclusion that state sovereign immunity did not bar a subpoena for records sought from state agencies and officials in connection with § 1983 suit arising out of the plaintiff's claim that her constitutional rights were violated when state officials permitted "improper, medically unnecessary and invasive surgery without her authorization" while she was incarcerated, *Allen v. Woodford*, 543 F. Supp. 2d 1138, 1140 (E.D. Cal. Feb. 20, 2008)); *Charleston Waterkeeper v. Frontier Logistics, L.P.*, 488 F. Supp. 3d 240 (D.S.C. 2020) (finding that the doctrine of state sovereign immunity did not preclude a third-party federal subpoena to a state agency seeking documents

relating to the release of plastic pellets into the environment); *Ali v. Carnegie Inst. of Washington*, 306 F.R.D. 20, 30 n.8 (D.D.C. 2014) (rejecting proposition that state sovereign immunity would affect "a sovereign's obligation to respond to a subpoena" in suit concerning ownership of patents co-owned by a public state institution of higher education (the University of Massachusetts)); *Wilson v. Venture Fin. Grp., Inc.*, No. C09-6768BHS, 2010 WL 4512803 (W.D. Wash. Nov. 2, 2010) (ordering the state of Washington to comply with a third-party subpoena in case challenging the handling of retirement accounts held for the plaintiff's benefit over the state's sovereign immunity objection); *Arista Records LLC v. Does 1–14*, No. 7:08-CV-00205, 2008 WL 5350246 (W.D. Va. Dec. 22, 2008) (denying motion to quash subpoenas for documents to a state university finding that the Eleventh Amendment does not apply to the subpoenas at issue).

In light of the complexity and importance of the constitutional issues here, the Court need not and does not purport to determine the breadth and scope of the federal courts' subpoena enforcement authority against states and state actors. But this Court remains unconvinced that responding to a subpoena is such an affront to state dignity that federal civil discovery subpoenas are barred by state sovereign immunity across the board. *But see Bennett v. Cuomo*, No. 22-CV-7846 (VSB) (SLC), 2024 WL 2963714, at *9–12 (S.D.N.Y. June 12, 2024); *Felix v. County of Nassau*, 344 F.R.D. 441, 444–46 (E.D.N.Y. 2023). This is especially true if the matter under consideration in the federal case is of federal significance, such as enforcement of the federal civil rights laws or federal court actions concerning state redistricting or voting rights — matters that go to the very heart of whether our Republic can function in accordance with its constitutional design. In addition, as noted above, *supra* note 9, the conclusion that sovereign immunity does not apply does not suggest that the state is then bound to respond to federal subpoenas

24

if there is a proper legal basis to object, whether that objection is grounded on relevance, proportionality, privilege, or any other valid ground to move to quash. For all of these reasons, the Court finds that state sovereign immunity does not bar Cuomo's subpoena to the New York State Office of the Attorney General.

## II. Motion to Compel & Motion to Quash

### A. Legal Standard

Under Federal Rule of Civil Procedure 45(d)(2)(B)(i), a party who has properly served a subpoena "may move the court for the district where compliance is required for an order compelling production or inspection." Fed. R. Civ. P. 45(d)(2)(B)(i); *see, e.g.*, *Gov't Emps. Ins. v. Dinesh Verma Med., P.C.*, No. 22-CV-2893 (GRB) (JMW), 2023 WL 2771638, at *1 (E.D.N.Y. Apr. 3, 2023). Conversely, "[a] party whose personal rights are implicated by a subpoena may move to quash . . . the subpoena if, *inter alia*, it 'requires disclosure of privileged . . . matter, if no exception or waiver applies.'" *Bennett v. Cuomo*, No. 22-CV-7846 (VSB) (SLC), 2024 WL 80271, at *3 (S.D.N.Y. Jan. 8, 2024) (quoting Fed. R. Civ. P. 45(d)(3)(A)(iii)). A party moving to quash a subpoena on the grounds that privilege prevents disclosure "bears the burden of establishing its applicability to the case at hand." *Id.* (quotation marks omitted); *see In re Grand Jury Subpoenas Dated March 19, 2002 & August 2, 2002*, 318 F.3d 379, 384 (2d Cir. 2003); *Silverstone Holding Grp., LLC v. Zhongtie Dacheng (Zhuhai) Inv. Mgt. Co., Ltd.*, 650 F. Supp. 3d 199, 203 (S.D.N.Y. 2023) ("The burden of persuasion in a motion to quash a subpoena issued in the course of civil litigation is borne by the movant." (quotation marks and alterations omitted).)

"Motions to compel and motions to quash a subpoena are both 'entrusted to the sound discretion of the district court.'" *In re Fitch Inc.*, 330 F.3d 104, 108 (2d Cir. 2003) (quoting *United States v. Sanders*, 211 F.3d 711, 720 (2d Cir. 2000)). A magistrate judge's rulings on discovery matters are reviewed under a "highly deferential" standard "as

magistrate judges are 'afforded broad discretion in resolving discovery disputes and reversal is appropriate only if their discretion is abused.'" *Best Payphones, Inc. v. Dobrin*, 409 F. Supp. 3d 130, 134 (E.D.N.Y. 2018) (quoting *McNamee v. Clemens*, No. 09-CV-1647 (SJ) (CLP), 2014 WL 1338720, at *2 (E.D.N.Y. Apr. 2, 2014)); *see also* Fed. R. Civ. P. 72(a) (providing that district courts may modify or set aside any part of a non-dispositive pre-trial order issued by a magistrate judge that is "clearly erroneous or is contrary to law"). "A court abuses its discretion when its decision rests on an error of law or on a clearly erroneous factual finding, or when its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) (quotation marks, modification, and citations omitted).

*   *   *   *   *

In moving to quash, the AG's Office argues that the interview memoranda are protected by the attorney-client privilege, the work product doctrine, the law enforcement privilege, the deliberative process privilege, and the public interest privilege. (*See* OAG Mem., ECF No. 69.) As to the unredacted transcripts, the OAG contends that the redacted material is protected by the law enforcement and public interest privileges. For the following reasons, the Court grants the OAG's motion to quash the Subpoena in part and denies it in part. For the same reasons, the Court grants Cuomo's motion to compel in part and denies it in part.

## B. Attorney-Client Privilege

The Court first turns to the question of whether the interview memoranda are protected by the attorney-client privilege and, if so, whether the privilege has been waived due to disclosure by the OAG.

26

1. *Elements & Application*

"The attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance." *In re County of Erie*, 473 F.3d 413, 418 (2d Cir. 2007). The privilege promotes "broader public interests in the observance of law and administration of justice" by encouraging "full and frank communication between attorneys and their clients." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). However, "[i]n order to balance this protection of confidentiality with the competing value of public disclosure . . . courts apply the privilege only where necessary to achieve its purpose and construe the privilege narrowly because it renders relevant information undiscoverable." *United States v. Krug*, 868 F.3d 82, 86 (2d Cir. 2017) (quotation marks omitted); *see Fisher v. United States*, 425 U.S. 391, 403 (1976) (explaining that the privilege "protects *only* those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege" (emphasis added)); *Richards v. Kallish*, No. 22-CV-9095 (CS) (VR), 2023 WL 8111831, at *2 (S.D.N.Y. Nov. 22, 2023) (quoting *Krug*, 868 F.3d at 86).

Under federal common law,[13] a party invoking the attorney-client privilege must establish three elements: "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *In re County of Erie*, 473 F.3d at 419; *see Richards*,

---

[13] In a federal question case, the issue of privilege is governed by federal common law. *See* Fed. R. Evid. 501 ("[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."); *Allianz Global Investors GmbH v. Bank of Am. Corp.*, 609 F. Supp. 3d 287, 289 (S.D.N.Y. 2022); *see also Urthtech LLC v. Gojo Indus.*, No. 22-CV-6727 (PKC) (KHP) & 24-MC-311 (PKC) (KHP), 2024 WL 3898179, at *3 (S.D.N.Y. 2024) ("The federal law of privileges applies in cases where there are federal question claims and the evidence at issue is relevant to the federal claim." (citing *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987)). Accordingly, the Court's privilege analyses throughout this opinion are based on federal common law unless otherwise indicated.

2023 WL 8111831, at *1. "The burden of establishing each element of the privilege, including the absence of any waiver, is upon the party asserting the privilege." *Robbins & Myers, Inc. v. J.M. Huber Corp.*, 274 F.R.D. 63, 83 (W.D.N.Y. 2011).

    a. <u>First Element: Communication Between Client & Counsel</u>

Critical to the attorney-client privilege is the relationship between client and counsel. It is well established that an attorney-client relationship exists between an entity and external counsel hired by the entity to conduct an investigation. *See, e.g., In re Grand Jury Subpoena*, 599 F.2d 504, 506, 510 (2d Cir. 1979) (finding an attorney-client relationship between a corporation and the external counsel it hired to investigate and produce a report concerning possible illegal payments); *Upjohn*, 449 U.S. at 383; *Cicel (Beijing) Sci. & Tech. Co., v. Misonix, Inc.*, 331 F.R.D. 218, 230–31 (E.D.N.Y. 2019).

Here, the OAG argues that "the circumstances giving rise to the Referral and the nature of services performed make clear that OAG engaged and deputized the Investigative Team attorneys to provide legal advice to OAG." (OAG Mem., ECF No. 69, at 26.) The OAG further argues that:

> [t]he interview memoranda were created by OAG's deputized attorney agents with the intent to share legal advice and planning with the Investigative Team (which for these purposes was part of the OAG) and in furtherance of ultimately making legal recommendations to OAG as to whether Cuomo engaged in sexual harassment and retaliation.

(OAG Reply, ECF No. 81, at 16.) In response, Cuomo contends that the memoranda do not constitute attorney-client communications because the attorneys who drafted the memoranda did not have a relationship with the "third party witnesses." (*See* Cuomo Mem., ECF No. 83, at 30.)

The Court finds that the AG's Office has amply shown that an attorney-client relationship existed between the Attorney General and the deputized attorneys. Specifically, the OAG has demonstrated that, in March 2021, following the referral from

Cuomo and pursuant to Executive Law § 63(8), the "OAG began appointing a team of private attorneys to investigate and report on allegations of, and circumstances surrounding, sexual harassment by then-Governor Cuomo (the 'Investigative Team')." (Longley Decl., ECF No. 70, ¶ 13.) The Investigative Team included special deputies and special assistants from two private law firms, which were retained for a specific assignment: "'to provide investigation and legal services by assisting the [OAG] in its review of allegations of, and circumstances surrounding, sexual harassment against Governor Andrew Cuomo' and 'produce a public report with their findings and conclusions.'" (*Id.* ¶¶ 13, 15 (citing Appointment Letters, ECF No. 70-4, and quoting Engagement Letters, ECF No. 70-5).) The engagement letters specifically provided that the retained firms "and their employees were to 'communicate and provide services solely at the direction of First Deputy Attorney General, Jennifer Levy, or [her] designee, on behalf of the Attorney General of the State of New York.'" (*Id.* ¶ 17 (quoting Engagement Letters, ECF No. 70-5 (modification in Longley Decl.)).) (*See generally* Appointment Letters, ECF No. 70-4 (providing that various attorneys "are hereby appointed as Special Deputy to the First Deputy Attorney General within the New York State Office of the Attorney General" to "investigate and report on allegations of, and circumstances surrounding, sexual harassment by Governor Andrew Cuomo" (emphasis omitted)); Engagement Letters, ECF No. 70-5, at 2, 5 (confirming that certain law firms have "agreed to provide investigation and legal services by assisting the Office of the Attorney General ('OAG') in its review of the allegations of, and circumstances surrounding, sexual harassment against Governor Andrew Cuomo"); Longley Decl., ECF No. 70, ¶¶ 14–16.) *Cf. In re Grand Jury Subpoena*, 599 F.2d at 506, 510; *Upjohn*, 449 U.S. at 383. Having reviewed the interview memoranda and interview summaries detailed in the privilege log, the Court has independently

29

confirmed that the documents comprise interview memoranda prepared for the case file and email messages that included summaries of interviews, which were circulated to the Investigative Team. The interview memoranda and summaries were drafted by the deputized attorneys and, in one instance, a paralegal working directly with the Investigative Team.

Cuomo's argument that an attorney-client relationship did not exist between the attorneys and the subjects of the interview memoranda is beside the point. (*See* Cuomo Mem., ECF No. 83, at 30.) The interview memoranda would never have been written but for the relationship between the deputized attorneys and the OAG, as client, and an attorney-client relationship between the attorneys and the interviewees need not exist for the interview memoranda to be privileged. *See Upjohn Co.*, 449 U.S. at 390 ("[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."); *id.* at 394–97 (holding that "communications by Upjohn employees to [the corporation's] counsel are covered by the attorney-client privilege," even though the employees do not enjoy an attorney-client relationship with the corporation's counsel); *Cicel (Beijing) Sci. & Tech. Co., Ltd.*, 331 F.R.D. at 230–31.

Also relevant to the first element is the distinction between facts versus communications: while communications are privileged, facts are not. *See Allen v. West Point-Pepperell Inc.*, 848 F. Supp. 423, 427–28 (S.D.N.Y. 1994) (noting that, while the privilege protects communications, the privilege does "not protect facts which an attorney obtains from independent sources and then conveys to his client"); *Upjohn*, 449 U.S. at 395–96 (explaining that "[a] fact is one thing and a communication concerning that fact is an entirely different thing" and observing that a "client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse

to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney" (quotation marks omitted)); *Kennedo v. United States*, No. 94-CV-2552 (CPS), 1995 WL 428660, at *2 (E.D.N.Y. July 6, 1995) (emphasizing that the scope of the privilege is limited to the "communication of facts, not to the underlying facts themselves").

Here, the OAG represents that the interview memoranda constitute attorney-client communications because they "were created for the primary purpose of allowing members of the Investigative Team to share information collected with other team members who were not present for those interviews," which information was "vital for enabling the whole Investigative Team to . . . decid[e] on future investigative steps . . . and form[] legal conclusions to be relayed to OAG, the client." (OAG Mem., ECF No. 69, at 26–27.) In response, Cuomo argues that the contents of the interview memoranda constitute facts because "[a]n attorney cannot convert third-party witness statements to attorney-client communications simply by putting them in a memo or hiring a court reporter to transcribe them." (Cuomo Mem., ECF No. 83, at 30.) Cuomo also relies on *Fisher*, 425 U.S. at 404, to argue that "while communications seeking legal advice are protected by attorney-client privilege, the underlying documents are not." (Cuomo Reply, ECF No. 84, at 16.)

Having reviewed the contested documents, the Court finds that the interview memoranda constitute communications protected by the attorney-client privilege. The interview memoranda are not merely "third-party witness statements" that were converted into attorney-client communications "simply by putting them in a memo." (Cuomo Mem., ECF No. 83, at 30.) Rather, the interview memoranda contain summaries prepared by members of the Investigative Team of what the witnesses said. (*See* Chun Decl., ECF No. 71, ¶¶ 13–14.) Except for the disclosures of the interview memoranda to

31

other law enforcement entities discussed herein, there is no evidence to suggest that the memoranda have otherwise been disclosed or that the witnesses themselves have reviewed or adopted the summaries contained in the memoranda. (*See* OAG Reply, ECF No. 81, at 17.) In addition, according to the OAG, the memoranda were "used by the Investigative Team at large to continually deliberate, design, and define the scope of the investigation," "to reach factual findings, help assess credibility issues as necessary, and ultimately form their conclusions and recommendations concerning the allegations of sexual harassment against Cuomo to OAG (the client)." (*Id*. ¶ 13.) The Court credits this representation, as well as the OAG's assertion that the memoranda reflect the attorneys' "impressions and recommendations concerning witness interviews" by "reflecting the information they deemed relevant for the rest of the team to receive." (*Id*.) All the while, the Investigative Team, including the deputized attorneys and their support staff, was working on the Investigation exclusively for the OAG pursuant to their engagement letters and reporting directly to the Deputy Attorney General, as discussed above. As the Supreme Court recognized in *Upjohn*, the "first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." *Upjohn Co.*, 449 U.S. at 390–91. Given the purpose that led to the creation of the memoranda and manner by which the Investigative Team prepared them, the Court finds that the OAG has readily satisfied the first element of the privilege — that the interview memoranda are covered by the attorney-client privilege. *See Urthtech LLC v. Gojo Indus.*, No. 22-CV-6727 (PKC) (KHP) & 24-MC-311 (PKC) (KHP), 2024 WL 3898179, at *4 (S.D.N.Y. 2024) ("It is not just communications that are subject to the [attorney-client] privilege. Internal investigation notes and documents also may be privileged." (citing *Upjohn Co.*, 449 U.S. at 390–91 & *Gucci Am., Inc. v.*

*Guess?, Inc.*, 271 F.R.D. 58, 71 (S.D.N.Y. 2010))); *Pearlstein v. BlackBerry Ltd.*, No. 13-CV-7060 (CM) (KHP), 2019 WL 1259382, at *4 (S.D.N.Y. Mar. 19, 2019) (same).[14]

> b. Second Element: Confidentiality

As to the second element, whether the communication was intended to be kept confidential,[15] "[i]t is of the essence of the attorney-client privilege that it is limited to those communications which are intended to be confidential." *United States v. Tellier*, 255 F.2d 441, 447 (2d Cir. 1958). In this vein, courts have held that "a communication intended for publication is not intended to be confidential and therefore is not within the privilege." *Favors v. Cuomo*, 285 F.R.D. 187, 198 (E.D.N.Y. 2012) (quotation marks and alterations omitted). In other words, privately made communications between an attorney and client "are not privileged if it was understood that the information communicated in the conversation was to be conveyed to others." *Tellier*, 255 F.2d at 447.

Critically, however, "'the fact that certain *information* in [otherwise protected] documents might ultimately be disclosed,' or 'that certain *information* might later be

---

[14] Courts have also recognized that not only communications from attorneys fall under the umbrella of the attorney-client privilege, but that even "[f]actual investigations conducted by an agent of the attorney, such as gathering statements from employees, clearly fall within the attorney-client rubric." *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 70 (S.D.N.Y. 2010) (quotation marks omitted). Accordingly, "courts have frequently extended the attorney-client privilege to communications made to investigators who have provided necessary assistance to attorneys." *Id.* (collecting cases). "Courts also have applied the privilege to communications among non-lawyer employees of a corporation where the purpose of the communication was to provide information to counsel or aid counsel in providing legal advice." *Pearlstein v. BlackBerry Ltd.*, No. 13-CV-7060 (CM) (KHP), 2019 WL 1259382, at *4 (S.D.N.Y. Mar. 19, 2019) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981)). As detailed above, the interview memoranda and summaries at issue in this case were prepared as part of the factual investigation conducted by the Investigative Team.

[15] The Court analyzes whether the communications were "in fact kept confidential," *In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007), when considering waiver of the privilege, as discussed *infra*.

disclosed to others,' does not, by itself, 'create the factual inference that the *communications* were not intended to be confidential at the time they were made.'" *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 529 (S.D.N.Y. 2015) (quoting *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1037 (2d Cir. 1984) (emphasis in original)). Indeed, "[w]ere it otherwise, any attorney-client communications relating to the preparation of publicly filed documents — such as court pleadings — would be unprotected, which is plainly not the law." *Id.* (quotation marks omitted).

Cuomo argues that the interview memoranda are not privileged because "the OAG cannot show that the Requested Materials were kept confidential"; in addition to disclosure to certain government agencies, Cuomo contends that "the OAG has disclosed the subject matter of the Requested Materials in its public Report detailing various witness statements." (Cuomo Mem., ECF No. 83, at 30.) The OAG, in turn, argues that while the OAG has "published the redacted transcripts and exhibits underlying the Report," "the Report does not cite to or reference the interview memoranda." (OAG Reply, ECF No. 81, at 17.) Moreover, the "OAG has consistently denied access to the memoranda to members of the public, including the witnesses themselves." (*Id.*; *see* Longley Decl., ECF No. 70, ¶ 41.)

The Court finds that the confidentiality requirement is satisfied. The interview memoranda were drafted "with the intention to be kept confidential, notwithstanding that the Report would be made public," (Chun Decl., ECF No. 71, ¶ 14), and the Engagement Letters themselves dictate that "[a]ll communications, information or materials provided to [the law firms] or identified as part of the Matter shall be treated as confidential, and not disclosed to any other party," (Engagement Letters, ECF No. 70-5, at ECF pp. 3, 6). Moreover, Executive Law § 63(8) mandates confidentiality; indeed,

34

"[i]t is a misdemeanor under Executive Law § 63(8) for anyone involved in a § 63(8) investigation to disclose information obtained during the investigation, including the names of witnesses, without prior authorization from the attorney general or the governor." (Longley Decl., ECF No. 70, ¶ 9 (citing N.Y. Exec. Law § 63(8)).) "The touchstone of the analysis . . . is not whether [the OAG] intended to keep confidential the results of its investigation, but rather whether it intended to keep confidential the communications reflected in the [i]nterview [memoranda]." *In re Gen. Motors*, 80 F. Supp. 3d at 529. It does not follow that because the OAG disclosed certain *facts* in its Report, the OAG "did not intend to keep the *communications* reflected in the Interview [memoranda] confidential." *Id.* at 528; *see In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1037.[16]

    c.  <u>Third Element: Legal Purpose</u>

Lastly, the communication must have been made for the purpose of obtaining or providing legal advice in order to be protected under the attorney-client privilege. *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1037 (emphasizing that "the privilege is triggered only by a client's request for legal, as contrasted with business, advice"). In determining whether a communication is protected by the attorney-client privilege, courts in this Circuit evaluate the predominant purpose of the communication. *In re County of Erie*, 473 F.3d at 419–20 (confidential communication is protected by the attorney-client privilege only if the

---

[16] Cuomo relies heavily on *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459 (S.D.N.Y. 1996) in arguing that, because the OAG specifically alluded to portions of the interview memoranda in its Report, the OAG cannot establish that the memoranda were intended to be and were in fact kept confidential. (Cuomo Mem., ECF No. 83, at 30–31.) The Court notes, however, that the analysis relied on in *Kidder* was originally elucidated in the context of *waiver* of the attorney-client privilege — not the initial existence of the privilege. Accordingly, the Court addresses this argument below, in its discussion of waiver.

predominant purpose of the communication is to render or solicit legal advice); *see AU New Haven, LLC v. YKK Corp.*, No. 15-CV-3411 (GHW) (SN), 2017 WL 4838793, at \*4 (S.D.N.Y. Oct. 24, 2017) (quoting *In re County of Erie*, 473 F.3d at 419–20). The predominant purpose test, however, "does not require a showing that obtaining or providing legal advice was the *sole* purpose . . . or that the communications at issue would not have been made but for the fact that legal advice was sought." *In re Gen. Motors*, 80 F. Supp. 3d at 530 (quotation marks omitted) (emphasis in original). Rather, "[s]o long as obtaining or providing legal advice was one of the significant purposes of the . . . investigation, the attorney-client privilege applies, even if there were also other purposes." *Id*. (quotation marks omitted). "The predominant purpose of a particular document" may "be informed by the overall needs and objectives that animate the client's request for advice." *In re County of Erie*, 473 F.3d at 421.

Here, the OAG posits that "the circumstances giving rise to the Referral and the nature of services performed make clear that OAG engaged and deputized the Investigative Team attorneys to provide legal advice to OAG." (OAG Mem., ECF No. 69, at 26.) Cuomo argues that "[t]he investigators were not hired to serve as counsel to the OAG," and that, "in public statements concerning the Investigation, the OAG highlighted the independence of the special deputies."[17] (Cuomo Mem., ECF No. 83, at 30.) Cuomo further asserts that because the attorneys' "only mandate was to conduct the investigation and prepare a public report, it is difficult to conceive how the Firms

---

[17] Specifically, Cuomo notes that "the OAG Report provided that, while the deputies 'periodically report[ed]' to the OAG regarding 'the Office's practice and procedures,' the deputies made 'all substantive decisions' concerning the Investigation as well as 'all decisions regarding the analysis and conclusions reached in this Report, independently.'" (Cuomo Mem., ECF No. 83, at 30 (quoting Report) (alterations in original).)

could have been providing legal advice to the OAG in interview memos that principally recorded third-party witness statements." (Cuomo Mem., ECF No. 83, at 30.)

The Court finds that the communications were made for the predominant purpose of providing legal advice to the OAG. As to Cuomo's first argument — that the independence of the attorneys vitiates the attorney-client relationship — the Court finds that the independent nature of the investigation does not negate the fact that the attorneys were retained for the sole purpose of evaluating the facts and law. In addition, none of the communications would have "been made but for the fact that legal advice was sought." *In re Gen. Motors*, 80 F. Supp. 3d at 530. Cuomo also argues that the "independence [of the attorneys] rendered legal advice and consultation impossible." (Cuomo Mem., ECF No. 84, at 16 (emphasis omitted).) To the contrary, the Engagement and Appointment Letters demonstrate that the OAG retained "ultimate authority" over the conduct of the attorneys. *Prate v. Freedman*, 583 F.2d 42, 48 (2d Cir. 1978) ("In our legal system, an attorney is his client's agent and representative; the client retains ultimate authority over the conduct of litigation."). (*See generally* Appointment Letters, ECF No. 70-4 (delineating the bounds of the attorneys' authority by granting them the "authority to investigate and report on allegations of, and circumstances surrounding, sexual harassment by Governor Andrew Cuomo," which authority specifically included "the power to subpoena witnesses, compel their attendance, examine them under oath and require that any books, records, documents or papers relevant or material to the inquiry be turned over to you for inspection, examination or audit"); Engagement Letters, ECF No. 70-5 (authorizing the firms to "utilize any of its resources as it deems appropriate to carry out the Matter consistent with the Section 63(8) appointment letters").) It does not follow that because the OAG granted the attorneys significant

authority to conduct the investigation, the OAG somehow ceased to be the attorneys' client or did not retain ultimate authority over the investigation.

Cuomo's second argument — that because the attorneys' only task was to conduct an investigation and prepare a report, the memoranda were not made for a legal purpose — falls equally flat. "Fundamentally, legal advice involves the interpretation and application of legal principles to guide future conduct or to assess past conduct." *In re County of Erie*, 473 F.3d at 419. Here, the Engagement Letters specifically provide that the firms were retained to "investigat[e] and report[] on allegations of, and circumstances surrounding, sexual harassment by Governor Andrew Cuomo." (Engagement Letters, ECF No. 70-5.) Indeed, the first sentence of the Letters confirms that the firms have "agreed to provide investigation and legal services by assisting the Office of the Attorney General" by investigating and reporting on the matter. (*Id.*) Because the "overall need[] and objective[] . . . animat[ing] the [OAG's] request for advice" was to make a legal determination on the allegations and circumstances surrounding the alleged sexual harassment by Cuomo, it is clear that the predominant purpose — in fact, the only purpose — of the attorney-client communications was legal in nature. *In re County of Erie*, 473 F.3d at 421.

Accordingly, the Court finds that the attorney-client privilege attaches to the interview memoranda because the OAG has established that the interview memoranda constituted "communication[s] between client and counsel" which were "intended to be . . . kept confidential" and which were "made for the purpose of . . . providing legal advice." *Id.* at 419.

2. *Waiver*

a. Publication of the Report

Cuomo argues that the OAG waived any existing attorney-client privilege because it "disclosed the subject matter of the Requested Materials in its public Report detailing various witness statements," (Cuomo Mem., ECF No. 83, at 30), and "consistently referenced and even relied on information plainly gleaned from witness interview memos." (Cuomo Reply, ECF No. 84, at 17.) Specifically, in his Reply, Cuomo asserts that the Report described in detail the following:

> (1) statements furnished by Senior Investigator #1 (now known to be James Boyle) concerning Trooper 1's recruitment, OAG ECF No. 3-10 at 34–35, 43–44; (2) statements furnished by an unidentified PSU member concerning Governor Cuomo's general conduct, *id.* at 39 & n.294; and (3) statements furnished by Senior Investigator #2 (now known to be Fabricio Plaskocinski) and other unidentified PSU members concerning Trooper 1's allegations that Governor Cuomo inappropriately touched her — statements which the OAG Report went so far as to assert "corroborated" Trooper 1's allegations, *id.* at 40–41, 44 & ns. 303, 305.

(*Id.*) Relying on these examples, Cuomo argues that "[b]ecause the Report incorporated and even relied on the witness interview memos, the OAG waived any attorney-client privilege over those memos." (*Id.*; Cuomo Mem., ECF No. 83, at 30–31.) On the other hand, the OAG, a non-party to the underlying *Trooper 1* case, maintains that "the Report does not cite to or reference the interview memoranda," and argues that there has been no waiver by disclosure. (OAG Reply, ECF No. 81, at 17.)

As a general rule, "[t]he attorney-client privilege cannot at once be used as a shield and a sword." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991). Accordingly, "[e]ven where the privilege does attach to a communication," a client may "'impliedly waive the privilege or consent to disclosure.'" *Favors*, 285 F.R.D. at 198 (quoting *In re von Bulow*, 828 F.2d 94, 101 (2d Cir. 1987)). Courts in this Circuit have found implied waiver "where the privilege holder 'asserts a claim that *in fairness*

39

requires examination of protected communications.'" *In re Grand Jury Procs.*, 219 F.3d 175, 182 (2d Cir. 2000) (emphasis in original) (quoting *Bilzerian*, 926 F.2d at 1292).

The question of "whether fairness requires disclosure has been decided by courts on a case-by-case basis and depends primarily on the specific context in which the privilege is asserted." *In re Grand Jury Procs.*, 219 F.3d at 183. Critically, in applying the fairness doctrine in the context of extrajudicial disclosures, the Second Circuit has unequivocally held as follows:

> [W]e hold therefore that the extrajudicial disclosure of an attorney-client communication — one not subsequently used by the client in a judicial proceeding to his adversary's prejudice — does not waive the privilege as to the undisclosed portions of the communication. Hence, though the district court correctly found a waiver by von Bulow [the privilege holder] as to the particular matters *actually disclosed* in the book, it was an abuse of discretion to broaden that waiver to include those portions of [additional attorney-client communications] which, because they were not published, remain secret.

*In re von Bulow*, 828 F.2d at 102 (emphasis in original). The facts of *In re von Bulow* warrant discussion given the importance of the rule announced in that case and its applicability here. In 1981, Claus von Bulow was charged with "assault with intent to murder for allegedly injecting his wife Martha von Bulow with insulin causing her to lapse into an irreversible coma." *Id.* at 96. After a jury trial, he was convicted, which conviction was later reversed after he "retained Harvard law professor Alan M. Dershowitz to represent him on appeal." *Id.* Following a successful appeal, von Bulow was retried and acquitted. *Id.* In May 1986, attorney Dershowitz published a book regarding the case, which disclosed specific attorney-client communications. *Id.* In a subsequent civil lawsuit against von Bulow by his wife (brought by her next friends), in applying the fairness rule, the district court found that the "publication by an attorney of a book chronicling his client's case waived the attorney-client privilege — not just as

40

to information actually disclosed in the book — but with respect to all communications underlying the subjects raised in it." *Id.* at 97.

The Second Circuit granted mandamus and vacated the district court's discovery order. *Id.* at 104. Critically, the *von Bulow* court examined the scope of the waiver effected by the publication of the book and concluded that there was no implied waiver when "the privilege-holder or his attorney has made extrajudicial disclosures, and those disclosures have not subsequently been placed at issue during litigation." *Id.* at 102. This is true even in a high-profile litigation, like the one at issue in *von Bulow*, for the following reasons:

> Although it is true that disclosures in the public arena may be "one-sided" or "misleading", so long as such disclosures are and remain extrajudicial, there is no *legal* prejudice that warrants a broad court-imposed subject matter waiver. The reason is that disclosures made in public rather than in court — even if selective — create no risk of *legal* prejudice until put at issue in the litigation by the privilege holder.

*Id.* at 103 (emphasis in original). *See also John Doe Co. v. United States*, 350 F.3d 299 (2d Cir. 2003) (rejecting implied waiver argument in a case where the U.S. Attorney's Office sought the underlying interview notes concerning interviews on which attorneys had relied in preparing a lengthy letter that was submitted to the government). Similarly, the court in *In re Kidder Peabody Securities Litigation*, relying on *In re von Bulow*, held that, in the context of an extrajudicial disclosure, the public release of a report "constitutes a waiver of the privilege only for the communications or *portions of communications disclosed in the report*," but "does not justify compelled production of interview documents that might disclose other information merely because those documents may have been considered by the authors of the report." *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 469 (S.D.N.Y. 1996) (emphasis added).

Applying *In re von Bulow*, the seminal case in our Circuit on extrajudicial disclosures, the Court rejects Cuomo's argument that the OAG waived its attorney-client privilege as to the interview memoranda by publishing the Report. First, the Court notes that the Second Circuit's analysis expressly distinguishes between disclosures made during a proceeding *by the party who holds the privilege* and an "extrajudicial disclosure," which the Circuit defined as disclosure of an attorney-client communication that is "not subsequently used *by the client* in a judicial proceeding to his adversary's prejudice." *In re von Bulow*, 828 F.2d at 102 (emphasis added); *see Urthtech LLC*, 2024 WL 3898179, at *5–6 ("When there has been a selective disclosure of attorney-client communications *in the litigation*, courts typically find the party has waived privilege as to all documents pertaining to the subject disclosed. . . . In contrast, when a privileged communication is disclosed *outside of a litigation or extrajudicially*, the scope of the waiver typically is limited to those matters actually revealed." (emphasis in original)). In *Trooper 1*, no party holds the privilege at issue. The privilege belongs to the AG's Office, which is not a party to the *Trooper 1* case. Indeed, although the OAG has received a subpoena in connection with *Trooper 1*, it has not used and cannot use any disclosures of attorney-client communications to disadvantage Cuomo in *Trooper 1* since it is not a party to the litigation. In addition, the Second Circuit has found that extrajudicial disclosures result only in a limited waiver. Even in *In re von Bulow*, where the holder of the privilege was a party to the litigation, the court concluded that the scope of the extrajudicial disclosures resulted in a very narrow waiver, finding as follows: "Matters actually disclosed in public lose their privileged status because they obviously are no longer confidential. The cat is let out of the bag, so to speak. But related matters not so disclosed remain confidential." *In re von Bulow*, 828 F.2d at 103. So is the case here. To the extent any of the statements in the Report were sourced from

attorney-client communications, those matters are clearly no longer confidential since they have been published. But the disclosure of the Report did not effect a broader subject matter waiver as to the interview memoranda, which remain confidential.[18]

> ### b. Disclosure to Other Law Enforcement Entities

Cuomo also argues that disclosure to other government entities, including the U.S. Department of Justice and five district attorney's offices across New York State, waived the privilege as to the interview memoranda that were disclosed to those entities. (Cuomo Mem., ECF No. 83, at 5, 29–30.) In response, the OAG contends that its disclosure of certain materials to other branches of law enforcement did not constitute waiver because the entities shared a common interest with the OAG and the disclosures were made in confidence. (OAG Reply, ECF No. 81, at 15–16; *see* Longley Decl., ECF No. 70, ¶ 27.) For the following reasons, Cuomo's argument is without merit.

As detailed in the Longley Declaration, the documents the OAG shared with these offices were disclosed due to the federal, state, and local governments' common interest in promoting the investigation of possible crimes and misconduct, which are compelling public interests, and that the disclosures were made pursuant to agreements to keep the materials confidential. (Longley Decl., ECF No. 70, ¶¶ 27–30.) *See generally United States v. Schwimmer*, 892 F.2d 237, 243–44 (2d Cir. 1989) (discussing common interest privilege). As the Second Circuit has observed, the common interest rule is not a privilege *per se*; rather, it "'somewhat relaxes the requirement of confidentiality by

---

[18] Trooper 1's discussion of the Report in the amended complaint has no bearing on the waiver analysis. She is not the privilege holder, the OAG is. Any efforts by Trooper 1 to use the Report cannot have any *legal* impact on the viability of the third-party privilege held by the OAG. *In re von Bulow*, 828 F.2d 94, 103 (2d Cir. 1987) (explaining that disclosures made in public, even if selective, "create no risk of *legal* prejudice until put at issue in the litigation *by the privilege-holder*" (first emphasis in original; second emphasis added)).

defining a widened circle of persons to whom clients may disclose privileged communications.'" *Krug*, 868 F.3d at 87 (quoting Restatement (Third) of the Law Governing Lawyers § 76 cmt. c (2000) (citation omitted)). "As with all attorney-client privilege claims, a claim of privilege under the common-interest rule 'requires a showing that the communication in question was given in confidence and that the client reasonably understood it to be so given.'" *Id*. at 86–87 (quoting *Schwimmer*, 892 F.2d at 244). The OAG has made those showings here. (*See* Longley Decl., ECF No. 70, ¶¶ 27–30.) Additionally, in concluding that the OAG's disclosures to other components of law enforcement did not amount to implied waiver, the Court is mindful of the Second Circuit's analysis in *In re Grand Jury Investigation*, where the court observed the following with regard to the application of the attorney-client privilege to communications involving government attorneys:

> We believe that, if anything, the traditional rationale for the privilege applies with special force in the government context. It is crucial that government officials, who are expected to uphold and execute the law and who may face criminal prosecution for failing to do so, be encouraged to seek out and receive fully informed legal advice. Upholding the privilege furthers a culture in which consultation with government lawyers is accepted as a normal, desirable, and even indispensable part of conducting public business. Abrogating the privilege undermines that culture and thereby impairs the public interest. *See* 1 Paul R. Rice, *Attorney-Client Privilege in the United States* § 4:28, at 4 (2d ed. 1999) ("If the government attorney is required to disclose [internal communications with counsel] upon grand jury request, it is sheer fantasy to suggest that it will not make internal governmental investigations more difficult, to the point of being impossible . . . . To the extent that the protection of the privilege is justified in any corporate context, the need within the government is equal, if not greater.").

399 F.3d 527, 534 (2d Cir. 2005). In this case, in connection with its duty to enforce the law, the OAG made disclosures to other law enforcement entities with an agreement that the information would be maintained as confidential, to the extent permitted by law. The Court finds that the OAG has established that this confidential sharing of

investigative materials did not waive the attorney-client privilege as to the documents that were so disclosed and did not effect a broad subject matter waiver.

*    *    *    *    *

For all of these reasons, the Court finds that the interview memoranda are protected by the attorney-client privilege and that the OAG's extrajudicial publication of the Report did not result in "*legal* prejudice that warrants a broad court-imposed subject matter waiver." *In re von Bulow*, 828 F.2d at 103 (emphasis in original). In addition, the OAG's confidential disclosures of certain interview memoranda to other law enforcement offices did not effect a waiver of the attorney-client privilege. Accordingly, as to the interview memoranda, the Court grants the Attorney General's motion to quash and denies Cuomo's cross-motion to compel.[19]

---

[19] In light of the Court's conclusion that the attorney-client privilege protects the interview memoranda from disclosure, the Court need not granularly analyze the other bases on which the OAG asserts privilege as to those documents. The Court notes, however, that the OAG's assertion of the deliberative process privilege has substantial force. "The deliberative process privilege, which is also referred to as the executive privilege, protects the decisionmaking processes of the executive branch in order to safeguard the quality and integrity of governmental decisions." *Citizens Union of N.Y.C. v. Att'y Gen. of N.Y.*, 269 F. Supp. 3d 124, 157 (S.D.N.Y. 2017) (quotation marks omitted).

Having reviewed the memoranda, the Court finds that they are predecisional because the memoranda were "prepared in order to assist an agency decisionmaker in arriving at [her] decision." *Tigue v. U.S. Dep't of Just.*, 312 F.3d 70, 80 (2d Cir. 2002) (quotation marks omitted). In addition, they are deliberative in that they were "prepared to help the agency formulate its position." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021). And although not every interview memorandum contains deliberative material on the face of the document, the Court finds that disclosing the large swath of interview memoranda Cuomo seeks "would reveal the deliberative process of summarization itself by demonstrating which facts . . . were considered significant by the decisionmaker." *Lead Indus. Ass'n, Inc. v. Occupational Safety & Health Admin.*, 610 F.2d 70, 85 (2d Cir. 1979). (*See* Chun Decl., ECF No. 71, ¶ 13 ("[I]ndividual team members communicated their impressions and recommendations concerning witness interviews by drafting memoranda reflecting the information they deemed relevant.").) In *Lead*

**C. Law Enforcement Privilege**

Having found that the interview memoranda are protected by the attorney-client privilege, the Court now turns to the deposition transcripts. As noted above, Cuomo seeks unredacted versions of the deposition transcripts for the complainants included in Trooper 1's complaint, which were published on the OAG's website in redacted form. The OAG asserts that the unredacted transcripts are protected by the law enforcement and public interest privileges.

1. *Legal Standards*

"The purpose of [the law enforcement] privilege is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *In re Dep't of Investigation*, 856 F.2d 481, 484 (2d Cir. 1988).

A party invoking the law enforcement privilege "must show that the documents contain information that the law enforcement privilege is intended to protect," such as "law enforcement techniques and procedures, information that would undermine the

---

*Industries*, like here, the reports were drafted to assist the agency "in rendering an informed decision upon the typically Gargantuan rule-making record." *Id.* at 83. Accordingly, the Court finds that disclosure of the interview memoranda would risk the concerns discussed in *Lead Industries*.

In addition, the fact that the decision being made here was not in connection with agency rulemaking or a legislative policy proposal is of no moment. *See U.S. Fish & Wildlife Serv.*, 592 U.S. at 267 ("[T]he deliberative process privilege shields from disclosure 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental *decisions* and policies are formulated.'" (emphasis added) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975))); *see also Thompson v. Lynbrook Police Dep't*, 172 F.R.D. 23, 26–27 (E.D.N.Y. 1997); *Miller v. Mehltretter*, 478 F. Supp. 2d 415, 429–30 (W.D.N.Y. 2007) (observing, in the Administrative Procedure Act context, that "[e]vidence regarding the basis or strategy of prosecutorial decisions or investigations is rarely subject to disclosure" and that the deliberative process privilege "applies to confidential deliberations of law or policymaking, reflecting opinions, recommendations, or advice" (quotation marks omitted)).

confidentiality of sources, information that would endanger witnesses and law enforcement personnel or the privacy of individuals involved in an investigation, and information that would otherwise interfere with an investigation." *In re The City of New York*, 607 F.3d 923, 944 (2d Cir. 2010) (quotation marks and alterations omitted); *see Murray v. City of New York*, No. 21-CV-6892 (EK) (VMS), 2023 WL 2734819, at *2 (E.D.N.Y. Mar. 30, 2023). The investigation in question "need not be ongoing for the law enforcement privilege to apply," because "the ability of a law enforcement agency to conduct future investigations may be seriously impaired if certain information is revealed to the public." *In re The City of New York*, 607 F.3d at 944 (quotation marks omitted); *see also Morrissey v. City of New York*, 171 F.R.D. 85, 90 (S.D.N.Y. 1997); *see also Borchers v. Commercial Union Assur. Co.*, 874 F. Supp. 78, 80 (S.D.N.Y. 1995).

To invoke the privilege, the party "must make a substantial threshold showing that there are specific harms likely to accrue from disclosure of specific materials," a showing which "must be discharged by presenting those facts that are the essential elements of the privileged relationship and not by mere conclusory or *ipse dixit* assertions." *MacNamara v. City of New York*, 249 F.R.D. 70, 79 (S.D.N.Y. 2008) (quotation marks and alterations omitted); *see Kunstler v. City of New York*, No. 04-CV-1145 (RWS) (MHD), 2005 WL 2656117, at *1 (S.D.N.Y. Oct. 18, 2005) (noting that the party invoking the privilege "must make a clear and specific evidentiary showing of the nature and extent of the harm that is likely to be encountered if disclosure is permitted, and they may not simply rely on generalized reiterations of the policies underlying the privilege").

The law enforcement privilege is a qualified privilege; therefore, "there are circumstances in which information subject to the privilege must nevertheless be disclosed." *In re The City of New York*, 607 F.3d at 940. This Circuit has held that there is

47

a "pretty strong presumption against lifting the privilege." *Id.* at 945. Accordingly, "[t]o rebut that presumption, the party seeking disclosure must show (1) that its suit is non-frivolous and brought in good faith, (2) that the information sought is not available through other discovery or from other sources, and (3) that the information sought is important to the party's case." *Id.* (quotation marks and alterations omitted). "With respect to the importance of the information sought," the party must establish a "compelling need."[20] *Id.* "Whether the showing of relevance and need rises to the requisite level is a discretionary determination that must be made on a case-by-case basis." *Moroughan v. County of Suffolk*, No. 12-CV-512 (JFB) (AKT), 2018 WL 11268801, at *5 (E.D.N.Y. Feb. 6, 2018) (quoting *Kitevski v. City of New York*, No. 04-CV-7402, 2006 WL 680527, at *3 (S.D.N.Y. Mar. 16, 2006)).

In making this case-by-case determination, courts must consider principles of fairness. The concept that "a party cannot use materials as a 'sword' in its defense 'while using privileges attaching to [materials relied upon for that defense] as a 'shield'" is important to this inquiry because this "general proposition is 'rooted in fairness.'" *In re The City of New York*, 607 F.3d at 946–47 (quoting *John Doe Co.*, 350 F.3d at 302). Accordingly, "'whether fairness requires disclosure . . . is best decided on a case by case basis, and depends primarily on the specific context in which the privilege is asserted.'" *Id*.

---

[20] While the "ultimate burden of demonstrating the law enforcement privilege is on the party asserting the privilege," the opposing party must "establish its 'compelling need' for the information," because "the party seeking disclosure of information is uniquely situated to explain to a court why it wants and needs that information." *In re The City of New York*, 607 F.3d 923, 945 n.23 (2d Cir. 2010).

2.  *Analysis*[21]

The OAG argues that "the information contained in . . . the redacted portions of the transcripts involve one or more of the types of sensitive and personal information that satisfy the test for applying the [law enforcement] privilege." (OAG Mem., ECF No. 69, at 29.) Specifically, the OAG posits that disclosure of such information would "reveal the identities of nonparty confidential witnesses involved in the Investigation," "invade the privacy of public and nonpublic witnesses," and "have a permanent chilling effect on witness cooperation in future OAG investigations." (*Id*. at 30.) In response, Cuomo argues that "these justifications are insufficient to support the application of the law enforcement privilege." (Cuomo Mem., ECF No. 83, at 33.) Cuomo makes two arguments in support of this assertion: first, the anonymity of confidential witnesses is not a legitimate basis to invoke the law enforcement privilege, and second, the OAG fails to make a specific evidentiary showing of the harm that would result from disclosing information "concerning NYSP duties or other security details."[22] (Cuomo Mem., ECF No. 83, at 33–34.)

Having carefully compared the redacted transcripts that the Attorney General published on its website to the unredacted versions that the Court has reviewed *in camera*, the Court finds that the OAG has not made the necessary "substantial threshold showing that there are specific harms likely to accrue from disclosure of [the redacted]

---

[21] Given the Court's finding that the interview memoranda are protected by the attorney-client privilege, the Court considers only whether the redacted portions of the transcripts are protected by the law enforcement privilege and does not separately analyze the interview memoranda here.

[22] Cuomo also argues that "factual recitations of witness statements in civil investigations do not implicate the concerns motivating" the privilege, but because this argument pertains only to the interview memoranda, the Court does not address this argument in its analysis. (Cuomo Mem., ECF No. 83, at 33.)

materials," a showing which "must be discharged by presenting those facts that are the essential elements of the privileged relationship and not by mere conclusory or *ipse dixit* assertions." *MacNamara*, 249 F.R.D. at 79 (quotation marks and alterations omitted). In other words, the OAG has not met its burden of explaining, in sufficient detail, how each redaction "involve[s] one or more of the types of sensitive and personal information that satisfy the test for applying the [law enforcement] privilege." (OAG Mem., ECF No. 69, at 29.)

The Court finds that because the OAG principally relies on generalized reiterations of the reasons for the privilege but has declined thus far to supply the Court with a redaction-by-redaction analysis, the Court is unable to determine which asserted justifications correspond with which redactions and, accordingly, cannot ascertain whether the privilege applies as to each redaction. *Cf. Kunstler*, 2005 WL 2656117, at *1. At the same time, however, the Court preliminarily believes that at least some of the proposed redactions are very likely to qualify as privileged under the considerations relevant to the law enforcement privilege analysis.

### D. Public Interest Privilege

For the same reasons that the Court cannot granularly analyze the assertion of the law enforcement privilege, the Court cannot determine whether to apply the New York State law public interest privilege to this case.

#### 1. *Legal Standards*

The public interest privilege, which is recognized by New York state law, "attaches to confidential communications between public officers, and to public officers, in the performance of their duties, where the public interest requires that such confidential communications or the sources should not be divulged." *Cirale v. 80 Pine St. Corp.*, 35 N.Y.2d 113, 117 (1974). The "hallmark of the privilege is its application when

the public interest would be harmed if the material were to lose its cloak of

confidentiality." *Acorn v. County of Nassau*, No. 05-CV-2301 (JB) (WDW), 2008 WL

708551, at *2 (E.D.N.Y. Mar. 14, 2008) (quotation marks omitted).

"Questions of privilege in federal civil rights cases are governed by federal law."

*King v. Conde*, 121 F.R.D. 180, 187 (E.D.N.Y. 1988) (collecting cases); *see* Fed. R. Evid. 501.

This is true even in cases containing both federal and state claims: "'the Federal Law of

privileges should be applied with respect to pendent State law claims when they arise

in a Federal question case.'" *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d

Cir. 1987) (quoting S. Rep. No. 1277, 93rd Cong., 2d Sess.); *see also* Fed. R. Evid. 501

advisory committee's note ("[A] federally developed common law based on modern

reason and experience shall apply except where the State nature of the issues renders

deference to State privilege law the wiser course, as in the usual diversity case.").

Accordingly, the New York State public interest privilege is not binding in this

case. *See Agran v. City of New York*, No. 95-CV-2170 (JFK), 1997 WL 107452, at *2

(S.D.N.Y. Mar. 11, 1997) (finding, in a "a civil action pending in federal court involv[ing]

federal and pendant state law claims, only privileges recognized as a matter of federal

law are applicable"); *New York State Ass'n of Realtors Inc. v. Shaffer*, 135 F.R.D. 78, 79 n.4

(S.D.N.Y. 1991) (noting that federal court "need not necessarily follow the courts of

New York State" in recognizing the public interest privilege).

2. *Analysis*

To establish the applicability of the public interest privilege, "a governmental

agency seeking to assert the privilege must specify the harm and must come forward

and show that the public interest would indeed be jeopardized by a disclosure of the

information." *Acorn*, 2008 WL 708551, at *2 (quotation marks omitted). Because not "all

governmental information is privileged or . . . may be withheld by a mere assertion of

privilege," the party asserting the privilege must allege "specific support." *Cirale*, 35 N.Y.2d at 118; *see also Dixon v. 80 Pine St. Corp.*, 516 F.2d 1278, 1281 (2d Cir. 1975).

Even if the Court were to deem the New York State public interest privilege applicable in this case, the OAG has not sustained its burden of showing that the privilege attaches to each redaction in the underlying transcripts. In support of its assertion of the public interest privilege, the OAG contends that "the protection of witnesses who cooperated with OAG's Investigation and the shielding of OAG's investigative techniques clearly fall within the scope of [the public interest] privilege," and that it is "manifestly in the public interest for government investigating agencies to be able to share information and materials with one another without waiving privilege or confidentiality of the shared materials." (OAG Mem., ECF No. 69, at 35.) This conclusory argument is insufficient to demonstrate the applicability of the privilege. As discussed above in the context of the law enforcement privilege, the OAG has not met its burden to illustrate, in sufficient detail, how disclosure of the information concealed by each redaction would harm the public interest and how "the overall public interest on balance would . . . be better served by nondisclosure." *Dixon*, 516 F.2d at 1281. Accordingly, the Court finds that even if the state public interest privilege were to apply in this federal case, the Court cannot evaluate it on the present record.

## CONCLUSION

For the reasons discussed herein, the OAG's motion to quash and Cuomo's motion to compel are granted in part and denied in part. Specifically, the Court holds that the doctrine of state sovereign immunity does not serve as a bar to the exercise of federal jurisdiction over the New York State Office of the Attorney General in connection with the Subpoena in this federal question case. Having conducted an *in camera, ex parte* review of the interview memoranda and unredacted transcripts former

Governor Cuomo seeks, the Court finds that the interview memoranda prepared by the Investigative Team working for the OAG in connection with its Investigation into Cuomo's misconduct are protected by the attorney-client privilege. As to the unredacted versions of the transcripts the OAG has published on its website, the record is insufficient for the Court to make a determination regarding the applicability of the privileges claimed by the OAG.

Accordingly, by **November 12, 2024,** the OAG is directed to either (1) disclose the transcripts to Cuomo in their entirety (subject to the protective order in this case) or (2) produce a redaction-by-redaction privilege log and supplemental brief that illustrates why the Court should find that each redaction should be protected by the asserted privilege.[23] *See generally In re The City of New York*, 607 F.3d at 944 (listing types of information that the law enforcement privilege is intended to protect). Should the OAG determine to submit the redaction-by-redaction privilege log in lieu of disclosure, the OAG shall submit the log to the Court for *in camera* inspection via Chambers by email at merkl_chambers@nyed.uscourts.gov, no later than **November 12, 2024**.

SO ORDERED.

Dated:  Brooklyn, New York
        October 28, 2024

*Taryn A. Merkl*
_____
TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE

---

[23] The Court also finds that the very limited scope of disclosure here, by which the OAG shall either disclose the deposition transcripts or may be required to modify the redactions as to the deposition transcripts of the complainants who are cited in Trooper 1's complaint, would result in disclosures that the Court deems relevant and proportional to the needs of the *Trooper 1* case. *See generally Cuomo I*, 683 F. Supp. 3d at 267–69 (discussing relevance and proportionality in the context of discovery in this case); *see id.* at 277 (observing that "in evaluating the burden to the OAG, a subpoenaed non-party, the Court considers various factors including relevance, the need for the documents, and the breadth of the request") (citing *Citizens Union*, 269 F. Supp. 3d at 138).