SHER TREMONTE LLP

November 26, 2024

**BY ECF**

The Honorable LaShann DeArcy Hall  
United States District Judge  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

**ORAL ARGUMENT**  
**REQUESTED**

Re: *Cuomo v. Office of the New York State Attorney General,* No. 22-mc-03044 (LDH) (TAM)

Dear Judge DeArcy Hall:

      For more than two years, the Office of the New York State Attorney General ("OAG") has resisted producing prior statements by Trooper 1 and other witnesses concerning allegations of sexual harassment against Governor Cuomo. These statements, taken in 2021, are crucial evidence, particularly because we now know that Trooper 1 and her witnesses destroyed contemporaneous communications and colluded with each other during the OAG investigation. In a recent Order, ECF No. 85 (the "Order"), Judge Merkl denied Governor Cuomo's motion to compel these memos. Governor Cuomo objects to the Order with respect to this denial because it is contrary to law for at least two reasons.[1] ***First***, the Order incorrectly holds that the interview memos are protected by attorney-client privilege. These memos, though drafted by counsel, contain nonprivileged statements made by third-party witnesses during interviews and do not constitute attorney-client communications. Moreover, even if the memos were ever covered by the attorney-client privilege, the OAG waived it by citing facts from the memos in the OAG Report, and then by subsequently sharing the memos with a number of other governmental agencies. ***Second***, the Order incorrectly concludes that the interview memos are likely covered by deliberative process privilege because they are recitations of fact.[2]

*Background*[3]

      On March 1, 2021, after several women publicly alleged sexual harassment against Governor Cuomo, the OAG deputized attorneys from the private law firm Cleary Gottlieb Steen & Hamilton LLC ("Cleary") and Vladeck, Raskin & Clark, PC ("Vladeck") to investigate. OAG ECF No. 79-2 ¶ 3. In the course of their investigation, these deputies interviewed at least 179 witnesses and generated at least 155 memos documenting the interviews. *Id.* ¶¶ 4-5. The OAG subsequently issued a public Report concluding that Governor Cuomo had sexually harassed Trooper 1 and ten other women, relying in large part on facts collected in the interviews. *Id.* ¶ 5. The OAG also disclosed the memos

---

[1] Governor Cuomo does not object to the Order to the extent it denied the OAG's motion to quash and granted Governor Cuomo's cross-motion to compel.

[2] It bears noting that the OAG already redacted the memos to scrub any attorney work product from them.

[3] Governor Cuomo respectfully refers the Court to OAG ECF No. 79-1 for a more fulsome case background.

90 Broad Street | 23rd Floor | New York, NY 10004  
www.shertremonte.com | tel. 212.202.2600 | fax. 212.202.4156

underlying the report to various District Attorneys' Offices across New York as well as the Department of Justice in aid of later and separate potential prosecutions and/or civil investigations against Governor Cuomo. OAG ECF No. 70 ¶¶ 26-32.

Trooper 1 then filed a Complaint against Governor Cuomo incorporating many findings from the OAG Report, including allegations about other complainants. Compl. ¶¶ 1-143. Governor Cuomo subpoenaed the OAG on July 11, 2022 seeking underlying investigative materials, including the witness interview memos and unredacted deposition transcripts. OAG ECF No. 3-3. Governor Cuomo issued a narrowed subpoena on April 23, 2024 that continued to seek the interview memos and unredacted transcripts. OAG ECF No. 70-8. The OAG moved to quash this narrowed subpoena and Governor Cuomo cross-moved to compel.

In partially granting the OAG's motion to quash, the Order held that the witness interview memos were covered by attorney-client privilege because (1) the interview memos constitute communications by counsel to a client rather than underlying facts, Order 28-33, and (2) disclosure of these memos in the OAG's Report and to prosecutorial agencies did not waive privilege, Order 33-35, 39-45. The Order also held that the memos were likely also covered by the deliberative process privilege because they were prepared to help the OAG formulate its conclusions concerning the allegations. Order 45 n.19.

### *The Witness Interview Memos Are Not Covered by Attorney-Client Privilege*

The Order's holding on attorney-client privilege is contrary to law for two reasons. ***First***, the interview memos constitute underlying facts rather than communications. As the Order acknowledges, "while communications are privileged, facts are not." Order 30; *accord Kennedo v. United States*, No. 94-CV-2552 (CPS), 1995 WL 428660, at *2 (E.D.N.Y. July 6, 1995). Although Judge Merkl reviewed the memos at issue *in camera*, nothing in the Order suggests that the memos are anything other than a memorialization of witness statements.[4] The Order instead asserts that some facts are actually privileged: specifically, internal investigation notes and documents gathered while attorneys are ascertaining the factual background for legally relevant facts. Order 32-33 & n.14 (citing *Upjohn Co. v. United States*, 449 U.S. 383, 390-391 (1981)).[5] Not so. Documents like the memos at issue here, which contain "factual account[s]" by third-party witnesses of an incident or multiple incidents, are not "primarily or predominantly of a legal character," and are not privileged, even if they are prepared for attorney review or communicated to a client. *Vessalico v. Costco Wholesale Warehouse*, No. 15-CV-1292 (LDW)(SIL), 2016 WL 3892403, at *2 (E.D.N.Y. July 24, 2016). "[T]he privilege does not protect facts which an attorney obtains from independent sources and then conveys to his client." *Allen v. W. Point-Pepperell Inc.*, 848 F. Supp. 423, 427-428 (S.D.N.Y. 1994).[6]

---

[4] An example memo, obtained through discovery in one of the now-dismissed criminal cases, is attached as Exhibit A.

[5] The Order's reliance on cases like *Upjohn* is misplaced because the interviews in those cases occurred between company counsel and employees. The same is not true here, where the OAG has no basis to claim privilege over information provided by individuals who were not OAG employees.

[6] Although the Order found that information in the memos was "confidential" because of the nature of the investigation, Order 33-35, that confidentiality in a privilege analysis, which depends on whether the

***Second***, the OAG waived any purported attorney-client privilege by (1) citing the interview memos in its public Report and (2) disclosing those memos to federal and state government agencies. As the Order notes, privilege is waived where, "in fairness," an operative claim "requires examination of protected communications." Order 39-40. The Order applies a *per se* rule that waiver occurs only when the privilege-holder itself asserts the litigation claims. Order 42. But the fairness doctrine is not limited to the circumstance where the party itself offers the information in litigation—rather, when a privilege-holder's assertions "have been offered" on a material issue in a judicial proceeding, the privilege-holder's privilege is waived with respect to "any communications whose disclosure might affect the factfinder's judgment as to that issue." *United States v. Aronoff*, 466 F. Supp. 855, 862 (S.D.N.Y. 1979). That is precisely the case here. Trooper 1 has made allegations directly citing and relying on the OAG Report and, indeed, has represented to the Court that she intends to introduce the OAG Report as evidence at trial. OAG ECF No. 42-1.

The Order also held, incorrectly, that OAG's disclosures of the memos to other law enforcement agencies did not constitute a waiver. Order 43-45. But common-interest privilege arises only when attorneys convey information in the course of a "joint defense effort or strategy that has been decided upon" to serve an ongoing "common legal enterprise." *Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015). Accordingly, common law-enforcement interest arises only when two offices are "prosecuting separate but parallel claims against the same defendant." *Info. Res., Inc. v. Dun & Bradstreet Corp.*, 999 F. Supp. 591, 591-592 (S.D.N.Y. 1998). No such common law-enforcement interest privilege existed between the OAG and any of the third-party government offices because at the time of disclosure the OAG had already completed its investigation and disclaimed pursuit of further litigation against Governor Cuomo. See OAG ECF No. 3-12 at 11. "[T]he voluntary submission of material to a government agency to incite it to attack the informant's adversary" breaks privilege. *Info. Res., Inc.*, 999 F. Supp. at 593.

### *The Witness Interview Memos Are Not Covered by Deliberative Process Privilege*

Documents are protected by deliberative process privilege when they are predecisional and deliberative. *Am. Civ. Liberties Union v. Dep't of Def.*, No. 15 Civ. 9317 (AKH), 2017 WL 4326524, at *5 (S.D.N.Y. Sept. 27, 2017). At the very least, the interview memos were not deliberative. In order to be deliberative, documents must be "more than mere summaries"—factual material must be "inextricably intertwined" with subjective analysis and policy recommendations. *Lead Indus. Ass'n, Inc. v. Occupational Safety & Health Admin.*, 610 F.2d 70, 83, 85 (2d Cir. 1979). The interview memos do not reflect deliberation—they are summaries of factual material collected from witnesses. The Order acknowledges as much: "not every interview memorandum contains deliberative material on the face of the document." Order 45 n.19. These memos do not pick out the most important facts and highlight why they are important, as the Order itself recognizes. As such, case law is clear that deliberative process privilege does not apply. *Am. Soc'y for Prevention of Cruelty to Animals v. Animal & Plant Health Inspection Serv.*, No. 19 Civ. 3122 (NRB), 2021 WL 1163627, at *11 (S.D.N.Y. Mar. 25, 2021).

---

communication is confidential between the attorney and client. Where the underlying information is a witness statement, it is by definition not a "confidential" attorney-client communication.

Respectfully submitted,

*/s/ Theresa Trzaskoma*

Theresa Trzaskoma

Attachment

# Exhibit A

CLEARY GOTTLIEB STEEN & HAMILTON LLP



DRAFT May 17, 2021

MEMORANDUM FOR FILE

From: Lilianna Rembar

Re: <u>Interview of Kelly Brady on May 12, 2021</u>

On Wednesday, May 12, 2021, Jennifer Kennedy Park and Lilianna Rembar of Cleary Gottlieb Steen & Hamilton LLP ("Cleary") and Yannick Grant of Vladeck, Raskin & Clark, P.C. ("Vladeck") interviewed Kelly Brady, Director of Correspondence in the Office of the Governor (the "Office"). Ms. Brady's attorneys, John Fietkiewicz and Rachel Higgins, were also present for the interview. The interview took place by videoconference, and lasted from approximately 2:00 PM EST until 3:00 PM EST.



Ms. Brady was advised of the purpose of the interview and that the Special Deputies would use any information to further their investigation.

Ms. Brady said that she started in the Office in 2013 as the Director of Correspondence, a position that she stills holds. Ms. Brady said that prior to working at the Office, she worked for the New York State Assembly as an editor in the Communications Department from 2008 to 2013. She said that before working in the State Assembly, she was in graduate school.

Ms. Brady said that she applied to the Office because she was looking for career growth and that the Director of Correspondence role was a supervisory position. She stated that she interviewed with Terri Brennan and Joe Percoco.

Ms. Brady stated that she is in charge of three units: correspondence, proclamations, and invitations. She said that the correspondence unit processes all phone calls, emails, and physical mail that comes to the Office. She said that the unit categorizes the correspondence, which is then sent to a senior staffer. Ms. Brady said that the email that comes to the correspondence unit goes through the state website, which then goes to a "blanket box" that the correspondence unit has access to. She stated that the Governor does not have an email address.

Ms. Brady said that the proclamations unit writes correspondence that comes out under the Governor's signature. She said that this correspondence includes letters, certificates, and state proclamations. Ms. Brady explained that certificates could include, for example, recognition of someone becoming an Eagle Scout or someone retiring.

Ms. Brady stated that the invitations unit tracks all invitations for events sent to the Governor and passes the information along to senior staffers.

Ms. Brady said that all correspondence, proclamations, and invitations are tracked on a system called Inter Track. She said that by state law, this information cannot be deleted. Ms. Brady added that the Office participates in an audit to ensure that the information stored on Inter Track is preserved. She said that is not responsible for letting employees know about the preservation requirements. Ms. Brady stated that she has never been directed to delete something that she thought should not be deleted.

Ms. Brady said that she sits in Agency Building 4 in Albany, which is next to the Capitol building. She said that the staffers for the correspondence office sit on the same floor with her. She stated that another floor in the building houses the FOIL team that is specific to the Executive Chamber.

\* \* \*

Ms. Brady said that she has completed trainings on ethics, sexual harassment, diversity in the workplace, and fire safety. She stated that she did these trainings when she joined the Office and each year since. She said that she each time she finishes a training, she completes a certification. Ms. Brady said that each employee in the three units she is in charge of also completes the trainings and certifications yearly. Ms. Brady said that the online trainings are updated every year, but that the hard copy handbook she has is the same one that she got when she started at the Office in 2013.

Ms. Brady said that the sexual harassment training is an online course. She stated that the training presents scenarios and requires users to answer questions based on the scenarios. She thought that the training told employees to report sexual harassment to GOER.

2

Ms. Brady said that her understanding is that if anyone reported a complaint to her, she should report it to GOER. She noted that employees can probably report a complaint to their supervisor, but as she is a supervisor, her instruction would be to report a complaint to GOER. Ms. Brady's counsel later clarified that Ms. Brady would report it to GOER as well as look at the handbook and talk to Jill DesRosiers. Ms. Brady said that she would talk to Ms. DesRosiers because she had worked with her prior to Ms. DesRosiers going on maternity leave. Ms. Brady said that she has never directed a complaint to GOER nor has she advised anyone else to do so. She stated that no one has reported potential sexual harassment to her.

Ms. Brady was not aware of particular practices or policies with respect to confidentiality. She said that she was not asked to sign an agreement saying that she would not disclose certain information.

Ms. Brady said that she generally communicates with staffers via email. She said that she also uses her office phone and her Chamber-issued iPhone. She stated that she does not text employees in the Office with her Chamber-issued iPhone.

* * *

Ms. Brady said that when she first accepted her position at the Office, she was invited to take a photograph with her family and the Governor. Ms. Brady said that her parents and two children joined the photo. She did not recall who was next to the Governor. She said that the Governor did not touch her when they took the photograph.

Ms. Brady stated that she interacted with the Governor on one other occasion. She said that Stephanie Benton called and asked Ms. Brady to come to the Governor's office. Ms. Brady said that she went in, the Governor handed her a painting of a fish from an artist in Sweden, and asked her to write an acknowledgement letter. Ms. Brady said that she told the Governor that she would, and left. Ms. Brady said that the interaction lasted about two minutes and that she did not feel uncomfortable.

Ms. Brady said that she has written other letters about paintings, but that this was the only occasion that she went to the Governor's office and he personally asked her to write an acknowledgement letter. She thought that the Governor asked her to write this letter because the job falls under the proclamations office. She said that she did not know why the Governor did not ask someone else to ask Ms. Brady. Ms. Brady said that she did not think it was unusual that the Governor asked her.

However, Ms. Brady noted that she usually gives everything that the Governor needs to sign to either Tracy Goodman or Farrah Kennedy. She said that she is never in the room when the Governor is signing letters.

Ms. Brady said that she has attended Office events, but has not interacted with the Governor at them. She said that when she works at events, she usually is at the nametag table, which is outside of the venue. Ms. Brady said that she would remain there for the duration of the

3

event and so would not be in the same room as the Governor. Ms. Brady added that she has not traveled with the Governor.

Ms. Brady said that the Governor has not touched her, shaken her hand, or given her a kiss. Ms. Brady said that the Governor has not commented on her appearance or her attire, yelled at her, or cursed at her. She said that she has not heard the Governor make comments of a sexual nature, make offensive comments, or comment about his hands. Ms. Brady said that the Governor has not asked her to memorize song lyrics.

Ms. Brady said that she has never heard about the Governor wanting a letter to go to a woman he met at a particular event.

Ms. Brady said that she has not seen the Governor touch any other staffer. She said that she has seen the Governor take photographs with others, but did not recall noticing where the Governor had his hands in those photographs. Ms. Brady said that she was unaware if the Governor commented on someone else's appearance or attire.

Ms. Brady said she has not heard the Governor yell or curse at others. She added that she has not heard any of the senior staff yell at employees.

Ms. Brady said that she has never received a present from the Governor. Ms. Brady said that on Valentine's Day (she could not remember the year), she saw a flower on Molly Streb's desk. Ms. Brady said that she talked to Ms. Streb about the flower, and Ms. Streb said everyone who worked in the Capitol building received one. When asked to clarify, Ms. Brady said that Ms. Streb said it was everyone, not that it was just women.

Ms. Brady said that she did not understand there to be rules about how either women or men were supposed to dress. She said that she did not observe the Governor treating women differently from men.

\* \* \*

Ms. Brady said that she interacts with Ms. Benton for her job, primarily via email. Ms. Brady said they also talk on the phone. Ms. Brady described Ms. Benton as very professional. Ms. Brady also said that she interacts with the administrative staff that work for Ms. Benton—Ms. Kennedy and Ms. Goodman. Ms. Brady described both Ms. Kennedy and Ms. Goodman as friendly. She said that Ms. Goodman is professional. Ms. Brady said that none of these women have confided in her about their interactions with the Governor.

Ms. Brady said she was unaware of the term "mean girls" other than having read it in the paper.

Ms. Brady stated that she also interacts with the IT team as well as the administration when she has human resources questions. She said that she would direct human resources questions to Lauren Grasso, who Ms. Brady believes to be the head of administration. Ms. Brady stated that she understands Ms. Grasso's role to be "a little bit separate" from human

4

resources. However, she said that her understanding is that Ms. Grasso generally deals with human resources issues, including trainings.

\* \* \*

Ms. Brady said that she learned of the allegations from the complainants who currently work or previously worked in the Office when she read the allegations in the paper or saw them on the news. Ms. Brady said that she was surprised to hear of each allegation, because she had not witnessed that behavior and had not heard previously of any allegations.

*Charlotte Bennett*. Ms. Brady stated that she interacted with Charlotte Bennett via email. She said that Ms. Bennett was based in New York City, so when Ms. Brady had information to get to Ms. Benton in New York City, she would send it through Ms. Bennett, as Ms. Brady is based in Albany.

*Alyssa McGrath*. Ms. Brady said that Alyssa McGrath works in the office with Ms. Goodman and Ms. Kennedy, so Ms. Brady sees her occasionally.

*Lindsey Boylan*. Ms. Brady stated that her interactions with Lindsey Boylan were minimal. She said that she would give Ms. Boylan correspondence when Ms. Boylan was the senior staffer for economic development.

*Ana Liss*. Ms. Brady said that she only knew of Ana Liss and has not interacted with her. Ms. Brady said that because she did not know Ms. Liss personally, Ms. Brady did not really have a reaction to Ms. Liss's allegations.

Ms. Brady stated that she has not spoken with any of the complainants about their interactions with the Governor. Ms. Brady said that no one else has relayed complaints about the Governor's conduct to her. She said that she is not aware of other complaints there may be about the Governor.

\* \* \*

Ms. Brady said that she has not discussed the allegations with any staffer, either current or former. She said that no one has asked how she felt or asked how she was doing following the allegations.

Ms. Brady said that she was not aware of discussions about a letter in support of the Governor.

Ms. Brady stated that Beth Garvey sent an email to all Office staff instructing them not to delete any records pertaining to the investigation. Ms. Brady said that the instruction to preserve records was related to both work and personal equipment. Ms. Brady did not recall if

5

Ms. Garvey said that if there was any conduct to report that it should reported to her. Ms. Brady did not recall if there were any instructions given about how to report misconduct.

* * *

The team concluded by thanking Ms. Brady for her time and asking her to reach out to her counsel if other information comes to mind. Ms. Brady's counsel asked if the team took the position under Executive Law § 63(8) that Ms. Brady was precluding from talking to anyone about the interview. The team explained that without reference to § 63(8), they would advise any witness not to talk about the substance of the interview.