**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GOVERNOR ANDREW M. CUOMO, | **ORAL ARGUMENT REQUESTED** |
| Movant, | |
| v. | Case No. 22-mc-03044 (LDH) (TAM) |
| OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL, | |
| Respondent. | |
| TROOPER 1, | |
| Plaintiff, | Pending In: Civil Action No. 22-cv-00893 (LDH) (TAM), United States District Court for the Eastern District of New York |
| v. | |
| NEW YORK STATE POLICE, et al., | |
| Defendants. | |

**GOVERNOR CUOMO'S OPPOSITION TO THE OAG'S OBJECTIONS TO THAT PORTION OF THE MAGISTRATE JUDGE'S OCTOBER 28, 2024 MEMORANDUM AND ORDER DECLINING TO QUASH THE SUBPOENA TO THE OAG BASED ON STATE SOVEREIGN IMMUNITY**

GLAVIN PLLC
Rita M. Glavin
Katherine E. Petrino
156 West 56th Street, Ste. 2004
New York, NY 10019
Tel: (646) 693-5505
rglavin@glavinpllc.com

SHER TREMONTE LLP
Theresa Trzaskoma
Allegra A. Noonan
90 Broad Street, 23rd Floor
New York, New York 10004
Tel.: (212) 202-2600
Fax: (212) 202-4156
ttrzaskoma@shertremonte.com

*Counsel for former Governor*
*Andrew M. Cuomo*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND ........................................................................................................ 3

LEGAL STANDARD .................................................................................................. 11

ARGUMENT ............................................................................................................... 11

I.    THE MAGISTRATE JUDGE CORRECTLY HELD THAT STATE SOVEREIGN IMMUNITY DOES NOT BAR ENFORCEMENT OF THE NARROWED SUBPOENA ............................................................ 11

      A.    The Magistrate Judge Correctly Held That Second Circuit Precedent Concerning Federal Sovereign Immunity Is Inapplicable ................................... 11

      B.    The Magistrate Judge Correctly Held That Congressional Abrogation of Sovereign Immunity Applies to Federal Discovery Subpoenas Issued Pursuant to Actions Brought Under Abrogating Statutes .................................... 16

      C.    The Magistrate Judge Properly Considered the Deleterious Effects of the OAG's Sovereign Immunity Argument ..................................................... 19

II.   THE OAG WAIVED ANY CLAIM TO STATE SOVEREIGN IMMUNITY .............. 21

CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ali v. Carnegie Inst. of Washington*,
  306 F.R.D. 20 (D.D.C. 2014)....................................................................... 14

*Allen v. Woodford*,
  544 F. Supp. 2d 1074 (E.D. Cal. 2008)....................................................... 14

*Alltel Commc'ns, LLC v. DeJordy*,
  675 F.3d 110 (8th Cir. 2012) ...................................................................... 13

*Barnes v. Black*,
  544 F.3d 807 (7th Cir. 2008) ...................................................................... 14

*Beaulieu v. Vermont,*
  807 F.3d 478 (2d Cir. 2015)................................................................... 22, 23

*Bennett v. Cuomo*,
  No. 22-cv-7846, 2024 WL 2963714 (S.D.N.Y. June 12, 2024) ............... 13

*Bonnet v. Harvest (U.S.) Holdings, Inc.*,
  741 F.3d 1155 (10th Cir. 2014) .................................................................. 13

*Catskill Dev. LLC v. Park Place Ent. Corp.*,
  206 F.R.D. 78 (S.D.N.Y. 2002) ................................................................. 13

*Charleston Waterkeeper v. Frontier Logistics, L.P.*,
  488 F. Supp. 3d 240 (D.S.C. 2020)....................................................... 14, 15

*Commonwealth of P.R. v. United States*,
  490 F.3d 50 (1st Cir. 2007)......................................................................... 14

*COMSAT Corp. v. Nat'l Sci. Found.*,
  190 F.3d 269 (4th Cir. 1999) ...................................................................... 14

*Derechin v. State Univ. of N.Y.*,
  963 F.2d 513 (2d Cir. 1992)........................................................................ 18

*EPA v. Gen. Elec. Co.*,
  197 F.3d 592 (2d Cir. 1999)................................................................ *passim*

*Exxon Shipping Co. v. U.S. Dep't of Interior*,
  34 F.3d 774 (9th Cir. 1994) ........................................................................ 14

*Feerick v. Safir*,
    297 A.D.2d 212 (N.Y. App. Div. 2002) ................................................................. 20

*Felix v. Cnty. of Nassau*,
    344 F.R.D. 441 (E.D.N.Y. 2023) ........................................................................ 13

*Fitzpatrick v. Bitzer*,
    427 U.S. 445 (1976) .......................................................................................... 16

*Fortin v. Comm'r of Mass. Dep't of Pub. Welfare*,
    692 F.2d 790 (1st Cir. 1982) ............................................................................. 18

*Freeman v. Rochester Psychiatric Ctr.*,
    No. 16-CV-6668T, 2018 WL 4275984 (W.D.N.Y. Sept. 7, 2018) ...................... 13

*Fritz v. LVNV Funding, LLC*,
    587 F. Supp. 3d 1 (E.D.N.Y. 2022) ................................................................... 11

*Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation*,
    No. 06-cv-1260 (KAM), 2009 WL 4981905 (E.D.N.Y. Dec. 10, 2009) ........ 24, 25

*Gross v. Lunduski*,
    304 F.R.D. 136 (W.D.N.Y. 2014) ....................................................................... 20

*Henry v. N.J. Transit Corp.*,
    39 N.Y.3d 361 (N.Y. 2023) ................................................................................ 22

*Hess v. PATH*,
    513 U.S. 30 (1994) ............................................................................................ 15

*Hous. Bus. J., Inc. v. Off. of Comptroller of Currency, U.S. Dep't of Treasury*,
    86 F.3d 1208 (D.C. Cir. 1996) .......................................................................... 15

*Hutto v. Finney*,
    437 U.S. 678 (1978) .......................................................................................... 18

*In re S.C. Dep't of Parks, Recreation, & Tourism*,
    103 F.4th 287 (4th Cir. 2024) ............................................................................ 18

*In re Long Visitor*,
    523 F.2d 443 (8th Cir. 1975) ............................................................................. 18

*In re Mo. Dep't of Nat. Res.*,
    105 F.3d 434 (8th Cir. 1997) ............................................................................. 14

*Info. Res., Inc. v. Dun & Bradstreet Corp.*,
    999 F. Supp. 591 (S.D.N.Y. 1998) ....................................................................... 23

*Jackson v. AFSCME Local 196*,
    Civ. No. 3:07CV0471 (JCH), 2008 WL 1848900 (D. Conn. Apr. 25, 2008) ......................... 14

*Jett v. Penner*,
    No. Civ S-02-2036 GEB JFM P, 2007 WL 127790 (E.D. Cal. Jan. 12, 2007) ...................... 24

*Knick v. Township of Scott, Pennsylvania*,
    588 U.S. 180 (2019) ................................................................................... 20

*Lapides v. Bd. of Regents of Univ. Sys. of Georgia*,
    535 U.S. 613 (2002) ................................................................................... 21

*Laxalt v. McClatchy*,
    109 F.R.D. 632 (D. Nev. 1986) ....................................................................... 14

*Lee v. Walters*,
    172 F.R.D. 421 (D. Or. 1997) ........................................................................ 18

*Leitner v. Westchester Cmty. Coll.*,
    779 F.3d 130 (2d Cir. 2015) ......................................................................... 15

*Lynch v. City of New York*,
    No. 17-CV-7577 (JGK) (BCM), 2022 WL 19836912 (S.D.N.Y. June 16, 2022) ................... 13

*Mick v. Gibbons*,
    No. 4:22CV3025, 2024 WL 448735 (D. Neb. Feb. 6, 2024) .................................. 15, 16

*Montesa v. Schwartz*,
    No. 12 Civ. 6057 (CS)(JCM), 2015 WL 13016354 (S.D.N.Y. Nov. 3, 2015) ...................... 13

*Morrison v. Budget Rent A Car Sys., Inc.*,
    230 A.D.2d 253 (N.Y. App. Div. 1997) ............................................................. 22

*NGV Gaming, Ltd. v. Upstream Point Molate, LLC*,
    Nos. C-04-3955 SC (JCS), C-05-1605 SC, 2009 WL 4258550 (N.D. Cal. Nov. 24, 2009) .... 24

*Pierce v. Demmon*,
    No. 9:14-CV-1028 (GTS/DEP), 2015 WL 7077227 (N.D.N.Y. Nov. 12, 2015) ................... 13

*Polk's Lessee v. Windel*,
    19 F. Cas. 940 (C.C.D. Tenn. 1817) ................................................................. 12

*Rossi v. City of Lakewood,*
    No. C07-5411-RBL, 2008 WL 4000563 (W.D. Wash. Aug. 25, 2008) .................................. 15

*Russell v. Jones,*
    49 F.4th 507 (5th Cir. 2022) ........................................................................................... 13

*Screen v. Quality Prot. Servs., Inc.,*
    No. 1:20-cv-02506 (LGS), 2020 WL 7246926 (S.D.N.Y. Dec. 8, 2020) .............................. 13

*St. Vincent Med. Grp., Inc. v. U.S. Dep't of Just.,*
    71 F.4th 1073 (7th Cir. 2023) ......................................................................................... 14

*Suffolk Cnty. Water Auth. v. Dow Chem. Co.,*
    No. 17-CV-6980 (NG), 2022 WL 1025932 (E.D.N.Y. Apr. 6, 2022) .................................... 13

*Tenn. Student Assistance Corp. v. Hood,*
    541 U.S. 440 (2004) ....................................................................................................... 11

*Trump v. Vance,*
    591 U.S. 786 (2020) ....................................................................................................... 16

*U.S. Dep't of Just. v. Ricco Jonas,*
    24 F.4th 718 (1st Cir. 2022) ........................................................................................... 14

*United States v. Caldwell,*
    2 U.S. 333 (C.C.D. Pa. 1795) ......................................................................................... 12

*United States v. James,*
    980 F.2d 1314 (9th Cir. 1992) .................................................................................. 22, 23

*United States v. Menominee Tribal Enters.,*
    Case No. 07-C-316, 2008 WL 2273285 (E.D. Wis. June 2, 2008) ....................................... 23

*United States v. Velarde,*
    40 F. Supp. 2d 1314 (D.N.M. 1999) ................................................................................ 23

*Wagoner Cnty. Rural Water Dist. No. 2 v. Grand River Dam Auth.,*
    577 F.3d 1255 (10th Cir. 2009) ...................................................................................... 15

*Weiner v. McKeefery,*
    No. 11-CV-2254 (JFB)(AKT), 2014 WL 2048381 (E.D.N.Y. May 19, 2014) ...................... 11

*Wilson v. Venture Fin. Grp.,*
    No. C09-5768BHS, 2010 WL 4512803 (W.D. Wash. Nov. 2, 2010) ................................... 14

*Winn v. Patterson*,
  34 U.S. 663 (1835)......................................................................................................... 12

**Statutes**

28 U.S.C. § 636 ................................................................................................................ 11

N.Y. Exec. Law § 63(8) ................................................................................................... 3

N.Y. Pub. Off. Law § 87 ................................................................................................ 20

N.Y. Pub. Off. Law § 89 ................................................................................................ 20

**Rules**

Fed. R. Civ. P. 45 ................................................................................................... 1, 7, 18

Fed. R. Civ. P. 72 ............................................................................................................ 11

Governor Cuomo respectfully submits this memorandum in opposition to the OAG's[1] objections to the Magistrate Judge's October 28, 2024 Order filed at ECF No. 85 ("Order").[2]

## PRELIMINARY STATEMENT

For nearly two and a half years, the OAG, a nonparty recipient of a valid and duly served Rule 45 subpoena in the underlying Trooper 1 Action, has refused to produce documents concerning Trooper 1's allegations. The OAG's objections in the Trooper 1 Action and related Bennett Action have resulted in hundreds of pages of briefing across different proceedings (so far), all at the expense of New York taxpayers who have had to foot the bill for the OAG's and other nonparties' discovery gamesmanship. One of the costliest litigation ploys has been the OAG's assertion—for the first time ever, in this case—that the OAG is immune from federal discovery subpoenas and thus cannot be compelled to produce even a narrow set of highly relevant documents—interview memos and unredacted transcripts containing witness statements.

Now, after years of expensive motion practice and two separate rounds of briefing on the issue of sovereign immunity, the Magistrate Judge finally decided that sovereign immunity is inapplicable and that the OAG should produce certain materials—specifically, unredacted versions of transcripts that already exist in that format. Compliance would impose hardly (if any) burden, yet the OAG—determined, apparently, to continue racking up Governor Cuomo's state-funded legal defense costs—insists on pursuing its sovereign immunity argument through an objection to this Court rather than turn over even those limited documents. Governor Cuomo respectfully urges

---

[1] In its objection, the OAG inaccurately refers to Governor Cuomo as "plaintiff" in this miscellaneous proceeding rather than "movant" and to itself as "defendant" rather than "respondent." This deliberate misnomer is an effort to cast the subpoena compliance process as the type of legal proceeding that would qualify as a "suit" for sovereign immunity purposes. As discussed below, however, the OAG is not a defendant in this litigation and calling itself one does not make it so.

[2] This brief uses terms and abbreviations as defined in the Order. This brief also refers to the underlying action, *Trooper 1 v. New York State Police*, 22-cv-00893 (LDH) (TAM), as the "Trooper 1 Action," and refers to the now-dismissed parallel action, *Bennett v. Cuomo*, 22-cv-07846 (VSB) (SLC), as the "Bennett Action."

this Court to (i) reject the OAG's sovereign immunity arguments, just as the Magistrate Judge did, and (ii) affirm that the OAG must produce the unredacted transcripts as ordered.[3]

Since the founding of the United States, courts have recognized that federal discovery subpoenas are distinct from the "suits" barred by state sovereign immunity, and that understanding remains widespread today. Across jurisdictions, federal courts continue to hold that state sovereign immunity does not apply to federal discovery subpoenas. Although the Second Circuit (like most circuits) has held that <u>federal</u> sovereign immunity applies to federal discovery subpoenas to federal agencies, that holding is not applicable to a federal discovery subpoena to state agencies because the interests protected by federal sovereign immunity in such circumstances—separation of powers—differ from the interests protected by state sovereign immunity—state dignity. In this federalist system, the dignity of any state is inherently limited by the federal courts' obligation to adjudicate cases over which they have jurisdiction. For this reason, many federal courts hold that that state sovereign immunity does not bar enforcement of federal discovery subpoenas to state entities, even while those same courts hold that federal sovereign immunity bars such subpoenas to federal entities. The different applications of sovereign immunity principles are particularly critical in actions like the underlying Trooper 1 Action—a federal civil rights case involving a Title VII claim against a New York state entity.

Ruling that state agencies are immune from federal discovery subpoenas would, as the Magistrate Judge recognized, be catastrophic: despite Congress having expressly abrogated state sovereign immunity under Title VII and other federal statutes, state actors could violate federal laws with near impunity because the involved state entities could simply decide to withhold critical

---

[3] Governor Cuomo has also filed an objection to a separate part of the Order holding that witness interview memos were protected by attorney-client privilege. ECF No. 89.

documents from federal courts during the discovery process. Cases in federal courts, including those involving employment discrimination, prisoner's rights, redistricting, voting rights, and many other similarly important types of litigation arising under federal statutes could be ground to a halt by a recalcitrant or politically minded state entity. This is not conjecture—state entities like the OAG have been raising sovereign immunity arguments in these types of cases. That any of them have found purchase in this radical argument is more than worrisome—it is institution- and nation-threatening. This Court should affirm the Magistrate Judge's correct decision.

Moreover, even if the OAG did have sovereign immunity (which it does not), the OAG waived it thrice over: first, through its voluntary disclosure to multiple federal government entities in attempts to encourage a civil prosecution of Governor Cuomo through Title VII; second, through its voluntary disclosure to Governor Cuomo consisting of investigative materials concerning Trooper 1 in response to the first iteration of the subpoena dating back to 2022; and third, through sharing the interview memos and unredacted transcripts with the Magistrate Judge *in camera* to obtain a favorable privilege ruling it could use in other fora. Because there is no sovereign immunity here—and because the OAG waived any sovereign immunity it would have had—the Court should affirm the Magistrate Judge's sovereign immunity analysis.

## BACKGROUND

### *Factual Background*

#### *The OAG Investigation and Report*

Between December and February 2021, two women publicly alleged that Governor Cuomo sexually harassed them. Order 2. On March 1, 2021, under New York Executive Law § 63(8), Governor Cuomo directed the OAG to select independent counsel to investigate the allegations and make a public report of the findings. *Id.* Rather than appoint unbiased counsel, the OAG deputized Joon Kim from Cleary Gottlieb Steen & Hamilton LLP ("Cleary") and Anne Clark from

Vladeck, Raskin & Clark, PC ("Vladeck") to investigate—both were deeply conflicted against Governor Cuomo and/or in favor of the accusers. *See* ECF No. 79-2 ¶ 4. Over the next several months, the OAG investigators interviewed 179 individuals and took testimony from 41 of them. Order 2. On August 3, 2021, the OAG released the OAG Report, which broadly credited allegations of sexual harassment by eleven women, including Trooper 1. ECF No. 79-2 ¶ 5 at 1. As discussed further below, discovery in this and related cases has confirmed that the OAG investigation was shockingly shoddy and clearly biased, and that, among other things, the investigators failed to ask for or collect crucial evidence concerning the allegations and the accusers' credibility. Not only that, Trooper 1 and others destroyed material evidence, including numerous text communications they sent and received during the OAG investigation.

After the release of the Report, the United States Department of Justice ("DOJ") and the United States Attorney's Office for the Eastern District of New York ("EDNY") requested materials from the OAG to aid a federal civil "investigation" of Governor Cuomo and the Executive Chamber under Title VII. ECF No. 70 ¶ 28. The OAG complied. *See id.* Around the same time, the OAG disclosed similar materials to five New York district attorney's offices to aid criminal investigations against Governor Cuomo based on the Report's allegations. *Id.* ¶¶ 26-32.

### *Discovery of Trooper 1's and PSU Members' Animus Towards Governor Cuomo*

Well before any of Governor Cuomo's alleged conduct, Trooper 1, alongside fellow members of the New York State Police—some of whom are crucial witnesses in this case— regularly expressed strong personal and political animus towards Governor Cuomo and wished for his political demise. Trooper 1 and her colleagues' dislike of Governor Cuomo was unrelated to any harassment allegations, and instead was fueled by personal enmity and disapproval of his policy positions, in particular those centered on criminal justice reform and COVID lockdowns.

4

See ECF Nos. 79-3–79-6, 79-8 (text messages and emails involving Trooper 1 and other NYSP members criticizing Governor Cuomo on political and professional bases).

Once the OAG investigation was announced, Trooper 1—along with her close friend and fellow PSU member Diane Parrotta—acted on their animosity and participated in a PSU-wide effort to spin a narrative that Governor Cuomo was attracted to Trooper 1 and had sexually harassed her. Parrotta in particular sprang into action. Among others, Parrotta enlisted the support of Steve Nevins, a then-retired former head of the PSU, who also harbored deep personal and political animus against Governor Cuomo. Nevins, who had never worked with Trooper 1 and who was unaware of Trooper 1's allegations until being contacted by Parrotta, was one of the first NYSP witnesses to speak to OAG investigators. See ECF No. 79-16 at 1. Parrotta spoke with investigators immediately thereafter, and also served as a confidential source of misinformation to reporters. See id.; ECF No. 79-18 at 10-11, 15, 19, 21.

Phone records from Parrotta, Trooper 1, and former PSU member Fabricio Plaskocinski confirm the ensuing collusion during the investigation. Parrotta and Trooper 1 frequently spoke with each other and other NYSP members right before and/or right after NYSP witnesses gave statements to OAG Investigators. See ECF No. 79-18. For example, Parrotta spoke with Nevins both directly before and after his April 7, 2021 OAG interview, and then spoke with Trooper 1, other Trooper interviewees, and OAG investigators in the days immediately following Nevins's interview and before her own interview. Id. at 12-14. Before Trooper 1's initial interview with the OAG, she spoke with Parrotta at least six times. Id. at 14.[4] The timing and consistency of these

---

[4] After Governor Cuomo filed the underlying cross-motion to compel, he received a substantial production of text messages that Trooper 1 sent and received during the OAG investigation. These text messages were only belatedly produced by a nonparty PSU member because Trooper 1 deleted them (even while she was under a clear legal obligation to preserve them). Though produced too late to be part of the record below, they are devastating to the credibility of Trooper 1 and each of her corroborating PSU witnesses. The texts confirm that Trooper 1 and her PSU

calls indicate that Trooper 1, Parrotta, and other Troopers were coordinating their stories before going in to meet with the OAG investigators. And Trooper 1 then covered up that extensive coordination by falsely testifying under oath to the OAG investigators that she had not spoken with others about her testimony. ECF No. 79-2 ¶ 7 at 12:15-18. Trooper 1 also destroyed text messages that evidenced the collusion. *See* ECF No. 76 at 8; ECF No. 79-2 ¶ 28.

Despite obvious reasons to question the motivations of Trooper 1 and other NYSP witnesses, including a long history of public reports of PSU members being disgruntled about Governor Cuomo's perceived influence on the NYSP, the OAG investigators never considered, much less looked into, the potential biases of Trooper 1 and others. Indeed, the OAG investigators apparently never questioned why Trooper 1 and other NYSP witnesses produced zero communications about their interactions with Governor Cuomo. *See id.* The OAG investigators either did not know or care about the extensive coordination between Trooper 1 and other PSU witnesses. Their failure to seek or obtain corroborating documentary evidence in this regard is particularly hard to fathom given that Trooper 1 had never reported her harassment to a single supervisor. ECF No. 79-2 ¶ 5 at 40-41. Instead, the OAG investigators simply credited Trooper 1's excuse that she was "fearful of speaking out," an explanation that was never believable considering how often PSU members spoke up when Governor Cuomo said or did something they disapproved of.

---

colleagues—who were charged with protecting the lives of Governor Cuomo and his family—had strong political and professional animus against him having nothing to do with any allegedly harassing conduct and often spoke in strongly disparaging terms about him. The texts also corroborate what the phone records show: that Trooper 1 and others coordinated their statements to the OAG investigators and did so for the purpose of destroying Governor Cuomo. The powerful evidence of collusion during the OAG investigation makes it all the more important for Governor Cuomo to obtain the statements Trooper 1 and others made to the OAG investigators. Even if this Court cannot consider such evidence in connection with the OAG's objections to the Order, the Court should be aware that Governor Cuomo's defenses to Trooper 1's allegations, and his criticisms of the OAG Investigation and Report, are not speculative conspiracy theories but are firmly grounded in evidence that he has had to spend years obtaining and developing.

***Procedural Background***

Trooper 1's Complaint is largely a summary of the OAG Report, or, more bluntly, a cut-and-paste job. Accordingly, nearly two and a half years ago, on July 11, 2022, Governor Cuomo served a FRCP 45 subpoena on the OAG seeking investigative materials ("Original Subpoena"),[5] and the OAG objected on relevance and privilege grounds. ECF Nos. 3-3–3-7. On October 6, 2022, Governor Cuomo filed a motion to compel compliance with the Original Subpoena. In opposition and in support of a cross-motion to quash, the OAG objected on the grounds that any enforcement of the discovery subpoena was prohibited by state sovereign immunity, an argument that, to our knowledge, the OAG had never made before. ECF No. 18 at 10-14. Even so, the OAG produced *some* investigative materials to Governor Cuomo in response to the Original Subpoena, including materials that specifically reference Trooper 1. ECF No. 70 ¶ 50.[6]

On July 21, 2023, the Magistrate Judge denied Governor Cuomo's motion to compel with respect to the Original Subpoena on the basis that it was overly broad, but reserved ruling on the OAG's cross-motion to quash. ECF No. 37 at 9. That order also questioned the relevance of materials sought to test "the independent and exhaustive nature of the OAG Report." *Id.* at 29-30. Governor Cuomo moved for reconsideration and narrowed the subpoena to a narrow set of clearly

---

[5] Governor Cuomo also subpoenaed a set of materials similar to the Requested Materials in the Bennett Action. ECF No. 79-10.

[6] Various parties, including Governor Cuomo, have also attempted to use New York's Freedom of Information Law ("FOIL") to obtain materials, but to no avail. On February 7, 2022, the New York Daily News submitted a request under FOIL for the memos from the interviews of the 179 witnesses. ECF No. 79-2 ¶ 6. The OAG denied this request and subsequent appeal on the basis that the memos were protected by attorney-client privilege and work-product. *Id.* Because the OAG took the position in this case that the FOIL process, rather than a discovery subpoena, was the appropriate avenue to obtain evidence from the OAG, Governor Cuomo also submitted his own FOIL request for interview memos and unredacted transcripts in July 2023. ECF No. 79-13 at 2. Although the OAG claims to be producing records responsive to that request, in reality the OAG has not produced a single witness interview memo (consistent with its privilege positions in this litigation) or a single unredacted transcript. ECF No. 79-14 at 13-14. The FOIL process will not yield production of these materials: as the OAG has stated repeatedly here and elsewhere, it will never produce interview memos or unredacted transcripts absent judicial order. *Id.* at 7-8.

relevant interview memos and unredacted transcripts. ECF No. 41.[7] At a subsequent status conference, Trooper 1's counsel confirmed that Trooper 1 did indeed intend to rely on the OAG Report at trial. *See* ECF No. 42-1.[8] Accordingly, in connection with the OAG's still-pending cross-motion to quash, the Magistrate Judge directed the OAG to submit a privilege log of the requested interview memos and transcripts. On November 17, 2023, the OAG produced a log listing memos and transcripts for 35 witnesses, many of whom were anonymized, asserting unspecified privileges over each document. *See* ECF No. 53. Thereafter, the Magistrate Judge ordered the OAG to submit the interview memos listed in the privilege log for *in camera* review so she could assess the OAG's privilege arguments in its motion to quash. Again, on December 13, 2023, the OAG complied and provided those documents for the Magistrate Judge's review. *See* ECF No. 54.

On April 19, 2024, the Magistrate Judge held another conference and, rather than rule on the pending motion to quash the Original Subpoena, directed Governor Cuomo to issue a narrowed subpoena to the OAG (the "Narrowed Subpoena") and ordered yet another round of briefing on the OAG's objections. ECF No. 62-1 at 91:2-23. The Narrowed Subpoena again requested production of materials related to Trooper 1's allegations, including as to the Investigation and Report: (1) interview memos of Trooper 1, the other ten complainants referenced in the Amended Complaint, and any current or former NYSP member listed in the OAG's privilege log, and (2) unredacted transcripts of Trooper 1's and the other ten complainants' OAG testimony (the "Requested Materials"). ECF No. 70-8 at 5. Pursuant to the Magistrate Judge's orders, on June 7, 2024, nearly two years after service of the Original Subpoena, the OAG moved to quash the Narrowed Subpoena, and on July 17, 2024, Governor Cuomo cross-moved to compel the

---

[7] The Magistrate Judge denied the motion for reconsideration on March 29, 2024. OAG ECF No. 57.

[8] Moreover, in August 2023, Governor Cuomo also sought the unredacted transcripts and interview memos in the Bennett Action. The OAG also resisted production in that case on grounds identical to those raised here.

Narrowed Subpoena. ECF Nos. 68, 76, 79. As in briefing concerning the Original Subpoena, the OAG argued in its papers that sovereign immunity barred enforcement of the Narrowed Subpoena. *See* ECF Nos. 69, 81.

On October 28, 2024, the Magistrate Judge issued the Order granting in part and denying in part the OAG's motion to quash. As pertinent here, the Magistrate Judge denied the OAG's motion to quash the Narrowed Subpoena's requests for unredacted transcripts. Order 52-53. As part of that denial, the Magistrate Judge held that "sovereign immunity does not provide the Attorney General with a shield from providing documents in response to the Subpoena in this case." *Id.* at 8. The Magistrate Judge first analyzed the history of state sovereign immunity in the United States and emphasized the Supreme Court's holdings that state sovereign immunity is "not absolute" because the states "did surrender a portion of their inherent immunity" upon ratification of the Constitution. *Id.* at 11. Thus, state sovereign immunity "confirms" the nature of our "constitutional structure," which includes the supremacy of federal law over state law. *Id.* at 12. Consequently, the Magistrate Judge reasoned, where federal courts preside over cases like this one, brought under Title VII—a federal statute that has expressly abrogated state sovereign immunity—"federal court jurisdiction must also extend to issuing and enforcing a *subpoena*" issued in that case. *Id.* at 13. Without such enforcement authority, the Magistrate Judge wrote, federal courts "could effectively be left without the ability to preside over cases that the Supreme Court has already held are within the federal courts' power." *Id.* The Magistrate Judge stated it in no uncertain terms: "This would create an entirely untenable situation." *Id.*

Under this framework, the Magistrate Judge rejected the OAG's arguments that sovereign immunity bars enforcement of the Narrowed Subpoena. To start, the Magistrate Judge rejected the OAG's contention that *EPA v. General Electric Co.*, 197 F.3d 592 (2d Cir. 1999), requires the

application of sovereign immunity here. *EPA* dealt with <u>federal</u> sovereign immunity rather than <u>state</u> sovereign immunity, and the OAG's argument "rests on the incorrect premise that federal and state sovereign immunity are the same." Order 14-15. As the Magistrate Judge recognized, *EPA*'s rationale does not hold up when the statute providing the underlying cause of action abrogates sovereign immunity—and, in any event, providing documents during federal discovery does "not compromise state sovereignty to a significant degree." *Id.*

Moreover, the Magistrate Judge rejected the OAG's argument that state sovereign immunity has barred federal discovery subpoenas since the adoption of the Eleventh Amendment (and under common law before that). The Magistrate Judge noted that, according to Blackstone and other early sources, subpoenas have long been considered distinguishable from the "suits" that are barred by sovereign immunity, and that there is thus a "long common law tradition" of acquiring evidence via subpoena and precedent dating from the late 1700s and early 1800s that "discuss[es] subpoenas directed at governmental officials." *Id.* at 20-22.

Finally, the Magistrate Judge expressed "grave concerns" about the disastrous consequences of applying state sovereign immunity to federal discovery subpoenas. *Id.* at 22. The Magistrate Judge recognized that, if "the rule espoused by the Attorney General" prevailed, it would be "up to the states" to decide "whether to produce documents and evidence to the federal courts" in cases where the state entity custodian is a non-party, with "no check by the federal court that is adjudicating the underlying suit." *Id.* "From records generated by state-run colleges and universities, to employment records for state employees," the list of documents that a state could withhold in important federal cases "goes on and on." *Id.* at 22-23. And the Magistrate Judge underlined that these concerns are not hypothetical—the Order cites many cases involving bedrock federal law wherein state entities opposed federal discovery subpoenas by asserting sovereign

10

immunity. *Id.* at 23-24. Highlighting the importance of the federal courts in vindicating federal rights, the Magistrate Judge concluded that, "if the matter under consideration in the federal case is of federal significance, such as enforcement of the federal civil rights laws or federal court actions concerning state redistricting or voting rights"—in other words, "matters that go to the very heart of whether our Republic can function in accordance with constitutional design"—state sovereign immunity cannot bar the operation of subpoenas in that matter. *Id.* at 24-25.

## LEGAL STANDARD

A district court may set aside a magistrate judge's order on a non-dispositive pretrial matter only if it is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). An order is contrary to law if it "fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Weiner v. McKeefery*, No. 11-CV-2254 (JFB)(AKT), 2014 WL 2048381, at *3 (E.D.N.Y. May 19, 2014). An order is contrary to law "only where it runs counter to controlling authority." *Fritz v. LVNV Funding, LLC*, 587 F. Supp. 3d 1, 7 (E.D.N.Y. 2022).

## ARGUMENT

I. **THE MAGISTRATE JUDGE CORRECTLY HELD THAT STATE SOVEREIGN IMMUNITY DOES NOT BAR ENFORCEMENT OF THE NARROWED SUBPOENA**

A. **The Magistrate Judge Correctly Held That Second Circuit Precedent Concerning Federal Sovereign Immunity Is Inapplicable**

The Eleventh Amendment provides that states are immune from suit in federal court. Order 10. Although the Supreme Court has recognized that "the States's sovereign immunity is not limited to the literal terms of the Eleventh Amendment," the Supreme Court has also concluded that "state sovereign immunity is not absolute" and that states "may still be bound by some [federal] judicial actions without their consent." *Id.* at 11 (citing *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 446 (2004)). As the Magistrate Judge outlined, "by ratifying the

11

Constitution," states consented to federal court jurisdiction for certain types of suits, such that the Eleventh Amendment was meant to codify the understanding of sovereign immunity as it existed when the Constitution was first enacted. *Id.* at 11-12.

The Magistrate Judge's historical analysis provides fundamental context for why state entities are not shielded from federal discovery subpoenas. There was "little question" in the Magistrate Judge's mind that "the framers of the Constitution and ratifiers of the Eleventh Amendment had a clear understanding of the distinction between a suit," explicitly covered by sovereign immunity, and a "subpoena." *Id.* at 20. Blackstone himself observed that subpoenas— "a mechanism for obtaining needed evidence for a case where the evidence was held by a third party"—were "not equivalent to a lawsuit or trial itself." *Id.* This understanding has been widespread in the judiciary since the years immediately following ratification of the Eleventh Amendment. In *United States v. Caldwell*, 2 U.S. 333 (C.C.D. Pa. 1795)—a case decided less than two months after ratification—the court stayed a trial so the defendant could serve nonparty subpoenas on two state judges. *Id.* at 334. One justice even remarked in concurrence that "[i]f we issue a subpoena to a Justice or a Judge, and it is not obeyed, we should be more strict in our proceedings against such characters . . . ." *Id.* at 334 n.*. And, in *United States v. Burr*, Aaron Burr successfully moved for a subpoena ordering then-President Thomas Jefferson to produce correspondence. *See* Order 20-21. In the following decades, subpoenas on state offices remained commonplace. *See Winn v. Patterson*, 34 U.S. 663, 676-677 (1835); *Polk's Lessee v. Windel*, 19 F. Cas. 940, 941 (C.C.D. Tenn. 1817), *rev'd on other grounds sub nom. Polk's Lessee v. Wendell*,

18 U.S. 293 (1820). Owing to this history, federal courts in this Circuit have routinely ordered state entities to produce documents pursuant to federal discovery subpoena.[9]

Nonetheless, the OAG asserts in its Objection, as it did before the Magistrate Judge, that *EPA*—a case concerning the application of federal sovereign immunity to federal discovery subpoenas—binds the Court and bars enforcement of a federal discovery subpoena served on a state agency. *See* ECF No. 90 at 9. The OAG also cites two in-circuit district court cases applying *EPA* in this manner: *Felix v. County of Nassau*, 344 F.R.D. 441 (E.D.N.Y. 2023), and *Bennett v. Cuomo*, No. 22-cv-7846, 2024 WL 2963714 (S.D.N.Y. June 12, 2024), ECF No. 90 at 9-10; and the OAG cites other precedent that either is out-of-circuit or concerns not state but tribal sovereign immunity, *id.* at 10-12 (citing *Russell v. Jones*, 49 F.4th 507 (5th Cir. 2022); *Catskill Dev. LLC v. Park Place Ent. Corp.*, 206 F.R.D. 78 (S.D.N.Y. 2002) (tribal sovereign immunity); *Alltel Commc'ns, LLC v. DeJordy*, 675 F.3d 110 (8th Cir. 2012) (tribal sovereign immunity); *Bonnet v. Harvest (U.S.) Holdings, Inc.*, 741 F.3d 1155 (10th Cir. 2014) (tribal sovereign immunity)). The Magistrate Judge was correct to reject the OAG's assertions.

As the Magistrate Judge reasoned, none of the OAG's authorities show why *EPA* should apply here. Order 16-18. The Magistrate Judge emphasized that the Second Circuit has never extended *EPA* to the state-sovereign-immunity context, Order 16, and that the First, Seventh, and Eighth Circuits have all permitted federal discovery subpoenas to proceed against state agencies,

---

[9] *See, e.g.*, *Suffolk Cnty. Water Auth. v. Dow Chem. Co.*, No. 17-CV-6980 (NG), 2022 WL 1025932, at *1-2 (E.D.N.Y. Apr. 6, 2022); *Screen v. Quality Prot. Servs., Inc.*, No. 1:20-cv-02506 (LGS), 2020 WL 7246926, at *1 (S.D.N.Y. Dec. 8, 2020); *Freeman v. Rochester Psychiatric Ctr.*, No. 16-CV-6668T, 2018 WL 4275984, at *4 (W.D.N.Y. Sept. 7, 2018), *report and recommendation adopted*, No. 6:16-CV-06668 (MAT)(MWP), 2018 WL 4562078 (W.D.N.Y. Sept. 24, 2018); *Pierce v. Demmon*, No. 9:14-CV-1028 (GTS/DEP), 2015 WL 7077227, at *2 (N.D.N.Y. Nov. 12, 2015); *see also Lynch v. City of New York*, No. 17-CV-7577 (JGK) (BCM), 2022 WL 19836912, at *2 (S.D.N.Y. June 16, 2022) (anticipating that New York state agencies would produce "some or all of the requested data" in response to nonparty subpoenas); *Montesa v. Schwartz*, No. 12 Civ. 6057 (CS)(JCM), 2015 WL 13016354, at *1 (S.D.N.Y. Nov. 3, 2015) (New York State Education Department taking the position that it was "required to respond to" a nonparty subpoena).

*id.* at 16-17 (citing *U.S. Dep't of Just. v. Ricco Jonas*, 24 F.4th 718 (1st Cir. 2022); *Barnes v. Black*, 544 F.3d 807 (7th Cir. 2008); *In re Mo. Dep't of Nat. Res.*, 105 F.3d 434 (8th Cir. 1997)). Alongside these circuit courts, several district courts in other circuits have held the same—as well as one district court in the Second Circuit. *See Jackson v. AFSCME Local 196*, Civ. No. 3:07CV0471 (JCH), 2008 WL 1848900, at *3 (D. Conn. Apr. 25, 2008); *Allen v. Woodford*, 544 F. Supp. 2d 1074, 1078-1079 (E.D. Cal. 2008); *Charleston Waterkeeper v. Frontier Logistics, L.P.*, 488 F. Supp. 3d 240, 250-251 (D.S.C. 2020); *Ali v. Carnegie Inst. of Washington*, 306 F.R.D. 20, 30 n.8 (D.D.C. 2014) (collecting cases); *Wilson v. Venture Fin. Grp.*, No. C09-5768BHS, 2010 WL 4512803, at *1-2 (W.D. Wash. Nov. 2, 2010); *Laxalt v. McClatchy*, 109 F.R.D. 632, 634-635 (D. Nev. 1986). Indeed, courts in other circuits have routinely held that federal discovery subpoenas are not subject to state sovereign immunity even when those circuits have also held— as the Second Circuit did in *EPA*—that federal discovery subpoenas are subject to federal sovereign immunity. *Compare, e.g.*, *Commonwealth of P.R. v. United States*, 490 F.3d 50, 57 (1st Cir. 2007); *COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 277 (4th Cir. 1999); *St. Vincent Med. Grp., Inc. v. U.S. Dep't of Just.*, 71 F.4th 1073, 1075 & n.1 (7th Cir. 2023); *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 779 n.9 (9th Cir. 1994); *with, e.g.*, *Ricco Jonas*, 24 F.4th at 727 (1st Cir.); *Charleston Waterkeeper*, 488 F. Supp. 3d at 251 (D.S.C.); *Barnes*, 544 F.3d at 812 (7th Cir.); *Allen*, 544 F. Supp. 2d at 1079 (E.D. Cal.). After acknowledging the Second Circuit's silence, the Magistrate Judge correctly applied the widespread rule that—even if federal sovereign immunity bars federal discovery subpoenas—state sovereign immunity does not.

The OAG takes issue with the Magistrate Judge's reliance on this precedent by arguing that all of these cases were wrongly decided. ECF No. 90 at 12-14. The OAG contends that, under the reasoning in *EPA*, federal sovereign immunity bars enforcement of federal discovery

subpoenas because such enforcement would transgress the federal government's dignity, so state sovereign immunity must also bar enforcement of federal discovery subpoenas to protect the states' dignity interest, and any cases holding otherwise are categorically wrong. *Id.*

But the OAG ignores the critical differences between federal sovereign immunity and state sovereign immunity. To start, dignity is a secondary interest when considering state sovereign immunity: Second Circuit precedent is clear that the vulnerability of the State's purse is "the most salient factor." *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015) (quoting *Hess v. PATH*, 513 U.S. 30, 47-48 (1994)). In contrast, dignity matters more in the federal sovereign immunity context: because of dignity's importance with respect to federal sovereign immunity, the federal government's consent to suit, "[u]nlike" Eleventh Amendment immunity, "cannot" even be "implied." *Wagoner Cnty. Rural Water Dist. No. 2 v. Grand River Dam Auth.*, 577 F.3d 1255, 1260 (10th Cir. 2009). But more than that, the respective dignity interests underlying federal and state sovereign immunity also differ: separation of powers motivates federal sovereign immunity, while dual sovereignty, mediated by federal supremacy, motivates state sovereign immunity. Federal courts must uphold their constitutional mandate to adjudicate cases within their jurisdiction, and so must be able to issue subpoenas and gather information. *See Hous. Bus. J., Inc. v. Off. of Comptroller of Currency, U.S. Dep't of Treasury*, 86 F.3d 1208, 1213 (D.C. Cir. 1996). Thus, courts interpret sovereign immunity differently as it applies to state governments and the federal government, according to the "distinct principles" that "undergird the doctrine of sovereign immunity with respect to each." *Charleston Waterkeeper*, 488 F. Supp. 3d at 249.[10] Consequently,

---

[10] The OAG's continued reliance on tribal immunity cases, OAG ECF No. 90 at 11-12, fails for a similar reason: tribal sovereign immunity also implicates fundamentally different interests than state sovereign immunity. Unlike states, Indian tribes are "ceded some independence due to their status as dependent domestic nations," such that tribal sovereign immunity may bar federal discovery subpoenas while state sovereign immunity does not. *Rossi v. City of Lakewood*, No. C07-5411-RBL, 2008 WL 4000563, at *2 (W.D. Wash. Aug. 25, 2008); *see also Mick v. Gibbons*,

the Magistrate Judge—in line with many other courts—correctly applied sovereign immunity to subpoenas on federal entities but not state entities.[11]

### B.     The Magistrate Judge Correctly Held That Congressional Abrogation of Sovereign Immunity Applies to Federal Discovery Subpoenas Issued Pursuant to Actions Brought Under Abrogating Statutes

The OAG objects to the Magistrate Judge's conclusion that state sovereign immunity cannot bar enforcement of federal discovery subpoenas against third parties in federal cases brought under statutes (like Title VII, here) that abrogate state sovereign immunity. It is first important to note that the Magistrate Judge did not "purport to determine" the full "breadth and scope of the federal courts' subpoena enforcement against states and state actors." Order 24. Rather, the Magistrate Judge simply rejected the OAG's contention that "responding to a subpoena is such an affront to state dignity that federal civil discovery subpoenas are barred by state sovereign immunity across the board." *Id.*

Moreover, the Magistrate Judge emphasized that states must be subject to the federal civil subpoena power "if the matter under consideration in the federal case is of federal significance," such as "enforcement of the federal civil rights laws or federal court actions concerning state redistricting or voting rights"—in other words, "matters that go to the very heart of whether our Republic can function in accordance with its constitutional design." *Id.* Thus, considering the Supreme Court's "clear" holding in *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976), that, "with the passage of Title VII, Congress abrogated sovereign immunity such that a state may be *sued*," the Magistrate Judge concluded that federal court jurisdiction "must also extend to issuing and

No. 4:22CV3025, 2024 WL 448735, at *2 (D. Neb. Feb. 6, 2024) (Eighth Circuit applies tribal sovereign immunity but not state sovereign immunity to federal discovery subpoenas because it "reached two different conclusions based on two incongruent immunities").

[11] The Magistrate Judge also noted that "it is well settled in the criminal context" that "the public has a right to every man's evidence," and properly considered it "instructive" that "the federal *President* does not enjoy absolute immunity from a federal subpoena." Order 15 n.10 (citing *Trump v. Vance*, 591 U.S. 786, 791 (2020)).

enforcing a *subpoena* in a case brought under Title VII that involves state employment." *Id.* at 13. The Magistrate Judge correctly reasoned that, "[w]ithout enforcement authority to procure needed non-party documents and evidence held by state entities," courts could "effectively be left without the ability to preside over cases" that the Supreme Court has already held are within the federal courts' power. *Id.* This result would be, as the Magistrate Judge put it, "untenable." *Id.*[12]

The OAG objects on the basis that the Magistrate Judge purportedly concluded that congressional abrogation of state sovereign immunity under Title VII "implicitly" abrogates state sovereign immunity in the separate "judicial proceeding" initiated by a federal discovery subpoena. ECF No. 90 at 14. In support, the OAG cites the general principle that Congress must "unequivocally express" its intent to abrogate state sovereign immunity when doing so through statutory power. *Id.* at 14-15. According to the OAG, because Congress abrogated state sovereign immunity only for "actions brought under Title VII," plaintiffs are free to name state entities "as [] party defendant[s]" under Title VII, but parties cannot subpoena third-party state entities to obtain evidence for or against claims under Title VII. *Id.* at 15.

The OAG's argument warps precedent concerning abrogation and, if accepted, would seriously limit federal-court power when presiding over claims brought under abrogating statutes. Case law demonstrates that, once a federal court obtains jurisdiction over a case wherein sovereign immunity has been abrogated, federal courts can enforce that jurisdiction against states through the mechanisms afforded them under the Federal Rules of Civil Procedure. For example, "a federal court is free to impose monetary sanctions under the Federal Rules of Civil Procedure against a state, its agencies and officials, as well as against the publicly employed attorneys who represent

---

[12] Because this case is one brought under Title VII, a federal civil rights statute, the Magistrate Judge's holding was limited to similar such cases. Order 15. But, as the Magistrate Judge reasoned, there is ample historical and constitutional precedent supporting the conclusion that state sovereign immunity bends to permit service of federal discovery subpoenas on state entities to preserve federal court jurisdiction over all federal cases. *Id.* at 15-25.

them," as long as those sanctions are ancillary to the court's jurisdiction. *Lee v. Walters*, 172 F.R.D. 421, 434 (D. Or. 1997) (citing *Derechin v. State Univ. of N.Y.*, 963 F.2d 513, 517-519 (2d Cir. 1992)). A federal court's power to order such relief is "ancillary to its power to order compliance with the law." *Fortin v. Comm'r of Mass. Dep't of Pub. Welfare*, 692 F.2d 790, 797-798 (1st Cir. 1982) (citing *Hutto v. Finney*, 437 U.S. 678, 691, 698 (1978)); *see also In re Long Visitor*, 523 F.2d 443, 446-447 (8th Cir. 1975) (holding that abrogation of tribal sovereign immunity under federal criminal statutes "inherently includes every aspect of federal criminal procedure applicable to the prosecution of such crimes," including the issuance of a federal grand jury subpoena on tribal entities). Consequently, the Magistrate Judge was correct to hold that a statute's abrogation of sovereign immunity such that a state can be sued "must also extend" to issuing and enforcing a subpoena in a case brought under that same statute. Order 13.

Moreover, as the OAG acknowledges, a New York state entity—the NYSP—is a defendant in the Trooper 1 case. ECF No. 90 at 15. Where one arm of the state has no sovereign immunity in an underlying case, another arm of that same state cannot then assert immunity in that case. For example, in *In re South Carolina Department of Parks, Recreation, and Tourism*, 103 F.4th 287 (4th Cir. 2024), the Fourth Circuit considered a case where the South Carolina attorney general's office sued Google for antitrust violations, but when Google served a federal discovery subpoena on the South Carolina Department of Parks, Recreation, and Tourism ("SCDPRT") under FRCP 45, SCDPRT refused to comply, claiming that it had sovereign immunity. *Id.* at 289-290. The Fourth Circuit rejected SCDPRT's sovereign immunity argument, reasoning that, because the South Carolina attorney general had waived sovereign immunity by joining the suit as a plaintiff, SCDPRT—a different arm of South Carolina—could not enjoy sovereign immunity to prevent enforcement of a federal discovery subpoena in the same case. *Id.* at 291-294. The case at bar

18

features a similar issue. Congress abrogated sovereign immunity for cases brought under Title VII—and Trooper 1 named the NYSP a defendant in her Title VII case. Because sovereign immunity has been abrogated for New York state as a defendant in the underlying case, no other arm of New York state—including the OAG—can credibly avoid enforcement of a subpoena in that case by asserting sovereign immunity.

### C.    The Magistrate Judge Properly Considered the Deleterious Effects of the OAG's Sovereign Immunity Argument

The Magistrate Judge recognized that, were the OAG correct in asserting that state sovereign immunity bars enforcement of federal discovery subpoenas on state entities, many federal litigants would be deprived of adequate process wherein state documents are required to prove claims brought under important federal civil rights statutes. *See* Order 22-25. Thus, the Magistrate Judge especially highlighted cases where "the matter under consideration in the federal case is of federal significance" and "matters that go to the very heart of whether our Republic can function in accordance with constitutional design" in rejecting the OAG's contentions. *Id.* at 24-25. The OAG attempts to brush aside the Magistrate Judge's "grave concerns." ECF No. 90 at 17-19. But the OAG cannot seriously dispute the "truly absurd" results that would gut our federalist judiciary and prevent the vindication of federal rights in federal court.

To start, the OAG argues that the Magistrate Judge's analysis of deleterious effects "amounts to an improper policy determination" that is foreclosed by the Second Circuit's decision in *EPA*. *Id.* at 17. As described above, *EPA* is inapplicable here because it concerns federal sovereign immunity rather than state sovereign immunity—and the Magistrate Judge was free (and correct) to consider the overwhelming policy concerns underlying the OAG's proposed rule.

Next, the OAG contends that the Magistrate Judge's "dire prediction" is "overblown" for several reasons. *Id.* at 17-18. Each of the OAG's assurances is empty:

19

- The OAG contends that civil litigants claiming violations of their federal rights "will typically name one or more state officials as defendants in their individual capacities," and "in that procedural posture" may obtain necessary discovery from the state by "serving discovery notices on those officials, who can then be compelled to produce material within their custody, possession, or control." *Id.* at 17. As the Magistrate Judge recognized, the OAG is wrong here—these records will frequently be inaccessible, even if an individual state agent is named as a party defendant in the case. *See* Order 22-23. In such cases, state entities would have no incentive to permit state employee access to these materials—and without such permission, these employees will lack possession, custody, or control over them. Indeed, at least one court has implied that, because New York state indemnifies state employees successfully sued for wrongful actions occurring within the scope of their employment, it is incentivized to shut off the flow of discovery wherever possible. *See Gross v. Lunduski*, 304 F.R.D. 136, 143-144 (W.D.N.Y. 2014).

- The OAG also argues that civil litigants can seek relevant documents "under New York's Freedom of Information Laws." ECF No. 90 at 17. But the OAG's suggestion is utterly disingenuous. Among other things, there are many exemptions to disclosure—including on grounds of personal privacy. Litigants cannot, for example, use FOIL to seek personnel records. *See Feerick v. Safir*, 297 A.D.2d 212, 213 (N.Y. App. Div. 2002); N.Y. Pub. Off. Law §§ 87(2)(b)-(c), 89(2). Nor could the litigants in this case have used FOIL to obtain confidential NYSP records. And, even if there were no such exceptions, requiring litigants to rely on FOIL denies them a federal forum to adjudicate federal claims—a concept anathema to crucial federal civil rights laws. *See Knick v. Township of Scott, Pennsylvania*, 588 U.S. 180, 185 (2019). The outcome is particularly unfair when a defendant in a federal lawsuit requires discovery from a state entity to disprove a federal plaintiff's allegations. Indeed, because the OAG insisted that Governor Cuomo go through the FOIL process, he did pursue that option. But the response (or lack thereof) from the OAG's FOIL office has been completely risible. ECF No. 79-14 at 13-14. Forcing federal litigants to obtain documents through a lethargic and potentially politically motivated state process is inefficient at best and likely would serve to deny litigants crucial documents by way of inordinate delay. For similar reasons, the OAG's suggestion that litigants turn to the New York Court of Claims is just as nonsensical. ECF No. 90 at 17-18.

- The OAG blithely suggests that parties can still sue state agencies under statutes that have abrogated sovereign immunity. ECF No. 90 at 18. But that is little comfort to a federal defendant who has zero control over who a plaintiff decides to sue. It is also little comfort where, as here, one New York entity is already a defendant but a separate state entity invokes state sovereign immunity to prevent a co-defendant from obtaining the evidence he needs to defend himself.

Having failed to allay the legitimate federalism and fairness concerns with its position, the OAG resorts to *ad hominem* attacks, questioning Governor Cuomo's motives and arguing that he seeks the Requested Materials "to serve his own interests in rehabilitating his political career," thus creating an "unwarranted burden on OAG at taxpayer expense." *Id.* To the contrary: as

detailed above, the Requested Materials are highly relevant to Governor Cuomo's defense in this case, as they are likely to corroborate and elaborate upon existing discovery showing that (1) Trooper 1 and other members of the PSU had deep-seated personal animus toward Governor Cuomo unrelated to any alleged sexual harassment, and Trooper 1 thus coordinated with other important PSU witnesses to align their statements to the OAG during the investigation; and (2) the OAG Report, which Trooper 1 plans to introduce at trial to support her claims, is biased and/or incomplete because it is missing any reference to evidence impugning the credibility of the PSU witnesses and Trooper 1 herself.

Further, to the extent that Governor Cuomo's pursuit of his defenses has created any burden on taxpayers, the OAG bears much of the blame: a sizable portion of fees have been incurred enforcing the subpoena to the OAG, which alone has resulted in more than two years of litigation. It is also fairly despicable that the OAG, having improperly credited Trooper 1's bogus allegations—actions that led to this meritless lawsuit in the first place—would go to such lengths to deprive Governor Cuomo of relevant documents, much less argue there is something untoward about Governor Cuomo exercising his due process rights to obtain the information he needs to show that the OAG Report is shoddy and unreliable and Trooper 1's claims are meritless.

## II.    THE OAG WAIVED ANY CLAIM TO STATE SOVEREIGN IMMUNITY

The OAG also asserts that it did not waive any sovereign immunity. Those arguments also fail. Unlike federal sovereign immunity, state sovereign immunity can be waived by conduct. To avoid "seriously unfair results," a state's engagement in voluntary conduct that is "anomalous or inconsistent" with the application of sovereign immunity waives the state's sovereign immunity. *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 619 (2002). The OAG maintains argument that, under New York law, sovereign immunity cannot be waived. ECF No. 90 at 20-21. Under federal law, a state may waive sovereign immunity by litigation conduct "notwithstanding

state law that precludes waiver otherwise." *See Beaulieu v. Vermont*, 807 F.3d 478, 491 (2d Cir. 2015). And, notwithstanding whether federal or state law controls the question, New York law too recognizes waiver of sovereign immunity by litigation conduct. The OAG's citations to the contrary—*Morrison v. Budget Rent A Car Systems, Inc.*, 230 A.D.2d 253 (N.Y. App. Div. 1997) and a federal case relying on the same—were abrogated by *Henry v. New Jersey Transit Corp.*, 39 N.Y.3d 361 (N.Y. 2023). *Henry* recognized that state sovereign immunity "is waivable based on litigation conduct." *Id.* at 371-372. The OAG represents that the *Henry* court's holding is limited to interstate sovereign immunity is waivable in New York, and that *Henry* affirms the unwaivable nature of ordinary state sovereign immunity because it is a matter of subject-matter jurisdiction in the New York Court of Claims. ECF No. 90 at 20-21. That is a misreading of *Henry*. The Court of Appeals instead held that litigation conduct may not effectuate a waiver of sovereign immunity in the Court of Claims because New York has bestowed limited statutory jurisdiction on the Court of Claims, and "[i]t is thus the scope of the Court of Claims Act, rather than sovereign immunity, that limits the Court of Claims' subject matter jurisdiction." *Henry*, 39 N.Y.3d at 372-373.

Because sovereign immunity is waivable under both federal and New York law, the OAG waived sovereign immunity in several ways, and it fails to refute each instance of waiver. **First**, the OAG produced some, if not all, of the Requested Materials to the DOJ/EDNY to bring about federal claims against Governor Cuomo and the Executive Chamber under Title VII. In *United States v. James*, 980 F.2d 1314 (9th Cir. 1992), the Ninth Circuit held that a tribe[13] waived its sovereign immunity by "voluntarily providing the Government with documents relevant to the case" because it would be unfair to "selectively provide documents and then hide behind a claim

---

[13] There is no case law regarding conduct waivers in the context of state sovereign immunity to federal discovery subpoenas—because most courts find that state sovereign immunity against federal discovery subpoenas is not applicable, they do not reach waiver analysis. As a result, case law concerning tribal sovereign immunity to federal discovery subpoenas is the most appropriate comparison.

of sovereign immunity" with respect to other documents "from the same agency." *Id.* at 1320; *accord United States v. Velarde*, 40 F. Supp. 2d 1314, 1317 (D.N.M. 1999); *United States v. Menominee Tribal Enters.*, Case No. 07-C-316, 2008 WL 2273285, at \*11-12 (E.D. Wis. June 2, 2008). And courts in this Circuit have applied the same principle to privileges other than sovereign immunity, like work-product privilege. *See Info. Res., Inc. v. Dun & Bradstreet Corp.*, 999 F. Supp. 591, 593 (S.D.N.Y. 1998) (holding that waiver of the work-product privilege resulted from "voluntary submission of material to a government agency to incite it to attack the informant's adversary").

The OAG attempts to distinguish these cases by arguing that disclosure to another party (rather than the federal government) is what constitutes waiver. ECF No. 90 at 23. Not so. In *James*, the court concluded that the tribe in question "expressly waived" its immunity by "voluntarily providing the <u>Government</u> with documents relevant to the case"—without delimiting its holding to the Government as litigation party. 980 F.2d at 1320 (emphasis added). Similarly, the court in *Velarde* found a waiver where the tribe in question voluntarily provided records to "federal officials"—not prosecutors. 40 F. Supp. 2d at 1317. And the court in *Menominee* found a waiver where the tribe in question provided information to a special agent of the Office of the Inspector General—again, not prosecutors. 2008 WL 2273285, at \*12. It is the disclosure to the federal government that constitutes a waiver.[14]

---

[14] Furthermore, in this case, the OAG failed to disclose any of its conduct with respect to providing its investigative materials to DOJ and EDNY until <u>years</u> after service of the Original Subpoena—even going so far as to argue in the Bennett Action that sovereign immunity is waived where a sovereign has "voluntarily provided" documents from one of its agencies "to the United States" to "aid in the government's prosecution" of that party while failing to disclose that it had done just that. *See* ECF No. 66-6 at 14. Accordingly, the OAG's citation to *Beaulieu* on this point is misplaced. Unlike the renunciation and delayed re-invocation of sovereign immunity in *Beaulieu*, 807 F.3d at 490-491, the OAG here sought to use production of the Requested Materials to the federal government as a prosecutorial sword against Governor Cuomo, and now seeks to use sovereign immunity as a shield, going so far as to cover up its prior disclosures to the federal government in order to prevent Governor Cuomo from using these materials in his civil defense. That conduct is patently unfair under the law.

**Second**, despite its objection to the Original Subpoena, the OAG nevertheless produced certain investigative materials referencing Trooper 1 by name. When a party produces a set of materials concerning an investigatory report, that party waives sovereign immunity over other materials concerning the same report because those materials are "sufficiently similar" to those that have already been produced. *See NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, Nos. C-04-3955 SC (JCS), C-05-1605 SC, 2009 WL 4258550 at *5-6 (N.D. Cal. Nov. 24, 2009); *see also Jett v. Penner*, No. Civ S-02-2036 GEB JFM P, 2007 WL 127790, at *2 (E.D. Cal. Jan. 12, 2007) (party cannot selectively produce certain documents but withhold other related documents). The OAG avers that, under *EPA*, a partial production of materials sought by a subpoena cannot operate as a waiver over requested materials. ECF No. 90 at 23. But the EPA never raised (and the Second Circuit never addressed) a selective waiver argument, so *EPA* is not and cannot be binding on this point. And even if the Second Circuit had addressed selective waiver, *EPA* would still be distinguishable because the Circuit never addressed the proper question: whether the materials sought by the subpoena were "sufficiently similar" to those already disclosed. *See NGV Gaming*, 2009 WL 4258550, at *5-6. Because the materials already produced from the OAG's investigatory file undoubtedly relate to other materials from the same file, the produced documents are sufficiently similar to the Requested Materials. Accordingly, the OAG's argument that the produced documents were "of no consequence whatsoever," *see* ECF No. 90 at 24, is of no consequence whatsoever—the produced materials meet the "sufficiently similar" test vis-à-vis the Requested Materials, so production of those materials constitutes a waiver.

**Third**, the OAG submitted the Requested Materials to the Magistrate Judge for *in camera* review in support of its privilege and confidentiality arguments in its cross-motion to quash. In *Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation*, No. 06-cv-1260 (KAM), 2009 WL

24

4981905 (E.D.N.Y. Dec. 10, 2009), the court found that certain defendants waived sovereign immunity by asserting counterclaims in their answer without simultaneously asserting sovereign immunity—even though they had asserted sovereign immunity earlier in the litigation and indicated an intent to re-assert it again later in the litigation. *Id.* at *9. The defendants waived sovereign immunity because their invocation of sovereign immunity was for a purely offensive purpose. *Id.* The OAG's submission to the Court in this case was also unconnected to sovereign immunity and made solely for purposes of offensive preclusion. Though the Magistrate Judge had already denied Governor Cuomo's motion to compel the Original Subpoena, the OAG did not withdraw its motion to quash or appeal the Magistrate Judge's order requiring submission of the materials because it wanted to obtain a favorable privilege ruling from the Magistrate Judge for use in other proceedings, including to stymie Governor Cuomo's efforts to obtain the Requested Materials through the FOIL process and in the *Bennett* action. Because the OAG submitted the Requested Materials to support just its privilege arguments in an effort to obtain a ruling for offensive preclusion purposes, the OAG waived sovereign immunity as to the Requested Materials. The OAG's claims that it did not make its submission voluntarily or to assert any affirmative claim for relief are thus disingenuous. *See* ECF No. 90 at 24-25. The OAG stood to benefit from the Magistrate Judge's ruling on privilege, so, rather than withdraw its motion to quash, it pursued affirmative relief from the Magistrate Judge.

## CONCLUSION

For the foregoing reasons, Governor Cuomo respectfully requests that the Court affirm the Magistrate Judge's holding that sovereign immunity does not bar enforcement of the Narrowed Subpoena—or, in the alternative, that the OAG waived its sovereign immunity.

Dated: New York, New York
      January 3, 2025

Respectfully submitted,

*/s Theresa Trzaskoma*

Theresa Trzaskoma
Allegra A. Noonan
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel.: (212) 202-2600
Fax: (212) 202-4156
ttrzaskoma@shertremonte.com

Rita M. Glavin
GLAVIN PLLC
156 West 56th Street, Ste. 2004
New York, NY 10019
Tel: (646) 693-5505
rglavin@glavinpllc.com

*Counsel for former Governor*
*Andrew M. Cuomo*